**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 2 5 2023

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:23-CV-788-BSM |
| v. | ) ) ) | |
| EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP, ARKANSAS DEVELOPMENT FINANCE AUTHORITY, AND ARVEST BANK, | ) ) ) ) ) ) ) | This case assigned to District Judge Miller and to Magistrate Judge Volpe |
| Defendant. | ) ) | |

**VERIFIED COMPLAINT FOR APPOINTMENT OF RECEIVER, TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, BREACH OF CONTRACT, FORECLOSURE, AND OTHER EQUITABLE AND LEGAL RELIEF**

Plaintiff Federal National Mortgage Association, by and through its undersigned counsel, for its Verified Complaint against Defendants Eastside Loft Apartments Phase II Limited Partnership, Arkansas Development Finance Authority, and Arvest Bank, alleges as follows:

**PARTIES**

1. Plaintiff Federal National Mortgage Association ("Fannie Mae") is the current owner and holder of the Note and Mortgage. Fannie Mae is a corporation organized and existing under the laws of the United States and is a citizen of the District of Columbia for purposes of jurisdiction. 12 U.S.C. § 1717(a)(2)(B). Fannie Mae is a government-sponsored enterprise and a federally chartered entity that Congress created to enhance the nation's housing-finance market. Under its federal statutory charter, Fannie Mae has a public mission to provide liquidity, stability,

and affordability to the U.S. housing market, including the market for quality, affordable rental housing. Fannie Mae is operating under the conservatorship of the Federal Housing Finance Agency ("FHFA"), which is an independent agency of the United States created in 2008 to supervise certain government sponsored enterprises including Fannie Mae. *See* 12 U.S.C. § 4511 *et seq*. Among other powers, Congress granted the Director of FHFA the authority to place Fannie Mae into conservatorship under certain, statutorily defined conditions, which the Director did in 2008. As Conservator, FHFA has broad statutory powers, including the powers to preserve and conserve Fannie Mae's assets and property, and to collect obligations due Fannie Mae. FHFA's ability to exercise its statutory powers and functions as Conservator is protected by federal law. *See, e.g.*, 12 U.S.C. § 4617(f).

2.      Defendant Eastside Loft Apartments Phase II Limited Partnership ("Borrower") is an Arkansas limited partnership with its principal place of business at 1400 Cumberland Street, Little Rock, Arkansas 72202. Upon information and belief, Borrower has three general partners, Steven W. Hitt, Cynthia R. Stone, and The Arc Arkansas, Inc.[1] Borrower may be served with process by serving The Arc Arkansas's registered agent, Laura Jane Stone at 2004 S. Main Street, Little Rock, Arkansas 72206.

3.      Defendant Arkansas Development Finance Authority ("ADFA") is an agency of the State of Arkansas organized to promote economic growth and provide financing for affordable housing, various business and economic development projects and related programs. ADFA may be served with process by serving its president, Mark Conine, at 1 Commerce Way, Suite 602,

---

[1] Upon information and belief, Borrower had one limited partner, NEF Assignment Corporation ("NEF"), an Illinois not-for profit corporation. Upon information and believe, NEF Assignment Corporation gave formal notice to Borrower of its withdrawal from the partnership, effective March 31, 2023.

Little Rock, Arkansas 72202. ADFA is a named defendant given that it may claim an interest in the Mortgaged Property (as defined herein) that is the subject of the Verified Complaint.

4.      Defendant Arvest Bank ("Arvest") is an Arkansas banking corporation with its principal place of business located at 75 North East Street, Fayetteville, Arkansas 72702. Arvest may be served with process through its registered agent, Randy L. Grice, Esq., at One Riverfront Place, U.S. Bank Building - 8th Floor, North Little Rock, Arkansas 72114. Arvest is a named defendant given that it may claim an interest in the Mortgaged Property that is the subject of the Verified Complaint.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

6.      Fannie Mae is deemed to be a citizen of the District of Columbia for purposes of jurisdiction and venue pursuant to 12 U.S.C. § 1717(a)(2)(B).

7.      Upon information and belief, all Defendants are citizens of Arkansas. The general partners of Borrower are citizens of Arkansas. NEF, the former limited partner, is a citizen of Illinois. No Defendants are a citizen of the District of Columbia.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 83(a)(1) and 1391(b)(2) because the property that is the subject of this action is situated in Pulaski County, Arkansas.

## FACTS

**A.    Introduction.**

9.      Borrower owns the residential apartment complex commonly known as the Eastside Loft Apartments located at 1400 Cumberland Street, Little Rock, Arkansas 72202 (the "Property") on which Fannie Mae holds a mortgage.

10.     Fannie Mae files the instant action to, among other things, protect its security interest in the Property and the improvements thereon, including the Property, all personal property, rents, income, revenues, issues and profits thereof, specifically described in the Security Instrument (as defined below).

11.     Based upon the terms of the Loan Documents (as defined below), Borrower's express consent to the appointment of a receiver upon default, and applicable law governing receiverships, Fannie Mae is entitled to the appointment of a receiver for the Property in order to protect the Property from waste, preserve the value of the Property, and account for and collect the rents, issues, profits, and revenues generated from the Property.  In addition, the Court should grant the requested temporary restraining order and injunctive relief to further protect Fannie Mae's secured interest in the Property and rents arising from the Property.

**B.    Prior Loans.**

12.     On or about November 22, 2005, Borrower obtained a loan in the original principal amount of $400,000.00 from ADFA (the "ADFA Loan") to assist in financing the rehabilitation and/or construction of the Property.  The ADFA Loan is evidenced by a Promissory Note dated November 22, 2005 and secured by a mortgage, dated November 22, 2005, and recorded in the Official Records of the Pulaski County Circuit/County Clerk's Office ("Recording Office") as Instrument Number 2005103433.

13.     On or about August 29, 2006, Borrower obtained a construction loan in the original principal amount of $3,000,000.00 from Arvest (the "Arvest Loan"), which is secured by a Construction Mortgage and an Arkansas Absolute Assignment of Rents and Leases, each dated August 29, 2006, as amended by a First Modification of Construction Mortgage, dated November 26, 2008, and further amended by a Second Modification of Construction Mortgage, dated June 2, 2009, and recorded in the Recording Office as Instrument Numbers 2006068512, 2006068513, 2008081774, and 2009074147.

14.     On or about August 29, 2006, ADFA subordinated the mortgage lien securing the ADFA Loan to the mortgage lien securing the Arvest Loan pursuant to a Subordination Agreement dated August 29, 2006 and recorded in the Recording Office as Instrument Number 2006068929.

15.     On or about August 14, 2007, Borrower obtained a loan in the original principal amount of $544,000.00 from ADFA under the ADFA Financing Adjustment Factor Program (the "ADFA FAF Loan"), which is secured by a Mortgage dated August 14, 2007, as amended by a Modified Mortgage dated November 28, 2007, and recorded in the Recording Office as Instrument Numbers 2007064414 and 2007091243.

16.     On or about November 19, 2007, Borrower also obtained a loan in the original principal amount of $130,000.00 from the City of Little Rock, Arkansas (the "City Loan"), to assist in rehabilitation and/or construction of the Property and was secured by a mortgage in favor of the City dated November 16, 2007, and recorded in the Recording Office as Instrument Number 2007088865.  True and correct copies of the recorded documents for the ADFA Loan, Arvest Loan, ADFA FAF Loan and City Loan (collectively, the "Subordinate Loans") are attached hereto as **Collective Exhibit A.**

17.     Prior to making a loan to Borrower, Original Lender (as defined herein) entered into separate subordination agreements with Arvest, ADFA and the City of Little Rock to subordinate the Subordinate Loans in order to conform to certain Fannie Mae requirements (collectively, the "Subordination Agreements"), which were duly recorded in the Recording Office on November 25, 2009 as Instrument Numbers 2009079203, 2009079204, 2009079205 and 2009079206. True and correct copies of the Subordination Agreements are attached hereto as **Collective Exhibit B**.

18.     Simultaneously, Borrower, Arvest, ADFA, the City of Little Rock, and The Arc Arkansas, entered into an Intercreditor and Subordination Agreement, whereby the parties agreed to the subordinate lien priorities of each their respective mortgages, recording the same in the Recording Office on November 25, 2009 as Instrument Number 2009079210. A true and correct copy of the Intercreditor and Subordination Agreement is attached hereto as **Exhibit C**.[2]

**C.     The Loan Documents and Related Agreements.**

19.     On or about November 24, 2009, Borrower obtained a loan in the original principal amount of $809,000.00 (the "Loan") from NEF Mortgage Corporation (the "Original Lender") pursuant to that certain Multifamily Note ("Note"). A true and correct copy of the Note is attached hereto as **Exhibit D**.

20.     The Maturity Date for full payment of the Loan is December 1, 2027, or any earlier date on which the unpaid principal balance of the Loan become due and payable by acceleration or otherwise.

21.     To secure repayment of the indebtedness evidenced in the Note and performance of all covenants and conditions contained therein, Borrower granted to Original Lender a first

---

[2] A Release of Mortgage, dated February 26, 2013, releasing the City Loan was recorded in the Recording Office on March 4, 2013 as Instrument Number 2013016446.

priority security interest in, among other things and without limitation, the real property, all buildings, structures, improvements, and alterations constructed or at any time in the future constructed or placed upon the Property, together with all rents, revenues, and income thereof as well as all personal property including equipment, inventory, and general intangibles used in connection with the ownership, management, or operation of the Property (collectively, "Mortgaged Property") pursuant to that certain  Multifamily Mortgage, Assignment of Rents and Security Agreement dated November  24, 2009 (the "Security Instrument") in the amount of $809,000.00, which was duly recorded in the Recording Office on November 25, 2009 as Instrument Number 2009079200.  A true and correct copy of the Security Instrument is attached hereto as **Exhibit E**.

22.    Pursuant to the Security Instrument and to further secure Borrower's obligations under the Note, Borrower granted to Original Lender assignment of all Rents related to the Property, as defined in the Security Instrument ("Rents").  *See* Exhibit E, §§ 1 and 3.

23.    The Security Agreement also grants a security interest in all Mortgaged Property, as defined in the Security Agreement, and all products and cash and non-cash proceeds thereof (collectively, "UCC Collateral").    Borrower authorized Original Lender to file financing statements and financing statement amendments to perfect or continue the perfection of this security interest. *See* Exhibit E, §§ 1 and 2.

24.    Additionally, in Section 3(d) of the Security Agreement, Borrower consented to the *ex parte* appointment of a receiver by the Court in the event of default.  The Security Agreement expressly states in relevant part as follows:

> [I]f an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged

Property...If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law.

Exhibit E, Sec. 3(d).

25.     The Note, Security Instrument, and all other documents referring to, relating to, or evidencing the Loan are hereinafter referred to as the "Loan Documents," and any capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to them in the Loan Documents.

26.     Original Lender assigned its right, title, and interest in and to the Loan and all Loan Documents and instruments executed and/or delivered in connection therewith or related thereto to The Community Development Trust, LP ("CDT") pursuant to that certain Endorsement of Multifamily Note dated November 24, 2009, and that certain Assignment of Collateral Documents and Other Loan Documents dated as of November 24, 2009 (collectively, "Note Assignment to CDT").

27.     The Security Instrument was assigned by Original Lender to CDT pursuant to that certain Assignment of Loan and Mortgage ("Mortgage Assignment to CDT," collectively with the Note Assignment to CDT, the "CDT Assignments"), dated November 24, 2009 and recorded on November 25, 2009 as Instrument Number 2009079201 in the Recording Office.  A true and correct copy of the CDT Assignments are attached hereto as **Collective Exhibit F**.

28.     Pursuant to the CDT Assignments, the security interest was perfected by the UCC-1 Financing Statement filed with the Arkansas Secretary of State on November 30, 2009, as File ID 40000004284426, as thereafter amended, modified and/or continued (the "State Financing Statement").  A true and correct copy of the State Financing Statement is attached as **Exhibit G**.

29.     Pursuant to the CDT Assignments, the security interest was also perfected by the UCC-1 Financing Statement filed with the Recording Office on November 25, 2009 as Instrument Number 2009079208, as thereafter continued by that certain UCC Financing Statement Amendment filed with the Recording Office on August 5, 2014, as Instrument Number 2014044881, and as further continued by that certain UCC Financing Statement Amendment filed with the Recording Office on June 26, 2019, as Instrument Number 2019039477 (collectively, the "County Financing Statements").  A true and correct copy of the County Financing Statements are attached as **Exhibit H**.

30.     On or about March 13, 2003, CDT and Fannie Mae entered into that certain Master Participation Agreement, whereby by CDT sells to Fannie Mae undivided ownership interests in an amount equal to either 90% or 85% ("Senior Participation") of eligible loans acquired by CDT, with CDT retaining the remaining interest in each loan, junior in priority of payments (the "Junior Participation").  A true and correct copy of the Master Participation Agreement is attached as **Exhibit I.**

31.     Pursuant to the Master Participation Agreement, CDT agreed that Midland Loan Services, Inc. ("Midland") would act as servicer for all loans CDT sells to Fannie Mae. Exhibit I, Sec. 3.

32.     On or about November 24, 2009, CDT sold to Fannie Mae a 90% Senior Participation in the Loan, in the participation amount of $728,100.00, pursuant to that certain Senior Participation Certificate.   A true and correct copy of the Senior Participation Certificate is attached as **Exhibit J**.  Pursuant to the Senior Participation Certificate, Fannie Mae is the owner of the Loan Documents and is entitled to enforce the same.

**D.    The Existing Defaults.**

33.    Beginning in April 2023 and continuing afterwards, Borrower failed to make the monthly required Loan payments.

34.    On behalf of Fannie Mae, Midland sent to Borrower a Notice of Payment Default, dated May 12, 2023 (the "Payment Default Notice"), notifying Borrower of a payment default for the monthly payment due on April 1, 2023 for the Loan.  A true and correct copy of the Payment Default Notice is attached hereto as **Exhibit K**.

35.    The Payment Default Notice informed Borrower of the amount necessary to bring the Loan current.

36.    The Borrower failed to bring the Loan current, and thereafter failed to make the May, June, July, and August 2023 monthly payments for the Loan, which are due on the first day of each month.

37.    Each of these failures to make payment constituted an automatic Event of Default as defined in Section 22 of the Security Instrument, thereby entitling Fannie Mae to accelerate the Loan.  *See* Exhibit E.

38.    Fannie Mae's counsel, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, sent a Notice of Acceleration and Demand to Borrower on July 5, 2023 (the "Notice of Acceleration"), which notified Borrower that Fannie Mae had accelerated the Loan (the "Accelerated Amount"), stating in pertinent part: "pursuant to Section 6 of the Note, all amounts due under the Loan have been accelerated and are fully due and payable to Fannie Mae."  A true and correct copy of the Notice of Acceleration is attached hereto as **Exhibit L**.

39.    The Notice of Acceleration further stated:

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS

HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED OR RECEIVES AFTER THE MATURITY DATE SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

40.    Borrower failed to pay the amounts due under the Loan Documents, including the Accelerated Amount.

41.    The unpaid principal amount of the Loan as of August 9, 2023 was $636,049.95, excluding past due interest, charges and fees. *See* **Exhibit M**.

42.    For purposes of this Verified Complaint, all the amounts owed by Borrower to Fannie Mae under the Loan Documents shall collectively be referred to herein as the "Indebtedness."  Under the Loan Documents, in addition to the Indebtedness, Borrower is obligated to reimburse Fannie Mae for costs and expenses incurred by Fannie Mae in connection with the Indebtedness, including, without limitation, attorneys' fees and other costs of collection, and costs of insuring, protecting, maintaining, and/or disposing of the Property (together with the Indebtedness, collectively, all such amounts are referred to herein as the "Obligations").

## CAUSES OF ACTION

### COUNT I – APPOINTMENT OF A RECEIVER

43.    Fannie Mae incorporates by reference the allegations set forth above as if set forth fully herein.

44.    Pursuant Ark. Code Ann. § 16-117-207(a), the Court may appoint a receiver upon application by a party in writing.

45.    In particular, Ark. Code Ann. § 16-117-207(a) states as follows:

> In an action . . . by a creditor to subject any property or fund to his or her claim, . . . on the application of plaintiff . . ., and where it is shown that the property or fund is in danger of being lost, removed, or materially injured, the court may appoint a receiver to take charge thereof during the pendency of the action, and may order and coerce the delivery of the property to him or her.

Ark. Code Ann. § 16-117-207(a).

46.     Fannie Mae is also entitled to the appointment of a Receiver under Ark. Code Ann.

§ 16-117-208, which states:

> In an action by a mortgagee for the foreclosure of his mortgage, and the sale of the mortgaged property, a receiver may be appointed where it appears that the mortgaged property is in danger of being lost, removed, or materially injured, or that the conditions of the mortgage have not been performed and that the property is probably insufficient to discharge the mortgage debt.

Ark. Code Ann. § 16-117-208.

47.     On or about July 5, 2023, a Property Condition Assessment determined the Property is in inferior condition, and is substandard when compared to properties of similar age and construction type. A true and correct copy of the Property Condition Assessment is attached as **Exhibit N**.

48.     The Property Condition Assessment revealed the Property is in need of immediate repairs, which have an estimated cost of $225,650.00. Some of the property conditions could affect the safety of the residents. The immediate repairs include, *inter alia*, the following:

  i.    Three (3) of the 34 apartment units in the Property are uninhabitable due to extensive mold contamination from a sewer leak in May 2023;

  ii.   The Property's sanity sewer system includes a sewer lift station, which pumps wastewater from the Property to join the sewer main, failed in May 2023. This resulted in the flooding of the three units. Only one of the pumps was replaced, leaving the system without a back-up pump;

  iii.  The fire extinguishers in the Property's common areas have inspection tags that expired in June 2022;

  iv.   The paved asphalt parking lot is damaged, with large areas of missing asphalt and the seal coat is worn;

v.     The building exterior brick veneer is stained and damaged in large areas, and the mortar joints are deteriorating;

vi.    The exterior concrete stairs are damaged in areas and the exterior concrete areas are stained throughout;

vii.   The painted wood roof soffits and fascia are rotted due to exposure to the elements and lack of timely preventative maintenance; and

viii.  The roof shingles appear to be over 20 years old and have reached the end of their useful life.  The shingles are curling and cracking in large areas and there are multiple areas of missing shingles.

49.     Furthermore, Section 3(d) of the Security Instrument provides that, upon the occurrence of any Event of Default, Fannie Mae's remedies include, without limitation, the appointment of a receiver ("Receiver").  *See* Exhibit E, § 3(e).  Pursuant to Section 3(d) of the Security Instrument, Borrower expressly consented to such appointment.  *Id.*

50.     The Receiver herein should have suitable business skills to maintain the Mortgaged Property and the Property in a viable condition pending a foreclosure sale of the Mortgaged Property.  The Receiver herein should have the business resources and experience to successfully manage the Mortgaged Property and operate the Property.

51.     Fannie Mae requests that the Court appoint Tarantino Properties, Inc. ("Tarantino") as the Receiver for the Mortgaged Property.  Tarantino and its principals have extensive experience in multifamily real estate asset management, as well as significant experience as a court-appointed receiver in Arkansas and states throughout the country.  Sal Thomas of Tarantino will be the primary contact person for Tarantino.

52.     Pursuant to Section 3 of the Security Instrument and this Court's equitable powers, Fannie Mae requests that the Receiver have, at Borrower's expense, all of the usual powers and duties of receivers in similar cases, including, without limitation, the full power to hold, develop,

13

rent, lease, manage, maintain, operate, market, sell and otherwise use or permit the use of the Mortgaged Property, subject to Fannie Mae's approval (collectively, "Receiver's Powers"), including, without limitation, the power to:

(a) enter upon and take possession and control of the Mortgaged Property, and to perform all acts necessary and appropriate for the operation and maintenance thereof;

(b) take and maintain possession of all documents, books, records, papers and accounts relating to the Mortgaged Property;

(c) exclude Borrower and its agents, servants and employees wholly from the Mortgaged Property, including changing any and all locks to the Mortgaged Property;

(d) allow Fannie Mae, its counsel, appraisers, and other independent third-party consultants engaged by Fannie Mae or its counsel access to the Mortgaged Property at all reasonable times to inspect the Mortgaged Property and all books and records, and to cooperate with Fannie Mae, its counsel, appraisers and other independent third-party consultants to evaluate the Mortgaged Property;

(e) manage and operate the Mortgaged Property under any existing name or trade name (or new name) if the Receiver deems appropriate to do so, subject to the consent of Fannie Mae;

(f) exercise any and all rights of Borrower and/or Fannie Mae (in any event subject to Fannie Mae's consent) in and to any and all license and/or franchise agreements;

(g) retain, hire or discharge on-site employees at the Mortgaged Property (none of whom are or shall be deemed to be employees of Fannie Mae) without any liability to the Receiver or Fannie Mae;

(h) establish pay rates for on-site employees at the Mortgaged Property;

(i) preserve, maintain, and make repairs and/or alterations to the Mortgaged Property;

(j) conduct a marketing or leasing program with respect to the Mortgaged Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Mortgaged Property under such terms and conditions as Fannie Mae may in its sole discretion deem appropriate or desirable;

(k) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as Fannie Mae may in its sole discretion

14

deem appropriate or desirable to implement and effectuate the rights and powers granted therein;

(l) execute and deliver, as attorney-in-fact and agent of Borrower or in Borrower's own name, such documents and instruments as are necessary or appropriate to consummate transactions authorized by this Order;

(m) enter into such leases, whether of real or personal Mortgaged Property, or tenancy agreements, under such terms and conditions as Fannie Mae may in its sole discretion deem appropriate or desirable;

(n) collect and receive all Rents and Profits from the Mortgaged Property;

(o) eject tenants or repossess personal property, as provided by law, for breaches of the conditions of their leases or other agreements;

(p) sue for unpaid Rents and Profits, payments, income or proceeds in the name of Borrower;

(q) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent;

(r) compromise or give acquittance for Rents and Profits, payments, income or proceeds that may become due;

(s) determine and report to the Court and Fannie Mae whether any Rents and Profits previously received by Borrower have been used for purposes other than for the maintenance, management and expenses of the Mortgaged Property;

(t) require any and all officers, directors, managers, agents, representatives, independent contractors, partners, affiliates, attorneys, accountants, shareholders and employees of the Borrower to return any and all Rents and Profits in their possession;

(u) to open and review mail directed to Borrower and its representatives pertaining to the Mortgaged Property;

(v) analyze, determine and implement the best approach to maximize value from the Mortgaged Property for the benefit of Borrower's creditors and interest holders, including without limitation, marketing and selling the Property as a going concern, subject to Fannie Mae's prior written approval, provided, however, that in no event shall Receiver's power to sell the property, or any other power granted hereunder, in any way impair Fannie Mae's ability to exercise its rights and remedies under the Loan Documents, including, without limitation, the right to foreclose the Amended Security Instrument;

(w) facilitate the assumption of the Loan by a third party, subject to Fannie Mae's prior written approval;

15

(x) communicate, negotiate, and otherwise deal with any franchisor in order to secure the continuation, renewal and reinstatement of any existing franchise or license agreements (or to obtain new franchise or license agreements) pertaining to the Mortgaged Property, including the payment of any franchise or licensing fees, but only upon terms and conditions that are subject to Fannie Mae's approval;

(y) enter into contracts and agreements necessary to continue normal operations of the Mortgaged Property;

(z) amend, modify or terminate any existing contracts affecting the operations of the Mortgaged Property, but only upon terms and conditions that are subject to Fannie Mae's approval;

(aa) pay all appropriate real estate taxes, personal property taxes, or other taxes or assessments against the Mortgaged Property;

(bb) exercise all rights of Borrower in and to all government-issued permits, certificates, licenses or other grants of authority, to take all steps necessary to ensure the continued validity of such permits, certificates and licenses, and to take all steps necessary to comply with all requirements, regulations and laws applicable to the Mortgaged Property;

(cc) maintain a separate account with a federally insured banking institution or a savings association with offices in the State of Tennessee in the Receiver's own name, as Receiver, from which the Receiver shall disburse all payments authorized by this Order;

(dd) receive and endorse checks pertaining to the Mortgaged Property, either in Receiver's name or in Borrower's name;

(ee) do any acts which Fannie Mae in its sole discretion deems appropriate or desirable to protect the security hereof and use such measures, legal or equitable (as Fannie Mae in its sole discretion deem appropriate or desirable) to implement and effectuate the provisions of the Loan Documents

53.     Pursuant to 3(d) of the Security Instrument, and as a result of Borrower's failure to meet the obligations under the Loan Documents as set forth above, including without limitation, the Events of Default, Fannie Mae is entitled to the appointment of a receiver, and the Borrower has consented to such appointment upon the occurrence of the Events of Default.

54.     Fannie Mae asserts that a receiver is necessary to take control of the Mortgaged Property to receive and manage the Rents, to prevent any further waste and diminution in value of

the Mortgaged Property, to protect the residents of the Property, and to protect the interest of Fannie Mae in the Mortgaged Property.

55.    Fannie Mae reserves the right to make future requests that the Court expand the Receiver's Powers should the same be deemed necessary.

56.    Fannie Mae requests that Rents and other revenues received from the operation of the Property be applied to reimburse the Receiver for all reasonable costs and expenses that it (or its delegates) incur as a result of serving as Receiver, for payment of insurance premiums and management fees authorized thereunder, to compensate Receiver for its services as receiver, and for payment of all Obligations.

57.    In accordance with the Security Instrument, the appointment of the Receiver should not impair or in any manner prejudice the rights of the Fannie Mae to receive payment of the Rents pursuant to the terms and provisions of the Loan Documents.

58.    Fannie Mae requests the receiver be authorized to remit to Fannie Mae all funds, profits, revenues, proceeds, and Rents that constitute collateral of Fannie Mae for application to the Indebtedness of Borrower under the Loan Documents, to the extent not expended for any of the purposes herein authorized.

59.    Fannie Mae requests that this Court enter an order providing that Receiver shall be paid the following monthly amounts: (i) Monthly Receivership Fee - $1,500.00 and (ii) Monthly Management Fee - $2,750.500 (collectively, the "Monthly Fees").  Fannie Mae also requests that the Receiver be entitled to recover a one-time set-up fee of $1,500.00 (the "One-Time Fee," and collectively with the Monthly Fees, the "Receiver Fee").

60.    Fannie Mae requests that the Court enter its order setting forth the process for paying the Receiver Fee to the Receiver from the operations of the Mortgaged Property.

## COUNT II – EXTRAORDINARY RELIEF – TEMPORARY RESTRAINING ORDER (FIRST REQUEST)

61.    Fannie Mae incorporates by reference the allegations set forth above as if set forth fully herein.

62.    Pursuant to the provisions of the Security Instrument and Fannie Mae's revocation of Borrower's right to collect the Rents, Fannie Mae is entitled to collect the Rents and apply the same in accordance with the Loan Documents.

63.    Fannie Mae revoked Borrower's license to collect Rents and has made demand for Borrower to hold the Rents. *See* Exhibit L, Notice of Acceleration.

64.    Borrower has failed to apply the Rents in accordance with the provisions of the Loan Documents, including its failure to pay outstanding principal and interest.

65.    Fannie Mae reasonably believes its interest in the Rents is endangered and likely to be lost or rendered inadequate without the entry of a temporary restraining order.

66.    Therefore, in addition to the rights granted Fannie Mae under the Loan Documents, the equities dictate that Fannie Mae be granted a temporary restraining order prohibiting Borrower and its agents from (i) transferring, selling, converting, assigning, or disposing of any Mortgaged Property; and (ii) removing, altering, and destroying any books, accounts, or records relating to the Mortgaged Property.

67.    Fannie Mae will suffer immediate and irreparable injury, loss, and damage unless Borrower is restrained as requested hereunder.

68.    Moreover, Fannie Mae is likely to prevail on the merits of this Verified Complaint and the balance of equities favors entry of a temporary restraining order.

69.    Unless such equitable relief is granted by the Court, the injuries, losses, and damages to Fannie Mae cannot be remedied by money damages alone.

70.     Because Fannie Mae has no adequate remedy at law and there is a substantial likelihood that it will prevail on the merits of this Verified Complaint, the temporary restraining order sought herein is appropriate.

## COUNT III – EXTRAORDINARY RELIEF – PRELIMINARY AND PERMANENT INJUNCTION (FIRST REQUEST)

71.     Fannie Mae incorporates by reference the allegations set forth above as if set forth fully herein.

72.     Fannie Mae has a first priority perfected security interest in the Mortgaged Property, and Fannie Mae possesses an absolute assignment of Rents.

73.     Based on the failure of Borrower to meet its obligations under the Note and the Loan Documents, Fannie Mae has a good faith basis for being gravely concerned about the protection and preservation of the Mortgaged Property.

74.     Indeed, Borrower's failure to make timely payment of the Indebtedness has adversely affected the Mortgaged Property, Fannie Mae's security for the Loan, and Fannie Mae's rights under the Loan Documents.

75.     Absent entry of a preliminary injunction restraining and enjoining Borrower its agents from collecting, transferring, or disposing of any of the Mortgaged Property, including the Rents, Fannie Mae reasonably believes that the Mortgaged Property, including the Rents, may be transferred, disposed, wasted, expended, converted, and destroyed in violation of the Loan Documents, thereby causing irreparable harm to Fannie Mae.

76.     As evidenced in the aforementioned factual allegations, Fannie Mae is likely to prevail on the merits of this action.

77.     Fannie Mae has sustained and will continue to sustain immediate and irreparable injury as a result of Borrower's actions concerning collection of Rents and refusal to remit the same to Fannie Mae.

78.     With respect to such conduct by Borrower, Fannie Mae has no adequate remedy at law.

79.     The balance of the equities favors the issuance of a preliminary injunction in favor of Fannie Mae.

80.     Accordingly, Fannie Mae requests this Court enter a preliminary injunction:

(a) prohibiting Borrower and its agents from disbursing, collecting, disposing, and converting any Rents;

(b) directing Borrower and its agents to account for all such Rents they have collected since default;

(c) further directing Borrower and its agents to remit all such Rents to the duly appointed Receiver;

(d) restraining and enjoining Borrower and its agents from collecting, transferring, disposing, wasting, and converting the Rents and other Mortgaged Property securing the Indebtedness owed;

(e) immediately, upon appointment of the aforesaid Receiver, directing Borrower and its agents to surrender possession of all the Mortgaged Property to said Receiver to allow said Receiver to operate the same; and

(f) immediately, upon appointment of the aforesaid Receiver, directing Borrower and its agents to turn over to said receiver all books, records, and accounts affecting the Mortgaged Property.

81.     Upon hearing, Fannie Mae requests that the Court issue a permanent injunction prohibiting Borrower and its agents from transferring, converting, or disposing of any of the Rents and directing Borrower and its agents to remit to Receiver all Rents in Borrower and its agents' possession or subsequently received.

## COUNT IV – BREACH OF CONTRACT – BORROWER

82.     Fannie Mae incorporates by reference the allegations set forth above as if set forth fully herein.

83.     Borrower executed the Loan Documents that secure the Loan.

84.     Pursuant to the Master Participation Agreement and the Senior Participation Certificate, Fannie Mae is entitled to enforce the Loan Documents.

85.     Under the Loan Documents, Borrower incurred various contractual obligations to Fannie Mae, including but not limited to the obligations to pay the full amount of the Indebtedness due and owing as of the Maturity Date, timely pay the expenses of operating and maintaining the Mortgaged Property, and turn over Rents to Fannie Mae upon default.

86.     Borrower has breached its Obligations to Fannie Mae under the Loan Documents by, among other things, failing to pay off the Loan on or before the Maturity Date and failing to turn over Rents to Fannie Mae upon default.

87.     Accordingly, Fannie Mae demands judgment against Borrower for breach of contract under the Loan Documents in an amount not less than $683,405.24, together with all accruing interest and costs, including, without limitation, default interest, prepayment premiums, attorneys' fees, and all expenses incurred by Fannie Mae in collecting the Loan Obligations.

## COUNT V – FORECLOSURE OF SECURITY INSTRUMENT

88.     Fannie Mae incorporates by reference the allegations set forth above as if set forth fully herein.

89.     Borrower executed the Loan Documents, including the Note and Security Instrument, and secured the Loan.

90.     Pursuant to the Master Participation Agreement and the Senior Participation Certificate, Fannie Mae is entitled to enforce the Loan Documents.

91.     Borrower has failed to pay sums payable under the Note, including, without limitation, the full amount of the Indebtedness owed as of the Maturity Date, plus associated late charges, default interest, and attorneys' fees due and owing by Borrower in an amount not less than $683,405.24.  Such failure constitutes an Event of Default under Section 22 of the Security Instrument.

92.     On May 12, 2023, Midland notified Borrower of the Event of Default. *See* Exhibit K, Payment Default Notice.

93.     Then, on July 5, 2023, Fannie Mae notified Borrower that the outstanding principal balance evidenced by the Note, together with all accrued and unpaid interest, late fees, and all other obligations due and owing under the Note and other Loan Documents, were immediately due and payable as a result of the expiration of the Maturity Date. *See* Exhibit L, Notice of Acceleration.

94.      Accordingly, the entire outstanding principal balance of the Loan, together with all accrued and unpaid interest, property protection advances, late charges, expenses of Fannie Mae, and all other amounts due under the Note and other Loan Documents is due.  The current payoff amount of said obligation as August 9, 2023 is $683,405.24, with interest continuing to accrue at the default rate of 11% per annum.

95.     Fannie Mae's right to foreclose is absolute due to Borrower's default.

96.     Pursuant to the terms and conditions of the Loan Documents, Fannie Mae is entitled to foreclosure of the Security Instrument.

97.     Fannie Mae requests that the Security Instrument be declared to be first and exclusive lien upon the Mortgaged Property, prior and paramount to the claims and liens of all other parties. Fannie Mae also requests that the Court allow the appointed Receiver to sell the Mortgaged Property.

98.     Fannie Mae also requests that the purchaser(s) at the sale of the Mortgaged Property be decreed to have a right to immediate possession of the applicable property and be given a Writ of Assistance to be executed by the Clerk of this Court to enforce delivery of possession.

WHEREFORE, ABOVE PREMISES CONSIDERED, Plaintiff Federal National Mortgage Association respectfully requests that this Court:

A.      Issue process and summons to compel Defendants to appear and answer this Verified Complaint;

B.      Appoint Tarantino Properties, Inc. as receiver to take possession of the Mortgaged Property with responsibilities and authorities consistent with the Receiver's Powers as set forth herein;

C.      Grant a temporary restraining order, restraining Defendants from, among other things: (i) transferring, selling, converting, assigning, or disposing of any Mortgaged Property; and (ii) removing, altering, and destroying any books, accounts, or records relating to the Mortgaged Property;

D.      Grant preliminary and permanent injunctive relief which, among other things, (i) enjoins the Defendants from interfering with the duties of the receiver and/or Fannie Mae; (ii) directs that payment of all Rents, receipts and revenues to the receiver and/or Fannie Mae; and (iii) provides all other relief as requested herein and as may be necessary to preserve and protect the

Mortgaged Property and in aid of the duties conferred on the receiver and/or Fannie Mae by this Court;

      E.      If requested, direct the receiver to administer the Mortgaged Property in a manner which will not jeopardize the operation of the Mortgaged Property, while maximizing the amount realized by Fannie Mae from the Mortgaged Property;

      F.      Enter judgment in favor of Fannie Mae against Borrower in an amount to be determined at trial, to the fullest extent to which Fannie Mae is entitled under the Loan Documents;

      G.      Enter a judgment of foreclosure; and

      H.      Grant Fannie Mae any such other, further, or different relief to which the Court deems Fannie Mae entitled under the premises.

**THIS IS THE FIRST APPLICATION FOR EXTRAORDINARY RELIEF.**

Respectfully submitted,

Robert F. Tom (Ark. Bar No. 2013026)
BAKER, DONELSON, BEARMAN
  CALDWELL & BERKOWITZ, PC
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: 901.577.2159
Facsimile: 901.577.0818
rtom@bakerdonelson.com

*Counsel for Plaintiff Federal National Mortgage Association*

## VERIFICATION

I, James Noakes, Senior Asset Manager, Portfolio Risk Management of Federal National Mortgage Association ("Fannie Mae"), having first been duly sworn, and being authorized to make this statement, do make oath that I am an adult citizen competent to testify to the matters stated herein, that I have read the foregoing Complaint and have examined the documents attached as Exhibits thereto, and that, based upon my personal knowledge of the facts stated therein and upon my review of the records of Fannie Mae that were kept as a regular practice of Fannie Mae in the course of Fannie Mae's regularly conducted business activity and that were made at or near the time of the occurrence of the matters set forth, the facts stated in the Complaint are true, and the documents attached as Exhibits are accurate copies of the records of the regularly conducted activity of Fannie Mae.

James Noakes, Senior Asset Manager of
Federal National Mortgage Association

STATE OF TEXAS
COUNTY OF COLLIN

Sworn to and subscribed before me this **23** day of **August**, 2023.

LINDA S. HENDERSON
My Notary ID # 1511536
Expires April 19, 2024

Notary Public

My Commission Expires:

**4-19-24**

# EXHIBIT A

2005103433
12/08/2005 04:51:56 AM
Filed & Recorded in
Official Records of
PAT O'BRIEN
PULASKI COUNTY
CIRCUIT/COUNTY CLERK
Fees $29.00

000176

This Instrument Prepared By
and When Recorded Return To:
Arkansas Development Finance Authority
Attn: Office of the General Counsel
P.O. Box 8023
Little Rock, Arkansas 72203-8023

# MORTGAGE
## ARKANSAS DEVELOPMENT FINANCE AUTHORITY
## HOME PROGRAM

## KNOW ALL MEN BY THESE PRESENTS:

That Eastside Lofts Apartments Phase II Limited Partnership (hereinafter called "Mortgagor"), for a valuable consideration, hereby grants, bargains, sells, conveys and delivers unto Arkansas Development Finance Authority (hereinafter called "Mortgagee"), and unto its successors and assigns, the real property (the "Property" or the "Project") situated in Pulaski County, Arkansas, as more particularly described on the attached Exhibit "A."

This Mortgage also conveys all buildings and improvements now or at any time hereafter located on any land herein above described, together with all of the following equipment now or at any time hereafter located in such building regardless of method or annexation or removability including, but not limited to: all electrical equipment (including lighting equipment, refrigeration equipment, ceiling fans, attic and window fans, motors and all other electrical paraphernalia) except items attached merely by plugging in wall sockets; all furnaces (including floor furnaces), heaters, radiators and all other heating equipment except small gas stoves on floor; all bath tubs, toilets, sinks, basins, pipes and other plumbing equipment; all screens, awnings, and window shades; all linoleum and other permanent floor coverings; all engines and elevators.



ADFA Mortgage
Page 1 of 8 -

000177

TO HAVE AND TO HOLD the same unto Arkansas Development Finance Authority, and its successors and assigns forever.

And Mortgagor covenants with Mortgagee, its successors and assigns, that Mortgagor will forever warrant and defend the title to all the Property against all lawful claims whatever.

PROVIDED, however, the foregoing conveyance is given as a Mortgage for the purpose of securing the following:

(a)    The payment of a promissory note (the "Note"), with an effective date of November 22, 2005 evidencing a principal indebtedness (which indebtedness, and all extensions and renewals thereof is hereinafter called the "Primary Indebtedness") of **Four Hundred Thousand and 00/100 Dollars ($400,000.00)** from date until maturity at the annual long-term compounding applicable federal interest rate **(4.57%)** per annum for a term of twenty (20) years payable over a twenty (20) year term, with the first payment beginning on **December 1, 2006** as follows: annual payments of principal and interest due under the Note shall be equal to one-half (1/2) of Surplus Cash (as defined below) of the Mortgagor as determined by the Mortgagor's certification and an independent audit conducted by an independent CPA acceptable to ADFA.    Any amounts not paid shall accrue and be payable on the Maturity Date, which is **December 1, 2026.**  "Surplus cash" shall mean the operating income of the project owned by Mortgagor known as **Eastside Lofts Phase II** (the "Project"), (excluding interest income earned on tenant security deposits and reserve accounts), which exceeds operating expenses.  For purposes of the Note, the term "operating expenses" shall include salaries of on-site property managers, management fees, accounting services, loan repayments, amounts deposited into a replacement reserve account, travel expenses, legal services, insurance expenses, utility expenses, office supplies, rental, maintenance (but not purchase) of office space and developers' fees each specifically related to the project.  All payments of surplus cash shall be applied first against interest and then principal for the current annual installment and then to all accrued, but unpaid annual installments (being applied in chronological order).  All accrued and unpaid principal and interest shall be due on **December 1, 2026,** the Maturity Date.

(b)    The payment of all future and additional indebtedness, direct or indirect, created after the date of this Mortgage, which may be owing by Mortgagor (or by any of the persons herein designated under the term "Mortgagor" to the holder of the Primary Indebtedness at any time prior to the payment in full of the Primary Indebtedness) or the foreclosure of this Mortgage therefore (the event occurring first to be controlling); such additional indebtedness to be secured hereby regardless of whether it shall be predicated upon future loans or advances hereafter made by the holder(s) of the Primary Indebtedness, or obligations hereafter acquired by such holder(s) through assignment or subrogation or otherwise, or shall represent indirect obligations (created after the date of this Mortgage) based upon any endorsements, guaranties or suretyship AND IT IS AGREED THAT THIS MORTGAGE SHALL STAND AS SECURITY FOR ALL SUCH FUTURE AND ADDITIONAL INDEBTEDNESS WHETHER IT BE INCURRED FOR ANY BUSINESS PURPOSE THAT WAS RELATED OR WHOLLY UNRELATED TO THE PURPOSE OF THE ORIGINAL LOAN, OR WHETHER IT WAS INCURRED FOR SOME PERSONAL OR NON-BUSINESS PURPOSE, OR FOR ANY OTHER PURPOSE RELATED OR UNRELATED, OR SIMILAR OR DISSIMILAR, TO THE PURPOSE OF THE ORIGINAL LOAN. THIS IS A NON-RECOURSE LOAN; and

(c)     The repayment to the holder(s) of the indebtedness secured hereby of all reimbursable expense at any time accruing to such holder(s) under the provisions of Paragraph (3) hereof.

Upon the payment of all such sums <u>and</u> compliance with the specified HOME Program Requirements, this Mortgage will become void and will be released by a proper marginal notation or, at the option of the holder(s) of the secured debt, by a release deed to be recorded at the expense of Mortgagor.

1.     <u>COVENANTS OF MORTGAGOR</u>.  Mortgagor agrees to the following:

   (a)     to pay, prior to delinquency, all taxes, special improvement assessments and other governmental charges against the Property, both real and personal, at any time levied or becoming due;

   (b)     to carry insurance upon all insurable property encumbered hereby against such hazards, in such amounts and under such form of policies, as shall be acceptable to, or requested by, the holder(s) of the indebtedness secured hereby; each insurance policy to carry mortgage clause in favor of such holder(s) upon such form as may be approved by the holder(s), and each policy to be delivered to and held by such holder(s).  Also to carry public liability insurance, and insurance against other hazards, to such extent as may be requested by the holder(s) of the secured indebtedness.  In each instance, Mortgagor shall have the right to select the insurer, subject to Mortgagee's right to reject the proposed insurer for reasonable cause;

   (c)     to prevent the Property from becoming encumbered by any lien or charge having priority over, or on a parity with, the lien of this Mortgage and to comply with all statutes, ordinances and regulations relating to such property; and

   (d)     to protect the Property from waste, injury or unusual deterioration and, without subjecting the Property to any statutory lien, to make all replacements and repairs necessary to keep the Property in good physical condition.  In that connection, it is agreed that Mortgagor may not cut the timber from any land encumbered hereby; moreover, Mortgagor may not remove or substantially remodel or alter any structure on the Property without prior written consent of the holder(s) of the secured indebtedness.

2.     <u>DEFAULT</u>.  The holder(s) of the Primary Indebtedness or any future or additional indebtedness secured hereby (whether such indebtedness then be evidenced by the original note(s) or by any instrument(s) given in renewal or extension of such indebtedness) may, at the option of such holder(s), declare the entire unmatured portion of all indebtedness secured hereby, together with all default interest accrued on the entire secured debt, to be immediately due and payable, and the same shall forthwith become immediately due and payable (which acceleration of maturity may be accomplished without notice to anyone), in any one of the following events:

   (a)     Upon the filing of a voluntary or involuntary petition to subject Mortgagor (or any party obligated as maker, endorser, surety or guarantor for the payment of

the secured indebtedness) to any bankruptcy, debt-adjustment, receivership or other insolvency proceeding.

(b)     Upon the occurrence of any event, which, under the terms of the instrument at any time evidencing the indebtedness secured hereby, warrants acceleration (at the option of the holder) of the maturity of said indebtedness.

(c)     If default shall be made in the payment of any part of the Primary Indebtedness or any indebtedness secured hereby, or any default interest accruing on such indebtedness, as the same becomes due and payable according to the terms of the original note(s), or of any extension or renewal thereof at any time evidencing such indebtedness.

(d)     If Mortgagor shall fail to comply with any of the agreements contained in this Mortgage.

(e)     If Mortgagor, being a partnership or a corporation, shall be dissolved or reorganized in any manner.

(f)     If at any time it shall appear that title to the Property, or any portion thereof, is subject to any prior lien, title or interest not mentioned in this Mortgage as a prior encumbrance.

(g)     If at any time Mortgagor shall sell or convey the title to or any interest in any realty mortgaged hereunder without the prior written consent of the holder(s) of the secured indebtedness.

(h)     If at any time it should appear that the Mortgagor has attempted to sell free from the lien of this Mortgage any personal property or removable fixture encumbered hereby, or is about to attempt such a sale; or that any personality or removable fixture encumbered hereby has been, or is about to be moved to a different jurisdiction, subjected to physical damage or unusual deterioration, seized under legal process, or subjected by the Mortgagor or a third party to any other disposition which in the opinion of the holder(s) of the secured indebtedness will impair the security value of this instrument.

(i)     If at any time it should appear that the Mortgagor's financial statements given to and relied upon by the Mortgagee incorrectly or inaccurately set forth the financial condition of the Mortgagor.

(j)     If Mortgagor breaches the HOME Investment Partnership Agreement between Mortgagor and Mortgagee.

It is particularly understood that the foregoing acceleration provisions will be applicable not only to the maturities recited in the original mortgage note(s) but also to any substituted maturities created by extension or renewal.  The failure of the holder(s) of the secured indebtedness to declare any acceleration of maturities when a ground therefore exists, even though such forbearance may be repeated from time to time, will not

0000180

constitute a waiver of the right of such holder(s) to accelerate maturities upon a reoccurrence of the same ground therefore, nor will the act of such holder(s) in remedying any condition resulting from Mortgagor's default bar the holder(s) from declaring an acceleration of maturities by reason of such default.

3.    REMEDIES UPON DEFAULT.  In the event of a default hereunder, the holder(s) of the indebtedness secured hereby shall be entitled to any of the following remedies:

(a)    Pursuit of any and all remedies provided by judicial proceedings and non-judicial remedies, including self-help repossession;

(b)    Foreclosure of this Mortgage in compliance with Act 53, "The Statutory Foreclosure Act of 1987" by public sale to the highest bidder for cash, on the premises or at the main door of the Courthouse of Crittenden County, public notice of the time, terms and place of said sale having been given for thirty (30) days by publication in some newspaper, published in Crittenden County, once a week for four (4) consecutive weeks prior to the date of sale, the final publication to be no more than seven (7) days prior to the sale, which advertisement shall be sufficient for the purpose of foreclosure.  THE OWNER OF THE NOTE SECURED HEREBY MAY BECOME A PURCHASER AT SUCH SALE.  No bid shall be accepted that is less than two-thirds (2/3) of the entire indebtedness due at the date of the sale.  Notice required under Act 53 of 1987 will be directed to the Mortgagor at the following address supplied by Mortgagor, to wit:

**Eastside Lofts Apartments Phase II Limited Partnership**
**Steven Hitt**
**2004 South Main Street**
**Little Rock, AR 72206**
**(501) 375-7770**

Election of either (a) or (b) by Mortgagee is not irrevocable and Mortgagee may at any time subsequent to commencement of the proceedings terminate such proceeding and proceed with any other remedy.

(c)    The holder(s) of the indebtedness secured hereby may require the Mortgagor to assemble (at Mortgagor's expense) any or all of the personal property encumbered hereby and make it available to such holder(s) at a place specified by such holder(s) which is reasonably convenient to both parties; and such holder(s) may enforce all of its or their remedies, in respect to the encumbered personal property, that may be available under the Uniform Commercial Code. In the last event all expenses of retaking, holding, preparing for sale, selling or the like, as well as all reasonable attorney's fees (not exceeding 10% of the secured indebtedness plus accrued default interest) and lawful expenses incurred by said holder(s) in enforcing such remedies shall be payable to said holder(s) by Mortgagor shall constitute a part of the secured indebtedness.

(d)    Such holder(s) may enforce the lien of this Mortgage in respect to any or all real and personal property encumbered hereby:

(i)     either separately or in bulk, in such order as Mortgagee, in is sole discretion, shall direct, including at any judicial or non-judicial sale; and

(ii)    by proceedings that are prosecuted simultaneously or are prosecuted separately in such order as the holder(s) may elect.

4.     **MORTGAGEE EXPENDITURES**. If the holder(s) of the indebtedness secured hereby shall expend any sum or sums for the protection of any of the Property or the lien of this Mortgage (such holder(s) to have uncontrolled discretion as to the necessity of making any such expenditures), the repayment of such sum or sums on demand (with interest thereon at the maximum legal rate from the date of each expenditure) shall be the personal obligation of Mortgagor; and such obligation to repay will constitute a part of the indebtedness secured hereby. The expenditures thus made reimbursable will include (without limiting the foregoing) taxes, special improvement assessments, insurance premiums, repairs and maintenance expenses, sums paid to discharge prior liens, rents on premises in which mortgaged personality may be situated, etc. The cost of any abstract, title commitment, or appraisal procured by the holder(s) of the secured indebtedness to facilitate foreclosure will also constitute a part of the reimbursable expense secured hereby.

5.     **RELINQUISHMENT OF MORTGAGOR'S RIGHTS**. Mortgagor releases all rights of dower, courtesy, homestead and appraisement hereunder and also releases unto Mortgagee all right of redemption under the laws of Arkansas, including particularly all right of redemption under Act No. 53 of May 8, 1989, and amendments thereto currently codified as ARK. CODE ANN. § 18-49-106.

EXECUTED on this **22ⁿᵈ** day of November 2005.

MORTGAGOR:

**Eastside Lofts Apartments Phase II Limited Partnership**

By:  Eastside GP II LLC
Its: General Partner

By: _Steven W. Hitt_

      **Steven W. Hitt**
Its: Manager
Federal I.D. Number: 71-0430462

**ACKNOWLEDGEMENT**

State of ARKANSAS

County of *Pulaski*

BEFORE ME, the undersigned Notary Public, on this day personally appeared Steven W. Hitt., Manager of Eastside GP II LLC., the General Partner of Eastside Lofts Apartments Phase II Limited Partnership, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same of the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _22_ day of November 2005.

NOTARY PUBLIC
State of Arkansas

My Commission Expires: _____

Escrow File No.: E-05-52497

**2005103433**

### EXHIBIT "A"

**Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.**

000183

2006068512
06/30/2006  08:32:39 AM
Filed & Recorded in
Official Records of
PAT O'BRIEN
PULASKI COUNTY
CIRCUIT/COUNTY CLERK
Fees $74.00

00000422

<u>THIS INSTRUMENT PREPARED BY</u>
<u>AND AFTER RECORDING RETURN TO:</u>

Randal B. Frazier, Esq.
Quattlebaum, Grooms, Tull & Burrow PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700

## CONSTRUCTION MORTGAGE
### (with Security Agreement, Absolute Assignment of Leases and Rents, Fixture Filing and Financing Statement)

**THIS MORTGAGE IS A CONSTRUCTION MORTGAGE, THE PURPOSE AND INTENT OF WHICH IS TO PROVIDE ARVEST BANK WITH A FIRST LIEN ON ALL PROPERTY DESCRIBED HEREIN, SUPERIOR TO ALL OTHER CLAIMS, INCLUDING WITHOUT LIMITATION ALL STATUTORY LIEN CLAIMANTS.**

MORTGAGOR:    **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership
2004 Main Street
Little Rock, Arkansas 72206

MORTGAGEE:    **ARVEST BANK,**
an Arkansas state bank
500 Broadway Place
Little Rock, Arkansas 72201

MORTGAGOR, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Mortgagor in hand paid by Mortgagee, the receipt and sufficiency of which are hereby acknowledged, does by these presents grant, bargain, sell, alien, convey and mortgage unto Mortgagee the Mortgaged Property hereinafter described, to secure certain indebtedness of the said Mortgagor to the said Mortgagee, as hereinafter described, TO HAVE AND TO HOLD the same unto Mortgagee for all purposes stated herein.

If Mortgagor shall well and truly pay all of the Secured Indebtedness, as herein defined, as the same becomes due, and shall perform each and every warranty, covenant and condition herein contained, then this instrument shall be of no further force and effect, and shall be released upon the request and at the expense of Mortgagor; otherwise to remain in full force and effect.

4158\10228\Constr-Mortgage_01 02 clean.doc

## ARTICLE I
## MORTGAGED PROPERTY

The "Mortgaged Property" shall consist of all real and personal property described in Paragraphs A through D of this Article:

A.    A certain tract of land located in Pulaski County, Arkansas, specifically described in **Exhibit A** hereto (the "Land"), together with all improvements and fixtures hereafter erected or located thereon (the "Improvements"), and all rights and appurtenances thereunto in anywise belonging (said Land and Improvements are hereinafter sometimes collectively referred to as the "Premises").

B.    All fixtures, machinery, building materials, appliances and supplies, equipment and other tangible personal property of whatever nature, now owned or hereafter acquired by Mortgagor, including without limitation items set forth on **Exhibit A and Exhibit B**, whether similar or dissimilar, all accessions thereto, replacements or substitutions therefor and all proceeds (including without limitation insurance proceeds and condemnation awards) and products therefrom, it being understood that the enumeration of any specific articles of property shall in no way result in or be held to exclude any items of property not specifically mentioned nor imply the presence, requirement or ownership of all such items or any particular item. It is the intention of the parties that each and every item described or otherwise included within this clause B which is of such nature that the same could become affixed to the Land shall be deemed a fixture and a part of the real estate as soon as and to the maximum extent allowed by applicable law.

C.    All architectural, construction or other plans and specifications, architectural or engineering studies, surveys, and other information or analyses of whatever nature, necessary or convenient for construction, use, promotion and sale of the Improvements or Premises, or any part thereof, or any interest therein; provided, nothing in this Article shall imply Mortgagee's consent to or approval of the sale, transfer or lease of any of the Mortgaged Property except as may be expressly otherwise provided or permitted in this instrument.

D.    Mortgagor warrants that it has good and indefeasible title to the Premises. Should the interest of Mortgagor in the Mortgaged Property be other or less than 100% full fee simple absolute title thereto, and should Mortgagor hereafter acquire any other or further right, title or interest therein, then such right, title or interest shall be included in the Mortgaged Property and shall be subject to the lien hereof to the same extent as if owned by Mortgagor on the date hereof.

## ARTICLE II
## SECURED INDEBTEDNESS

Mortgagor has applied to Mortgagee for a construction loan (the "Loan") in the principal sum of Three Million and No/100 United States Dollars ($3,000,000.00) (which principal sum, together with interest thereon from and after the advances on the amount advanced as described and provided in the Note (described herein), shall hereinafter be referred to as the "Secured Indebtedness") and the Mortgagee has agreed to make such Loan for the purpose of constructing Improvements on the Land. Mortgagor hereby represents, warrants and covenants to and for the benefit of Mortgagee that any sum advanced (up to the total principal sum of Three Million and No/100 United States Dollars ($3,000,000.00)) by Mortgagee shall be used solely for said purposes. Mortgagor understands and agrees the Loan shall be utilized exclusively for the purposes set forth above and for paying all direct

and indirect costs for the construction of the Improvements on the Land, and to provide funds for the purchase of materials furnished and the payment of labor performed in connection with the construction of the Improvements.

**MORTGAGOR IS JUSTLY INDEBTED TO THE MORTGAGEE FOR ADVANCES MADE AND TO BE MADE HEREAFTER BY THE MORTGAGEE TO THE MORTGAGOR, FROM TIME TO TIME, AGGREGATING THE PRINCIPAL SUM AFORESAID, TO BE EVIDENCED BY A NEGOTIABLE TERM PROMISSORY NOTE (HEREINAFTER, TOGETHER WITH ANY AND ALL RENEWALS, EXTENSIONS, MODIFICATIONS OR SUBSTITUTIONS THEREOF OR THEREFOR, THE "NOTE") OF THE MORTGAGOR, PAYABLE TO THE ORDER OF THE MORTGAGEE, OF EVEN DATE HEREWITH, SAID NOTE TO BE IN THE PRINCIPAL SUM OF THREE MILLION AND NO/100 UNITED STATES DOLLARS ($3,000,000.00), BEARING INTEREST AND PAYABLE AS PROVIDED IN SAID NOTE, THE TERMS, PROVISIONS AND CONDITIONS OF WHICH ARE INCORPORATED HEREIN BY REFERENCE. THE SECURED INDEBTEDNESS SHALL HAVE A FINAL MATURITY DATE OF AUGUST 1, 2008. MORTGAGEE AGREES THAT THE ACCEPTANCE AND RECORDATION OF THIS MORTGAGE BINDS THE MORTGAGEE, ITS SUCCESSORS AND ASSIGNS, SO LONG AS MORTGAGOR IS NOT IN DEFAULT HEREUNDER OR UNDER THE LOAN AGREEMENT DEFINED IN SECTION 7.1 OF THIS INSTRUMENT, AND SO LONG AS MORTGAGOR HAS MET, COMPLIED WITH AND SATISFIED ALL OF THE CONDITIONS PRECEDENT SET FORTH IN SAID LOAN AGREEMENT, ABSOLUTELY AND UNCONDITIONALLY (WHICH ARE WITHIN THE EXCLUSIVE CONTROL OF MORTGAGOR), TO MAKE THE LOAN (ADVANCES MADE AND TO BE MADE HEREAFTER AND HEREUNDER) FOR SAID PURPOSE. THE CONSIDERATION FOR THIS MORTGAGE IS THE PRESENT AND FUTURE ADVANCEMENT OF SAID FUNDS TO MORTGAGOR BY MORTGAGEE, WHICH ADVANCEMENTS MORTGAGEE SHALL MAKE IN ACCORDANCE WITH THE PROVISIONS OF THIS MORTGAGE, AND THIS MORTGAGE SHALL SECURE ALL SUCH FUTURE ADVANCEMENTS AND THE LIEN OF EACH SUCH ADVANCEMENT SHALL RELATE BACK TO THE DATE OF THIS MORTGAGE AND THIS MORTGAGE SHALL HAVE THE FULL FORCE, EFFECT AND BENEFITS OF A MORTGAGE TO SECURE FUTURE ADVANCEMENTS OF MONEY.**

THE SECURED INDEBTEDNESS SHALL ALSO CONSIST OF, AND THIS MORTGAGE SHALL ALSO SECURE, ANY AND ALL EXTENSIONS, RENEWALS, MODIFICATIONS, REPLACEMENTS, SUBSTITUTIONS OR REARRANGEMENTS OF OR FOR THE NOTE, AND ANY AND ALL OTHER FUTURE, NEW, ADDITIONAL OR OTHER INDEBTEDNESS OF MORTGAGOR TO MORTGAGEE WHETHER NOW EXISTING OR HEREAFTER ARISING AT ANY TIME PRIOR TO THE SATISFACTION OF RECORD OF THE LIEN CREATED HEREBY, AND WHETHER OR NOT REPRESENTED BY ANY NOTE OR NOTES, OR ANY GUARANTY, ENDORSEMENT OR CONTRACT OF SURETYSHIP, OR SECURED BY ANY OTHER SECURITY, AND WHETHER OR NOT SUCH FUTURE ADVANCES OR ADDITIONAL OR OTHER INDEBTEDNESS ARE FOR PURPOSES RELATED OR UNRELATED TO THE PURPOSES FOR WHICH THE LOAN EVIDENCED BY THE NOTE IS MADE, AND WHETHER MORTGAGOR'S OBLIGATIONS OR INDEBTEDNESS TO MORTGAGEE BE AS A MAKER, PRINCIPAL, ENDORSER, SURETY, GUARANTOR, OR OTHERWISE, JOINT OR SEVERAL, DUE OR TO BECOME DUE, ABSOLUTE OR CONTINGENT, DIRECT OR INDIRECT, LIQUIDATED OR UNLIQUIDATED, AND WHETHER CREATED OR ARISING BY WAY OF A LOAN, FUTURE ADVANCE,

00000425

ACCEPTANCE, OVERDRAFT, OPEN ACCOUNT OR ANY OTHER EXTENSION OF CREDIT OF WHATSOEVER KIND OR NATURE, WHETHER NOW EXISTING OR HEREAFTER ARISING AT ANY TIME PRIOR TO THE SATISFACTION OF RECORD OF THE LIEN CREATED HEREBY, AND WHETHER OR NOT REPRESENTED BY ANY NOTE OR NOTES, OR ANY GUARANTY, ENDORSEMENT OR CONTRACT OF SURETYSHIP, OR SECURED BY ANY OTHER SECURITY, AND WHETHER OR NOT SUCH FUTURE ADVANCES OR ADDITIONAL OR OTHER INDEBTEDNESS ARE FOR PURPOSES RELATED OR UNRELATED TO THE PURPOSES FOR WHICH THE LOAN EVIDENCED BY THE NOTE IS MADE, AND WHETHER MORTGAGOR'S OBLIGATIONS OR INDEBTEDNESS TO MORTGAGEE BE AS A MAKER, PRINCIPAL, ENDORSER, SURETY, GUARANTOR, OR OTHERWISE, JOINT OR SEVERAL, DUE OR TO BECOME DUE, ABSOLUTE OR CONTINGENT, DIRECT OR INDIRECT, LIQUIDATED OR UNLIQUIDATED, AND WHETHER CREATED OR ARISING BY WAY OF A LOAN, FUTURE ADVANCE, ACCEPTANCE, OVERDRAFT, OPEN ACCOUNT OR ANY OTHER EXTENSION OF CREDIT OF WHATSOEVER KIND OR NATURE.

In order to further secure the Secured Indebtedness described herein and to set forth certain understandings and conditions between the Mortgagor and the Mortgagee with respect thereto, Mortgagor hereby covenants and agrees with Mortgagee as follows:

### ARTICLE III
#### WARRANTIES AND COVENANTS OF MORTGAGOR

3.1     **Warranties.** As an inducement to the extension of credit upon the security of this instrument, Mortgagor hereby represents and warrants:

(a)     Mortgagor is the owner of 100% full fee simple absolute interest in the Mortgaged Property, and has the right to sell, assign and mortgage the same;

(b)     All taxes and assessments levied or assessed against the Premises have been paid, except for taxes and assessments the payments of which are not yet due;

(c)     The execution of and performance under this instrument and the incurring of the Secured Indebtedness by Mortgagor does not violate any legal requirement, nor does it, to the knowledge of Mortgagor after reasonable investigation, violate or constitute a breach of or event of default under any other instrument or agreement binding upon Mortgagor;

(d)     There are no actions, suits, proceedings or investigations pending, or to the knowledge of Mortgagor threatened, against or affecting Mortgagor, or the Premises, or involving the validity or enforceability of this instrument or the Secured Indebtedness, or the priority of the liens created hereby;

(e)     No activity described in Ark. Code Ann. § 18-44-101, including preparation or construction on the Land has commenced or taken place on the Land, nor has Borrower made any verbal or written contract or arrangement of any kind, the occurrence of which would give rise to a lien on the Land of equal or greater priority than the lien and security interest of the Mortgage.

(f)     Mortgagor shall warrant and forever defend the title to the Mortgaged Property to Mortgagee, its successors and assigns, against any adverse claim whatsoever.

3.2     **Survival of Warranties.** Each of the above warranties shall survive the execution and delivery hereof, and shall be deemed made for the benefit of any successor or assign of the named Mortgagee.

3.3     **Affirmative Covenants.** In consideration of the extension of credit secured hereby, Mortgagor hereby covenants as follows:

(a)     Mortgagor shall pay each and every installment or part of the Secured Indebtedness as the same becomes due;

(b)     Mortgagor shall perform fully each and every covenant of Mortgagor provided in any of the documents evidencing or securing the Loan (collectively the "Loan Documents"), and Mortgagee shall be entitled to enforce compliance with each and every such covenant;

(c)     Mortgagor shall pay, prior to delinquency, all taxes and assessments levied or assessed against the Mortgaged Property except for any tax or assessment which Mortgagor contests in good faith;

(d)     Mortgagor shall maintain its existence and good standing, and pay all franchise taxes and other taxes necessary to that end;

(e)     In the event Mortgagor contests any charge or claim asserted for labor or materials in connection with the Mortgaged Property, or any tax or assessment levied or assessed against the same, Mortgagor will, if requested by Mortgagee, provide Mortgagee with a bond in an amount and with sureties satisfactory to Mortgagee to protect Mortgagee against any cost, loss, damage or liability in connection with contesting such claim or assessment. If Mortgagor fails to supply such a bond within thirty (30) days after a request therefor, or if prior to the furnishing of any such bond, any lien is filed, judgment or decree of foreclosure is entered or any execution made or notice of sale at foreclosure posted with respect to the Mortgaged Property or any part thereof, Mortgagee may, without prejudice to any other remedies Mortgagee may have for breach of this covenant, pay any such disputed charge, tax or assessment, or discharge any lien, and Mortgagor will immediately reimburse Mortgagee for any amounts so paid and any costs incurred in connection with same, without regard to the validity or enforceability of such lien, claim, tax or assessment;

(f)     Mortgagor shall keep (or cause to be kept) such portion of the Mortgaged Property as is of an insurable nature insured to such extent and against such risks and hazards in such amounts and under such form of policies as shall be acceptable to or reasonably requested by Mortgagee, each policy to be delivered to and held by Mortgagee. Without limiting the foregoing, Mortgagor shall procure and maintain (or cause to be procured and maintained) builder's risk insurance during construction of the Improvements in accordance with the Loan Agreement, defined in Section 7.1 of this instrument. To the extent possible, Mortgagor further agrees to provide in each such policy or policies carried pursuant to the foregoing, (i) an Agreed Amount Endorsement, (ii) a Replacement Cost Endorsement, (iii) a Standard Mortgagee Clause (Mortgagee and any party designated by Mortgagee shall be named as mortgagee and loss payee), and (iv) Inflation Guard Endorsement. All insurance policies required of Mortgagor hereunder shall be underwritten by a company which is satisfactory to Mortgagee and which is lawfully qualified to do business in the State of Arkansas. In connection herewith, Mortgagor shall, if required by Mortgagee, also procure

and maintain loss of rents and business interruption insurance. All such insurance policies shall be held by Mortgagee, and shall provide for notice to Mortgagee at least thirty (30) days prior to cancellation thereof. In the event of a loss by reason of an insured hazard to the Improvements upon the Mortgaged Property, the Mortgagee (or after entry of decree of foreclosure, any purchaser at the sale, or the decree creditor, as the case may be) is hereby authorized either (a) to settle and adjust any claim under such insurance policies without the Mortgagor's consent or joinder, such consent not to be unreasonably withheld, and each insurance company is hereby authorized and directed by Mortgagor to make payment for an insured hazard directly to Mortgagee as its interest may appear instead of to Mortgagor and Mortgagee jointly, and neither Mortgagee nor any insurance company involved shall be liable in any manner to Mortgagor upon the making of a settlement of an insured hazard, or (b) to allow Mortgagor to agree with the insurance company or companies on the amount to be paid upon the loss. In either case, the Mortgagee is hereby fully authorized and empowered to collect and receive any such insurance proceeds. Such insurance proceeds shall be held by the Mortgagee and used to reimburse the Mortgagor, or its agent, for the cost of rebuilding or restoring the Improvements on the Mortgaged Property unless (i) Mortgagor is in default hereunder, (ii) the Improvements are not, in Mortgagee's reasonable discretion, substantially complete at the time of their damage or destruction, (iii) in the sole reasonable judgment of Mortgagee, the Mortgaged Property cannot be restored or rebuilt or repaired for an economic use which is the same as the current use of the Mortgaged Property as a commercial building, and to an economic unit not less valuable than the same was prior to the insured hazard, and adequately securing the outstanding balance of the Secured Indebtedness, (iv) in the reasonable judgment of Mortgagee, the rebuilding, restoration or repair of the Mortgaged Property cannot be substantially complete by the maturity date of the Note, or (v) Mortgagee should not approve in its reasonable discretion the plans and specifications submitted by Mortgagor for any rebuilding, restoration or repair, in any of which events Mortgagee shall be entitled, at its option, to apply such insurance proceeds to the reduction of the Secured Indebtedness, approval by Mortgagee not to be unreasonably withheld. Any such replacement or repair of Improvements shall be to at least an equal value and substantially of the same character as prior to any such damage or destruction. In the event the Mortgagor is entitled to reimbursement out of such insurance proceeds for replacement or repair, such proceeds shall be made available, from time to time, to the Mortgagor upon the Mortgagee being furnished with satisfactory evidence of the estimated cost of completion of such repairs or Improvements with an architect's certificate, waivers of liens, contractors' sworn statements and other evidence of cost and payments as the Mortgagee may reasonably require and approve, and with all plans and specifications for such rebuilding or restoration as the Mortgagee may reasonably require and approve. No payment made prior to final completion of any such work of restoration or repair shall exceed ninety percent (90%) of the value of the work performed with materials provided, from time to time, and at all times the undisbursed balance of the said proceeds remaining in the hands of the Mortgagee shall be at least sufficient to pay the cost of completion of the work free and clear of liens. Mortgagor covenants and agrees that it shall be solely responsible for payment of all costs of rebuilding, restoration or repair in excess of the proceeds of insurance, including but not limited to the fees charged by any architect selected by Mortgagee (following consultation with Mortgagor) to review the plans and specifications submitted by Mortgagor for purposes of rebuilding, restoring or repairing any damage to the Mortgaged Property and the fee charged by any architect selected by Mortgagee to inspect the Mortgaged Property and make periodic reports during any rebuilding, restoration or repair of or to the Mortgaged Property, it being understood that Mortgagee shall have the right, at its option, and at Mortgagor's expense, to retain an architect to inspect the Mortgaged Property and make written reports to Mortgagee on the progress and quality of any rebuilding, restoration or repair work of, to or on the Mortgaged Property.

00000423

In case of loss after foreclosure proceedings have been instituted, the proceeds of any such insurance policy or policies, if not applied in rebuilding or restoring the Improvements upon the Mortgaged Property, shall be used to pay the amount due in accordance with any decree of foreclosure that may be entered in any such proceedings, and the balance, if any, shall be paid as the court may direct. In case of the foreclosure of this Mortgage, the court in its decree may provide that the Mortgagee's clause attached to each of such insurance policies, may be canceled and the decree creditor may cause a new loss payable clause to be attached to each of the said policies making the loss thereunder payable to such decree creditor; and any such foreclosure decree may further provide that, in case of one or more redemptions under said decree, if any, each redemption may cause the preceding loss clause attached to such insurance policies to be canceled and new loss payable clauses to be attached thereto making the losses thereunder payable to such redemption. In the event of a foreclosure sale, the Mortgagee is hereby authorized without consent of the Mortgagor, to assign any and all insurance policies to the purchaser at the sale, or to take such other steps as the Mortgagee may deem advisable, to cause the interest of such purchaser to be protected by any of such insurance policies;

Mortgagor shall also, at its sole cost and expense, obtain and maintain general public liability and worker's compensation insurance against claims for bodily injury or death occurring upon, in or about the Mortgaged Property, and such insurance shall afford protection in amounts reasonably required and approved by Mortgagee. Such policies shall name Mortgagee as an additional insured.

Mortgagor shall deliver all policies or certificates of insurance required by this instrument to Mortgagee promptly upon their issuance; and, if Mortgagor fails to do so, Mortgagee, at its option, may procure such insurance at Mortgagor's expense. All renewal and substitute policies of insurance shall be delivered at the office of the Mortgagee, premiums paid, at least ten (10) days before termination of policies theretofore delivered to Mortgagee.

(g)     Mortgagor shall promptly notify Mortgagee of the filing or threatened filing of any lien, suit, claim, or complaint in any court or administrative agency, or in any public record, or the commencement of any investigation by any governmental agency, which affects or might affect title to the Mortgaged Property, the validity or priority of the lien of this instrument, or which asserts the liability of Mortgagor for any expense alleged to have been incurred or tax alleged to be due with respect to the Mortgaged Property or the violation of any Legal Requirement in connection therewith or of the terms or conditions of any Governmental Permit. Mortgagee may participate in any negotiations or proceedings resulting from any such claim or suit to any extent that Mortgagee may reasonably deem necessary for the protection of its interest, and Mortgagor shall reimburse Mortgagee for all reasonable costs incurred by Mortgagee in so doing, including attorneys' fees;

(h)     In the event of the actual filing of any suit, administrative proceeding, notice of violation or affidavit claiming any lien, or other official act commencing any proceeding or investigation within the scope of the foregoing Paragraph, Mortgagor shall, if requested by Mortgagee, provide Mortgagee with a bond in an amount and with sureties reasonably satisfactory to Mortgagee to secure Mortgagee against any reasonable cost, loss or damage in connection therewith. If Mortgagor fails to supply such bond within thirty (30) days after request therefor, Mortgagee may, without prejudice to any other remedies of Mortgagee, defend such suit or claim in Mortgagor's name or compromise the same, as Mortgagee may, in its reasonable judgment, determine, and Mortgagor will reimburse Mortgagee for all reasonable expenses, including reasonable attorneys' fees, incurred in so doing and for any amount paid or agreed to be paid by Mortgagee in settlement thereof or pursuant to any final order of judgment against Mortgagor;

(i)     Mortgagor shall indemnify and hold harmless Mortgagee from and against any liability to third parties incurred as a result of any action taken or omitted by said Mortgagee (agent, independent contractor or agent thereof) in connection with this transaction or the Mortgaged Property pursuant to or not in violation of this instrument; provided, that this indemnity shall not apply to any acts of Mortgagee of a willful or grossly negligent nature. In the event that Mortgagee takes possession of and operates the Mortgaged Property at any time prior to foreclosure pursuant to Arkansas Rule of Civil Procedure 66 (or replacement thereof) or as provided in the Loan Documents, Mortgagee shall not be deemed a "mortgagee in possession" but may obtain liability insurance to protect Mortgagee against any such claim and claims arising from Mortgagee's own negligence, and Mortgagor shall reimburse Mortgagee for the reasonable cost of obtaining such insurance;

(j)     Mortgagor shall pay all reasonable costs, including reasonable attorneys' fees, incurred by Mortgagee:

-     in closing this transaction, including the preparation, execution and recording and keeping current of this instrument and the other Loan Documents whether at original closing or thereafter;

-     in supervising, and in the event of default enforcing, compliance with all warranties, covenants, and conditions herein provided or provided in the other Loan Documents, including but not limited to enforcement by judicial proceeding;

-     in taking possession of, operating, preparing for sale and selling the Mortgaged Property or any part thereof;

-     in collecting the Secured Indebtedness or any part thereof which may be at any time due and unpaid (including collection from any guarantor thereof), including collection through bankruptcy, insolvency, probate, or other judicial proceeding, or otherwise; and in releasing the liens of this instrument and any other lien given in connection herewith upon final payment of the Secured Indebtedness;

(k)     Mortgagor shall, when reasonably requested by Mortgagee, execute and deliver any other instruments which Mortgagee may require to correct any error herein, or in any instrument given in connection herewith, or to preserve or make effective the lien of this instrument or other liens given to secure the Secured Indebtedness.

3.4     **Negative Covenants.** Mortgagor shall not, without prior permission in writing from Mortgagee:

(a)     Convey, transfer, or encumber (except for liens in favor of Mortgagee) any of the Mortgaged Property, or contract to convey, transfer, or encumber the Mortgaged Property, or convey or transfer any right to manage (except pursuant to a written management agreement with a reputable real estate management firm approved by Mortgagee) any of the Premises or to receive any rents, profits, proceeds or any insurance proceeds thereof;

(b)     Except as contemplated by the Loan Agreement described in Section 7.1 of this instrument, remodel, add to, reconstruct, improve or demolish any of the Premises;

(c)     Create or suffer to be created any lien, encumbrance, easement, use or charge affecting any of the Mortgaged Property, except for leases executed in the ordinary course of Mortgagor's business and a lien which is covered by a bond in accordance with sub-paragraphs (e) and (h) of Section 3.3.

3.5     **Interest on Obligations Arising Hereunder.**  Every obligation of Mortgagor under the terms of this instrument to pay any sum to Mortgagee shall bear interest, in the case of any payment due to Mortgagee other than as a reimbursement, from the date when demand for such payment is made; and in the case of any reimbursement due Mortgagee for any cost, expense or other payment to a third party, from the date payment is made to such third party by Mortgagee until paid.  The rate of interest in either case shall be the rate provided in the Note.

3.6     **Subrogation.**  With respect to any liability of Mortgagor hereunder to reimburse Mortgagee for any amount paid by Mortgagee to any third party pursuant to any authorization herein or otherwise for the protection of Mortgagee or of the security afforded by this instrument, Mortgagee shall, without prejudice to any remedy otherwise provided herein, be subrogated to any rights or remedies of such third party against Mortgagor with respect to the amount so paid.

### ARTICLE IV
### DEFAULT

4.1     **Events of Default.**  The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)     If Mortgagor fails to pay any amount of the Secured Indebtedness, including principal, interest, costs, reimbursements and any other item of the Secured Indebtedness when the same becomes due, or within any applicable grace period, either as originally provided, or pursuant to any provision for demand or acceleration;

(b)     If any warranty of Mortgagor contained herein, in the Note, the Loan Agreement described in Section 7.1 hereof, or any representation or warranty otherwise made by Mortgagor to Mortgagee proves to be untrue in any material respect, when made or deemed made and after expiration of any cure period only if such matter can be cured by Mortgagor;

(c)     If (other than as described in subparagraph (a) above) Mortgagor breaches any covenant or condition contained herein, in the Note, the Loan Agreement, or in any of the other Loan Documents after expiration of the cure period;

(d)     If any suit, administrative proceeding or lien claim of the character described in sub-paragraphs (e) and (h) of Section 3.3 hereof is filed, and Mortgagor fails to provide a bond for the protection of Mortgagee as provided in said sub-sections;

(e)     If Mortgagor shall sell, encumber, or contract to sell or encumber, legal or equitable title to the Land;

(f)     If Mortgagor shall:

(1)     voluntarily suspend transaction of the business operated on the Premises;

(2)     become insolvent or unable to pay its debts as they mature;

(3)     file a voluntary petition under any bankruptcy laws;

(4)     make a general assignment for the benefit of creditors;

(5)     apply for or consent to the appointment of any receiver or trustee for all or any substantial portion of the Premises;

(g)     If an involuntary petition shall be filed with any court or other authority seeking the adjudication of Mortgagor as bankrupt or insolvent or proceedings with respect to Mortgagor is commenced under any bankruptcy law;

(h)     If any action, suit, proceeding or investigation shall be instituted against Mortgagor, the Mortgaged Property or the Premises, or which involves the validity or enforceability of this instrument, the Note which this instrument is given to secure, or the priority of the lien created hereby, at law or in equity, or before any Governmental Authority, which in the reasonable judgment of Mortgagee impairs or would impair its interest in the Premises, the enforceability of any of the Loan Documents executed in connection herewith or related hereto, or its ability to collect the Secured Indebtedness when due;

(i)     The dissolution, liquidation, or termination of the existence of Mortgagor;

(j)     If any other event not described in (a)-(i) above occurs which constitutes an Event of Default under the Loan Agreement described in Section 7.1 hereof or under any of the other Loan Documents; and

(k)     Should Mortgagor fail to timely perform or pay any other obligation now existing or hereafter incurred and owed by Mortgagor to Mortgagee.

Notwithstanding the first sentence of this Section 4.1, occurrence of the events listed in Section 4.1(c) and (j) shall not constitute an Event of Default until notice from Mortgagee to Mortgagor has been provided, if required in the Loan Agreement described in Section 7.1 hereof; provided, however, at any time when an Event of Default exists, Mortgagee may enter upon and take possession of the Mortgaged Property if, in Mortgagee's sole and reasonable judgment, such action is necessary to prevent significant loss of, damage to or diminution in value of such Mortgaged Property.

4.2     **Acceleration.**  Except for notice specified in Section 4.1 of this Loan Agreement, at any time when any Event of Default is continuing hereunder, Mortgagee may, without any prior notice to Mortgagor or any other person and without making any demand upon Mortgagor or any other person to cure such default, all rights to any such prior notice or demand being hereby expressly waived, declare the entire amount of the Secured Indebtedness, including all interest accrued thereon, to be immediately due and payable.  Whether or not Mortgagee elects to accelerate as herein provided, Mortgagee may simultaneously, or thereafter, without any further notice to Mortgagor, exercise any other right or remedy provided in this instrument or applicable law.

**4.3    Remedies When Secured Indebtedness Due and Unpaid.**  When any Event of Default is continuing hereunder and the Secured Indebtedness, or any part thereof, is due, whether by acceleration or otherwise, and is unpaid, Mortgagee, at its option, shall have the right to foreclose the lien hereof for such indebtedness or any part thereof through judicial proceedings or through use of the statutory Foreclosure Act of 1987, Ark. Code Ann. § 18-50-101, et seq., or pursuant to any other available remedy.  In any proceeding to foreclose the lien hereof, there shall be allowed and included an additional indebtedness payable to Mortgagee, whether in a decree for sale, mortgagee's deed or similar instrument, all reasonable expenditures and expenses which may be paid or incurred by or on behalf of the Mortgagee for attorneys' fees, filing and service of process fees, appraiser's charges, documentary and experts' evidence, stenographer's charges, publication costs, and any costs, which may be estimated, for procuring abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to title as the Mortgagee may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or the value of Mortgaged Property.  All expenditures and expenses of the nature in this Paragraph mentioned, and such expenses and fees as may be incurred in the protection of the Mortgaged Property and the maintenance of the lien of this Mortgage, including the fees as may be incurred in the protection of the Mortgaged Property and the maintenance of the lien of this Mortgage, including the fees and costs of any attorney employed by Mortgagee in any litigation or proceeding affecting this Mortgage, the Note or the Mortgaged Property, including bankruptcy proceedings, or in preparations for the commencement of defense of any proceedings or threatened suit or proceeding, shall be immediately due and payable by the Mortgagor, with interest thereon at the rate provided in the Note from the date expended until repaid and the same shall be secured by this Mortgage.

Mortgagee's remedies hereunder shall be cumulative of all others, and no resort to any one remedy shall preclude simultaneous or subsequent pursuit of any other remedy until Mortgagee has obtained full satisfaction, nor shall any resort to any remedy exhaust the same or preclude Mortgagee from again pursuing the same remedy so long as any amount remains due and unpaid.

**4.4    Remedies Where No Amount of Secured Indebtedness Due.**  In the event of any breach of this Agreement which constitutes an Event of Default hereunder, Mortgagee may, if it so desires, without regard to whether any amount of the Secured Indebtedness is then due and unpaid, and without resort to any right of acceleration but without waiving such right, file and prosecute suit against Mortgagor or any other person legally answerable therefor to recover any actual damages sustained as a result of any breach of this instrument, or to enforce compliance herewith, and whether or not it does so, cure such default for the account of Mortgagor.  All sums expended and costs incurred by Mortgagee in so curing shall, at the election of Mortgagee, either (i) be deemed advances made to Mortgagee pursuant to the Loan Agreement, if any, or (ii) constitute additional indebtedness of Mortgagor to Mortgagee, due on demand, to which the provisions of Sections 3.5 and 3.6 shall apply and, in either case, shall be part of the Secured Indebtedness.  The rights of Mortgagee under this Section are cumulative of and shall not preclude the simultaneous or subsequent resort to any rights or remedies otherwise provided in this Article, or by applicable law.

**4.5    Receivership.**  Upon, or at any time after, the filing of a complaint to foreclose this Mortgage, the court in which such complaint is filed may appoint a receiver of said Mortgaged Property.  Such appointment may be made either before or after sale, with or without notice, and without regard to the insolvency or solvency of the Mortgagor at the time of the application for such receiver and without regard to the then value of the Mortgaged Property.  Such receiver shall have the power to collect the rents, issues and profits of the said Mortgaged Property during the pendency

of any such foreclosure suit and, in case of a sale and a deficiency, up to time when possession shall be given to the purchaser at such foreclosure sale, and all other powers which may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Mortgaged Property during the whole of said period. The court from time to time may authorize the receiver to apply the net income in his hands in payment in whole or part to: (a) the indebtedness secured hereby (the Secured Indebtedness), or by any decree foreclosing this Mortgage, or any tax, special assessment or other lien which may be or become superior to the lien hereof or of such decree, provided such application is made prior to foreclosure sale; or (b) the deficiency in case of a sale under foreclosure resulting in a deficiency.

**ARTICLE V**
<u>POSSESSION</u>

     5.1    **Prior to Default.** Notwithstanding language of grant herein, Mortgagor shall retain possession of the Mortgaged Property and all rights to manage and control the same, except as otherwise expressly provided herein or in any other of the Loan Documents, so long as no Event of Default has occurred hereunder. The Mortgagee shall, however, be entitled to reasonable access during normal business hours.

     5.2    **Upon Default.** At any time when any Event of Default is continuing hereunder, or when otherwise specifically authorized hereby, whether before or after declaration of the entire balance of the principal secured hereby in accordance with its option so to do, or whether before or after the institution of legal proceedings to foreclose the lien hereof or before or after sale thereunder, upon demand of the Mortgagee, the Mortgagor shall forthwith surrender to the Mortgagee and the Mortgagee shall be entitled to take actual possession of the Mortgaged Property or any part thereof, personally, or by its agents or attorneys, as for a condition broken, and the Mortgagee, in its discretion and in the exercise of good faith may, with or without force and with or without process of law, enter upon and take and maintain possession of all or any part of the Mortgaged Property, together with all documents, books, records, papers and accounts of the Mortgagor or the then owner of the Mortgaged Property relating thereto, and may exclude the Mortgagor, its agents or servants wholly therefrom and may as Attorney-In-Fact or agent of the Mortgagor, or in its own name as Mortgagee and under the powers herein granted, hold, operate, manage and control the Mortgaged Property and conduct the business, if any, thereof, either personally or by its agents, and with full power to use such measures, legal or equitable, as in its reasonable discretion or in the proper discretion of its successors or assigns may be deemed proper in the exercise of good faith or necessary to enforce the payment or security of the rents, issues and profits of the Mortgaged Property, including action for the recovery of rents, action in unlawful detainer and actions in distress for rent, hereby granting full power and authority to exercise each and every of the rights, privileges and powers herein granted at any and all times hereafter, without notice to the Mortgagor, and with full power to cancel or terminate any lease or sublease for any cause on any ground which would entitle the Mortgagor to cancel the same, to elect to disaffirm any lease or sublease made subsequent to this Mortgage or subordinated to the lien hereof, to make all necessary or proper repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements to the Mortgaged Property as it may deem judicious, insure and reinsure the same and all risks incident to Mortgagee's possession, operation and management thereof and to receive all of such rents, issues and profits.

     Any lessee of the Mortgaged Property (or any portion thereof) takes its interest therein subject to this Mortgage and, in the event title or possession of the Mortgaged Property is obtained

by Mortgagee or its agent or a purchaser at foreclosure sale, the person or entity obtaining title or possession, including the Mortgagee, shall have the right, but shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any lease affecting all or any portion of the Mortgaged Property, and the Mortgagor shall and does hereby agree to indemnify and hold the Mortgagee harmless of and from any and all liability, loss or damage which it might or may incur under any such leases or under or by reason of the assignment thereof and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in said leases, except for liabilities, losses or damage resulting from Mortgagee's own negligence or willful misconduct. Should the Mortgagee incur any such liability, loss or damage under said leases or under or by reason of the assignment thereof, or in the defense of any claims or demands, the amount thereof including costs, expenses and reasonable attorneys' fees, shall be hereby secured, and the Mortgagor shall reimburse the Mortgagee therefore immediately upon demand. Upon written request from Mortgagor, Mortgagee shall execute a reasonable (in Mortgagee's sole discretion) non-disturbance agreement in favor of any tenant claiming any possessory interest in the Premises pursuant to a written lease agreement provided such tenant has executed a subordination and attornment agreement in form and content reasonably satisfactory to Mortgagee.

In the event of a foreclosure of this Mortgage, the court shall direct a sale of the Mortgaged Property as is herein described at public sale, to the highest bidder, at the courthouse for an in the county where the Land is located, public notice of the time, the terms and place of sale having first been given twenty (20) days prior to said sale by advertising in some newspaper printed and published in the county where the Land is located, by at least three (3) insertions, at which sale any of the parties hereto, their heirs, successors or assigns, may bid and purchase as any third person might do. In the event of a foreclosure of this instrument, the proceeds of the sale of said property shall be applied after the payment of the reasonable costs and expenses of the foreclosure proceeding first, to the payment of all sums advanced and expended under the authority of this instrument for taxes, special assessments, fire and other hazard insurance premiums and abstract of title expense, with interest thereon; second, to the payment of the Note secured hereby or of any note taken in extension or renewal thereon; third, to the payment of any other indebtedness secured hereby; fourth, the remainder, if any after payment of all the aforementioned indebtedness in full, with interest, to the Mortgagor, its heirs and assigns. And any deed made by Mortgagee in pursuance of the power herein granted and all recitals therein contained shall be prima facie evidence of the facts therein set forth.

## ARTICLE VI
## ASSIGNMENT OF LEASES AND RENTS

6.1     **Assignment.** Mortgagor hereby presently and irrevocably grants, bargains, sells, conveys, aliens and assigns to Mortgagee all of Mortgagor's interest as Lessor in any and all leases or rental agreements (oral or written) now or hereafter existing with respect to any part of the Mortgaged Property, and all rentals, issues and profits due or which may become due to Mortgagor under the terms of such leases or rental agreements (oral or written).

6.2     **Additional Covenants and Warranties of Mortgagor.** Mortgagor hereby covenants and warrants to Mortgagee that it has not executed any prior assignment or pledge of any leases or rents related to the Premises, that no default exists on the part of any lessee or assignor as lessor in the performance of their respective covenants and obligations thereunder, that no lessee has

any right of setoff against Mortgagor, that Mortgagor has not granted any modification whatsoever of said leases except as heretofore approved by Mortgagee, that said leases are valid and enforceable in accordance with their original terms, and that no rent has been paid in advance under said leases save as required by the terms thereof.

6.3   **Rights of Mortgagor Prior to Default.**  This assignment is an absolute assignment and not an assignment as security only. However, so long as no Event of Default exists hereunder, Mortgagor shall have a revocable license to collect all rents due or which may become due under any of the assigned leases (provided that Mortgagor may not accept prepayment of any rent due more than one month in advance unless it has received the prior written consent of Mortgagee to such action which shall not be unreasonably withheld), to execute new leases, to renew and extend leases, to enforce any covenants or conditions of such leases, and otherwise to deal with such leases as if Mortgagor were the owner thereof. In no event, however, shall Mortgagor, without prior written permission of Mortgagee which shall not be unreasonably withheld, accept a surrender of any such lease, or modify any such lease in a manner which would materially amend or modify any such lease so as to have an adverse effect on Mortgagee's interest therein. Such material modifications include but are not limited to payments of rent more than thirty (30) days in advance, reduction of rent and modification in the length of the term of any such lease.

6.4   **Rights of Mortgagee Upon Default.**  From and after the occurrence of any Event of Default hereunder, Mortgagor acknowledges revocation of the license granted in Section 6.3, thus no longer having any rights with respect to any leases or rents assigned hereby, and Mortgagee shall be entitled to notify any lessees to pay all rentals due, or which may thereafter become due, under such leases directly to Mortgagee (MORTGAGOR HEREBY DIRECTING AND AUTHORIZING ALL TENANTS UNDER SUCH LEASES TO PAY ALL RENTS AND OTHER AMOUNTS DUE UNDER SUCH LEASES TO MORTGAGEE UPON DEMAND WITHOUT THE NECESSITY OF ANY FURTHER CONSENT OF OR LIABILITY TO MORTGAGOR AND ANY TENANT SHALL BE ENTITLED TO RELY UPON A WRITTEN DEMAND BY MORTGAGEE FOR SUCH PAYMENT AND SHALL BE FULLY PROTECTED FROM ANY CLAIMS BY MORTGAGOR FOR ALL PAYMENTS MADE TO MORTGAGEE FOLLOWING SUCH DEMAND FROM MORTGAGEE), and in all other respects to exercise all the rights and privileges of ownership of such leases, either in its own name or in Mortgagor's name. Without in any way limiting the foregoing, Mortgagee shall have the right, power and privilege (but shall be under no duty) to take possession of the Mortgaged Property subject to any lease and have, hold, manage, lease and operate the same on such terms and for such period of time as Mortgagee may deem proper; and either with or without taking possession of the property subject to any lease, Mortgagee shall have the right, power and privilege (but shall be under no duty) immediately to demand, collect and sue for, in its own name or in the name of Mortgagor, all rents, rentals and other sums of money due and payable under the leases, as they become due and payable, including those past due and unpaid, and to apply such rents, rentals and other sums of money (in such order as Mortgagee shall determine) to the payment of:

(a)   All reasonable expenses of managing the Mortgaged Property subject to any lease, including but not limited to the salaries, fees and wages of a managing agent and such other employees as Mortgagee may deem necessary or desirable, and all reasonable expenses of operating and maintaining the property subject to any such leases, including but not limited to all taxes, assessments, charges, claims, utility costs, and premiums for insurance, and the costs of all alterations, renovations, repairs or replacements, and all reasonable expenses incident to taking and

retaining possession of the property subject to any lease or collecting the rent, rentals and other sums of money due and payable under any lease; and

(b)      The Note, principal and interest, and reasonable attorneys' and collection fees, in such order as Mortgagee, in its sole discretion, may determine. A written demand by Mortgagee under such leases for the payment of rents, rentals and other sums of money that become due under the leases shall be sufficient to warrant such lessees or tenants to make all future payments of such rents, rentals and other sums of money directly to Mortgagee without the necessity of further consent by or from Mortgagor. Each such lessee or tenant shall be entitled to rely upon a written demand by Mortgagee for such payment and shall be fully protected from any claims by Mortgagor for all payments made to Mortgagee after receipt of such written demand.

Mortgagee shall not be liable for any loss sustained by Mortgagor resulting from Mortgagee's failure to let the Mortgaged Property subject to any lease, or any part thereof, or from any other act or omission of Mortgagee in managing the Mortgaged Property subject to any lease.

6.5      **Exculpation of Mortgagee/Assignee.**      The acceptance by Mortgagee of this Assignment of Leases and Rents (as a result of Mortgagee's acceptance and recordation of this instrument), with all of the rights, powers, privileges and authority created hereby, shall not, prior to entry upon and taking possession of the Mortgaged Property by Mortgagee, be deemed or construed to constitute Mortgagee as a "mortgagee in possession" nor thereafter or at any time or in any event obligate the Mortgagee to appear in or defend any action or proceeding relating to the leases, the rents, issues and profits due or to become due therefrom, or the Mortgaged Property, or to take any action hereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under any leases, or to assume any obligation or responsibility for any security deposits or other deposits delivered to Mortgagor/Assignor by any lessee or tenant and not assigned and delivered to Mortgagee, nor shall Mortgagee be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property.

6.6      **Mortgagor's Indemnity.**  Mortgagor agrees to and shall indemnify Mortgagee in respect of, and save and hold Mortgagee harmless from, any and all claims, liability, loss, damage or expense whatsoever which may be incurred by or asserted against Mortgagee under any lease or by virtue of this Assignment, solely except matters which are solely the fault of Mortgagee.

6.7      **No Merger.**  Notwithstanding the conveyance or transfer of title to any or all of the Premises to any lessee under any lease (or to any sublessee under any sublease), the lessee's leasehold estate under such lease or sublease shall not merge into the fee estate (or such other estate as may be held by Mortgagor), and the lessee shall remain obligated under such lease as assigned under this Article.

6.8      **Reassignment.**  Upon final release of this Mortgage, Mortgagee shall reassign to Mortgagor or its successors all leases assigned by this Article.

### ARTICLE VII
### MISCELLANEOUS PROVISIONS

7.1      **Definitions.**  This Mortgage is executed and delivered pursuant to a Construction and Loan Agreement among Mortgagor and Mortgagee of even date herewith (the "Loan Agreement").

All terms defined in the Loan Agreement and used herein shall have the same meaning herein as assigned to such terms in the Loan Agreement unless a different meaning is expressly stated herein or unless the context requires otherwise; any capitalized terms used herein which are not defined in the Loan Agreement or herein shall have the meaning required by the context in which they are used and customarily given to such terms. The terms, provisions and conditions of the Loan Agreement are hereby incorporated by reference.

7.2    **Security Agreement: Financing Statement.**  As to such portion of the Mortgaged Property as is personal property, and except for removable trade fixtures and personal property of Tenants in possession, this instrument constitutes a Security Agreement within the meaning of Article 9 of the Uniform Commercial Code, Ark. Code Ann. § 4-1-101, et seq. (the "Code") as the same is in force and effect in Arkansas, the Mortgagor hereby granting and giving Mortgagee a security interest in and to all property described in this Mortgage, other agreements between Mortgagor and Mortgagee, and as set forth on Exhibit B, with the intention that such security interest shall immediately attach. In addition, as to such portion of the Mortgaged Property as is or may become fixtures, affixed to the real estate described in Article I hereof, this instrument shall constitute a "fixture filing" pursuant to Ark. Code Ann. § 4-9-502. The following information is accordingly included:

(a)    The name of the debtor is EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP, an Arkansas limited partnership.

(b)    The name of the secured party is ARVEST BANK, an Arkansas state bank.

(c)    The address of the secured party ("Mortgagee") from which information may be obtained is set forth in the heading of this instrument.

(d)    The mailing address of the debtor ("Mortgagor") is set forth in the heading of this instrument.

(e)    A description of the collateral is set forth in Article I (and **Exhibits A and B**) hereof.

(f)    A legal description of the real estate to which the collateral is or may become fixed is set forth in Article I hereof.

In addition to Mortgagee's other rights hereunder, Mortgagee shall also have all the rights of a secured party under the Code. Mortgagor authorizes Mortgagee to file on its behalf and also agrees, if requested by Mortgagee, to execute and deliver to Mortgagee all financing or continuation statements that may be required or desired by Mortgagee to establish or maintain the validity, perfection and priority of Mortgagee's security interest, and Mortgagor shall bear all costs related thereto, including all Code (lien) searches reasonably required by Mortgagee. If Mortgagee should dispose of any of the Mortgaged Property pursuant to the Code, ten (10) days' written notice by Mortgagee to Mortgagor of Mortgagee's intent to do so shall be deemed reasonable notice; provided specifically, however, Mortgagee may, at its option, dispose of such property in accordance with the foreclosure proceedings of this instrument in lieu of proceeding under the Code.

00000458

7.3    **Waiver or Release.** Mortgagee may, by instrument in writing:

(a)    Consent to the doing of any act prohibited hereby, or to the omission of any act required hereby.

(b)    Release from the operation hereof any part of the Mortgaged Property or any other property or rights held as security for the Secured Indebtedness.

(c)    Grant any extension, modification or partial forgiveness of the Secured Indebtedness.

No such consent, release or modification shall have any effect beyond its express terms.

7.4    **No Implied Waiver.** No failure of Mortgagee to declare any default or to exercise any right or remedy herein provided in any one or more instances or for any period of time, and no acquiescence in, or acceptance by Mortgagee of, any late or defective notice or performance hereunder shall be deemed a waiver of any provision hereof. Notwithstanding any such acquiescence or indulgence, Mortgagee shall at all times have the right, without any prior notice to or demand upon any person, to require strict performance of each and every term and provision hereof. At any time when any event of default is continuing hereunder, Mortgagee may, without any prior notice to Mortgagor or any other person except such notice as may be herein otherwise required, exercise any right or remedy of Mortgagee arising by reason of such default, notwithstanding the length of time such event of default has been continuing, or the occurrence in the past of similar events or events of default for which no remedy has been revoked.

7.5    **Security Not Affected by Other Security.** The liens provided for herein shall not affect nor be affected by any other security or guaranty now or hereafter existing with respect to the Secured Indebtedness or any part thereof, nor shall they be affected by the release of any such other security or guaranty.

7.6    **Waiver of Certain Provisions of Law.** Mortgagor hereby expressly waives, to the maximum extent permitted by law, any of the following rights: notice of acceleration, demand prior to foreclosure, presentment, protest, notice of protest, marshaling of assets, appraisement, stay, equitable and statutory redemption, foreclosure in any particular order. Without limiting the foregoing, Mortgagor expressly waives all rights of redemption conferred by Act 153 of 1899 (codified at Ark. Code Ann. § 18-49-106, as amended from time to time).

7.7    **Usurious Interest Prohibited.** It is the intention of Mortgagor and Mortgagee to strictly comply with applicable usury law, as preempted by federal law, including without limitation 12 U.S.C. §1831 (u). In no event, and upon no contingency, shall the Mortgagee or subsequent holder hereof ever be entitled to receive, collect or apply as interest, any interest, fees, charges or other payments equivalent to interest, in excess of the Maximum Rate which Mortgagee may lawfully charge under applicable statutes and laws from time to time in effect; and in the event the Mortgagee or subsequent holder hereof ever receives, collects, or applies as interest, any such excess, such amount which, but for this provision, would be excessive interest, such amount shall be applied to the reduction of the principal amount of the indebtedness hereby evidenced; and if the principal amount of the indebtedness evidenced hereby, all lawful interest thereon and all lawful fees and charges in connection therewith, are paid in full, any remaining excess shall forthwith be paid to Mortgagor, or other party lawfully entitled thereto. Any provision hereof or any other agreement

between the Mortgagee and Mortgagor that operates to bind, obligate or compel the undersigned to pay interest in excess of the Maximum Rate shall be construed to require the payment of the Maximum Rate only. The provisions of this paragraph shall be given precedence over any other provision contained herein, or in any other agreement between the holder and the undersigned that it is in conflict with the provisions of this paragraph. The provisions of this Paragraph 7.7 shall be given precedence over any other provision contained herein or in any other agreement between Mortgagor and Mortgagee that is in conflict with the provisions of this paragraph 7.7.

If any provision of this Agreement shall be construed to be invalid or unenforceable, the remaining provisions of this Agreement shall not be affected by such invalidity or unenforceability. Each term or provision hereof shall, however, be valid and be enforced to the fullest extent permitted by law.

7.8    **Notice.** All notices, demands and requests given or required to be given by either party hereto to the other party shall be in writing. All such notices, demands and requests by the Lender to the Borrower shall be deemed to have been properly given if served in person or mailed by United States registered or certified mail, return receipt requested, postage prepaid, or by Federal Express, Airborne or any other insured and reputable overnight delivery service, addressed to the Mortgagor at the following address:

> **EASTSIDE LOFT APARTMENTS**
> **PHASE II LIMITED PARTNERSHIP,**
> an Arkansas limited partnership
> 2004 Main Street
> Little Rock, Arkansas 72206
> Attention: Steven W. Hitt

or to such other address as the Mortgagor may from time to time designate by written notice to the Lender given as herein required. All notices, demands and requests by the Mortgagor to the Lender shall be deemed to have been properly given if served in person or mailed by United States registered or certified mail, return receipt requested, postage prepaid, or by Federal Express, Airborne or any other insured and reputable overnight delivery service, addressed to the Mortgagee at the following address:

> **ARVEST BANK,**
> an Arkansas state bank
> 500 Broadway Place
> Little Rock, Arkansas  72202
> Attention:  Mark Norwine, Vice President

or to such other address as the Mortgagor may from time to time designate by written notice to the Mortgagor given as herein required.

Notices, demands and requests sent pursuant to this Paragraph 7.8 shall be deemed to be received (i) if personally delivered in the manner aforesaid, on the date of delivery, (ii) if sent by registered or certified mail in the manner aforesaid, on the earlier of the second (2nd) business day following the day sent, or (iii) if sent by overnight delivery service in the manner aforesaid, on the next business day immediately following the day sent.

7.9     **Additional Documents.**  Mortgagor shall execute, file, or refile (or cause to be executed, filed or refiled), such mortgages, security instruments, financing statements, continuation statements, modification agreements, and like documents as Mortgagee may from time to time require or desire to perfect, maintain or continue the priority of its lien and any and all security interests or assignments granted or created or intended to be created by Mortgagor to secure payment of the Secured Indebtedness.  Mortgagor will and hereby does agree to execute, acknowledge and deliver to Mortgagee such other and further assurances and documents as Mortgagee shall require to cure or eliminate any omission, mistake or ambiguity in the Mortgage or any of the other Loan Documents.

7.10     **Integration.**  This instrument and the other Loan Documents of even date herewith constitute the entire agreement of the parties to the exclusion of any prior or contemporaneous agreement, oral or written.

7.11     **Successors and Assigns, Third Party Beneficiaries.**  This instrument shall be binding on and shall inure to the benefit of the heirs, successors and assigns of each party, but Mortgagor shall not be relieved of any duty hereunder by assignment, unless Mortgagee expressly agrees thereto in writing.  Except as provided in the foregoing sentence or otherwise specifically provided herein, no person shall be a third party beneficiary of any warranty or covenant herein contained.

7.12     **Principles of Construction.**  In this instrument the singular number shall include the plural and vice versa.  All pronouns shall include masculine, feminine and neuter gender, regardless of gender used.  Titles of articles and sections are for convenience and shall not limit the operation of any provision.  All Exhibits attached hereto are incorporated herein for all purposes.

7.13     **Severability.**  If any part of this instrument is invalid or unenforceable, all other provisions shall nevertheless remain in full force and effect.

7.14     **Counterparts.**  This instrument may be executed in multiple counterparts, any one of which shall be an original, and all of which shall constitute one instrument.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN TESTIMONY WHEREOF, Mortgagor has caused this instrument to be executed on this 29th day of August, 2006.

MORTGAGOR:

**EASTSIDE LOFT APARTMENTS
  PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:     Its General Partner
        **EASTSIDE LOFTS GP PHASE II, LLC,**
        an Arkansas limited liability company

        By: _____
            ~~Authorized Member~~ MANAGER

MORTGAGEE:

**ARVEST BANK,**
an Arkansas state bank

By: _____
Name: _____
Title: _____

STATE OF ARKANSAS    )
                      ) ss:        **ACKNOWLEDGMENT**
COUNTY OF PULASKI    )

On this day personally appeared before the undersigned, a Notary Public within and for the County and State aforesaid, duly qualified, commissioned and acting, the within named _Sharon W. Hict_ an authorized member of **EASTSIDE LOFTS GP PHASE II, LLC**, the General Partner of **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, and stated that he was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said limited partnership, and further stated and acknowledged that he had so signed, executed and delivered the foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 29 day of August, 2006.



_____
Notary Public

My commission expires:

(SEAL)

STATE OF ARKANSAS    )
                      ) ss.        **ACKNOWLEDGMENT**
COUNTY OF PULASKI    )

On this day, before me, a Notary Public, duly commissioned, qualified and acting, with and for said County and State, appeared in person the within named _Mark Nowin_, to me well known, who stated that he was _V. P._ of **ARVEST BANK**, an Arkansas state bank, and was duly authorized in that capacity to execute the foregoing instrument for and in the name and on behalf of said bank, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 29 day of August, 2006.

_____
Notary Public

My commission

(SEAL)

## EXHIBIT A

| | |
|---|---|
| Borrower/Debtor/<br>Mortgagor/Record Owner: | **EASTSIDE LOFT APARTMENTS**<br>  **PHASE II LIMITED PARTNERSHIP,**<br>an Arkansas limited partnership<br>2004 Main Street<br>Little Rock, Arkansas  72206 |
| Lender/Secured Party/<br>Mortgagee/Creditor: | **ARVEST BANK,**<br>an Arkansas state bank<br>500 Broadway Place<br>Little Rock, Arkansas  72201 |
| Facility/Collateral/Personal Property: | Description of Personalty is on **EXHIBIT B** |

Legal Description:

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas, and being shown on plat records as Plat No. F-931, records of Pulaski County, Arkansas.

AND all bridges, easements, rights-of-way, licenses, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, minerals, landscaping, flowers, plants, shrubs, trees, timber and other emblements now or hereafter located on the above-described real property under or above the same or any part thereof or appurtenant to the title to the above-described real property, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversion and reversions, remainder and remainders, whatsoever, in any way belonging, relating or appertaining to the above-described real property or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired and all rights, titles and interests in and to any vacating or hereafter vacated streets or roads adjoining the above-described real property and any and all reversionary or remainder rights.

1

**EXHIBIT A**

## EXHIBIT B

00000443

| | |
|---|---|
| Borrower/Debtor/<br>Mortgagor/Record Owner: | **EASTSIDE LOFT APARTMENTS**<br>  **PHASE II LIMITED PARTNERSHIP,**<br>an Arkansas limited partnership<br>2004 Main Street<br>Little Rock, Arkansas  72206 |
| Lender/Secured Party/<br>Mortgagee/Creditor: | **ARVEST BANK,**<br>an Arkansas state bank<br>500 Broadway Place<br>Little Rock, Arkansas  72201 |

Facility/Collateral/Personal Property:

All buildings, structures, improvements, fixtures, fittings, building materials, machinery, furniture, furnishings, appliances, materials, equipment, accounts, contract rights, general intangibles, payment intangibles, deposit accounts, inventory, leasehold interests, and all other tangible and intangible personal property of every kind and description whether now owned or hereafter acquired, which were, are, or hereafter are owned or hereafter acquired, which were, are, or hereafter are located on or associated with the operation and use of the real estate described in Exhibit A (the "Property"), wherever located, and all accessories, alterations, additions, accessions, products and proceeds, including, but not limited to: (a) all attachments, walks, ways, and parking facilities affixed thereto, located in, upon or intended for use in or upon the Property (whether stored or located thereon or elsewhere); (b) all fixtures including without limitation, all lighting, heating, air conditioning, plumbing and electrical fixtures, equipment, machinery, appliances, light fixtures, storm doors, water heaters, cooking systems, refrigeration systems, cleaning equipment, venting systems, awnings, window coverings, floor coverings, smoke detectors, fire extinguishing systems, sprinkler systems, burglar alarm systems, gas, water and electrical equipment, elevators, escalators, attached shelving, partitions, carpeting, communications equipment, boilers, furnaces, motors, window shades, screens, awnings, canopies, safes, security deposits, ledgers and books of account and records, files, computer programs, disks and tapes, and related electronic data processing software with respect to the Property, together with all accessions, used or intended to be used, now owned or hereafter acquired, and all improvements, appurtenances, substituted and replaced fixtures and any proceeds, including without limitation insurance proceeds, thereof, (c) all contract rights (including without limitation all construction, architectural, engineering and other contracts relating to renovation or construction of improvements on the real estate described on the attached Exhibit A), leases, occupancy agreements, rents, income, revenues, earnings, royalties, issues and profits, and all guaranties thereof, presently existing or subsequently arising with respect to the Property or the Collateral; (d) all accounts, accounts receivable, chattel paper, documents, investment property, securities entitlements, instruments, money, cash and the right to withdraw cash, bank accounts, security deposits, utility deposits, claims to rebates, refunds or abatements of real estate taxes, special assessments or other taxes, plans and specifications, surveys, architectural or engineering studies, drawings and other information or analysis of whatever nature, permits, certificates of occupancy, environmental certificates, licenses and permits, all other licenses, warranties and guaranties with respect to the Property or on any of the tangible or intangible personal property set forth herein, all signs, brochures, advertising, good will, copyrights, trade names, trademarks, and phone numbers now owned or hereafter acquired or wherever located relating to the Property or any of the tangible or intangible personal property set forth herein; and (e) all proceeds, proceeds of insurance, eminent domain or condemnation awards with respect to such Property and improvements and the aforementioned personal property.

1

**EXHIBIT B**

2006068513
08/30/2006 08:32:40 AM
Filed & Recorded in
Official Records of
PAT O'BRIEN
PULASKI COUNTY
CIRCUIT/COUNTY CLERK
Fees $32.00

<u>THIS INSTRUMENT PREPARED BY</u>
<u>AND AFTER RECORDING RETURN TO:</u>

Randal B. Frazier, Esq.
Quattlebaum, Grooms, Tull & Burrow PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700



## ARKANSAS ABSOLUTE ASSIGNMENT OF RENTS AND LEASES

KNOW ALL PERSONS BY THESE PRESENTS:

    THAT THIS ABSOLUTE ASSIGNMENT OF RENTS AND LEASES (the "Assignment") made and entered into as of this 29th day of August, 2006, by **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, whose address is 2004 Main Street, Little Rock, Arkansas 72206 ("Assignor"), in favor of **ARVEST BANK**, an Arkansas state bank, whose address is 500 Broadway Place, Little Rock, Arkansas 72202 ("Assignee");

### WITNESSETH:

    THAT FOR AND IN CONSIDERATION OF TEN DOLLARS ($10.00) cash in hand paid by Assignee to Assignor and the debt hereinafter mentioned, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby presently bargain, grant, sell, convey, deliver, confirm and warrant unto Assignee, its successors and assigns, as a present and absolute assignment and not merely one for security, all of the right, title and interest of Assignor in and to all rental agreements, leases, subleases or other instruments now or hereafter entered into, whether oral or written, which demise any portion of the real property located in Pulaski County, Arkansas, and described in **Exhibit A** attached hereto (the "Property"), together with any and all extensions and renewals thereof (all such rental agreements, leases and subleases being hereinafter collectively referred to as the "Leases," some of which may be attached as **Exhibit B** hereto, but not essential to the conveyance and assignment represented hereby), together with any guarantees of the tenant's obligations thereunder, together with the immediate and continuing right to collect and receive all rents, income, payments and profits arising out of the Leases or out of the Property or any part thereof, together with the right to all proceeds payable to Assignor pursuant to any purchase options on the part of the tenants under the Leases, together with all payments derived therefrom, including but not limited to claims for recovery of damages done to the Property by any tenants or subtenants or for the abatement of any nuisance existing thereon as the result of the conduct of any tenant or subtenant, claims for damages resulting from default under the Leases whether resulting from acts of insolvency or acts of bankruptcy or otherwise, and lump sum payments for the cancellation of the Leases or the waiver of any obligation or term thereof prior to the expiration date (hereinafter collectively referred to (and intended by all parties to be considered, for purposes of 11 U.S.C. §§ 363, 552, to be included) as the "Rents").

to (and intended by all parties to be considered, for purposes of 11 U.S.C. §§ 363, 552, to be included) as the "Rents").

AND ASSIGNOR FURTHER AGREES, ASSIGNS AND COVENANTS AS FOLLOWS:

1.   **Performance of Leases.**  To faithfully abide by, perform and discharge each and every obligation, covenant and agreement of the Leases by the lessor to be performed; to use its best efforts to enforce or secure the performance of each and every obligation, covenant, condition and agreement of the Leases by the tenants to be performed; not to borrow against, pledge or assign any rentals due under the Leases, nor consent to a subordination or assignment of the interests of the tenants thereunder to any party other than Assignee, nor anticipate the rents thereunder for more than one month in advance or reduce the amount of the Rents and other payments thereunder.

2.   **Protect Security.**  At Assignor's sole cost and expense, to appear in and defend any action or proceeding arising under, growing out of or in any manner connected with the Leases or the obligations, duties or liabilities of the lessor thereunder and to pay all costs and expenses of Assignee, including attorneys' fees in a reasonable sum, at any such action or proceeding in which Assignee in its sole discretion may appear.

3.   **Representations and Warranties.**  Assignor hereby represents and warrants: (i) Assignor has full right and title to assign the Leases and Rents; (ii) no other assignment of any interest therein has been made by Assignor; (iii) there are no existing defaults of a material nature under the provisions of the Leases; and (iv) the tenants under the Leases have no defenses, setoffs or counterclaims against Assignor.

4.   **Absolute and Present Assignment.**  It is understood and agreed the Assignment granted herein shall constitute a perfected, absolute and present assignment from Assignor to Assignee and not an assignment for security purposes only.  Notwithstanding the foregoing, unless and until an Event of Default should exist under the terms of that certain (i) Negotiable Term Promissory Note of even date herewith in the principal amount of Three Million and No/100 United State Dollars ($3,000000.00), executed by Assignor in favor of Assignee (the "Note"), (ii) Construction Mortgage (with Security Agreement, Absolute Assignment of Rents and Leases, Fixture Filing and Financing Statement) of even date herewith given to secure payment of the Note (the "Mortgage"), executed by Assignor in favor of Assignee, or (iii) Construction Loan Agreement (the "Loan Agreement"), of even date herewith, executed by Assignor and delivered to Assignee, or default (beyond any applicable cure periods) pursuant to any other loan agreement by and between Assignor and Assignee, or default (beyond any applicable cure periods) under any of the other Loan Documents (defined below), Assignor shall have the right to collect, but not prior to accrual, all of the Rents and to retain, use and enjoy the same.

5.   **No Obligation Upon Assignee.**  Assignee's acceptance of the assignment of Leases and Rents provided for herein shall not obligate Assignee to appear in nor defend any proceeding relating to any of the Leases or to the Property, take any action hereunder, expend any money, incur any expenses or perform any obligation or liability under the Leases or assume any obligation for any deposits delivered to Assignor by any tenant.  Notwithstanding the foregoing, should Assignor fail to perform, comply with or discharge any obligations of Assignor under any Lease, or should Assignee become aware of or be notified by any tenant under any Lease of a failure on the part of Assignor to so perform, comply with or discharge its obligations under the Lease, Assignee may, without waiving or releasing Assignor from any obligation contained in this Assignment, the Note, the Mortgage, the



Loan Agreement, or other documents or instruments concerning, evidencing or securing the obligation of Assignor to Assignee (collectively, the "Loan Documents"), remedy such failure, and Assignor hereby agrees to repay upon demand all sums incurred by Assignee in remedying any such failure together with interest at the rate then in effect under the terms of the Loan Documents. All such sums, together with interest as aforesaid, shall become additional indebtedness due under the Loan Documents, but no such event shall be deemed to relieve Assignor from any default hereunder or thereunder.

6. **Remedies.** Upon or at any time after the occurrence of an Event of Default under the Loan Documents, or a default in the performance of any obligation, covenant or agreement contained herein, Assignee may, after ten (10) day notice to Assignor, declare all indebtedness evidenced by the Loan Documents immediately due and payable, may revoke the privilege granted Assignor hereunder to collect the Rents, and may, at its option, without notice, either in person or by agent, with or without taking possession of or entering the Property, with or without bringing any action or proceeding, or by receiver to be appointed by the Court, collect all the Rents payable under the Leases and enforce the payment thereof and exercise all the rights of Assignor under the Leases and all of the rights of Assignee hereunder, and may enter upon, take possession of, manage and operate the Property, or any part thereof; may cancel, enforce or modify the Leases and fix or modify the Rents, and do any acts which Assignee deems proper to protect the security hereof with or without taking possession of the Property, and may apply the same to the costs and expenses of operation, management and collection, including reasonable attorneys' fees to the payment of the expenses of any agent appointed by Assignee, to the payment of taxes, assessments, insurance premiums and expenditures for the upkeep of the Property, to the performance of the lessor's obligations under the Leases and to any indebtedness evidenced by the Loan Documents, all in such order as Assignee may determine. The entering upon and taking possession of the Property, the collection of the Rents and the application thereof as aforesaid, shall not cure or waive any default or waive, modify or affect notice of default in the Loan Documents or invalidate any act pursuant to such notice or in any way operate to prevent Assignee from pursuing any remedy which it now or hereafter may have under the terms or conditions of the Loan Documents. Further, such entry onto the Property will be merely to protect Assignee's "security interest" in the Property, and its absolute present assignment of the Leases, without in any respect constituting the management or operation of any business conducted thereon, and thus without incurring liability under any state or federal environmental law.

7. **Assignor to Hold Assignee Harmless.** Assignor shall and does hereby agree to indemnify and hold Assignee harmless of and from any and all liability, loss or damage which it may or might incur under the Leases or by reason or this Assignment and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases, except negligent or intentionally wrongful acts of Assignee, its employees and servants. Should Assignee incur any such liability or any costs or expenses in the defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be added to the indebtedness evidenced by the Loan Documents and Assignor shall reimburse Assignee therefor immediately upon demand, and the continuing failure of Assignor to do so shall constitute a default hereunder and an event of default under the Loan Documents.

8. **Security Deposits.** Assignor agrees on demand to transfer to Assignee any security deposits held by Assignor under the terms of the Leases. Assignor agrees such security deposits may be held by Assignee without any allowance of interest thereon, except statutory interest accruing to the benefit of the tenants, and shall become the absolute property of Assignee upon an event of

default (continuing beyond any applicable cure period) under the Loan Documents to be applied in accordance with the provisions of the Leases. Until Assignee makes such demand and the deposits are paid over to Assignee, Assignee assumes no responsibility to the tenants for any such security deposits.

9. **Authorization to Tenants.** The tenants under the Leases are hereby irrevocably authorized and directed to recognize the claims of Assignee or any receiver appointed hereunder without investigating the reason for any action taken by Assignee or such receiver, or the validity or the amount of indebtedness owing to Assignee, or the existence of any event of default under the Loan Documents, or under or by reason of this Assignment, or the application to be made by Assignee or receiver. Assignor hereby irrevocably directs and authorizes the tenants to pay to Assignee or such receiver all sums due under the Leases and consents and directs that such sums shall be paid to Assignee or any such receiver in accordance with the terms of its receivership without the necessity for a judicial determination that a default has occurred hereunder, under the Loan Documents, or that Assignee is entitled to exercise its rights hereunder, and to the extent such sums are paid to Assignee for the same. The sole signature of Assignee or such receiver shall be sufficient for the exercise of any rights under this Assignment, and the sole receipt of Assignee or such receiver for any sums received shall be a full discharge and release therefor to any such tenants or occupants of the Property. Checks for all or any part of the Rents collected under this Assignment shall upon notice from Assignee or such receiver be drawn to the exclusive order of Assignee or such receiver.

10. **Satisfaction.** Upon the payment in full of all indebtedness evidenced by the Loan Documents, this Assignment shall, without the need for any further satisfaction or release, become null and void and shall be of no further effect.

11. **Assignee Creditor of the Tenants.** Upon or at any time during the continuance of a default in payment of the indebtedness evidenced by the Loan Documents, Assignor agrees Assignee, not Assignor, shall be deemed to be the creditor of the tenants in respect of assignments for the benefit of creditors and bankruptcy, reorganization, insolvency, dissolution or receivership proceedings affecting such tenants (without obligation on the part of Assignee, however, to file or make timely filings of claims in such proceedings or otherwise to pursue creditor's rights therein and reserving the right to Assignor to make such filing in such event), with an option to Assignee to apply any money received by Assignee as such creditor in reduction of the indebtedness evidenced by the Loan Documents.

12. **Assignee Attorney-In-Fact.** Assignor hereby irrevocably appoints Assignee and its successors and assigns as its agent and attorney-in-fact, which appointment is coupled with an interest, to exercise any rights or remedies hereunder and execute and deliver during the term of this Assignment such instruments as Assignee may deem necessary to make this Assignment and any further assignment effective.

13. **General Assignment of Leases and Rents.** The rights contained in this Assignment are in addition to and shall be cumulative with any corresponding rights given and created pursuant to the Loan Documents, assigning generally all leases, rents and profits of the Property, and shall in no way limit the rights created thereunder.

14. **Not a Mortgagee in Possession.** Nothing herein contained and no actions taken pursuant to this Assignment shall be construed to make Assignee a "mortgagee in possession."

15. **Continuing Rights.**  The rights and powers of Assignee or any receiver hereunder shall continue and remain in full force and effect until all indebtedness evidenced by the Loan Documents are paid in full and shall continue after commencement of a foreclosure action and after foreclosure sale and until expiration of the equity of redemption if Assignee shall be purchaser at the foreclosure sale.

16. **Successors and Assigns.**  This Assignment and each and every covenant, agreement and provision hereof shall be binding upon Assignor and its successors and assigns, including without limitation each and every record owner of the Property or any other person having an interest therein and shall inure to the benefit of Assignee and its successors and assigns.  As used herein, the words "successors and assigns" shall also be deemed to mean the heirs, executors, representatives and administrators of any natural person who is a party to this Assignment.

17. **Governing Law.**  The rights and remedies provided to Assignee by this Assignment are intended to be governed by the laws of the State of Arkansas, and applicable federal laws.

18. **Validity Clause.**  It is the intent of this Assignment to confer to Assignee the rights and benefits hereunder to the full extent allowable by law.  The unenforceability or invalidity of any provisions hereof shall not render any other provision or provisions herein contained unenforceable or invalid.  Any pro-visions found to be unenforceable shall be severable from this Assignment.

19. **Notices.**  Any notice that any party hereto may desire or may be required to give to any other party shall be done in accordance with the Loan Agreement and shall constitute service of notice hereunder to Assignor or to Assignor's successors or assigns or any subsequent owner of the Property.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]



IN WITNESS WHEREOF, Assignor has executed or has caused this Assignment of Leases and Rents to be executed as of the date first above written.

ASSIGNOR:

**EASTSIDE LOFT APARTMENTS
PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:   Its General Partner
     **EASTSIDE LOFTS GP PHASE II, LLC,**
     an Arkansas limited liability company

By: _____
    Authorized Member MANAGER

ASSIGNEE:

**ARVEST BANK,**
an Arkansas state bank

By:_____
Name:_____
Title:_____

STATE OF ARKANSAS    )
                     ) ss:    **ACKNOWLEDGMENT**
COUNTY OF PULASKI    )

On this day personally appeared before the undersigned, a Notary Public within and for the County and State aforesaid, duly qualified, commissioned and acting, the within named _Steven W. Nutt_ an authorized ~~member~~ of **EASTSIDE LOFTS GP PHASE II, LLC**, the General Partner of **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, and stated that he was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said limited partnership, and further stated and acknowledged that he had so signed, executed and delivered the foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 29ᵗʰ day of August, 2006.

_Bradley H Sims_
Notary Public

My Commission expires:

STATE OF ARKANSAS    )
                     ) ss.    **ACKNOWLEDGMENT**
COUNTY OF PULASKI    )

On this day, before me, a Notary Public, duly commissioned, qualified and acting, with and for said County and State, appeared in person the within named _Mark Nowne_ to me well known, who stated that he was _V. P._ of **ARVEST BANK**, an Arkansas state bank, and was duly authorized in that capacity to execute the foregoing instrument for and in the name and on behalf of said bank, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 29 day of August, 2006.

_Bradley H Sims_
Notary Public

My Commission expires:

DOC# 2006068513

## EXHIBIT A

Borrower/Debtor/
Mortgagor/Record Owner:

**EASTSIDE LOFT APARTMENTS**
  **PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership
2004 Main Street
Little Rock, Arkansas  72206

Lender/Secured Party/
Mortgagee/Creditor:

**ARVEST BANK,**
an Arkansas state bank
500 Broadway Place
Little Rock, Arkansas  72201

Legal Description:

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas, and being shown on plat records as Plat No. F-931, records of Pulaski County, Arkansas.

AND all bridges, easements, rights-of-way, licenses, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, minerals, landscaping, flowers, plants, shrubs, trees, timber and other emblements now or hereafter located on the above-described real property under or above the same or any part thereof or appurtenant to the title to the above-described real property, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversion and reversions, remainder and remainders, whatsoever, in any way belonging, relating or appertaining to the above-described real property or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired and all rights, titles and interests in and to any vacating or hereafter vacated streets or roads adjoining the above-described real property and any and all reversionary or remainder rights.

**EXHIBIT A**

Doc# 2006068513

00000434

## EXHIBIT B

| | |
|---|---|
| Borrower/Debtor/<br>Mortgagor/Record Owner: | **EASTSIDE LOFT APARTMENTS**<br>  **PHASE II LIMITED PARTNERSHIP,**<br>an Arkansas limited partnership<br>2004 Main Street<br>Little Rock, Arkansas 72206 |
| Lender/Secured Party/<br>Mortgagee/Creditor: | **ARVEST BANK,**<br>an Arkansas state bank<br>500 Broadway Place<br>Little Rock, Arkansas 72201 |

Leases:

1                                                           **EXHIBIT B**

2008081774 Received: 12/9/2008 9:50:53 AM Recorded: 12/09/2008 09:55:09 AM
Filed & Recorded in Official Records of PAT O'BRIEN, PULASKI COUNTY
CIRCUIT/COUNTY CLERK Fees $35.00

Case 4:09-cv-00743-BSM Document 1 Filed 08/07/23 Page 67 of 423

3452978

RETURN THIS INSTRUMENT TO:
Kevin R. Burns
Rose Law Firm
120 East 4th Street
Little Rock, AR 72201



# ORIGINAL

**This instrument modifies the terms of that certain Construction Mortgage (with Security Agreement, Absolute Assignment of leases and Rents, Fixture Filing and Financing Statement) from Borrower to Lender, dated as of August 29, 2006, and filed of record on August 30, 2006, as Instrument No. 2006068512 in the office of the Circuit Clerk and Ex-Officio Recorder of Pulaski County, Arkansas.**

## FIRST MODIFICATION OF CONSTRUCTION MORTGAGE

This FIRST MODIFICATION OF CONSTRUCTION MORTGAGE (with Security Agreement, Absolute Assignment of leases and Rents, Fixture Filing and Financing Statement) ("Mortgage Modification") is dated as of the 26th day of November, 2008, from Eastside Loft Apartments Phase II Limited Partnership ("Borrower") to Arvest Bank ("Lender").

WHEREAS, Borrower borrowed $3,000,000.00 from Lender and executed a promissory note on August 29, 2006, (the "Note"), which Note is incorporated herein and secured by the above referenced Construction Mortgage (with Security Agreement, Absolute Assignment of leases and Rents, Fixture Filing and Financing Statement) dated August 29, 2006 (the "Mortgage"), said Mortgage being incorporated herein;

WHEREAS, the Mortgage currently encumbers the property described in Exhibit "A" hereto and states that its lien serves as security for the Note and other indebtedness of Borrower to Lender; and

WHEREAS, the maturity date of the Note is being extended, as more particularly set forth in a First Allonge which is part of the Note and incorporated herein, and a First Modification of Construction Loan Agreement of even date herewith;

NOW, THEREFORE, be it agreed by Borrower and Lender as follows:

1.     All references to the final maturity date of the Note in the Mortgage are hereby amended and modified to reflect a final maturity date of June 2, 2009, unless sooner paid pursuant to the terms of the relevant documents.

2.     This Mortgage Modification is a modification of the Mortgage and is not a payment, accord, satisfaction or novation of the Note or the Mortgage. All terms and provisions of the Mortgage not expressly modified hereby shall remain in full force and effect, including, without

limitation, the granting clauses, construction notices, language and priority provisions contained in the Mortgage.

3.    All of the recitals set forth in this Mortgage Modification Agreement are hereby incorporated and made a part hereof.

4.    BORROWER HAS HAD THE OPPORTUNITY TO RETAIN COUNSEL TO REVIEW THIS MORTGAGE MODIFICATION AND BORROWER AGREES AND ACKNOWLEDGES THAT BORROWER IS NOT RELYING ON LENDER OR LENDER'S COUNSEL IN ANY MANNER IN CONNECTION WITH BORROWER'S DECISION TO EXECUTE AND DELIVER THIS MORTGAGE MODIFICATION.

5.    BORROWER ACKNOWLEDGES AND AGREES THAT LENDER IS UNDER NO OBLIGATION TO GRANT ANY FUTURE EXTENSIONS, RENEWALS, OR FOREBEARANCES UPON MATURITY OF THE NOTE OR OF ANY OTHER NOTES DESCRIBED HEREIN.

6.    All other terms of the Mortgage shall remain in full force and effect, as well as the terms of the Note and all documents evidencing such debt, except as expressly modified hereby. All terms of other documents executed by the parties hereto shall remain in effect.

7.    This Mortgage Modification shall have no effect on the original obligation of the Borrower to repay the sums borrowed, except as specifically modified hereby.

8.    THE MORTGAGE SECURES THE PAYMENT OF ALL FUTURE AND ADDITIONAL INDEBTEDNESS, DIRECT OR INDIRECT, CREATED AFTER THE DATE OF THIS SECURITY INSTRUMENT, WHICH MAY BE OWING BY BORROWER TO LENDER AT ANY TIME PRIOR TO PAYMENT IN FULL WITH INTEREST OF THE NOTE (SUCH ADDITIONAL INDEBTEDNESS TO BE SECURED HEREBY REGARDLESS OF WHETHER IT SHALL BE PREDICATED UPON FUTURE LOANS OR ADVANCES HEREAFTER MADE BY THE LENDER, OR OBLIGATION HEREAFTER ACQUIRED BY LENDER THROUGH ASSIGNMENT, SUBROGATION OR OTHERWISE), AND IT IS AGREED THIS SECURITY INSTRUMENT SHALL STAND AS SECURITY FOR ALL SUCH FUTURE AND ADDITIONAL INDEBTEDNESS WHETHER IT BE INCURRED FOR ANY BUSINESS OR OTHER PURPOSE THAT WAS RELATED OR WHOLLY UNRELATED TO THE PURPOSES OF THE NOTE, OR WHETHER IT WAS INCURRED FOR SOME PERSONAL OR NON-BUSINESS PURPOSE, OR FOR ANY OTHER PURPOSE RELATED OR UNRELATED, OR SIMILAR OR DISSIMILAR TO THE PURPOSE OF THE NOTE, and all judgments, burdens, awards or decrees arising from or related to the foregoing, all of which is part of the Obligations.

9.    Lender may exercise its rights, remedies and powers under the Mortgage with respect to the property encumbered thereby individually against any parcel of property, collectively against all properties or in any combination, and in any number of proceedings and at any times as Lender in its sole discretion may determine to be reasonable or appropriate. No action by Lender with respect to less than all the property will diminish or prejudice the rights, remedies and powers

of Lender with respect to remaining property unless all sums due to Lender and secured by all property are indefeasibly paid in full.

IN WITNESS WHEREOF, this Mortgage Modification is executed and delivered on the date first above written.

BORROWER:

Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership

By: Eastside Lofts GP Phase II, LLC, an Arkansas limited liability company, its General Partner

By: _Steven W. Hitt_____
             Steven W. Hitt, Manager

193345

3

## ACKNOWLEDGMENT

STATE OF ARKANSAS )
                             ) ss.
COUNTY OF PULASKI )

       On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Steven W. Hitt, who stated that he is a manager of Eastside Lofts GP Phase II, LLC, an Arkansas limited liability company, the General Partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said company; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 26th day of November, 2008.



                                        Notary Public

My Commission Expires:

June 27 2018

BEULAH BYNUM
MY COMMISSION # 12366511
EXPIRES: June 27, 2016
Pulaski County

193345

4

## EXHIBIT A

### LEGAL DESCRIPTION

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas, and being shown on plat records as Plat No. F-931, records of Pulaski County, Arkansas.

2009074147 Received: 11/3/2009 12:22:23 PM Recorded: 11/03/2009 12:24:44 PM
Filed & Recorded in Official Records of BRIENNE DAVIS PULASKI COUNTY
CIRCUIT/COUNTY CLERK Fees $35.00



RETURN THIS INSTRUMENT TO:
Kevin R. Burns
Rose Law Firm
120 East 4ᵗʰ Street
Little Rock, AR 72201


      **This instrument modifies the terms of that certain Construction Mortgage (with Security Agreement, Absolute Assignment of leases and Rents, Fixture Filing and Financing Statement) from Borrower to Lender, dated as of August 29, 2006, and filed of record on August 30, 2006, as Instrument No. 2006068512 in the office of the Circuit Clerk and Ex-Officio Recorder of Pulaski County, Arkansas.**


## SECOND MODIFICATION OF CONSTRUCTION MORTGAGE


      This SECOND MODIFICATION OF CONSTRUCTION MORTGAGE (with Security Agreement, Absolute Assignment of leases and Rents, Fixture Filing and Financing Statement) ("Mortgage Modification") is dated as of the 2ⁿᵈ day of June, 2009, from Eastside Loft Apartments Phase II Limited Partnership ("Borrower") to Arvest Bank ("Lender").

      WHEREAS, Borrower borrowed $3,000,000.00 from Lender and executed a promissory note on August 29, 2006, (the "Original Note"), as amended by that certain First Allonge dated as of November 26, 2008 (together with the Original Note, the "Note"), which Note is incorporated herein and secured by the above referenced Construction Mortgage (with Security Agreement, Absolute Assignment of Leases and Rents, Fixture Filing and Financing Statement) dated August 29, 2006 (the "Mortgage"), said Mortgage being incorporated herein;

      WHEREAS, the Mortgage currently encumbers the property described in Exhibit "A" hereto and states that its lien serves as security for the Note and other indebtedness of Borrower to Lender; and

      WHEREAS, the maturity date of the Note is being extended, as more particularly set forth in a Second Allonge which is part of the Note and incorporated herein, and a Second Modification of Construction Loan Agreement of even date herewith;

      NOW, THEREFORE, be it agreed by Borrower and Lender as follows:

      1.    All references to the final maturity date of the Note in the Mortgage are hereby amended and modified to reflect a final maturity date of December 2, 2009, unless sooner paid pursuant to the terms of the relevant documents.

      2.    This Mortgage Modification is a modification of the Mortgage and is not a payment, accord, satisfaction or novation of the Note or the Mortgage. All terms and provisions of the



Mortgage not expressly modified hereby shall remain in full force and effect, including, without limitation, the granting clauses, construction notices, language and priority provisions contained in the Mortgage.

3.     All of the recitals set forth in this Mortgage Modification Agreement are hereby incorporated and made a part hereof.

4.     BORROWER HAS HAD THE OPPORTUNITY TO RETAIN COUNSEL TO REVIEW THIS MORTGAGE MODIFICATION AND BORROWER AGREES AND ACKNOWLEDGES THAT BORROWER IS NOT RELYING ON LENDER OR LENDER'S COUNSEL IN ANY MANNER IN CONNECTION WITH BORROWER'S DECISION TO EXECUTE AND DELIVER THIS MORTGAGE MODIFICATION.

5.     BORROWER ACKNOWLEDGES AND AGREES THAT LENDER IS UNDER NO OBLIGATION TO GRANT ANY FUTURE EXTENSIONS, RENEWALS, OR FOREBEARANCES UPON MATURITY OF THE NOTE OR OF ANY OTHER NOTES DESCRIBED HEREIN.

6.     All other terms of the Mortgage shall remain in full force and effect, as well as the terms of the Note and all documents evidencing such debt, except as expressly modified hereby. All terms of other documents executed by the parties hereto shall remain in effect.

7.     This Mortgage Modification shall have no effect on the original obligation of the Borrower to repay the sums borrowed, except as specifically modified hereby.

8.     THE MORTGAGE SECURES THE PAYMENT OF ALL FUTURE AND ADDITIONAL INDEBTEDNESS, DIRECT OR INDIRECT, CREATED AFTER THE DATE OF THIS SECURITY INSTRUMENT, WHICH MAY BE OWING BY BORROWER TO LENDER AT ANY TIME PRIOR TO PAYMENT IN FULL WITH INTEREST OF THE NOTE (SUCH ADDITIONAL INDEBTEDNESS TO BE SECURED HEREBY REGARDLESS OF WHETHER IT SHALL BE PREDICATED UPON FUTURE LOANS OR ADVANCES HEREAFTER MADE BY THE LENDER, OR OBLIGATION HEREAFTER ACQUIRED BY LENDER THROUGH ASSIGNMENT, SUBROGATION OR OTHERWISE), AND IT IS AGREED THIS SECURITY INSTRUMENT SHALL STAND AS SECURITY FOR ALL SUCH FUTURE AND ADDITIONAL INDEBTEDNESS WHETHER IT BE INCURRED FOR ANY BUSINESS OR OTHER PURPOSE THAT WAS RELATED OR WHOLLY UNRELATED TO THE PURPOSES OF THE NOTE, OR WHETHER IT WAS INCURRED FOR SOME PERSONAL OR NON-BUSINESS PURPOSE, OR FOR ANY OTHER PURPOSE RELATED OR UNRELATED, OR SIMILAR OR DISSIMILAR TO THE PURPOSE OF THE NOTE, and all judgments, burdens, awards or decrees arising from or related to the foregoing, all of which is part of the Obligations.

9.     Lender may exercise its rights, remedies and powers under the Mortgage with respect to the property encumbered thereby individually against any parcel of property, collectively against all properties or in any combination, and in any number of proceedings and at any times as Lender in its sole discretion may determine to be reasonable or appropriate. No action by Lender

203136                                        2

with respect to less than all the property will diminish or prejudice the rights, remedies and powers of Lender with respect to remaining property unless all sums due to Lender and secured by all property are indefeasibly paid in full.

**IN WITNESS WHEREOF**, this Mortgage Modification is executed and delivered on the date first above written.

**BORROWER:**

Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership

By: Eastside Lofts GP Phase II, LLC, an Arkansas limited liability company, its General Partner

By: _____
Steven W. Hitt, Manager

203136                               3

## ACKNOWLEDGMENT

STATE OF ARKANSAS    )
                         ) ss.
COUNTY OF PULASKI    )

On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Steven W. Hitt, who stated that he is a manager of Eastside Lofts GP Phase II, LLC, an Arkansas limited liability company, the General Partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said company; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 2nd day of June, 2009.

_____
Notary Public

My Commission Expires:

JANE A. BROWN      Notary Public
Pulaski County      State Of Arkansas
My Commission Expires Sept. 8, 2010

203136                    4

## EXHIBIT A

### LEGAL DESCRIPTION

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas, and being shown on plat records as Plat No. F-931, records of Pulaski County, Arkansas.

2006068929
08/31/2006  08:24:21 AM
Filed & Recorded in
Official Records of
PAT O'BRIEN
PULASKI COUNTY
CIRCUIT/COUNTY CLERK
Fees $14.00

THIS INSTRUMENT PREPARED BY:
DOVER DIXON HORNE PLLC
425 W. Capitol, Suite 3700
Little Rock, AR 72201
(501) 375-9151

00000184

## SUBORDINATION AGREEMENT

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, Arkansas Development Finance Authority, (hereafter designated as "ADFA") a public body, politic and corporate organized under the laws of the State of Arkansas is the owner and holder of a mortgage which was filed for record November 22, 2005, and recorded as Instrument No. 2005103433 executed by Eastside Lofts Apartments Phase II Limited Partnership (the "ADFA Mortgage"), which mortgage encumbers the property described on **Exhibit "A"** attached hereto and made a part hereof by this reference.

Believing that it is in its best interest that the ADFA Mortgage be subordinated to the lien of a mortgage which Eastside Lofts Apartments Phase II Limited Partnership desires to grant to Arvest Bank, in order to provide financing for the construction of improvements on the lands described on **Exhibit "A"**, ADFA is willing to subordinate the lien of the ADFA Mortgage to the lien of the following described mortgage:

Construction Mortgage with Security Agreement, Absolute Assignment of Leases and Rents, Fixture Filing and Financing Statement in favor of Arvest Bank, Little Rock, Arkansas, securing payment of the sum of $3,000,000.00 dated August 29, 2006, and recorded in the Pulaski County Arkansas land records as Instrument No. 2006068512 (the "Arvest Mortgage").

NOW, THEREFORE, WITNESSETH:

In consideration of the foregoing, and in consideration of the sum of Ten Dollars in hand paid by Arvest Bank to ADFA, the ADFA hereby subordinates the lien of the ADFA Mortgage to the lien of the Arvest Mortgage and to any renewals or extensions of the Arvest Mortgage and ADFA further agrees that the lien of the Arvest Mortgage shall at all times be, and remain, a lien

-1-

or charge on the property described on **Exhibit "A"** which is prior, paramount and superior to the lien or charge of the ADFA as evidenced by the ADFA Mortgage.

IN WITNESS WHEREOF, the ADFA has hereunto set its hand and seal by its duly authorized and acting officer this 29th day of August, 2006.

ARKANSAS DEVELOPMENT FINANCE AUTHORITY

BY:_____

Mac Dodson, President

00000185

## ACKNOWLEDGMENT

STATE OF ARKANSAS        )
                    Jefferson )
COUNTY OF ~~PULASKI~~        )

On this 29th day of August, 2006, before me, the undersigned officer, personally appeared Mac Dodson, who acknowledged himself to be the President of Arkansas Development Finance Authority, an agency of the State of Arkansas, and that he, as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the Arkansas Development Finance Authority by himself as such officer.

IN WITNESS WHEREOF I hereunto set my hand and official seal.

_____
Notary Public

MY COMMISSION EXPIRES:

_____

NANCY A. COVINGTON
NOTARY
PUBLIC
#12348457
EXPIRES
6-12-2016
JEFFERSON COUNTY AR

-2-

# EXHIBIT "A"

Lot 2R, Block 20, Original City of Little Rock, Pulaski County,
Arkansas and being shown on plat recorded as Plat No. F-931,
records of Pulaski County, Arkansas

00000186

2007064414
08/16/2007 08:59:12 AM
Filed & Recorded in
Official Records of
PAT O'BRIEN
PULASKI COUNTY
CIRCUIT/COUNTY CLERK
Fees $45.00

This Instrument Prepared By
and When Recorded Return To:
Arkansas Development Finance Authority
Attn: Office of the General Counsel
P.O. Box 8023
Little Rock, Arkansas 72203-8023

# MORTGAGE
## ARKANSAS DEVELOPMENT FINANCE AUTHORITY
## FAF PROGRAM

00000258

**KNOW ALL MEN BY THESE PRESENTS:**

That Eastside Loft Apartments Phase II Limited Partnership (hereinafter called "Mortgagor"), for a valuable consideration, hereby grants, bargains, sells, conveys and delivers unto Arkansas Development Finance Authority (hereinafter called "Mortgagee"), and unto its successors and assigns, the real property (the "Property" or the "Project") situated in Pulaski County, Arkansas, as more particularly described on the attached Exhibit "A."

This Mortgage also conveys all buildings and improvements now or at any time hereafter located on any land herein above described, together with all of the following equipment now or at any time hereafter located in such building regardless of method or annexation or removability including, but not limited to: all electrical equipment (including lighting equipment, refrigeration equipment, ceiling fans, attic and window fans, motors and all other electrical paraphernalia) except items attached merely by plugging in wall sockets; all furnaces (including floor furnaces), heaters, radiators and all other heating equipment except small gas stoves on floor; all bath tubs, toilets, sinks, basins, pipes and other plumbing equipment; all screens, awnings, and window shades; all linoleum and other permanent floor coverings; all engines and elevators.

TO HAVE AND TO HOLD the same unto Arkansas Development Finance Authority, and its successors and assigns forever.

And Mortgagor covenants with Mortgagee, its successors and assigns that Mortgagor will forever warrant and defend the title to all the Property against all lawful claims whatever.

PROVIDED, however, the foregoing conveyance is given as a Mortgage for the purpose of securing the following:

(a)     The payment of a promissory note (the "Note"), with an effective date of **August** 2007 evidencing a principal indebtedness (which indebtedness, and all extensions and renewals thereof is hereinafter called the "Primary Indebtedness") of **Five Hundred Forty-Four Thousand and 00/100 Dollars ($544,000.00)** with interest accruing thereon at the rate of **One Percent (1%) per annum**, payable as follows: Beginning September 1, 2007, in equal monthly installments of interest only in the amount of Four Hundred Fifty-Five and 33/100 Dollars ($455.33) for a period of thirty-six (36) months. Beginning September 1, 2010, principal and interest shall be payable in equal monthly installments of Two Thousand Five Hundred One and 83/100 Dollars ($2,501.83) for 240 months. All accrued and unpaid principal shall be due on **August 1, 2030**, the Maturity Date.

ADFA Mortgage – FAF Program
Page 1 of 7

00000255

(b)    The payment of all future and additional indebtedness, direct or indirect, created after the date of this Mortgage, which may be owing by Mortgagor (or by any of the persons herein designated under the term "Mortgagor" to the holder of the Primary Indebtedness at any time prior to the payment in full of the Primary Indebtedness) or the foreclosure of this Mortgage therefore (the event occurring first to be controlling); such additional indebtedness to be secured hereby regardless of whether it shall be predicated upon future loans or advances hereafter made by the holder(s) of the Primary Indebtedness, or obligations hereafter acquired by such holder(s) through assignment or subrogation or otherwise, or shall represent indirect obligations (created after the date of this Mortgage) based upon any endorsements, guaranties or suretyship AND IT IS AGREED THAT THIS MORTGAGE SHALL STAND AS SECURITY FOR ALL SUCH FUTURE AND ADDITIONAL INDEBTEDNESS WHETHER IT BE INCURRED FOR ANY BUSINESS PURPOSE THAT WAS RELATED OR WHOLLY UNRELATED TO THE PURPOSE OF THE ORIGINAL LOAN, OR WHETHER IT WAS INCURRED FOR SOME PERSONAL OR NON-BUSINESS PURPOSE, OR FOR ANY OTHER PURPOSE RELATED OR UNRELATED, OR SIMILAR OR DISSIMILAR, TO THE PURPOSE OF THE ORIGINAL LOAN. THIS IS A NON-RECOURSE LOAN; and

(c)    The repayment to the holder(s) of the indebtedness secured hereby of all reimbursable expense at any time accruing to such holder(s) under the provisions of Paragraph (3) hereof.

Upon the payment of all such sums and compliance with the specified FAF Program Requirements, this Mortgage will become void and will be released by a proper marginal notation or, at the option of the holder(s) of the secured debt, by a release deed to be recorded at the expense of Mortgagor.

1.    **COVENANTS OF MORTGAGOR.** Mortgagor agrees to the following:

(a)    to pay, prior to delinquency, all taxes, special improvement assessments and other governmental charges against the Property, both real and personal, at any time levied or becoming due;

(b)    to carry insurance upon all insurable property encumbered hereby against such hazards, in such amounts and under such form of policies, as shall be acceptable to, or requested by, the holder(s) of the indebtedness secured hereby; each insurance policy to carry mortgage clause in favor of such holder(s) upon such form as may be approved by the holder(s), and each policy to be delivered to and held by such holder(s). Also to carry public liability insurance, and insurance against other hazards, to such extent as may be requested by the holder(s) of the secured indebtedness. In each instance, Mortgagor shall have the right to select the insurer, subject to Mortgagee's right to reject the proposed insurer for reasonable cause;

(c)    to prevent the Property from becoming encumbered by any lien or charge having priority over, or on a parity with, the lien of this Mortgage and to comply with all statutes, ordinances and regulations relating to such property; and

(d)    to protect the Property from waste, injury or unusual deterioration and, without subjecting the Property to any statutory lien, to make all replacements and repairs necessary to keep the Property in good physical condition. In that connection, it is agreed that Mortgagor may not cut the timber from any land encumbered

00000250

hereby; moreover, Mortgagor may not remove or substantially remodel or alter any structure on the Property without prior written consent of the holder(s) of the secured indebtedness.

2.   **DEFAULT.**   The holder(s) of the Primary Indebtedness or any future or additional indebtedness secured hereby (whether such indebtedness then be evidenced by the original note(s) or by any instrument(s) given in renewal or extension of such indebtedness) may, at the option of such holder(s), declare the entire unmatured portion of all indebtedness secured hereby, together with all default interest accrued on the entire secured debt, to be immediately due and payable, and the same shall forthwith become immediately due and payable (which acceleration of maturity may be accomplished without notice to anyone), in any one of the following events:

(a)   Upon the filing of a voluntary or involuntary petition to subject Mortgagor (or any party obligated as maker, endorser, surety or guarantor for the payment of the secured indebtedness) to any bankruptcy, debt-adjustment, receivership or other insolvency proceeding.

(b)   Upon the occurrence of any event, which, under the terms of the instrument at any time evidencing the indebtedness secured hereby, warrants acceleration (at the option of the holder) of the maturity of said indebtedness.

(c)   If default shall be made in the payment of any part of the Primary Indebtedness or any indebtedness secured hereby, or any default interest accruing on such indebtedness, as the same becomes due and payable according to the terms of the original note(s), or of any extension or renewal thereof at any time evidencing such indebtedness.

(d)   If Mortgagor shall fail to comply with any of the agreements contained in this Mortgage.

(e)   If Mortgagor, being a partnership or a corporation, shall be dissolved or reorganized in any manner.

(f)   If at any time it shall appear that title to the Property, or any portion thereof, is subject to any prior lien, title or interest not mentioned in this Mortgage as a prior encumbrance.

(g)   If at any time Mortgagor shall sell or convey the title to or any interest in any realty mortgaged hereunder without the prior written consent of the holder(s) of the secured indebtedness.

(h)   If at any time it should appear that the Mortgagor has attempted to sell free from the lien of this Mortgage any personal property or removable fixture encumbered hereby, or is about to attempt such a sale; or that any personality or removable fixture encumbered hereby has been, or is about to be moved to a different jurisdiction, subjected to physical damage or unusual deterioration, seized under legal process, or subjected by the Mortgagor or a third party to any other

00000251

disposition which in the opinion of the holder(s) of the secured indebtedness will impair the security value of this instrument.

(i)    If at any time it should appear that the Mortgagor's financial statements given to and relied upon by the Mortgagee incorrectly or inaccurately set forth the financial condition of the Mortgagor.

(j)    If Mortgagor fails to comply with the "RESTRICTIVE COVENANT – FAF Program" document executed by Mortgagor on the _____ day of August, 2007.

It is particularly understood that the foregoing acceleration provisions will be applicable not only to the maturities recited in the original mortgage note(s) but also to any substituted maturities created by extension or renewal. The failure of the holder(s) of the secured indebtedness to declare any acceleration of maturities when a ground therefore exists, even though such forbearance may be repeated from time to time, will not constitute a waiver of the right of such holder(s) to accelerate maturities upon a reoccurrence of the same ground therefore, nor will the act of such holder(s) in remedying any condition resulting from Mortgagor's default bar the holder(s) from declaring an acceleration of maturities by reason of such default.

3.    **REMEDIES UPON DEFAULT.**  In the event of a default hereunder, the holder(s) of the indebtedness secured hereby shall be entitled to any of the following remedies:

(a)    Pursuit of any and all remedies provided by judicial proceedings and non-judicial remedies, including self-help repossession;

(b)    Foreclosure of this Mortgage in compliance with Act 53, "The Statutory Foreclosure Act of 1987" by public sale to the highest bidder for cash, on the premises or at the main door of the Courthouse of Crittenden County, public notice of the time, terms and place of said sale having been given for thirty (30) days by publication in some newspaper, published in Crittenden County, once a week for four (4) consecutive weeks prior to the date of sale, the final publication to be no more than seven (7) days prior to the sale, which advertisement shall be sufficient for the purpose of foreclosure.   THE OWNER OF THE NOTE SECURED HEREBY MAY BECOME A PURCHASER AT SUCH SALE.  No bid shall be accepted that is less than two-thirds (2/3) of the entire indebtedness due at the date of the sale.  Notice required under Act 53 of 1987 will be directed to the Mortgagor at the following address supplied by Mortgagor, to wit:

**Eastside Loft Apartments Phase II Limited Partnership**
**Steven Hitt**
**2004 South Main Street**
**Little Rock, AR 72206**
**(501) 375-7770**

00000292

Election of either (a) or (b) by Mortgagee is not irrevocable and Mortgagee may at any time subsequent to commencement of the proceedings terminate such proceeding and proceed with any other remedy.

(c)    The holder(s) of the indebtedness secured hereby may require the Mortgagor to assemble (at Mortgagor's expense) any or all of the personal property encumbered hereby and make it available to such holder(s) at a place specified by such holder(s) which is reasonably convenient to both parties; and such holder(s) may enforce all of its or their remedies, in respect to the encumbered personal property, that may be available under the Uniform Commercial Code. In the last event all expenses of retaking, holding, preparing for sale, selling or the like, as well as all reasonable attorney's fees (not exceeding 10% of the secured indebtedness plus accrued default interest) and lawful expenses incurred by said holder(s) in enforcing such remedies shall be payable to said holder(s) by Mortgagor shall constitute a part of the secured indebtedness.

(d)    Such holder(s) may enforce the lien of this Mortgage in respect to any or all real and personal property encumbered hereby:

(i)     either separately or in bulk, in such order as Mortgagee, in is sole discretion, shall direct, including at any judicial or non-judicial sale; and

(ii)    by proceedings that are prosecuted simultaneously or are prosecuted separately in such order as the holder(s) may elect.

4.    **MORTGAGEE EXPENDITURES**.  If the holder(s) of the indebtedness secured hereby shall expend any sum or sums for the protection of any of the Property or the lien of this Mortgage (such holder(s) to have uncontrolled discretion as to the necessity of making any such expenditures), the repayment of such sum or sums on demand (with interest thereon at the maximum legal rate from the date of each expenditure) shall be the personal obligation of Mortgagor; and such obligation to repay will constitute a part of the indebtedness secured hereby.  The expenditures thus made reimbursable will include (without limiting the foregoing) taxes, special improvement assessments, insurance premiums, repairs and maintenance expenses, sums paid to discharge prior liens, rents on premises in which mortgaged personality may be situated, etc.  The cost of any abstract, title commitment, or appraisal procured by the holder(s) of the secured indebtedness to facilitate foreclosure will also constitute a part of the reimbursable expense secured hereby.

5.    **RELINQUISHMENT OF MORTGAGOR'S RIGHTS**.  Mortgagor releases all rights of dower, courtesy, homestead and appraisement hereunder and also releases unto Mortgagee all right of redemption under the laws of Arkansas, including particularly all right of redemption under Act No. 53 of May 8, 1989, and amendments thereto currently codified as ARK. CODE ANN. § 18-49-106.

EXECUTED on this _14_ day of August 2007.                    00000253

MORTGAGOR:

EASTSIDE LOFT APARTMENTS PHASE II
LIMITED PARTNERSHIP

By: Eastside Lofts GP Phase II, LLC
Its: General Partner

By: _____

Printed Name: Steven W. Hitt
Title:    Chief Executive Officer of The Arc Arkansas, Inc.,
          Managing Member of the General Partner
          Federal I.D. Number: 20-3827817

## ACKNOWLEDGMENT

STATE OF ARKANSAS        )
COUNTY OF Pulaski        )

BEFORE ME, the undersigned Notary Public, on this day personally appeared **Steven W. Hitt**, Chief **Executive Officer of the Arc Arkansas, Inc., Managing Member of Eastside Lofts GP Phase II, LLC, the General Partner of Eastside Loft Apartments Phase II Limited Partnership,** known to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he had executed the same as Chief Executive Officer of the Arc Arkansas, Inc., Managing Member of Eastside Lofts GP Phase II, LLC, the General Partner of Eastside Loft Apartments Phase II Limited Partnership, with authority to do so, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given My Hand and Seal of Office this _14th_ day of August, 2007.

_____
Notary Public, State of Arkansas

My Commission Expires _____

BRADLEY H. SIMS
NOTARY
PUBLIC
01-08-2009
PULASKI COUNTY, AR

ADFA Mortgage – FAF Program
Page 6 of 7

00000254

**Attachment A**

**Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Arkansas, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

Case 4:20-cv-00736-BSM   Document 1   Filed 06/25/21   Page 87 of 423



ADFA Mortgage – FAF Program
Page 1 of 7
This Instrument Prepared By
and When Recorded Return To:
Arkansas Development Finance Authority
Attn: Office of the General Counsel
P.O. Box 8023
Little Rock, Arkansas 72203-8023

# MODIFIED MORTGAGE
## ARKANSAS DEVELOPMENT FINANCE AUTHORITY
## FAF PROGRAM

**KNOW ALL MEN BY THESE PRESENTS:**

That Eastside Loft Apartments Phase II Limited Partnership (hereinafter called "Mortgagor"), for and in consideration of the modification of the payment terms of that certain promissory note dated August 14th, 2007, modification of the payment terms set forth herein and other valuable consideration the receipt and sufficiency of which is acknowledged, hereby grants, bargains, sells, conveys and delivers unto Arkansas Development Finance Authority (hereinafter called "Mortgagee"), and unto its successors and assigns, the real property (the "Property" or the "Project") situated in Pulaski County, Arkansas, as more particularly described on the attached Exhibit "A."

This Modified Mortgage also conveys all buildings and improvements now or at any time hereafter located on any land herein above described, together with all of the following equipment now or at any time hereafter located in such building regardless of method or annexation or removability including, but not limited to: all electrical equipment (including lighting equipment, refrigeration equipment, ceiling fans, attic and window fans, motors and all other electrical paraphernalia) except items attached merely by plugging in wall sockets; all furnaces (including floor furnaces), heaters, radiators and all other heating equipment except small gas stoves on floor; all bath tubs, toilets, sinks, basins, pipes and other plumbing equipment; all screens, awnings, and window shades; all linoleum and other permanent floor coverings; all engines and elevators.

TO HAVE AND TO HOLD the same unto Arkansas Development Finance Authority, and its successors and assigns forever.

And Mortgagor covenants with Mortgagee, its successors and assigns that Mortgagor will forever warrant and defend the title to all the Property against all lawful claims whatever.

PROVIDED, however, the foregoing conveyance is given as a Mortgage for the purpose of securing the following:

(a)     The payment of an amended and modified promissory note (the "Note"), with an effective date of **November  28 , 2007** evidencing a principal indebtedness (which indebtedness, and all extensions and renewals thereof is hereinafter called the "Primary Indebtedness") of **Five Hundred Forty-Four Thousand and 00/100 Dollars ($544,000.00)** with interest accruing thereon at the rate of **One Percent (1%) per annum**, payable as follows: Beginning September 1, 2007, in monthly installments of interest only in an amount equal to

One Half (1/2) of Mortgagor's monthly surplus cash, derived exclusively from the operation of Mortgagor's apartment complex described herein as the Project, not to exceed Four Hundred Fifty-Five and 33/100 Dollars ($455.33) per month for a period of thirty-six (36) months. Beginning September 1, 2010, principal and interest shall be payable in monthly installments equal to One Half (1/2) of the Mortgagor's monthly surplus cash derived exclusively from the operation of Mortgagor's apartment complex described herein as the Project, not to exceed Two Thousand Five Hundred One and 83/100 Dollars ($2,501.83) per month for 240 months. All accrued and unpaid principal and shall be due on **August 1, 2030**, the Maturity Date.

(b)     The payment of all future and additional indebtedness, direct or indirect, created after the date of this Mortgage, which may be owing by Mortgagor (or by any of the persons herein designated under the term "Mortgagor" to the holder of the Primary Indebtedness at any time prior to the payment in full of the Primary Indebtedness) or the foreclosure of this Mortgage therefore (the event occurring first to be controlling); such additional indebtedness to be secured hereby regardless of whether it shall be predicated upon future loans or advances hereafter made by the holder(s) of the Primary Indebtedness, or obligations hereafter acquired by such holder(s) through assignment or subrogation or otherwise, or shall represent indirect obligations (created after the date of this Mortgage) based upon any endorsements, guaranties or suretyship AND IT IS AGREED THAT THIS MORTGAGE SHALL STAND AS SECURITY FOR ALL SUCH FUTURE AND ADDITIONAL INDEBTEDNESS WHETHER IT BE INCURRED FOR ANY BUSINESS PURPOSE THAT WAS RELATED OR WHOLLY UNRELATED TO THE PURPOSE OF THE ORIGINAL LOAN, OR WHETHER IT WAS INCURRED FOR SOME PERSONAL OR NON-BUSINESS PURPOSE, OR FOR ANY OTHER PURPOSE RELATED OR UNRELATED, OR SIMILAR OR DISSIMILAR, TO THE PURPOSE OF THE ORIGINAL LOAN. THIS IS A NON-RECOURSE LOAN; and

(c)     The repayment to the holder(s) of the indebtedness secured hereby of all reimbursable expense at any time accruing to such holder(s) under the provisions of Paragraph (3) hereof.

Upon the payment of all such sums <u>and</u> compliance with the specified FAF Program Requirements, this Mortgage will become void and will be released by a proper marginal notation or, at the option of the holder(s) of the secured debt, by a release deed to be recorded at the expense of Mortgagor.

1.     **COVENANTS OF MORTGAGOR**. Mortgagor agrees to the following:

(a)     to pay, prior to delinquency, all taxes, special improvement assessments and other governmental charges against the Property, both real and personal, at any time levied or becoming due;

(b)     to carry insurance upon all insurable property encumbered hereby against such hazards, in such amounts and under such form of policies, as shall be acceptable to, or requested by, the holder(s) of the indebtedness secured hereby; each insurance policy to carry mortgage clause in favor of such holder(s) upon such form as may be approved by the holder(s), and each policy to be delivered to and held by such holder(s). Also to carry public liability insurance, and insurance against other hazards, to such extent as may be requested by the holder(s) of the secured indebtedness. In each instance, Mortgagor shall have the right to select the insurer, subject to Mortgagee's right to reject the proposed insurer for reasonable cause;

(c)    to prevent the Property from becoming encumbered by any lien or charge having priority over, or on a parity with, the lien of this Mortgage and to comply with all statutes, ordinances and regulations relating to such property; and

(d)    to protect the Property from waste, injury or unusual deterioration and, without subjecting the Property to any statutory lien, to make all replacements and repairs necessary to keep the Property in good physical condition. In that connection, it is agreed that Mortgagor may not cut the timber from any land encumbered hereby; moreover, Mortgagor may not remove or substantially remodel or alter any structure on the Property without prior written consent of the holder(s) of the secured indebtedness.

2.    **DEFAULT**. The holder(s) of the Primary Indebtedness or any future or additional indebtedness secured hereby (whether such indebtedness then be evidenced by the original note(s) or by any instrument(s) given in renewal or extension of such indebtedness) may, at the option of such holder(s), declare the entire unmatured portion of all indebtedness secured hereby, together with all default interest accrued on the entire secured debt, to be immediately due and payable, and the same shall forthwith become immediately due and payable (which acceleration of maturity may be accomplished without notice to anyone), in any one of the following events:

(a)    Upon the filing of a voluntary or involuntary petition to subject Mortgagor (or any party obligated as maker, endorser, surety or guarantor for the payment of the secured indebtedness) to any bankruptcy, debt-adjustment, receivership or other insolvency proceeding.

(b)    Upon the occurrence of any event, which, under the terms of the instrument at any time evidencing the indebtedness secured hereby, warrants acceleration (at the option of the holder) of the maturity of said indebtedness.

(c)    If default shall be made in the payment of any part of the Primary Indebtedness or any indebtedness secured hereby, or any default interest accruing on such indebtedness, as the same becomes due and payable according to the terms of the original note(s), or of any extension or renewal thereof at any time evidencing such indebtedness.

(d)    If Mortgagor shall fail to comply with any of the agreements contained in this Mortgage.

(e)    If Mortgagor, being a partnership or a corporation, shall be dissolved or reorganized in any manner.

(f)    If at any time it shall appear that title to the Property, or any portion thereof, is subject to any prior lien, title or interest not mentioned in this Mortgage as a prior encumbrance.

(g)     If at any time Mortgagor shall sell or convey the title to or any interest in any realty mortgaged hereunder without the prior written consent of the holder(s) of the secured indebtedness.

(h)     If at any time it should appear that the Mortgagor has attempted to sell free from the lien of this Mortgage any personal property or removable fixture encumbered hereby, or is about to attempt such a sale; or that any personality or removable fixture encumbered hereby has been, or is about to be moved to a different jurisdiction, subjected to physical damage or unusual deterioration, seized under legal process, or subjected by the Mortgagor or a third party to any other disposition which in the opinion of the holder(s) of the secured indebtedness will impair the security value of this instrument.

(i)     If at any time it should appear that the Mortgagor's financial statements given to and relied upon by the Mortgagee incorrectly or inaccurately set forth the financial condition of the Mortgagor.

(j)     If Mortgagor fails to comply with the "RESTRICTIVE COVENANT – FAF Program" document executed by Mortgagor on the 14th day of August, 2007, and filed and recorded in the official records of the Pulaski County Circuit/County Clerk on August 16, 2007, as Instrument Number 2007064415.

It is particularly understood that the foregoing acceleration provisions will be applicable not only to the maturities recited in the original mortgage note(s) but also to any substituted maturities created by extension or renewal. The failure of the holder(s) of the secured indebtedness to declare any acceleration of maturities when a ground therefore exists, even though such forbearance may be repeated from time to time, will not constitute a waiver of the right of such holder(s) to accelerate maturities upon a reoccurrence of the same ground therefore, nor will the act of such holder(s) in remedying any condition resulting from Mortgagor's default bar the holder(s) from declaring an acceleration of maturities by reason of such default.

3.     **REMEDIES UPON DEFAULT.**  In the event of a default hereunder, the holder(s) of the indebtedness secured hereby shall be entitled to any of the following remedies:

(a)     Pursuit of any and all remedies provided by judicial proceedings and non-judicial remedies, including self-help repossession;

(b)     Foreclosure of this Mortgage in compliance with Act 53, "The Statutory Foreclosure Act of 1987" by public sale to the highest bidder for cash, on the premises or at the main door of the Courthouse of Crittenden County, public notice of the time, terms and place of said sale having been given for thirty (30) days by publication in some newspaper, published in Crittenden County, once a week for four (4) consecutive weeks prior to the date of sale, the final publication to be no more than seven (7) days prior to the sale, which advertisement shall be sufficient for the purpose of foreclosure.  THE OWNER OF THE NOTE SECURED HEREBY MAY BECOME A PURCHASER AT SUCH SALE.  No bid shall be accepted that is less than two-thirds (2/3) of the entire indebtedness

due at the date of the sale.  Notice required under Act 53 of 1987 will be directed to the Mortgagor at the following address supplied by Mortgagor, to wit:

**Eastside Loft Apartments Phase II Limited Partnership**
**Steven Hitt**
**2004 South Main Street**
**Little Rock, AR 72206**
**(501) 375-7770**

Election of either (a) or (b) by Mortgagee is not irrevocable and Mortgagee may at any time subsequent to commencement of the proceedings terminate such proceeding and proceed with any other remedy.

(c)    The holder(s) of the indebtedness secured hereby may require the Mortgagor to assemble (at Mortgagor's expense) any or all of the personal property encumbered hereby and make it available to such holder(s) at a place specified by such holder(s) which is reasonably convenient to both parties; and such holder(s) may enforce all of its or their remedies, in respect to the encumbered personal property, that may be available under the Uniform Commercial Code. In the last event all expenses of retaking, holding, preparing for sale, selling or the like, as well as all reasonable attorney's fees (not exceeding 10% of the secured indebtedness plus accrued default interest) and lawful expenses incurred by said holder(s) in enforcing such remedies shall be payable to said holder(s) by Mortgagor shall constitute a part of the secured indebtedness.

(d)    Such holder(s) may enforce the lien of this Mortgage in respect to any or all real and personal property encumbered hereby:

   (i)    either separately or in bulk, in such order as Mortgagee, in is sole discretion, shall direct, including at any judicial or non-judicial sale; and

   (ii)    by proceedings that are prosecuted simultaneously or are prosecuted separately in such order as the holder(s) may elect.

4.    **MORTGAGEE EXPENDITURES**.  If the holder(s) of the indebtedness secured hereby shall expend any sum or sums for the protection of any of the Property or the lien of this Mortgage (such holder(s) to have uncontrolled discretion as to the necessity of making any such expenditures), the repayment of such sum or sums on demand (with interest thereon at the maximum legal rate from the date of each expenditure) shall be the personal obligation of Mortgagor; and such obligation to repay will constitute a part of the indebtedness secured hereby.  The expenditures thus made reimbursable will include (without limiting the foregoing) taxes, special improvement assessments, insurance premiums, repairs and maintenance expenses, sums paid to discharge prior liens, rents on premises in which mortgaged personality may be situated, etc.  The cost of any abstract, title commitment, or appraisal procured by the holder(s) of the secured indebtedness to facilitate foreclosure will also constitute a part of the reimbursable expense secured hereby.

5.   **RELINQUISHMENT OF MORTGAGOR'S RIGHTS**.  Mortgagor releases all rights of dower, courtesy, homestead and appraisement hereunder and also releases unto Mortgagee all right of redemption under the laws of Arkansas, including particularly all right of redemption under Act No. 53 of May 8, 1989, and amendments thereto currently codified as ARK. CODE ANN. § 18-49-106.

EXECUTED on this ___28th___ day of November, 2007.

**MORTGAGOR:**

**EASTSIDE LOFT APARTMENTS PHASE II**
**LIMITED PARTNERSHIP**

By: **Eastside Lofts GP Phase II, LLC**
Its: General Partner

By: _____

Printed Name: Steven W. Hitt
Title:    Chief Executive Officer of Arc Arkansas, Inc.,
         Managing Member of the General Partner
         Federal I.D. Number:  20-3827817_

**ACKNOWLEDGMENT**

STATE OF ARKANSAS        )
                         )
COUNTY OF PULASKI        )

BEFORE ME, the undersigned Notary Public, on this day personally appeared **Steven W. Hitt**, **Chief Executive Officer of Arc Arkansas, Inc., Managing Member of Eastside Lofts GP Phase II, LLC, the General Partner of Eastside Loft Apartments Phase II Limited Partnership**, known to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he had executed the same as **Chief Executive Officer of Arc Arkansas, Inc., Managing Member of Eastside Lofts GP Phase II, LLC, the General Partner of Eastside Loft Apartments Phase II Limited Partnership**, with authority to do so, for the purposes and consideration therein expressed, and in the capacity therein stated.

**Given My Hand and Seal of Office this _28th_ day of November, 2007.**

_____
Notary Public, State of Arkansas

My Commission Expires: _10-03-11_

OFFICIAL SEAL
**ANALISE S. JERNIGAN**
NOTARY PUBLIC-ARKANSAS
PULASKI COUNTY
MY COMMISSION EXPIRES: 10-03-11

**Attachment A**

**Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Arkansas, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

Case 4:12-cv-00786-BSM Document 1 Filed 08/25/12 Page 94 of 423



## MORTGAGE (realty)
### (for construction and other purposes)

KNOW ALL MEN BY THESE PRESENTS:

THAT Eastside Loft Apartments Phase II, Limited Partnership, by Eastside Lofts, Inc., its general partner, hereinafter called "Mortgagor," whether one or more, for a valuable consideration, does hereby grant, bargain, sell, convey and deliver unto the City of Little Rock, Arkansas, hereinafter called "Mortgagee," whether one or more, and unto its successors and assigns, the following described lands situated in Pulaski County, Arkansas, to-wit:

### LEGAL DESCRIPTION

Lot 2R, Block 20, Original City of Little Rock, Pulaski County Arkansas and being shown on plat recorded as Plat No. F-931 in the records of Pulaski County, Arkansas.

Hereinafter called "Premises" or "Property."

This mortgage also conveys all buildings and improvements now or at any time hereafter located on the Premises, together with all of the following equipment now or at any time hereafter located in the Premises regardless of the method of annexation or removability: All electrical equipment, including lighting, refrigeration equipment, ceiling fans, attic and window fans, motors and all other electrical paraphernalia, except items attached merely by plugging in wall sockets; all furnaces, including floor furnaces, heaters, radiators and all other equipment except small gas stoves on floor; all bath tubs, toilets, sinks, basins, pipes, and other plumbing equipment; all screens, awnings and window shades; all linoleum and other permanent floor coverings; all engines and elevators.

TO HAVE AND TO HOLD the same unto the Mortgagee, its successors and assigns forever.

And Mortgagor covenants with Mortgagee, that Mortgagor will forever warrant and defend the title to all said property against all lawful claims whatever.

PROVIDED ALWAYS, that this instrument is made, executed and delivered upon the following conditions, and in accordance with an executed agreement between the City of Little Rock and The ARC Arkansas dated August 2, 2007 to-wit:

1

1.    This mortgage is subject and subordinate to the prior mortgage of Arvest Bank dated August 29, 2006, and recorded on August 30, 2006 as instrument # 2006068512, as first mortgage holder, hereinafter called the "First Mortgage." This Mortgage is also subject and subordinate to the prior mortgage of Arkansas Development Finance Authority dated November 22, 2005 and recorded on December 8, 2005 as instrument #2005103422 hereinafter called the "Second Mortgage". This Mortgage is subject and subordinate to the prior mortgage of Arkansas Development Finance Authority dated August 13, 2007 and recorded on August 16, 2007 as instrument #2007064414 as third mortgage holder, hereinafter called the "Third Mortgage", and is further subject and subordinate to that Mortgage to be executed in favor of Local Initiative Support Corporation dated_____2007 and recorded on _____2007 as instrument # _____as forth mortgage holder, hereinafter referred to (Fourth Mortgage").    This Mortgage and Mortgagor acknowledge and agree that this Subordinate Mortgage is subject and subordinate in all respects to the liens, terms, covenants and conditions of the First Mortgage, Second Mortgage, Third Mortgage and Fourth Mortgage and to all advances heretofore made or which may hereafter be made pursuant to the First Mortgage, Second Mortgage, Third Mortgage and Fourth Mortgage including all sums advanced for the purpose of (a) protecting or further securing the liens of the such Mortgages, curing defaults by the Mortgagor under such Mortgages or for any other purpose expressly permitted by the First Mortgage, Second Mortgage, Third Mortgage and Fourth Mortgage or (b) constructing, renovating, repairing, furnishing, fixtures or equipping the Premises. The terms and provisions of the First Mortgage, Second Mortgage, Third Mortgage and Fourth Mortgage are paramount and controlling, and supersede any other terms and provisions hereof in conflict therewith.  In the event of a foreclosure or deed in lieu of foreclosure of the First Mortgage, Second Mortgage, Third Mortgage and Fourth Mortgage, any provisions herein or any provisions in any other collateral agreement restricting the use of the Premises to low or moderate income households or otherwise restricting the Mortgagor's ability to sell the Premises shall have no effect on subsequent owners or purchasers of the Premises.    Any person, including his successors or assigns, other than the Mortgagor or a related entity of the Mortgagor, receiving title to the Premises through a foreclosure or deed in lieu of foreclosure of the First Mortgage shall receive title to the Premises free and clear from such restrictions.

2.    The ARC Arkansas has applied to the Mortgagee for a HOME Investment Partnership Program subsidy loan in the principal sum of ONE HUNDRED THIRTY THOUSAND and No/100 DOLLARS ($130,000.00), hereinafter referred to as "HOME Subsidy" on the lands above described, and the Mortgagee has agreed to make such loan for such purposes.  The ARC Arkansas has executed a Promissory Note of even date herewith and a HOME agreement dated August 2, 2007, evidencing The ARC Arkansas' obligation to Mortgagee regarding the HOME Subsidy. The Mortgagor and the ARC Arkansas shall comply with the terms and conditions of the HOME agreement and the Promissory Note.

3.      Mortgagor agrees to retain fee title in the Premises and to use the Premises for a period not less than five (5) years from the date of the completion of the project utilizing the HOME Subsidy, but for the duration of any prior mortgage insured by an agency of the United States Government, hereinafter called the "Restricted Period."  The HOME-assisted units operated on the Premises shall remain affordable in terms of tenant incomes, allowable HOME rents, and Housing Quality Standards for the full period of affordability, based on the per unit HOME subsidy, and in conformance with all affordability requirements of 24 C.F.R. Sec. 92.252 (1996), as may be amended, of the HOME Program Regulations.  **The ARC Arkansas shall affirmatively market and lease ten (10) rental housing units to   special needs clients whose incomes do not exceed sixty percent (60%) of the adjusted area median income, with at least two (2) units leased to very-low income tenants. Very low-income tenants are defined as persons or families having income at or less than fifty percent (50%) of median family income, adjusted for family size, based on the total of current annual household incomes.**

4.      The ARC Arkansas shall apply rent limitations to all ten (10) housing units developed under the HOME agreement as follows:

1)      Rents for the ten (10) housing units shall be the lesser of the HUD-established Fair Market Rent for existing housing for comparable units in the area, less the monthly allowance for utilities and services to be paid by the tenant; or

2)      a rent that does not exceed thirty percent (30%) of the monthly adjusted income of a family whose gross income equals sixty-five percent (65%) of the respected adjusted area median income as determined by HUD, and for very low-income tenants, no more than thirty percent (30%) of the monthly adjusted income of a family whose gross income equals fifty percent (50%) of the respected adjusted area median income as determined by HUD, with adjustments for number of bedrooms in the unit, less the monthly allowance for utilities and services to be paid by the tenants for the ten (10) units.

The ARC Arkansas shall not refuse to lease the units assisted under the HOME agreement to qualified developmentally disabled individuals that are holders of a rental certificate, rental voucher, or a tenant-based rental assistance document based on the status of the prospective tenant as a holder of such certificate, voucher, or tenant-based rental assistance document.

The ARC Arkansas shall reexamine tenant income, family size, and family composition at least once annually and recalculate monthly rent, if necessary,

3

based on applicable gross rents, income adjustment, and monthly allowances for utilities or services. Mortgagee shall review and approve any changes in rent. Mortgagor shall give tenant(s) thirty (30) days prior written notice before implementing any increase in rent.

     5.    HOME funding provided under the HOME agreement and Promissory Note will be in the form of a forgiveable, deferred payment loan at zero percent (0%) interest for a term coinciding with the full term of this agreement. HOME funding in the amount of $130,000.00 will be forgiven at the rate of 20% each year on the anniversary date of agreement execution for the full term of the HOME agreement, contingent upon the HOME project being continually used and maintained as affordable housing for eligible developmentally disabled clients whose incomes do not exceed sixty percent (60%) of the adjusted area median income, including twenty-percent (20%) of the units, the equivalent of two (2) units for eligible tenants whose incomes do not exceed fifty percent (50%) of the adjusted area median income, and further contingent upon ownership of the subject properties by Mortgagor and as a primary residence of the client occupants. It is hereby understood and agreed that the period of affordability applicable under this agreement is five (5) years, based on the terms of the loan.

     6.    Except for a conveyance to the Senior Lien Holder under the First Mortgage, if all or any part of the Premises or any interest in it is sold or transferred, or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person, at any time during the Restricted Period Without Mortgagee's prior written consent, including a transfer of all or any part of the Premises to any person who, at initial occupancy of the Premises, does not use the Premises as the primary residence or for "low-income housing" within the meaning of the HOME Program, Mortgagee shall have the right to declare the entire amount of the HOME Subsidy loan immediately due and payable, or if the net proceeds of any conveyance within the Restricted Period are less than the full amount of the HOME Subsidy, then the Mortgagee shall have the right to declare the net proceeds of the sale immediately due and payable. For purposes of this mortgage, "net proceeds" means the sale proceeds minus loan repayment and closing costs. However, this option shall not be exercised by Mortgagee if exercise is prohibited by federal law as of the date of the Promissory Note.

     In that event, Mortgagor or The ARC Arkansas shall make payment within thirty (30) days of written demand therefor, and Mortgagee shall have the right to exercise all remedies provided in the Promissory Note, the HOME agreement, this Mortgage, or otherwise at law or equity.

     If the Mortgagor be husband and wife, the consequences of transfer, assignment, or conveyance of the Premises under this paragraph shall not apply in the event of the death of either or transfer by either to the other as part of a divorce

4

settlement, provided the other shall assume all obligations of the Mortgagor under this instrument.

7.     Mortgagor hereby agrees to pay all taxes and assessments that may be levied upon said Premises, when said taxes are due, or upon any interest or estate herein, including the interest represented by this mortgage lien, or upon this mortgage or the Promissory Note or debt hereby secured; and Mortgagor further agrees to pay any tax, assessment or charge that may be levied, assessed against, or required from the holders of said Promissory Note as a condition precedent to maintaining or enforcing the lien of this mortgage for the collection of said indebtedness; and also the insurance premiums for the amount of insurance hereinafter specified; and if not so paid the said Mortgagee, or the legal holder or holders of this mortgage, may without notice, declare the whole sum of money hereby secured due and payable at once, or may elect to pay such taxes, assessments or insurance premiums; and the amount so paid shall be a lien on the Premises aforesaid and be secured by this mortgage, and collected in the same manner as the principal debt hereby secured.   In such event, the legal holder or holders hereof may immediately cause this mortgage to be foreclosed, and shall be entitled to the appointment of a Receiver without proof or evidence of the insolvency of Mortgagor, and shall further be entitled to the immediate possession of the Premises, and the rents, issues and profits thereof.

8.     Mortgagor shall keep said Premises in compliance with all applicable State and local codes, including but not limited to the Housing Code of the City of Little Rock.   Mortgagor agrees to keep the premises clean and to keep all buildings, fences and improvements in good repair and condition and abstain from the commission of waste on said premises.   No building or other structure, improvement or fixture mortgaged hereby shall be removed or demolished without the prior written consent of the Mortgagee.   Mortgagor will not make, permit or suffer any alteration of or addition to any building or other structure or improvement upon the mortgaged property, or any part thereof without the prior written consent of Mortgagee.   The Mortgagor will not use, or permit or suffer the use of any of the mortgaged property for any purpose other than the purpose or purposes for which the same is now used, without prior written consent of the Mortgagee.

9.     That the buildings now on said Premises or that may be hereafter erected thereon shall be kept constantly insured against loss from such hazards and in such amounts and with such companies as are approved by or found satisfactory to the Mortgagee, its successors and assigns, and Mortgagor shall cause loss payable clauses to be attached to all such policies providing for payment of the proceeds thereof to Mortgagee, its successors and assigns, as its interest may appear.   All such policies shall be delivered to Mortgagee and held by it or its successors and assigns until all indebtedness secured by this mortgage has been paid in full.   Mortgagee is hereby authorized and empowered to collect under such policies and the proceeds of any such collection shall be applied first to

5

the costs and expenses of collection, including attorney's fees, if any, and second, toward payment of the indebtedness hereby secured; provided the Mortgagee may, at its election, permit the same to be used by Mortgagor to restore the damaged or destroyed improvements or land; provided, further, that the rights of the Mortgagee to collect and apply said proceeds shall be subject and subordinate to the rights of the First Mortgage holder to collect and apply such proceeds in accordance with the First Mortgage.

10.   Should the Mortgagee, or the then holder of said Promissory Note, institute suit to collect any indebtedness secured by this instrument and to foreclose the lien thereof, the Mortgagee, or the then holder of said Promissory Note, shall be entitled to have the abstract of title covering said property certified to date at the expense of the Mortgagor.   The party instituting such foreclosure proceedings shall have the right to pay any sums so paid, which shall be secured by the lien of this instrument and shall be paid out of the proceeds of the foreclosure sale as part of the cost and expense of making such sale.

11.   Mortgagor hereby agrees that if the makers of said Promissory Note fail to pay or cause to be paid any part of said money, either principal or interest, according to the tenor and effect of said Promissory Note when the same becomes due, or to conform or to comply with any of the foregoing covenants and conditions, the whole sum of money hereby secured shall, at the option of the then legal holder or holders hereof, become due and payable at once without notice, and the holder or holders of said Promissory Note shall become entitled to an immediate foreclosure of this mortgage by a Court of competent jurisdiction.

In the event of such default the Mortgagee shall immediately notify the First Mortgage holder of default of this Subordinate Mortgage.

In the event of a foreclosure of this mortgage, which shall be pursuant to and in compliance with Act 53, "The Statutory Foreclosure Act of 1987," the Court shall direct a public sale of the premises to the highest bidder for cash, on the premises or at the Courthouse of Pulaski County, State of Arkansas, and the Mortgagor shall pay all the costs and expenses of making such sale, including a reasonable attorney's fee in superintending the proper foreclosure at such sale.  In the event of a foreclosure of this instrument, the proceeds of the sale of said premises shall be applied, after payment of the costs and expense of the foreclosure proceedings; first, to the payment of all sums advanced or expended under the authority of this instrument for ground rents, taxes, special assessments, fire and other hazard insurance premiums and abstract of title expense, with lawful interest thereon; second, to the payment of the HOME Subsidy herein secured, or of any notes taken in other indebtedness secured hereby; third, to the payment of any other indebtedness secured hereby; fourth, the remainder, if any, after payment of all of the indebtedness in full, with interest, to the Mortgagor, its successors or assigns.

6

12.    The Mortgagor hereby releases all right of appraisement hereunder and also releases unto the Mortgagee all right of redemption under the laws of Arkansas, Ark. Code Ann., including particularly all right of redemption under Ark. Code Ann. § 18-49-106 (Michie 1987), as may be amended.

And We, for and in consideration of the loan herein secured being granted and made, do hereby release and relinquish into the Mortgagee, its successors and assigns, all our rights of dower, curtsey and homestead in and to said Premises and every part thereof.

NOW, if the Mortgagor and the ARC Arkansas shall keep and perform the covenants and conditions hereinabove recited in the time and manner herein specified, then the above conveyance shall be void and inoperative, and the lien of this instrument satisfied at the expense of the Mortgagor, otherwise to remain in full force and effect. The covenants and conditions herein contained shall bind, and the privileges, benefits and advantages herein contained shall inure to the respective heirs, executors, administrators, successors or assigns of the parties hereto. Whenever used, the singular shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

IN TESTIMONY WHEREOF, Mortgagor has hereunto subscribed its name on the _16th_ day of November, 2007.

**EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP, an Arkansas limited partnership**

By:    **EASTSIDE LOFTS GP PHASE II, LLC**
       **an Arkansas  Limited Liability Company**
       **General Partner**


       By:    **THE ARC ARKANSAS, INC.**
              **an Arkansas non-profit corporation**
              **its sole Member**

By:    _____
       **Steve, Hitt,  Chief Executive Officer**

7

## ACKNOWLEDGMENT

**STATE OF ARKANSAS** )
                    Saline ) SS.
**COUNTY OF** ~~PULASKI~~ )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Steve Hitt, Chief Executive Officer of The ARC Arkansas, Inc the sole member of EASTSIDE LOFTS GP PHASE II, LLC. the general partner of Eastside Loft Apartments Phase II, Limited Partnership, an Arkansas limited partnership, known to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that they had executed the same on behalf of said limited partnership, and further stated and acknowledged that he had signed, executed and delivered said foregoing instrument for the consideration , uses and purposes therein mentioned and set forth.

Given under my hand and seal of office this day of 16th November, 2007.

_____
Notary Public

My Commission Expires:

RAMONA BOYCE
Saline County
My Commission Expires
November 8, 2014

8

## MORTGAGE LOAN RIDER

This Rider, incorporated by reference, is attached to and made a part of the promissory note, the mortgage to which it is attached and all other documents evidencing, securing, and governing a loan in the amount of One Hundred Thirty Thousand Dollars ($130,000) (the "Loan") made by **THE CITY OF LITTLE ROCK, ARKANSAS** ("Lender") to **THE ARC ARKANSAS, INC.** (the "ARC"), and secured by a mortgage from **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP** ("ELAP") (ELAP and the ARC are collectively referred to herein as the "Borrower") for certain costs of construction or rehabilitation of Eastside Lofts (the "Project") which is located on the real property described as Lot 2R, Block 20, Original City of Little Rock, Arkansas, and set forth in the Mortgage of even date herewith. The form of this Rider has been designed for use whether Borrower is a limited partnership, a land trust of which a limited partnership is the beneficiary, or otherwise. Accordingly, the limited partnership developing the Project, whether or not identified as Borrower, is sometimes referred to herein as the "Partnership". The Articles of Limited Partnership forming or continuing the Partnership are referred to herein as the "Partnership Agreement".

The parties hereto agree that the following covenants, terms, and conditions shall be part of and shall modify or supplement each of the documents evidencing, securing, or governing the disbursement of the Loan (collectively the "Loan Documents"), and that in the event of any inconsistency or conflict between the covenants, terms, and conditions of the Loan Documents and this Rider, the following covenants, terms, and conditions shall control and prevail:

1.    **Nonrecourse Obligation.** The Loan is a nonrecourse obligation of Borrower. Neither Borrower nor any of its general and limited partners (or, if borrower is not the Partnership the general and limited partners of the Partnership), nor any other party shall have any personal liability for repayment of the Loan. The sole resource of Lender under the Loan Documents for repayment of the Loan shall be the exercise of its rights against the Project and related security thereunder.

2.    **General Partner Change.** The withdrawal, removal, and/or replacement of a general partner of the Partnership pursuant to the terms of the Partnership Agreement shall not constitute a default under any of the Loan Documents, and any such actions shall not accelerate the maturity of the Loan, provided that any required substitute general partner is reasonably acceptable to Lender and is selected with reasonable promptness.

3.  **Monetary Default.** If a monetary event of default occurs under the terms of any of the Loan Documents, prior to exercising any remedies thereunder Lender shall give Borrower and each of the general and limited partners of the Partnership, as identified in the Partnership Agreement, simultaneous written notice of such default. Borrower shall have a period of ten (10) days after such notice is given within which to cure the default prior to exercise of remedies by Lender under the Loan Documents, or such longer period of time as may be specified in the Loan Documents.

4.  **Non-Monetary Default.** If a non-monetary event of default occurs under the terms of any of the Loan Documents, prior to exercising any remedies thereunder Lender shall give Borrower and each of the general and limited partners of the Partnership, as identified in the Partnership Agreement, simultaneous written notice of such default. If the default is reasonably capable of being cured within thirty (30) days, Borrower shall have such period to effect a cure prior to the exercise of remedies by Lender under the Loan Documents, or such longer period of time as may be specified in the Loan Documents. If the default is such that it is not reasonably capable of being cured within thirty (30) days or such longer period if so specified, and if Borrower (a) initiates corrective action within said period, and (b) diligently, continually, and in good faith works to effect a cure as soon as possible, then Borrower shall have such additional time as is reasonably necessary to cure the default prior to exercise of any remedies by Lender. If Borrower fails to take corrective action or to cure the default within a reasonable time, Lender shall give Borrower and each of the general and limited partners of the Partnership written notice thereof, whereupon the limited partner may remove and replace the general partner with a substitute general partner who shall effect a cure within a reasonable time thereafter in accordance with the foregoing provisions. In no event shall Lender be precluded from exercising remedies if its security becomes or is about to become materially jeopardized by any failure to cure a default or the default is not cured within one hundred eighty (180) days after the first notice of default is given, or such longer period of time as may be specified in the Loan Documents.

5.  **Casualty, Condemnation, Etc.** In the event of any fire or other casualty to the Project or eminent domain proceedings resulting in condemnation of the Project or any part thereof, Borrower shall have the right to rebuild the Project, and to use all available insurance or condemnation proceeds therefor, provided that (a) such proceeds are sufficient to keep the Loan in balance and rebuild the Project in a manner that provides adequate security to Lender for repayment of the Loan or if such proceeds are insufficient then Borrower shall have funded any deficiency, (b) Lender shall have the right to approve plans and specifications for any major rebuilding and the right to approve disbursements of insurance or condemnation proceeds for rebuilding under a construction escrow or similar arrangement, and (c) no material default then exists under the Loan Documents. If the casualty or condemnation affects only part of the Project and total rebuilding is infeasible, then proceeds may be used for partial rebuilding and partial repayment of the Loan in a manner that provides adequate security to Lender for repayment of the remaining balance of the Loan.

2

**6.** **Force Majeure.** There shall be no default for construction or rehabilitation delays beyond the reasonable control of the Borrower, provided that such delays do not exceed one hundred eighty (180) days, or such longer period of time as may be specified in the Loan Documents.

**7.** **Purchase Rights.** The execution and delivery of the purchase option and right of first refusal agreement described in the Partnership Agreement shall not constitute a default under the Loan Documents or accelerate the maturity of the Loan thereunder. Any requisite consent of Lender to (a) the exercise of said purchase option and right of first refusal agreement by the project sponsor identified therein, and to (b) the assumption without penalty of Loan obligations by the project sponsor and the release of Borrower from such obligations, shall not be unreasonably withheld. Subject to any such consent requirement, the exercise of rights under such agreement shall not constitute a default or accelerate maturity of the Loan.

**8.** **Loan Assumption.** If the purchase option and right of first refusal agreement described in the Partnership Agreement is not exercised and the Project is sold subject to low-income housing use restrictions as continued in an existing regulatory agreement or other recorded covenant, any requisite consent of Lender to said sale, and to the assumption without penalty of loan obligations by the purchaser and the release of Borrower from such obligations, shall not be unreasonably withheld.

**9.** **Lender Approvals, Etc.** In any approval, consent, or other determination by Lender required under any of the Loan Documents, Lender shall act reasonably and in good faith.

**10.** **Prohibition of Sale.** Lender shall not (a) sell, assign, transfer, or convey any such indebtedness (or any interest therein) to Federal Home Loan Mortgage Corporation ("Freddie Mac"), or (b) include such indebtedness (or any interest therein) in a pool of loans to be sold, assigned, transferred or conveyed to Freddie Mae.

IN WITNESS WHEREOF, the undersigned have caused this Rider to be executed the 16th day of November, 2007.

Lender:

**THE CITY OF LITTLE ROCK,**
**Pulaski County, Arkansas**

By:_____

**Bruce Moore, City Manager**

3

Borrower

**EASTSIDE LOFT APARTMENTS PHASE II
LIMITED PARTNERSHIP**, an Arkansas Limited
Partnership

By:    **EASTSIDE LOFTS GP PHASE II, LLC**
       an Arkansas Limited Liability Company
       General Partner

       By:    **THE ARC ARKANSAS, INC.**
              an Arkansas non-profit corporation
              its sole Member

By: _____
       Steve Hitt, Chief Executive Officer

4

STATE OF ARKANSAS    )
                     )          **Acknowledgement**
COUNTY OF PULASKI    )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Bruce Moore, the City Manager of the City of Little Rock, Pulaski County, Arkansas, known to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he had executed the same on behalf of said entity, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

Given under my hand and seal of office this 16th day of November, 2007.

_____
Notary Public

My Commission Expires: 4-26-09

SEAL

OFFICIAL SEAL
BRENDA J. JOHNSON
NOTARY PUBLIC-ARKANSAS
PULASKI COUNTY
MY COMMISSION EXPIRES: 4-26-2009

STATE OF ARKANSAS    )
          SALINE      )          **Acknowledgement**
COUNTY OF PULASKI    )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Steve Hitt, Chief Executive Officer of The ARC Arkansas, sole member of Eastside Lofts GP Phase II, LLC. the general partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership, known to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he had executed the same on behalf of said entity, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

Given under my hand and seal of office this 16th day of November, 2007.

_____
Notary Public

My Commission expires
Saline County
My Commission Expires
November 8, 2014

# EXHIBIT B

Case 4:11-cv-00785-BSM Document 1-1 Filed 08/25/11 Page 108 of 423



Drafted by and when Recorded return to:
Roberta R. Russ
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226-3506

---

For Recorder's Use                                          For Recorder's Use

### SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is entered into as of the 24th day of November, 2009 by and among (i) **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, whose address is 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606 (the "Senior Lender"), (ii) **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, whose address is Attn: Cynthia R. Stone, 2004 Main Street, Little Rock, Arkansas 72206 (the "Borrower"), and (iii) **ARVEST BANK**, an Arkansas state bank, whose address is 500 Broadway Place, Little Rock, Arkansas 72202 ("Subordinate Lender") subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

### RECITALS:

A.      The Senior Lender has made or is making a loan (the "First Mortgage Loan") to the Borrower in the original principal amount of $809,000. The First Mortgage Loan is or will be secured by a first mortgage lien (the "First Mortgage") on a multifamily housing project located in the City of Little Rock, Pulaski County, Arkansas (the "Property"). The Property is more fully described in Exhibit A attached hereto. The Borrower's obligation to repay the First Mortgage Loan is evidenced by a Multifamily Note dated as of November 24, 2009 (the "First Mortgage Note"), and is due in full on December 1, 2027.

B.      Subordinate has previously made a construction loan to Borrower in the original principal amount of $3,000,000 and has agreed to convert a portion of its construction loan in the amount of $732,069.28 to a permanent loan to Borrower ("Subordinate Loan"), which Subordinate Loan is secured by a mortgage lien against the Property.

C.      Subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

D.     The Senior Lender intends to sell, transfer and deliver the First Mortgage Note and assign the First Mortgage to The Community Development Trust, LP, a Delaware limited partnership ("CDT").

NOW, THEREFORE, The Senior Lender, the Subordinate Lender and the Borrower agree as follows:

**1.     Definitions.**

In addition to the terms defined in the Recitals to this Agreement, for purposes of this Agreement the following terms have the respective meanings set forth below:

"Affiliate" means, when used with respect to a Person, any corporation, partnership, joint venture, limited liability company, limited liability partnership, trust or individual controlled by, under common control with, or which controls such Person (the term "control" for these purposes shall mean the ability, whether by the ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to make management decisions on behalf of, or independently to select the managing partner of, a partnership, or otherwise to have the power independently to remove and then select a majority of those individuals exercising managerial authority over an entity, and control shall be conclusively presumed in the case of the ownership of 50% or more of the equity interests).

"Borrower" means the Person named as such in the first paragraph of this Agreement and any other Person (other than the Senior Lender) who acquires title to the Property after the date of this Agreement.

"Business Day" means any day other than Saturday, Sunday or a day on which the Senior Lender is not open for business.

"Default Notice" means: (a) a copy of the written notice from the Senior Lender to the Borrower stating that a First Mortgage Loan Default has occurred under the First Mortgage Loan; or (b) a copy of the written notice from the Subordinate Lender to the Borrower stating that a Subordinate Loan Default has occurred under the Subordinate Loan. Each Default Notice shall specify the default upon which such Default Notice is based.

"First Mortgage Loan Default" means the occurrence of an "Event of Default" as that term is defined in the First Mortgage Loan Documents.

"First Mortgage Loan Documents" means the First Mortgage Note and all other documents evidencing, securing or otherwise executed and delivered in connection with the First Mortgage Loan.

"Person" means an individual, estate, trust, partnership, corporation, limited liability company, limited liability partnership, governmental department or agency or any other entity which has the legal capacity to own property.

"Senior Lender" means the Person named as such in the first paragraph on page 1 of this Agreement. When CDT or any other Person becomes the legal holder of the First Mortgage Note, CDT or such other Person shall automatically become the Senior Lender.

"Subordinate Lender" means the Person named as such in the first paragraph on page 1 of this Agreement and any other Person who becomes the legal holder of the Subordinate Note after the date of this Agreement.

"Subordinate Loan Default" means a default by the Borrower in performing or observing any of the terms, covenants or conditions in the Subordinate Loan Documents to be performed or observed by it, which continues beyond any applicable period provided in the Subordinate Loan Documents for curing the default.

"Subordinate Loan Documents" means the Subordinate Note, the Subordinate Mortgage, and all other documents evidencing, securing or otherwise executed and delivered in connection with the Subordinate Loan.

"Subordinate Mortgage" means collectively, the (i) Amended and Restated Mortgage encumbering the Property as security for the Subordinate Loan, as recorded in the Official Records of Pulaski County, Arkansas as Instrument No. 2009079202 which amended and restated that certain Construction Mortgage (with Security Agreement, Absolute Assignment of Leases and Rents, Fixture Filing and Financing Statement) dated August 29, 2006, recorded as Instrument No. 2006068512 in official records of Pulaski County, Arkansas, as amended by Amendment dated November 26, 2008 recorded as Instrument No. 2008081774 in the Official Records of Pulaski County, Arkansas, and as further amended by Amendment dated June 2, 2009 recorded as Instrument No. 2009074147, in Official Records of Pulaski County, Arkansas, (ii) that certain Arkansas Absolute Assignment of Rents and Leases dated August 29, 2006 given by Borrower in favor of Subordinate Lender as recorded as Instrument No. 2006068513, in Official Records of Pulaski County, Arkansas and (iii) Uniform Commercial Code showing Subordinate Lender as secured party and Borrower as debtor, recorded as Instrument No. 2006068514, in Official Records of Pulaski County, Arkansas.

"Subordinate Note" means the amended and restated promissory note in the amount of $732,069.28 dated November 24, 2009 issued by the Borrower to the Subordinate Lender, or order, to evidence the Subordinate Loan.

## 2.    Permission to Place Mortgage Lien Against Property.

The Senior Lender agrees, notwithstanding the prohibition against inferior liens on the Property contained in the First Mortgage Loan Documents and subject to the provisions of this Agreement, to permit the Subordinate Lender to record the Subordinate Mortgage and other recordable Subordinate Loan Documents against the Property (which are subordinate in all respects to the lien of the First Mortgage) to secure the Borrower's obligation to repay the Subordinate Note and all other obligations, indebtedness and liabilities of the Borrower to the Subordinate Lender under and in connection with the Subordinate Loan.  Such permission is

**Fannie Mae Subordination Agreement –**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT.3934775.5

**Form 4503**    10/98    (Page 3)
© 1997-1998 Fannie Mae

subject to the condition that each of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is true and correct on the date of this Agreement and on the date on which the proceeds of the Subordinate Loan are disbursed to the Borrower. If any of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is not true and correct on both of those dates, the provisions of the First Mortgage Loan Documents applicable to unpermitted liens on the Property shall apply.

**3.      Borrower's and Subordinate Lender's Representations and Warranties.**

The Borrower and the Subordinate Lender (if applicable) each makes the following representations and warranties to the Senior Lender:

**(a)      Subordinate Note.**   The Subordinate Note contains the following provision:

The indebtedness evidenced by this Note is and shall be subordinate in right of payment to the prior payment in full of the indebtedness evidenced by a Multifamily Note of even date herewith in the original principal amount of $809,000 issued by ("Maker") and payable to NEF Mortgage Corporation, an Illinois non-profit corporation ("Senior Lender"), or order, to the extent and in the manner provided in that certain Subordination Agreement of even date herewith between the payee of this Note, and the Senior Lender and Maker (the "Subordination Agreement").  The Mortgage securing this Note is and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of the Multifamily Mortgage securing the Multifamily Note as more fully set forth in the Subordination Agreement.  The rights and remedies of the payee and each subsequent holder of this Note under the Mortgage securing this Note are subject to the restrictions and limitations set forth in the Subordination Agreement. Each subsequent holder of this Note shall be deemed, by virtue of such holder's acquisition of the Note, to have agreed to perform and observe all of the terms, covenants and conditions to be performed or observed by the Subordinate Lender under the Subordination Agreement.

**(b)      Relationship of Borrower to Subordinate Lender and Senior Lender.**  The Subordinate Lender is not an Affiliate of the Borrower and is not in possession of any facts which would lead it to believe that the Senior Lender is an Affiliate of the Borrower.

**(c)      Term.**  The term of the Subordinate Note does not end before the term of the First Mortgage Note.

Fannie Mae Subordination Agreement —
Affordable Housing
Eastside Lofts (Arvest)
DETROIT.3934775.5

Form 4503     10/98     (Page 4)
© 1997-1998 Fannie Mae

**(d)** **Subordinate Loan Documents.** The executed Subordinate Loan Documents are substantially in the same forms as those submitted to, and approved by, CDT prior to the date of this Agreement. Upon the execution and delivery of the Subordinate Loan Documents, Borrower shall deliver to Senior Lender an executed copy of each of the Subordinate Loan Documents certified to be true, correct and complete.

**(e)** **Senior Loan Documents**. Borrower alone represents and warrants that the executed Senior Loan Documents are substantially in the same forms as, when applicable, those submitted to, and approved by, CDT prior to the date of this Agreement. Upon execution and delivery of the Senior Loan Documents, Borrower shall deliver to Subordinate Lender an executed copy of each of the Senior Loan Documents, certified to be true, correct and complete.

**4.** **Terms of Subordination.**

**(a)** **Agreement to Subordinate.** The Senior Lender and the Subordinate Lender agree that: (i) the indebtedness evidenced by the Subordinate Loan Documents is and shall be subordinated in right of payment, to the extent and in the manner provided in this Agreement to the prior payment in full of the indebtedness evidenced by the First Mortgage Loan Documents, and (ii) the Subordinate Mortgage and the other Subordinate Loan Documents are and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of the First Mortgage and the other First Mortgage Loan Documents and to all advances heretofore made or which may hereafter be made pursuant to the First Mortgage and the other First Mortgage Loan Documents (including but not limited to, all sums advanced for the purposes of (1) protecting or further securing the lien of the First Mortgage, curing defaults by the Borrower under the First Mortgage Loan Documents or for any other purpose expressly permitted by the First Mortgage, or (2) constructing, renovating, repairing, furnishing, fixturing or equipping the Property).

**(b)** **Subordination of Subrogation Rights.** The Subordinate Lender agrees that if, by reason of its payment of real estate taxes or other monetary obligations of the Borrower, or by reason of its exercise of any other right or remedy under the Subordinate Loan Documents, it acquires by right of subrogation or otherwise a lien on the Property which (but for this subsection) would be senior to the lien of the First Mortgage, then, in that event, such lien shall be subject and subordinate to the lien of the First Mortgage.

**(c)** **Payments Before First Mortgage Loan Default.** Until the Subordinate Lender receives a Default Notice of a First Mortgage Loan Default from the Senior Lender, the Subordinate Lender shall be entitled to retain for its own account all payments made under or pursuant to the Subordinate Loan Documents.

**(d)** **Payments After First Mortgage Loan Default.** The Borrower agrees that, after it receives notice (or otherwise acquires knowledge) of a First Mortgage Loan Default, it will not make any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT.3934775.5

Form 4503     10/98     (Page 5)
© 1997-1998 Fannie Mae

payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent.   The Subordinate Lender agrees that, after it receives a Default Notice from the Senior Lender with written instructions directing the Subordinate Lender not to accept payments from the Borrower on account of the Subordinate Loan, it will not accept any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent. If the Subordinate Lender receives written notice from the Senior Lender that the First Mortgage Loan Default which gave rise to the Subordinate Lender's obligation not to accept payments has been cured, waived, or otherwise suspended by the Senior Lender, the restrictions on payment to the Subordinate Lender in this Section 4 shall terminate, and the Senior Lender shall have no right to any subsequent payments made to the Subordinate Lender by the Borrower prior to the Subordinate Lender's receipt of a new Default Notice from the Senior Lender in accordance with the provisions of this Section 4(d).

(e)   **Remitting Subordinate Loan Payments to Senior Lender.**   If, after the Subordinate Lender receives a Default Notice from the Senior Lender in accordance with subsection (d) above, the Subordinate Lender receives any payments under the Subordinate Loan Documents, the Subordinate Lender agrees that such payment or other distribution will be received and held in trust for the Senior Lender and unless the Senior Lender otherwise notifies the Subordinate Lender in writing, will be promptly remitted, in kind to the Senior Lender, properly endorsed to the Senior Lender, to be applied to the principal of, interest on and other amounts due under the First Mortgage Loan Documents in accordance with the provisions of the First Mortgage Loan Documents.   By executing this Agreement, the Borrower specifically authorizes the Subordinate Lender to endorse and remit any such payments to the Senior Lender, and specifically waives any and all rights to have such payments returned to the Borrower or credited against the Subordinate Loan.   Borrower and Senior Lender acknowledge and agree that payments received by the Subordinate Lender, and remitted to the Senior Lender under this Section 4, shall not be applied or otherwise credited against the Subordinate Loan, nor shall the tender of such payment to the Senior Lender waive any Subordinate Loan Default which may arise from the inability of the Subordinate Lender to retain such payment or apply such payment to the Subordinate Loan.

(f)   **Agreement Not to Commence Bankruptcy Proceeding.**   The Subordinate Lender agrees that during the term of this Agreement it will not commence, or join with any other creditor in commencing any bankruptcy reorganization, arrangement, insolvency or liquidation proceedings with respect to the Borrower, without the Senior Lender's prior written consent.

5..   **Default Under Subordinate Loan Documents.**

(a)   **Notice of Default and Cure Rights.**   The Subordinate Lender shall deliver to the Senior Lender a Default Notice within five Business Days in each case where the Subordinate Lender has given a Default Notice to the Borrower.   Failure of the Subordinate Lender to send a Default Notice to the Senior Lender shall not prevent

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT.3934775.5

**Form 4503**   10/98   (Page 6)
© 1997-1998 Fannie Mac

the exercise of the Subordinate Lender's rights and remedies under the Subordinate Loan Documents, subject to the provisions of this Agreement. The Senior Lender shall have the right, but not the obligation, to cure any Subordinate Loan Default within 60 days following the date of such notice; provided, however that the Subordinate Lender shall be entitled, during such 60-day period, to continue to pursue its rights and remedies under the Subordinate Loan Documents. All amounts paid by the Senior Lender in accordance with the First Mortgage Loan Documents to cure a Subordinate Loan Default shall be deemed to have been advanced by the Senior Lender pursuant to, and shall be secured by the lien of, the First Mortgage.

**(b)    Subordinate Lender's Exercise of Remedies After Notice to Senior Lender.** If a Subordinate Loan Default occurs and is continuing, the Subordinate Lender agrees that, without the Senior Lender's prior written consent, it will not commence foreclosure proceedings with respect to the Property under the Subordinate Loan Documents or exercise any other rights or remedies it may have under the Subordinate Loan Documents, including, but not limited to accelerating the Subordinate Loan, collecting rents, appointing (or seeking the appointment of) a receiver or exercising any other rights or remedies thereunder unless and until it has given the Senior Lender at least 60 days' prior written notice; during such 60 day period, however, the Subordinate Lender shall be entitled to exercise and enforce all other rights and remedies available to the Subordinate Lender under the Subordinate Loan Documents and/or under applicable laws, including without limitation, rights to enforce covenants and agreements of the Borrower relating to income, rent, or affordability restrictions contained in the Land Use Restriction Agreement.

**(c)    Cross Default.** The Borrower and the Subordinate Lender agree that a Subordinate Loan Default shall constitute a First Mortgage Loan Default under the First Mortgage Loan Documents and the Senior Lender shall have the right to exercise all rights or remedies under the First Mortgage Loan Documents in the same manner as in the case of any other First Mortgage Loan Default. If the Subordinate Lender notifies the Senior Lender in writing that any Subordinate Loan Default of which the Senior Lender has received a Default Notice has been cured or waived, as determined by the Subordinate Lender in its sole discretion, then provided that Senior Lender has not conducted a sale of the Property pursuant to its rights under the First Mortgage Loan Documents, any First Mortgage Loan Default under the First Mortgage Loan Documents arising solely from such Subordinate Loan Default shall be deemed cured, and the First Mortgage Loan shall be reinstated, provided, however, that the Senior Lender shall not be required to return or otherwise credit for the benefit of the Borrower any default rate interest or other default related charges or payments received by the Senior Lender during such First Mortgage Loan Default.

**6.    Default Under First Mortgage Loan Documents.**

**(a)    Notice of Default and Cure Rights.** The Senior Lender shall deliver to the Subordinate Lender a Default Notice within five Business Days in each case where the Senior Lender has given a Default Notice to the Borrower. Failure of the Senior Lender to send a Default Notice to the Subordinate Lender shall not prevent the exercise of the Senior Lender's rights and remedies under the Senior Loan Documents,

**Fannie Mae Subordination Agreement —**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT.3934775.5

**Form 4503**    10/98    (Page 7)
© 1997-1998 Fannie Mae

subject to the provisions of this Agreement.  The Subordinate Lender shall have the right, but not the obligation, to cure any such First Mortgage Loan Default within 60 days following the date of such notice; provided, however, that the Senior Lender shall be entitled during such 60-day period to continue to pursue its remedies under the First Mortgage Loan Documents.  Subordinate Lender may have up to 90 days from the date of the Default Notice to cure a non-monetary default if during such 90-day period Subordinate Lender keeps current all payments required by the First Mortgage Loan Documents.  In the event that such a non-monetary default creates an unacceptable level of risk relative to the Property, or Senior Lender's secured position relative to the Property, as determined by Senior Lender in its sole discretion, then Senior Lender may exercise during such 90-day period all available rights and remedies to protect and preserve the Property and the rents, revenues and other proceeds from the Property.  All amounts paid by the Subordinate Lender to the Senior Lender to cure a First Mortgage Loan Default shall be deemed to have been advanced by the Subordinate Lender pursuant to, and shall be secured by the lien of, the Subordinate Mortgage.

**(b)   Cross Default.**  The Subordinate Lender agrees that, notwithstanding any contrary provision contained in the Subordinate Loan Documents, a First Mortgage Loan Default shall not constitute a default under the Subordinate Loan Documents if no other default occurred under the Subordinate Loan Documents until either (i) the Senior Lender has accelerated the maturity of the First Mortgage Loan, or (ii) the Senior Lender has taken affirmative action to exercise its rights under the First Mortgage to collect rent, to appoint (or seek the appointment of) a receiver or to foreclose on (or to exercise a power of sale contained in) the First Mortgage.  At any time after a First Mortgage Loan Default is determined to constitute a default under the Subordinate Loan Documents, the Subordinate Lender shall be permitted to pursue its remedies for default under the Subordinate Loan Documents, subject to the restrictions and limitations of this Agreement.   If at any time the Borrower cures any First Mortgage Loan Default to the satisfaction of the Senior Lender, as evidenced by written notice from the Senior lender to the Subordinate Lender, any default under the Subordinate Loan Documents arising from such First Mortgage Loan Default shall be deemed cured and the Subordinate Loan shall be retroactively reinstated as if such First Mortgage Loan Default had never occurred.

**7.  ·   Conflict.**

The Borrower, the Senior Lender and the Subordinate Lender each agrees that, in the event of any conflict or inconsistency between the terms of the First Mortgage Loan Documents, the Subordinate Loan Documents and the terms of this Agreement, the terms of this Agreement shall govern and control solely as to the following:  (a) the relative priority of the security interests of the Senior Lender and the Subordinate Lender in the Property; (b) the timing of the exercise of remedies by the Senior Lender and the Subordinate Lender under the First Mortgage and the Subordinate Mortgage, respectively; and (c) solely as between the Senior Lender and the Subordinate Lender, the notice requirements, cure rights, and the other rights and obligations which the Senior Lender and the Subordinate Lender have agreed to as expressly provided in this Agreement.  Borrower acknowledges that the terms and provisions of this Agreement shall not, and shall not be deemed to: extend Borrower's time to cure any First Mortgage Loan Default or Subordinate Loan Default, as the case may be; give the

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT:3934775.5

Form 4503     10/98     (Page 8)
© 1997-1998 Fannie Mae

Borrower the right to notice of any First Mortgage Loan Default or Subordinate Loan Default, as the case may be other than that, if any, provided, respectively under the First Mortgage Loan Documents or the Subordinate Loan Documents; or create any other right or benefit for Borrower as against Senior Lender or Subordinate Lender.

**8.    Rights and Obligations of the Subordinate Lender Under the Subordinate Loan Documents and of the Senior Lender under the First Mortgage Loan Documents.**

Subject to each of the other terms of this Agreement, all of the following provisions shall supersede any provisions of the Subordinate Loan Documents covering the same subject matter:

**(a)    Protection of Security Interest.** The Subordinate Lender shall not, without the prior written consent of the Senior Lender in each instance, take any action which has the effect of increasing the indebtedness outstanding under, or secured by, the Subordinate Loan Documents, except that the Subordinate Lender shall have the right to advance funds to cure First Mortgage Loan Defaults pursuant to Section 6(a) above and advance funds pursuant to the Subordinate Mortgage for the purpose of paying real estate taxes and insurance premiums, making necessary repairs to the Property and curing other defaults by the Borrower under the Subordinate Loan Documents.

**(b)    Condemnation or Casualty.** In the event of: a taking or threatened taking by condemnation or other exercise of eminent domain of all or a portion of the Property (collectively, a "Taking"); or the occurrence of a fire or other casualty resulting in damage to all or a portion of the Property (collectively, a "Casualty"), at any time or times when the First Mortgage remains a lien on the Property the following provisions shall apply:

(1)    The Subordinate Lender hereby agrees that its rights (under the Subordinate Loan Documents or otherwise) to participate in any proceeding or action relating to a Taking and/or a Casualty, or to participate or join in any settlement of, or to adjust, any claims resulting from a Taking or a Casualty shall be and remain subordinate in all respects to the Senior Lender's rights under the First Mortgage Loan Documents with respect thereto, and the Subordinate Lender shall be bound by any settlement or adjustment of a claim resulting from a Taking or a Casualty made by the Senior Lender; provided, however, this subsection and/or anything contained in this Agreement shall not limit the rights of the Subordinate Lender to file any pleadings, documents, claims or notices with the appropriate court with jurisdiction over the proposed Taking and/or Casualty; and

(2)    all proceeds received or to be received on account of a Taking or a Casualty, or both, shall be applied (either to payment of the costs and expenses of repair and restoration or to payment of the First Mortgage Loan) in the manner determined by the Senior Lender in its sole discretion; provided, however, that if the Senior Lender elects to apply such proceeds to payment of

**Fannie Mae Subordination Agreement —**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT.3934775.5

Form 4503      10/98      (Page 9)
© 1997-1998 Fannie Mae

the principal of, interest on and other amounts payable under the First Mortgage Loan, any proceeds remaining after the satisfaction in full of the principal of, interest on and other amounts payable under the First Mortgage Loan shall be paid to, and may be applied by, the Subordinate Lender in accordance with the applicable provisions of the Subordinate Loan Documents, provided however, the Senior Lender agrees to consult with the Subordinate Lender in determining the application of Casualty proceeds, provided further however that in the event of any disagreement between the Senior Lender and the Subordinate Lender over the application of Casualty proceeds, the decision of the Senior Lender, in its sole discretion, shall prevail.

    **(c)**    **No Modification of Subordinate Loan Documents.**  The Borrower and the Subordinate Lender each agrees that, until the principal of, interest on and all other amounts payable under the First Mortgage Loan Documents have been paid in full, it will not, without the prior written consent of the Senior Lender in each instance, increase the amount of the Subordinate Loan, increase the required payments due under the Subordinate Loan, decrease the term of the Subordinate Loan, increase the interest rate on the Subordinate Loan, or otherwise amend the Subordinate Loan terms in a manner that creates an adverse effect upon the Senior Lender under the First Mortgage Loan Documents. Any unauthorized amendment of the Subordinate Loan Documents or assignment of the Subordinate Lender's interest in the Subordinate Loan without the Senior Lender's consent shall be void ab initio and of no effect whatsoever.

    **9.**    **Modification or Refinancing of First Mortgage Loan.**

    The Subordinate Lender consents to any agreement or arrangement in which the Senior Lender waives, postpones, extends, reduces or modifies any provisions of the First Mortgage Loan Documents, including any provision requiring the payment of money. Subordinate Lender further agrees that its agreement to subordinate hereunder shall extend to any new mortgage debt which is for the purpose of refinancing all or any part of the First Mortgage Loan (including reasonable and necessary costs associated with the closing and/or the refinancing); and that all the terms and covenants of this Agreement shall inure to the benefit of any holder of any such refinanced debt; and that all references to the First Mortgage Loan, the First Mortgage Note, the First Mortgage, the First Mortgage Loan Documents and Senior Lender shall mean, respectively, the refinance loan, the refinance note, the mortgage securing the refinance note, all documents evidencing securing or otherwise pertaining to the refinance note and the holder of the refinance note.

    **10.**    **Default by the Subordinate Lender or Senior Lender.**

    If the Subordinate Lender or Senior Lender defaults in performing or observing any of the terms, covenants or conditions to be performed or observed by it under this Agreement, the other, non-defaulting lender shall have the right to all available legal and equitable relief.

    **11.**    **Notices.**

    Each notice, request, demand, consent, approval or other communication (hereinafter in this Section referred to collectively as "notices" and referred to singly as a "notice") which

the Senior Lender or the Subordinate Lender is required or permitted to give to the other party pursuant to this Agreement shall be in writing and shall be deemed to have been duly and sufficiently given if: (a) personally delivered with proof of delivery thereof (any notice so delivered shall be deemed to have been received at the time so delivered); or (b) sent by Federal Express (or other similar national overnight courier) designating early morning delivery (any notice so delivered shall be deemed to have been received on the next Business Day following receipt by the courier); or (c) sent by United States registered or certified mail, return receipt requested, postage prepaid, at a post office regularly maintained by the United States Postal Service (any notice so sent shall be deemed to have been received two days after mailing in the United States), addressed to the respective parties as follows:

**SENIOR LENDER:**

NEF Mortgage Corporation
120 South Riverside Plaza, 15th Floor
Chicago, Illinois 60606
Attention: Mark Siranovic

With a copy to:                          The Community Development Trust, LP
                                         1350 Broadway, Suite 700
                                         New York, New York 10018
                                         Attention: Operations – Asset Management

**SUBORDINATE LENDER:**

Arvest Bank
500 Broadway Place
Little Rock, Arkansas 72201
Attention: Roger Steging

Either party may, by notice given pursuant to this Section, change the person or persons and/or address or addresses, or designate an additional person or persons or an additional address or addresses for its notices, but notice of a change of address shall only be effective upon receipt.

13. **General.**

(a)    **Assignment/Successors.**  This Agreement shall be binding upon the Borrower, the Senior Lender and the Subordinate Lender and shall inure to the benefit of the respective legal successors and assigns of the Senior Lender and the Subordinate Lender.

(b)    **No Partnership or Joint Venture.**  The Senior Lender's permission for the placement of the Subordinate Loan Documents does not constitute the Senior Lender as a joint venturer or partner of the Subordinate Lender.  Neither party hereto shall hold itself out as a partner, agent or Affiliate of the other party hereto.

**I**    **Senior Lender's and Subordinate Lender's Consent.**  Wherever the Senior Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Senior Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.  Wherever the Subordinate Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Subordinate Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.

**(d)**    **Further Assurances.**  The Subordinate Lender, the Senior Lender and the Borrower each agree, at the Borrower's expense, to execute and deliver all additional instruments and/or documents reasonably required by any other party to this Agreement in order to evidence that the Subordinate Mortgage is subordinate to the lien, covenants and conditions of the First Mortgage, or to further evidence the intent of this Agreement.

**(e)**    **Amendment.**  This Agreement shall not be amended except by written instrument signed by all parties hereto.

**(f)**    **Governing Law.**  This Agreement shall be governed by the laws of the State in which the Property is located.

**(g)**    **Severable Provisions.**  If any provision of this Agreement shall be invalid or unenforceable to any extent, then the other provisions of this Agreement, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**(h)**    **Term.**  The term of this Agreement shall commence on the date hereof and shall continue until the earliest to occur of the following events: (i) the payment of all of the principal of, interest on and other amounts payable under the First Mortgage Loan Documents; (ii) the payment of all of the principal of, interest on and other amounts payable under the Subordinate Loan Documents, other than by reason of payments which the Subordinate Lender is obligated to remit to the Senior Lender pursuant to Section 4 hereof; (iii) the acquisition by the Senior Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the First Mortgage; or (iv) the acquisition by the Subordinate Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the Subordinate Mortgage, but only if such acquisition of title does not violate any of the terms of this Agreement.

**(i)**    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall together constitute one and the same instrument.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (Arvest)
DETROIT.3934775.5

Form 4503    10/98    (Page 12)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SENIOR LENDER:**

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

By: _____
Mark Siranovic
Its:  Senior Vice President

STATE OF _Illinois_     )
                                        ) ss.
COUNTY OF _COOK_    )

On this, the 24th day of November, 2009, before me, a Notary Public, the undersigned officer, personally appeared Mark Siranovic who acknowledged to be the Senior Vice President of NEF Mortgage Corporation, an Illinois non-profit corporation, and that such officer, being authorized to do so, executed said instrument for the purposes contained therein.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires: 4/29/2011

[Notarial Seal]

RENEE B. MURDOCK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 29, 2011

Fannie Mae Subordination Agreement —                     Form 4503     10/98   (Page 13)
Affordable Housing                                        © 1997-1998 Fannie Mae
Eastside Lofts (Arvest)
DETROIT 3934775.3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SUBORDINATE LENDER:**

**ARVEST BANK,**
an Arkansas state bank

_____ _S.V.P._
Roger Steging
Its: Senior Vice President

STATE OF ARKANSAS      )
                       )ss          **ACKNOWLEDGMENT**
COUNTY OF PULASKI      )

On this day, before me, a Notary Public, duly commissioned, qualified and acting, with and for said County and State, appeared Roger Steging , to me well known, who stated that he was the Senior Vice President of ARVEST BANK, an Arkansas state bank, and was duly authorized in that capacity to execute the foregoing instrument for and in the name and on behalf of said bank, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _19th_ day of _November_, 2009.

_Nadine G. Roller_____
Notary Public

My commission expires:

[Seal]
1-10-2016

Fannie Mae Subordination Agreement –            Form 4503    10/98    (Page 14)
**Affordable Housing**                           © 1997-1998 Fannie Mae
**Eastside Lofts (Arvest)**
DETROIT.3934775.3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**BORROWER:**

**EASTSIDE LOFT APARTMENTS PHASE II
LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:  Eastside Lofts GP II, LLC,
       an Arkansas limited liability company
       Its:  General Partner

       By:  The ARC Arkansas,
              an Arkansas non-profit corporation
              Its:  Sole Member *managing member*

              By: _____
                     Steve Hitt
                     Its: Chief Executive Officer

STATE OF _Arkansas_ )
COUNTY OF _Pulaski_ )

       On this _20th_ day of _November_, 2009 before me, a notary public duly commissioned, qualified and acting within and for said county and state, personally appeared in said county and state, Steve Hitt, who stated he is the Chief Executive Officer of The ARC Arkansas, an Arkansas non-profit corporation, sole member of Eastside Lofts GP II, LLC, an Arkansas limited liability company, the general partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership, and duly authorized on behalf of the corporation, the limited liability company and limited partnership to execute the foregoing instrument, and further stated and acknowledged that they had executed such instrument for the consideration and purposes set forth above.

       **IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal this day of _November_, 2009.

                     _____
                     Notary Public, State of _Arkansas_
                     My Commission Expires: _11-8-2014_

                     RAMONA BOYCE
                     Saline County
                     My Commission Expires
                     November 8, 2014

Fannie Mae Subordination Agreement --
Affordable Housing
**Eastside Lofts (Arvest)**
DETROIT 5934775 3

Form 4503     10/98   (Page 15)
© 1997-1998 Fannie Mae

**EXHIBIT A**
**Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (Arvest)**
DETROIT:3934775.3

**Form 4503**    10/98  (Page A-1)
© 1997-1998 Fannie Mae

2009079206 Received 00/28/2009 8:23:32 AM Recorded 08/23/2009 02:38 423
Case 4:23-cv-00723-BSM Document Filed 08/23/20 Page 00 of 423
Filed & Recorded in Official Records of PAT O'BRIEN, PULASKI COUNTY
CIRCUIT/COUNTY CLERK Fees $95.00



Drafted by and when Recorded return to:
Roberta R. Russ
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226-3506

---

For Recorder's Use                                          For Recorder's Use

### SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is entered into as of the 24th day of November, 2009 by and among (i) **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, whose address is 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606 (the "Senior Lender"), (ii) **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, whose address is Attn: Cynthia R. Stone, 2004 South Main Street, Little Rock, Arkansas 72206 (the "Borrower"), and (iii) **CITY OF LITTLE ROCK, ARKANSAS**, whose address is Little Rock City Hall, 500 West Markham, Suite 120W, Little Rock, Arkansas 72201 ("City") and (iv) **THE ARC ARKANSAS**, an Arkansas non-profit corporation, whose address is 2004 South Main Street, Little Rock, Arkansas 72206 ("Arc"; and Arc and the City are sometimes hereinafter collectively referred to as the "Subordinate Lender"), subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

### RECITALS:

A.      The Senior Lender has made or is making a loan (the "First Mortgage Loan") to the Borrower in the original principal amount of $809,000. The First Mortgage Loan is or will be secured by a first mortgage lien (the "First Mortgage") on a multifamily housing project located in the City of Little Rock, Pulaski County, Arkansas (the "Property"). The Property is more fully described in <u>Exhibit A</u> attached hereto. The Borrower's obligation to repay the First Mortgage Loan is evidenced by a Multifamily Note dated as of November 24, 2009 (the "First Mortgage Note"), and is due in full on December 1, 2027.

B.      Arc, an affiliate of Borrower, received a $130,000 HOME Loan from the City, and Arc has used the proceeds of the $130,000 HOME Loan from the City to make a $130,000 loan to Borrower (collectively, "Subordinate Loan"), and the Subordinate Loan is secured by a mortgage lien or liens against the Property.

C.      Subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

**Fannie Mae Subordination Agreement --**                **Form 4503**      10/98      (Page 1)
**Affordable Housing**                                              © 1997-1998 Fannie Mae
**Eastside Lofts (City of Little Rock/ARCS Home Loan)**
DETROIT.3938597.3

D.     The Senior Lender intends to sell, transfer and deliver the First Mortgage Note and assign the First Mortgage to The Community Development Trust, LP, a Delaware limited partnership ("CDT").

NOW, THEREFORE, The Senior Lender, the Subordinate Lender and the Borrower agree as follows:

**1.     Definitions.**

In addition to the terms defined in the Recitals to this Agreement, for purposes of this Agreement the following terms have the respective meanings set forth below:

"Affiliate" means, when used with respect to a Person, any corporation, partnership, joint venture, limited liability company, limited liability partnership, trust or individual controlled by, under common control with, or which controls such Person (the term "control" for these purposes shall mean the ability, whether by the ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to make management decisions on behalf of, or independently to select the managing partner of, a partnership, or otherwise to have the power independently to remove and then select a majority of those individuals exercising managerial authority over an entity, and control shall be conclusively presumed in the case of the ownership of 50% or more of the equity interests).

"Borrower" means the Person named as such in the first paragraph of this Agreement and any other Person (other than the Senior Lender) who acquires title to the Property after the date of this Agreement.

"Business Day" means any day other than Saturday, Sunday or a day on which the Senior Lender is not open for business.

"Default Notice" means: (a) a copy of the written notice from the Senior Lender to the Borrower stating that a First Mortgage Loan Default has occurred under the First Mortgage Loan; or (b) a copy of the written notice from the Subordinate Lender to the Borrower stating that a Subordinate Loan Default has occurred under the Subordinate Loan. Each Default Notice shall specify the default upon which such Default Notice is based.

"First Mortgage Loan Default" means the occurrence of an "Event of Default" as that term is defined in the First Mortgage Loan Documents.

"First Mortgage Loan Documents" means the First Mortgage Note and all other documents evidencing, securing or otherwise executed and delivered in connection with the First Mortgage Loan.

"Person" means an individual, estate, trust, partnership, corporation, limited liability company, limited liability partnership, governmental department or agency or any other entity which has the legal capacity to own property.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (City of Little Rock/ARCS Home Loan)
DETROIT.3938597.3

Form 4503     10/98     (Page 2)
© 1997-1998 Fannie Mae

"Senior Lender" means the Person named as such in the first paragraph on page 1 of this Agreement. When CDT or any other Person becomes the legal holder of the First Mortgage Note, CDT or such other Person shall automatically become the Senior Lender.

"Subordinate Lender" means the Person named as such in the first paragraph on page 1 of this Agreement and any other Person who becomes the legal holder of the Subordinate Note after the date of this Agreement.

"Subordinate Loan Default" means a default by the Borrower in performing or observing any of the terms, covenants or conditions in the Subordinate Loan Documents to be performed or observed by it, which continues beyond any applicable period provided in the Subordinate Loan Documents for curing the default.

"Subordinate Loan Documents" means the Subordinate Note, the Subordinate Mortgage, and all other documents evidencing, securing or otherwise executed and delivered in connection with the Subordinate Loan.

"Subordinate Mortgage" means, collectively (i) the mortgage given by Borrower in favor of the City encumbering the Property as security for the Subordinate Loan, as recorded in Instrument #2007088865 in the Official Records of Pulaski County, Arkansas, (ii) the Mortgage dated December 21, 2007, given by Borrower in favor of ARC which may or may not be recorded.

"Subordinate Note" means (i) the promissory note in the amount of $130,000 dated December 21, 2007 issued by the Borrower to ARC as amended, and (ii) the obligations of ARC to the City pursuant to an Agreement by and between City of Little Rock and The Arc Arkansas dated August 2, 2007 to evidence the Subordinate Loan.

## 2.    Permission to Place Mortgage Lien Against Property.

The Senior Lender agrees, notwithstanding the prohibition against inferior liens on the Property contained in the First Mortgage Loan Documents and subject to the provisions of this Agreement, to permit the Subordinate Lender to record the Subordinate Mortgage and other recordable Subordinate Loan Documents against the Property (which are subordinate in all respects to the lien of the First Mortgage) to secure the Borrower's obligation to repay the Subordinate Note and all other obligations, indebtedness and liabilities of the Borrower to the Subordinate Lender under and in connection with the Subordinate Loan. Such permission is subject to the condition that each of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is true and correct on the date of this Agreement and on the date on which the proceeds of the Subordinate Loan are disbursed to the Borrower. If any of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is not true and correct on both of those dates, the provisions of the First Mortgage Loan Documents applicable to unpermitted liens on the Property shall apply.

**3.      Borrower's and Subordinate Lender's Representations and Warranties.**

The Borrower and the Subordinate Lender (if applicable) each makes the following representations and warranties to the Senior Lender:

**(a)      Subordinate Note.**    The Subordinate Note contains the following provision or substantially the following:

The indebtedness evidenced by this Note is and shall be subordinate in right of payment to the prior payment in full of the indebtedness evidenced by a Multifamily Note dated as of November 24, 2009 in the original principal amount of $809,000 issued by the Borrower and payable to NEF Mortgage Corporation, an Illinois non-profit corporation ("Senior Lender"), or order, to the extent and in the manner provided in that certain Subordination Agreement of even date herewith between the payee of this Note, the Senior Lender and Borrower, ARC and the City (the "Subordination Agreement"). The Mortgage securing this Note is and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of the Multifamily Mortgage securing the Multifamily Note as more fully set forth in the Subordination Agreement. The rights and remedies of the payee and each subsequent holder of this Note under the Mortgage securing this Note are subject to the restrictions and limitations set forth in the Subordination Agreement. Each subsequent holder of this Note shall be deemed, by virtue of such holder's acquisition of the Note, to have agreed to perform and observe all of the terms, covenants and conditions to be performed or observed by the Subordinate Lender under the Subordination Agreement.

**(b)      Relationship of Borrower to Subordinate Lender and Senior Lender.** The City is not an Affiliate of the Borrower and is not in possession of any facts which would lead it to believe that the Senior Lender is an Affiliate of the Borrower.  ARC is an Affiliate of Borrower and is not in possession of any facts that would lead it to believe that Senior Lender is an Affiliate of Borrower.

**(c)      [Intentionally Omitted]**

**(d)      Subordinate Loan Documents.**    The executed Subordinate Loan Documents are substantially in the same forms as those submitted to, and approved by, CDT prior to the date of this Agreement.

**(e)      Senior Loan Documents**.    ARC and Borrower alone represent and warrant that the Senior Loan Documents are substantially in the same forms as, when applicable, those submitted to, and approved by, CDT prior to the date of this Agreement.  Upon execution and delivery of the Senior Loan Documents, Borrower shall deliver to Subordinate Lender an executed copy of each of the Senior Loan Documents, certified to be true, correct and complete.

4.      **Terms of Subordination.**

(a)      **Agreement to Subordinate.**  The Senior Lender and the Subordinate Lender agree that: (i) the indebtedness evidenced by the Subordinate Loan Documents is and shall be subordinated in right of payment, to the extent and in the manner provided in this Agreement to the prior payment in full of the indebtedness evidenced by the First Mortgage Loan Documents, and (ii) the Subordinate Mortgage and the other Subordinate Loan Documents are and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of the First Mortgage and the other First Mortgage Loan Documents and to all advances heretofore made or which may hereafter be made pursuant to the First Mortgage and the other First Mortgage Loan Documents (including but not limited to, all sums advanced for the purposes of (1) protecting or further securing the lien of the First Mortgage, curing defaults by the Borrower under the First Mortgage Loan Documents or for any other purpose expressly permitted by the First Mortgage, or (2) constructing, renovating, repairing, furnishing, fixturing or equipping the Property).

(b)      **Subordination of Subrogation Rights.**  The Subordinate Lender agrees that if, by reason of its payment of real estate taxes or other monetary obligations of the Borrower, or by reason of its exercise of any other right or remedy under the Subordinate Loan Documents, it acquires by right of subrogation or otherwise a lien on the Property which (but for this subsection) would be senior to the lien of the First Mortgage, then, in that event, such lien shall be subject and subordinate to the lien of the First Mortgage.

(c)      **Payments Before First Mortgage Loan Default.**      Until the Subordinate Lender receives a Default Notice of a First Mortgage Loan Default from the Senior Lender, the Subordinate Lender shall be entitled to retain for its own account all payments made under or pursuant to the Subordinate Loan Documents.

(d)      **Payments After First Mortgage Loan Default.**  The Borrower agrees that, after it receives notice (or otherwise acquires knowledge) of a First Mortgage Loan Default, it will not make any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent.      The Subordinate Lender agrees that, after it receives a Default Notice from the Senior Lender with written instructions directing the Subordinate Lender not to accept payments from the Borrower on account of the Subordinate Loan, it will not accept any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent.  If the Subordinate Lender receives written notice from the Senior Lender that the First Mortgage Loan Default which gave rise to the Subordinate Lender's obligation not to accept payments has been cured, waived, or otherwise suspended by the Senior Lender, the restrictions on payment to the Subordinate Lender in this Section 4 shall terminate, and the Senior Lender shall have no right to any subsequent payments made to the Subordinate Lender by the Borrower

prior to the Subordinate Lender's receipt of a new Default Notice from the Senior Lender in accordance with the provisions of this Section 4(d).

**(e)    Remitting Subordinate Loan Payments to Senior Lender.**  If, after the Subordinate Lender receives a Default Notice from the Senior Lender in accordance with subsection (d) above, the Subordinate Lender receives any payments under the Subordinate Loan Documents, the Subordinate Lender agrees that such payment or other distribution will be received and held in trust for the Senior Lender and unless the Senior Lender otherwise notifies the Subordinate Lender in writing, will be promptly remitted, in kind to the Senior Lender, properly endorsed to the Senior Lender, to be applied to the principal of, interest on and other amounts due under the First Mortgage Loan Documents in accordance with the provisions of the First Mortgage Loan Documents.   By executing this Agreement, the Borrower specifically authorizes the Subordinate Lender to endorse and remit any such payments to the Senior Lender, and specifically waives any and all rights to have such payments returned to the Borrower or credited against the Subordinate Loan.   Borrower and Senior Lender acknowledge and agree that payments received by the Subordinate Lender, and remitted to the Senior Lender under this Section 4, shall not be applied or otherwise credited against the Subordinate Loan, nor shall the tender of such payment to the Senior Lender waive any Subordinate Loan Default which may arise from the inability of the Subordinate Lender to retain such payment or apply such payment to the Subordinate Loan.

**(f)    Agreement Not to Commence Bankruptcy Proceeding.**    The Subordinate Lender agrees that during the term of this Agreement it will not commence, or join with any other creditor in commencing any bankruptcy reorganization, arrangement, insolvency or liquidation proceedings with respect to the Borrower, without the Senior Lender's prior written consent.

**5.    Default Under Subordinate Loan Documents.**

**(a)    Notice of Default and Cure Rights.**  The Subordinate Lender shall deliver to the Senior Lender a Default Notice within five Business Days in each case where the Subordinate Lender has given a Default Notice to the Borrower.  Failure of the Subordinate Lender to send a Default Notice to the Senior Lender shall not prevent the exercise of the Subordinate Lender's rights and remedies under the Subordinate Loan Documents, subject to the provisions of this Agreement.  The Senior Lender shall have the right, but not the obligation, to cure any Subordinate Loan Default within 60 days following the date of such notice; provided, however that the Subordinate Lender shall be entitled, during such 60-day period, to continue to pursue its rights and remedies under the Subordinate Loan Documents.  All amounts paid by the Senior Lender in accordance with the First Mortgage Loan Documents to cure a Subordinate Loan Default shall be deemed to have been advanced by the Senior Lender pursuant to, and shall be secured by the lien of, the First Mortgage.

**(b)    Subordinate Lender's Exercise of Remedies After Notice to Senior Lender.**  If a Subordinate Loan Default occurs and is continuing, the Subordinate Lender agrees that, without the Senior Lender's prior written consent, it will not commence foreclosure proceedings with respect to the Property under the Subordinate

2009079204 7 #5217

Loan Documents or exercise any other rights or remedies it may have under the Subordinate Loan Documents, including, but not limited to accelerating the Subordinate Loan, collecting rents, appointing (or seeking the appointment of) a receiver or exercising any other rights or remedies thereunder unless and until it has given the Senior Lender at least 60 days' prior written notice; during such 60 day period, however, the Subordinate Lender shall be entitled to exercise and enforce all other rights and remedies available to the Subordinate Lender under the Subordinate Loan Documents and/or under applicable laws, including without limitation, rights to enforce covenants and agreements of the Borrower relating to income, rent, or affordability restrictions contained in the HOME Agreement.

      **(c)**    **Cross Default.**  The Borrower and the Subordinate Lender agree that a Subordinate Loan Default shall constitute a First Mortgage Loan Default under the First Mortgage Loan Documents and the Senior Lender shall have the right to exercise all rights or remedies under the First Mortgage Loan Documents in the same manner as in the case of any other First Mortgage Loan Default.  If the Subordinate Lender notifies the Senior Lender in writing that any Subordinate Loan Default of which the Senior Lender has received a Default Notice has been cured or waived, as determined by the Subordinate Lender in its sole discretion, then provided that Senior Lender has not conducted a sale of the Property pursuant to its rights under the First Mortgage Loan Documents, any First Mortgage Loan Default under the First Mortgage Loan Documents arising solely from such Subordinate Loan Default shall be deemed cured, and the First Mortgage Loan shall be reinstated, provided, however, that the Senior Lender shall not be required to return or otherwise credit for the benefit of the Borrower any default rate interest or other default related charges or payments received by the Senior Lender during such First Mortgage Loan Default.

**6.**    **Default Under First Mortgage Loan Documents.**

      **(a)**    **Notice of Default and Cure Rights.**  The Senior Lender shall deliver to the Subordinate Lender a Default Notice within five Business Days in each case where the Senior Lender has given a Default Notice to the Borrower.  Failure of the Senior Lender to send a Default Notice to the Subordinate Lender shall not prevent the exercise of the Senior Lender's rights and remedies under the Senior Loan Documents, subject to the provisions of this Agreement.  The Subordinate Lender shall have the right, but not the obligation, to cure any such First Mortgage Loan Default within 60 days following the date of such notice; provided, however, that the Senior Lender shall be entitled during such 60-day period to continue to pursue its remedies under the First Mortgage Loan Documents.  Subordinate Lender may have up to 90 days from the date of the Default Notice to cure a non-monetary default if during such 90-day period Subordinate Lender keeps current all payments required by the First Mortgage Loan Documents.  In the event that such a non-monetary default creates an unacceptable level of risk relative to the Property, or Senior Lender's secured position relative to the Property, as determined by Senior Lender in its sole discretion, then Senior Lender may exercise during such 90-day period all available rights and remedies to protect and preserve the Property and the rents, revenues and other proceeds from the Property.  All amounts paid by the Subordinate Lender to the Senior Lender to cure a First

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (City of Little Rock/ARCS Home Loan)**
DETROIT.3938597.3

**Form 4503**    10/98   (Page 7)
© 1997-1998 Fannie Mae

Mortgage Loan Default shall be deemed to have been advanced by the Subordinate Lender pursuant to, and shall be secured by the lien of, the Subordinate Mortgage.

**(b)    Cross Default.**  The Subordinate Lender agrees that, notwithstanding any contrary provision contained in the Subordinate Loan Documents, a First Mortgage Loan Default shall not constitute a default under the Subordinate Loan Documents if no other default occurred under the Subordinate Loan Documents until either (i) the Senior Lender has accelerated the maturity of the First Mortgage Loan, or (ii) the Senior Lender has taken affirmative action to exercise its rights under the First Mortgage to collect rent, to appoint (or seek the appointment of) a receiver or to foreclose on (or to exercise a power of sale contained in) the First Mortgage.  At any time after a First Mortgage Loan Default is determined to constitute a default under the Subordinate Loan Documents, the Subordinate Lender shall be permitted to pursue its remedies for default under the Subordinate Loan Documents, subject to the restrictions and limitations of this Agreement.   If at any time the Borrower cures any First Mortgage Loan Default to the satisfaction of the Senior Lender, as evidenced by written notice from the Senior lender to the Subordinate Lender, any default under the Subordinate Loan Documents arising from such First Mortgage Loan Default shall be deemed cured and the Subordinate Loan shall be retroactively reinstated as if such First Mortgage Loan Default had never occurred.

**7.    Conflict.**

The Borrower, the Senior Lender and the Subordinate Lender each agrees that, in the event of any conflict or inconsistency between the terms of the First Mortgage Loan Documents, the Subordinate Loan Documents and the terms of this Agreement, the terms of this Agreement shall govern and control solely as to the following:  (a) the relative priority of the security interests of the Senior Lender and the Subordinate Lender in the Property; (b) the timing of the exercise of remedies by the Senior Lender and the Subordinate Lender under the First Mortgage and the Subordinate Mortgage, respectively; and (c) solely as between the Senior Lender and the Subordinate Lender, the notice requirements, cure rights, and the other rights and obligations which the Senior Lender and the Subordinate Lender have agreed to as expressly provided in this Agreement.  Borrower acknowledges that the terms and provisions of this Agreement shall not, and shall not be deemed to: extend Borrower's time to cure any First Mortgage Loan Default or Subordinate Loan Default, as the case may be; give the Borrower the right to notice of any First Mortgage Loan Default or Subordinate Loan Default, as the case may be other than that, if any, provided, respectively under the First Mortgage Loan Documents or the Subordinate Loan Documents; or create any other right or benefit for Borrower as against Senior Lender or Subordinate Lender.

**8.    Rights and Obligations of the Subordinate Lender Under the Subordinate Loan Documents and of the Senior Lender under the First Mortgage Loan Documents.**

Subject to each of the other terms of this Agreement, all of the following provisions shall supersede any provisions of the Subordinate Loan Documents covering the same subject matter:

Fannie Mae Subordination Agreement --
Affordable Housing
**Eastside Lofts (City of Little Rock/ARCS Home Loan)**
DETROIT.3938597.3

Form 4503    10/98    (Page 8)
© 1997-1998 Fannie Mae

**(a)    Protection of Security Interest.** The Subordinate Lender shall not, without the prior written consent of the Senior Lender in each instance, take any action which has the effect of increasing the indebtedness outstanding under, or secured by, the Subordinate Loan Documents; except that the Subordinate Lender shall have the right to advance funds to cure First Mortgage Loan Defaults pursuant to Section 6(a) above and advance funds pursuant to the Subordinate Mortgage for the purpose of paying real estate taxes and insurance premiums, making necessary repairs to the Property and curing other defaults by the Borrower under the Subordinate Loan Documents.

**(b)    Condemnation or Casualty.** In the event of: a taking or threatened taking by condemnation or other exercise of eminent domain of all or a portion of the Property (collectively, a "Taking"); or the occurrence of a fire or other casualty resulting in damage to all or a portion of the Property (collectively, a "Casualty"), at any time or times when the First Mortgage remains a lien on the Property the following provisions shall apply:

(1)    The Subordinate Lender hereby agrees that its rights (under the Subordinate Loan Documents or otherwise) to participate in any proceeding or action relating to a Taking and/or a Casualty, or to participate or join in any settlement of, or to adjust, any claims resulting from a Taking or a Casualty shall be and remain subordinate in all respects to the Senior Lender's rights under the First Mortgage Loan Documents with respect thereto, and the Subordinate Lender shall be bound by any settlement or adjustment of a claim resulting from a Taking or a Casualty made by the Senior Lender; provided, however, this subsection and/or anything contained in this Agreement shall not limit the rights of the Subordinate Lender to file any pleadings, documents, claims or notices with the appropriate court with jurisdiction over the proposed Taking and/or Casualty; and

(2)    all proceeds received or to be received on account of a Taking or a Casualty, or both, shall be applied (either to payment of the costs and expenses of repair and restoration or to payment of the First Mortgage Loan) in the manner determined by the Senior Lender in its sole discretion; provided, however, that if the Senior Lender elects to apply such proceeds to payment of the principal of, interest on and other amounts payable under the First Mortgage Loan, any proceeds remaining after the satisfaction in full of the principal of, interest on and other amounts payable under the First Mortgage Loan shall be paid to, and may be applied by, the Subordinate Lender in accordance with the applicable provisions of the Subordinate Loan Documents, provided however, the Senior Lender agrees to consult with the Subordinate Lender in determining the application of Casualty proceeds, provided further however that in the event of any disagreement between the Senior Lender and the Subordinate Lender over the application of Casualty proceeds, the decision of the Senior Lender, in its sole discretion, shall prevail.

**(c)    No Modification of Subordinate Loan Documents.** The Borrower and the Subordinate Lender each agrees that, until the principal of, interest on and all other amounts payable under the First Mortgage Loan Documents have been paid in full, it will not, without the prior written consent of the Senior Lender in each instance, increase the amount of the Subordinate Loan, increase the required payments due under the Subordinate Loan, decrease the term of the Subordinate Loan, increase the interest rate on the Subordinate Loan, or otherwise amend the Subordinate Loan terms in a manner that creates an adverse effect upon the Senior Lender under the First Mortgage Loan Documents. Any unauthorized amendment of the Subordinate Loan Documents or assignment of the Subordinate Lender's interest in the Subordinate Loan without the Senior Lender's consent shall be void ab initio and of no effect whatsoever.

**9.    Modification or Refinancing of First Mortgage Loan.**

The Subordinate Lender consents to any agreement or arrangement in which the Senior Lender waives, postpones, extends, reduces or modifies any provisions of the First Mortgage Loan Documents, including any provision requiring the payment of money. Subordinate Lender further agrees that its agreement to subordinate hereunder shall extend to any new mortgage debt which is for the purpose of refinancing all or any part of the First Mortgage Loan (including reasonable and necessary costs associated with the closing and/or the refinancing); and that all the terms and covenants of this Agreement shall inure to the benefit of any holder of any such refinanced debt; and that all references to the First Mortgage Loan, the First Mortgage Note, the First Mortgage, the First Mortgage Loan Documents and Senior Lender shall mean, respectively, the refinance loan, the refinance note, the mortgage securing the refinance note, all documents evidencing securing or otherwise pertaining to the refinance note and the holder of the refinance note.

**10.    Default by the Subordinate Lender or Senior Lender.**

If the Subordinate Lender or Senior Lender defaults in performing or observing any of the terms, covenants or conditions to be performed or observed by it under this Agreement, the other, non-defaulting lender shall have the right to all available legal and equitable relief.

**11.    Notices.**

Each notice, request, demand, consent, approval or other communication (hereinafter in this Section referred to collectively as "notices" and referred to singly as a "notice") which the Senior Lender or the Subordinate Lender is required or permitted to give to the other party pursuant to this Agreement shall be in writing and shall be deemed to have been duly and sufficiently given if: (a) personally delivered with proof of delivery thereof (any notice so delivered shall be deemed to have been received at the time so delivered); or (b) sent by Federal Express (or other similar national overnight courier) designating early morning delivery (any notice so delivered shall be deemed to have been received on the next Business Day following receipt by the courier); or (c) sent by United States registered or certified mail, return receipt requested, postage prepaid, at a post office regularly maintained by the United States Postal Service (any notice so sent shall be deemed to have been received two days after mailing in the United States), addressed to the respective parties as follows:

**SENIOR LENDER:**

NEF Mortgage Corporation
120 South Riverside Plaza, 15th Floor
Chicago, Illinois 60606
Attention: Mark Siranovic

With a copy to:                    The Community Development Trust, LP
1350 Broadway, Suite 700
New York, New York 10018
Attention: Operations – Asset Management

**SUBORDINATE LENDER:**

City of Little Rock, Arkansas
CDBG and Housing Program
500 West Markham, Suite 120W
Little Rock, AR 72201
Attention: CDBG Manager

and

The ARC Arkansas, Inc.
2004 South Main Street
Little Rock, Arkansas 72206
Attention: Steve Hitt

Either party may, by notice given pursuant to this Section, change the person or persons and/or address or addresses, or designate an additional person or persons or an additional address or addresses for its notices, but notice of a change of address shall only be effective upon receipt.

13.    **General.**

(a)    **Assignment/Successors.**  This Agreement shall be binding upon the Borrower, the Senior Lender and the Subordinate Lender and shall inure to the benefit of the respective legal successors and assigns of the Senior Lender and the Subordinate Lender.

(b)    **No Partnership or Joint Venture.**  The Senior Lender's permission for the placement of the Subordinate Loan Documents does not constitute the Senior Lender as a joint venturer or partner of the Subordinate Lender.  Neither party hereto shall hold itself out as a partner, agent or Affiliate of the other party hereto.

I    **Senior Lender's and Subordinate Lender's Consent.**  Wherever the Senior Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Senior Lender in its sole and

absolute discretion, unless otherwise expressly provided in this Agreement. Wherever the Subordinate Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Subordinate Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.

**(d)    Further Assurances.** The Subordinate Lender, the Senior Lender and the Borrower each agree, at the Borrower's expense, to execute and deliver all additional instruments and/or documents reasonably required by any other party to this Agreement in order to evidence that the Subordinate Mortgage is subordinate to the lien, covenants and conditions of the First Mortgage, or to further evidence the intent of this Agreement.

**(e)    Amendment.** This Agreement shall not be amended except by written instrument signed by all parties hereto.

**(f)    Governing Law.** This Agreement shall be governed by the laws of the State in which the Property is located.

**(g)    Severable Provisions.** If any provision of this Agreement shall be invalid or unenforceable to any extent, then the other provisions of this Agreement, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**(h)    Term.** The term of this Agreement shall commence on the date hereof and shall continue until the earliest to occur of the following events: (i) the payment of all of the principal of, interest on and other amounts payable under the First Mortgage Loan Documents; (ii) the payment of all of the principal of, interest on and other amounts payable under the Subordinate Loan Documents, other than by reason of payments which the Subordinate Lender is obligated to remit to the Senior Lender pursuant to Section 4 hereof; (iii) the acquisition by the Senior Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the First Mortgage; or (iv) the acquisition by the Subordinate Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the Subordinate Mortgage, but only if such acquisition of title does not violate any of the terms of this Agreement.

**(i)    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall together constitute one and the same instrument.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (City of Little Rock/ARCS Home Loan)
DETROIT.3938597.3

Form 4503        10/98    (Page 12)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SENIOR LENDER:**

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

_(signature)_
Mark Siranovic
Its:  Senior Vice President

STATE OF _Illinois_     )
                        ) ss.
COUNTY OF _Cook_        )

On this, the _24th_ day of _November_ 2009, before me, a Notary Public, the undersigned officer, personally appeared Mark Siranovic who acknowledged him to be the Senior Vice President of NEF Mortgage Corporation, an Illinois non-profit corporation, and that such officer, being authorized to do so, executed said instrument for the purposes contained therein.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_(signature)_
Notary Public
My Commission Expires: _4/29/2011_

[Notarial Seal]

RENEE B. MURDOCK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 29, 2011

Fannie Mae Subordination Agreement --              Form 4503     10/98    (Page 13)
Affordable Housing                                 © 1997-1998 Fannie Mae
Eastside Lofts (City of Little Rock/ARCS Home Loan)
DETROIT.3938597.2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**CITY:**

**CITY OF LITTLE ROCK, ARKANSAS**

By: _____
       Bruce T. Moore
       Its:  City Manager


STATE OF ARKANSAS       )
                        ) ss.
COUNTY OF Pulaski       )

On this, the 19th day of November, 2009 before me, a Notary Public, duly commissioned, qualified and acting, with and for said County and State, appeared in person the within named Bruce T. Moore, to me well known, who stated that he was City Manager of the City of Little Rock, and was duly authorized in that capacity to execute the foregoing instrument for and in the name and on behalf of the City of Little Rock, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 19th day of November, 2009.

_____
Notary Public

My Commission Expires:

6 | 15 | 2019

[Seal]

SUSAN K. LANGLEY
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS
My Commission Expires June 15, 2019
Commission No. 12571885

Fannie Mae Subordination Agreement —
Affordable Housing
Eastside Lofts (City of Little Rock/ARCS Home Loan)

Form 4503    10/98   (Page 16)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**ARC:**

**THE ARC ARKANSAS,**
an Arkansas non-profit corporation

By: _Steve Hitt_
Steve Hitt
Its:  Chief Executive Officer

## **ACKNOWLEDGMENT**

STATE OF ARKANSAS   )
                     )SS.
COUNTY OF PULASKI   )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Steven W. Hitt, the Chief Executive Officer of The ARC Arkansas known to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he had executed the same for the consideration, uses and purposes therein mentioned and set forth.

Given under my hand and seal of office this _20th_ day of _November_ 2009.

_Ramona Boyce_
Notary Public

My Commission Expires: _11-8-2014_

RAMONA BOYCE
Saline County
My Commission Expires
November 8, 2014

SEAL

---

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (City of Little Rock/ARCS Home Loan)
DETROIT 3938597 3

Form 4503    10/98   (Page 15)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**BORROWER:**

**EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:  Eastside Lofts GP II, LLC,
an Arkansas limited liability company
Its:  General Partner

By:  The ARC Arkansas,
an Arkansas non-profit corporation
Its:  Sole Member *Managing Member*

By: _Steve Hitt_____
Steve Hitt
Its: Chief Executive Officer

STATE OF _Arkansas_ )
COUNTY OF _Pulaski_ )

On this _20th_ day of _November_ 2009 before me, a notary public duly commissioned, qualified and acting within and for said county and state, personally appeared in said county and state, Steve Hitt, who stated he is the Chief Executive Officer of The ARC Arkansas, an Arkansas non-profit corporation, sole member of Eastside Lofts GP II, LLC, an Arkansas limited liability company, the general partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership, and duly authorized on behalf of the corporation, the limited liability company and limited partnership to execute the foregoing instrument, and further stated and acknowledged that they had executed such instrument for the consideration and purposes set forth above.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal this day of _November_, 2009.

_Ramona Boyce_
Notary Public, State of _Arkansas_
My Commission Expires: _11-8-2004_

RAMONA BOYCE
Saline County
My Commission Expires
November 8, 2014

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (City of Little Rock/ARCS Home Loan)
DETROIT.3938597.3

Form 4503    10/98    (Page 16)
© 1997-1998 Fannie Mae

**EXHIBIT A**
**Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (City of Little Rock/ARCS Home Loan)
DETROIT.3938597.3

Form 4503    10/98  (Page A-1)
© 1997-1998 Fannie Mae



Drafted by and when Recorded return to:
Roberta R. Russ
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226-3506

For Recorder's Use                                          For Recorder's Use

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is entered into as of the 24th day of November, 2009 by and among (i) **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, whose address is 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606 (the "Senior Lender"), (ii) **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, whose address is Attn: Cynthia R. Stone, 2004 Main Street, Little Rock, Arkansas 72206 (the "Borrower"), and (iii) **ARKANSAS DEVELOPMENT FINANCE AUTHORITY**, whose address is P. O. Box 8052, Little Rock, Arkansas 72203 ("Subordinate Lender"), subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

### RECITALS:

A.      The Senior Lender has made or is making a loan (the "First Mortgage Loan") to the Borrower in the original principal amount of $809,000. The First Mortgage Loan is or will be secured by a first mortgage lien (the "First Mortgage") on a multifamily housing project located in the City of Little Rock, Pulaski County, Arkansas (the "Property"). The Property is more fully described in <u>Exhibit A</u> attached hereto. The Borrower's obligation to repay the First Mortgage Loan is evidenced by a Multifamily Note dated as of November 24, 2009 (the "First Mortgage Note"), and is due in full on December 1, 2027.

B.      The Subordinate Lender has previously made a subordinate loan to Borrower in the amount of $400,000 (the "Subordinate Loan") and has secured the Subordinate Loan by, among other things, placing a mortgage lien against the Property.

C.      Subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

D.      The Senior Lender intends to sell, transfer and deliver the First Mortgage Note and assign the First Mortgage to The Community Development Trust, LP, a Delaware limited partnership ("CDT").

**Fannie Mae Subordination Agreement --**          **Form 4503**      10/98      (Page 1)
**Affordable Housing**                                                       © 1997-1998 Fannie Mae
**Eastside Lofts (ADFA Home Loan)**
DETROIT:3938582.2

NOW, THEREFORE, The Senior Lender, the Subordinate Lender and the Borrower agree as follows:

### 1.    Definitions.

In addition to the terms defined in the Recitals to this Agreement, for purposes of this Agreement the following terms have the respective meanings set forth below:

"Affiliate" means, when used with respect to a Person, any corporation, partnership, joint venture, limited liability company, limited liability partnership, trust or individual controlled by, under common control with, or which controls such Person (the term "control" for these purposes shall mean the ability, whether by the ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to make management decisions on behalf of, or independently to select the managing partner of, a partnership, or otherwise to have the power independently to remove and then select a majority of those individuals exercising managerial authority over an entity, and control shall be conclusively presumed in the case of the ownership of 50% or more of the equity interests).

"Borrower" means the Person named as such in the first paragraph of this Agreement and any other Person (other than the Senior Lender) who acquires title to the Property after the date of this Agreement.

"Business Day" means any day other than Saturday, Sunday or a day on which the Senior Lender is not open for business.

"Default Notice" means: (a) a copy of the written notice from the Senior Lender to the Borrower stating that a First Mortgage Loan Default has occurred under the First Mortgage Loan; or (b) a copy of the written notice from the Subordinate Lender to the Borrower stating that a Subordinate Loan Default has occurred under the Subordinate Loan. Each Default Notice shall specify the default upon which such Default Notice is based.

"First Mortgage Loan Default" means the occurrence of an "Event of Default" as that term is defined in the First Mortgage Loan Documents.

"First Mortgage Loan Documents" means the First Mortgage Note and all other documents evidencing, securing or otherwise executed and delivered in connection with the First Mortgage Loan.

"Person" means an individual, estate, trust, partnership, corporation, limited liability company, limited liability partnership, governmental department or agency or any other entity which has the legal capacity to own property.

"Senior Lender" means the Person named as such in the first paragraph on page 1 of this Agreement. When CDT or any other Person becomes the legal holder of the First Mortgage Note, CDT or such other Person shall automatically become the Senior Lender.

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA Home Loan)**
DETROIT:3938582.2

Form 4503      10/98      (Page 2)
© 1997-1998 Fannie Mae

"Subordinate Lender" means the Person named as such in the first paragraph on page 1 of this Agreement and any other Person who becomes the legal holder of the Subordinate Note after the date of this Agreement.

"Subordinate Loan Default" means a default by the Borrower in performing or observing any of the terms, covenants or conditions in the Subordinate Loan Documents to be performed or observed by it, which continues beyond any applicable period provided in the Subordinate Loan Documents for curing the default.

"Subordinate Loan Documents" means the Subordinate Note, the Subordinate Mortgage, and all other documents evidencing, securing or otherwise executed and delivered in connection with the Subordinate Loan.

"Subordinate Mortgage" means the mortgage or deed of trust encumbering the Property as security for the Subordinate Loan, as recorded as Instrument #2005103433 in the Official Records of Pulaski County, Alabama.

"Subordinate Note" means the amended and restated promissory note in the amount of $400,000 dated December 21, 2007 issued by the Borrower to the Subordinate Lender, or order, to evidence the Subordinate Loan, which Subordinate Note amended and restated that certain Promissory Note dated November 22, 2005 issued by Borrower to Subordinate Lender.

**2.     Permission to Place Mortgage Lien Against Property.**

The Senior Lender agrees, notwithstanding the prohibition against inferior liens on the Property contained in the First Mortgage Loan Documents and subject to the provisions of this Agreement, to permit the Subordinate Lender to record the Subordinate Mortgage and other recordable Subordinate Loan Documents against the Property (which are subordinate in all respects to the lien of the First Mortgage) to secure the Borrower's obligation to repay the Subordinate Note and all other obligations, indebtedness and liabilities of the Borrower to the Subordinate Lender under and in connection with the Subordinate Loan. Such permission is subject to the condition that each of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is true and correct on the date of this Agreement and on the date on which the proceeds of the Subordinate Loan are disbursed to the Borrower. If any of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is not true and correct on both of those dates, the provisions of the First Mortgage Loan Documents applicable to unpermitted liens on the Property shall apply.

**3.     Borrower's and Subordinate Lender's Representations and Warranties.**

The Borrower and the Subordinate Lender each makes the following representations and warranties to the Senior Lender:

**(a)     [Intentionally Omitted]**

(b)    **Relationship of Borrower to Subordinate Lender and Senior Lender.**  The Subordinate Lender is not an Affiliate of the Borrower and is not in possession of any facts which would lead it to believe that the Senior Lender is an Affiliate of the Borrower.

(c)    **Term.**  The term of the Subordinate Note does not end before the term of the First Mortgage Note.

(d)    **Subordinate Loan Documents.**  The executed Subordinate Loan Documents are substantially in the same forms as those submitted to, and approved by, CDT prior to the date of this Agreement.

(e)    **Senior Loan Documents.**  The executed Senior Loan Documents are substantially in the same forms as, when applicable, those submitted to, and approved by, CDT prior to the date of this Agreement.  Upon execution and delivery of the Senior Loan Documents, Borrower shall deliver to Subordinate Lender an executed copy of each of the Senior Loan Documents, certified to be true, correct and complete.

**4.    Terms of Subordination.**

(a)    **Agreement to Subordinate.**  The Senior Lender and the Subordinate Lender agree that: (i) the indebtedness evidenced by the Subordinate Loan Documents is and shall be subordinated in right of payment, to the extent and in the manner provided in this Agreement to the prior payment in full of the indebtedness evidenced by the First Mortgage Loan Documents, and (ii) the Subordinate Mortgage and the other Subordinate Loan Documents are and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of the First Mortgage and the other First Mortgage Loan Documents and to all advances heretofore made or which may hereafter be made pursuant to the First Mortgage and the other First Mortgage Loan Documents (including but not limited to, all sums advanced for the purposes of (1) protecting or further securing the lien of the First Mortgage, curing defaults by the Borrower under the First Mortgage Loan Documents or for any other purpose expressly permitted by the First Mortgage, or (2) constructing, renovating, repairing, furnishing, fixturing or equipping the Property).

(b)    **Subordination of Subrogation Rights.**  The Subordinate Lender agrees that if, by reason of its payment of real estate taxes or other monetary obligations of the Borrower, or by reason of its exercise of any other right or remedy under the Subordinate Loan Documents, it acquires by right of subrogation or otherwise a lien on the Property which (but for this subsection) would be senior to the lien of the First Mortgage, then, in that event, such lien shall be subject and subordinate to the lien of the First Mortgage.

(c)    **Payments Before First Mortgage Loan Default.**  Until the Subordinate Lender receives a Default Notice of a First Mortgage Loan Default from the Senior Lender, the Subordinate Lender shall be entitled to retain for its own account all payments made under or pursuant to the Subordinate Loan Documents.

(d)    **Payments After First Mortgage Loan Default.**  The Borrower agrees that, after it receives notice (or otherwise acquires knowledge) of a First Mortgage Loan Default, it will not make any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent.    The Subordinate Lender agrees that, after it receives a Default Notice from the Senior Lender with written instructions directing the Subordinate Lender not to accept payments from the Borrower on account of the Subordinate Loan, it will not accept any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent.  If the Subordinate Lender receives written notice from the Senior Lender that the First Mortgage Loan Default which gave rise to the Subordinate Lender's obligation not to accept payments has been cured, waived, or otherwise suspended by the Senior Lender, the restrictions on payment to the Subordinate Lender in this Section 4 shall terminate, and the Senior Lender shall have no right to any subsequent payments made to the Subordinate Lender by the Borrower prior to the Subordinate Lender's receipt of a new Default Notice from the Senior Lender in accordance with the provisions of this Section 4(d).

(e)    **Remitting Subordinate Loan Payments to Senior Lender.**  If, after the Subordinate Lender receives a Default Notice from the Senior Lender in accordance with subsection (d) above, the Subordinate Lender receives any payments under the Subordinate Loan Documents, the Subordinate Lender agrees that such payment or other distribution will be received and held in trust for the Senior Lender and unless the Senior Lender otherwise notifies the Subordinate Lender in writing, will be promptly remitted, in kind to the Senior Lender, properly endorsed to the Senior Lender, to be applied to the principal of, interest on and other amounts due under the First Mortgage Loan Documents in accordance with the provisions of the First Mortgage Loan Documents.  By executing this Agreement, the Borrower specifically authorizes the Subordinate Lender to endorse and remit any such payments to the Senior Lender, and specifically waives any and all rights to have such payments returned to the Borrower or credited against the Subordinate Loan.  Borrower and Senior Lender acknowledge and agree that payments received by the Subordinate Lender, and remitted to the Senior Lender under this Section 4, shall not be applied or otherwise credited against the Subordinate Loan, nor shall the tender of such payment to the Senior Lender waive any Subordinate Loan Default which may arise from the inability of the Subordinate Lender to retain such payment or apply such payment to the Subordinate Loan.

(f)    **Agreement Not to Commence Bankruptcy Proceeding.**  The Subordinate Lender agrees that during the term of this Agreement it will not commence, or join with any other creditor in commencing any bankruptcy reorganization, arrangement, insolvency or liquidation proceedings with respect to the Borrower, without the Senior Lender's prior written consent.

**5.    Default Under Subordinate Loan Documents.**

**(a)    Notice of Default and Cure Rights.**  The Subordinate Lender shall deliver to the Senior Lender a Default Notice within five Business Days in each case where the Subordinate Lender has given a Default Notice to the Borrower.  Failure of the Subordinate Lender to send a Default Notice to the Senior Lender shall not prevent the exercise of the Subordinate Lender's rights and remedies under the Subordinate Loan Documents, subject to the provisions of this Agreement.  The Senior Lender shall have the right, but not the obligation, to cure any Subordinate Loan Default within 60 days following the date of such notice; provided, however that the Subordinate Lender shall be entitled, during such 60-day period, to continue to pursue its rights and remedies under the Subordinate Loan Documents.  All amounts paid by the Senior Lender in accordance with the First Mortgage Loan Documents to cure a Subordinate Loan Default shall be deemed to have been advanced by the Senior Lender pursuant to, and shall be secured by the lien of, the First Mortgage.

**(b)    Subordinate Lender's Exercise of Remedies After Notice to Senior Lender.**  If a Subordinate Loan Default occurs and is continuing, the Subordinate Lender agrees that, without the Senior Lender's prior written consent, it will not commence foreclosure proceedings with respect to the Property under the Subordinate Loan Documents or exercise any other rights or remedies it may have under the Subordinate Loan Documents, including, but not limited to accelerating the Subordinate Loan, collecting rents, appointing (or seeking the appointment of) a receiver or exercising any other rights or remedies thereunder unless and until it has given the Senior Lender at least 60 days' prior written notice; during such 60 day period, however, the Subordinate Lender shall be entitled to exercise and enforce all other rights and remedies available to the Subordinate Lender under the Subordinate Loan Documents and/or under applicable laws, including without limitation, rights to enforce covenants and agreements of the Borrower relating to income, rent, or affordability restrictions contained in the Land Use Restriction Agreement.

**(c)    Cross Default.**  The Borrower and the Subordinate Lender agree that a Subordinate Loan Default shall constitute a First Mortgage Loan Default under the First Mortgage Loan Documents and the Senior Lender shall have the right to exercise all rights or remedies under the First Mortgage Loan Documents in the same manner as in the case of any other First Mortgage Loan Default.  If the Subordinate Lender notifies the Senior Lender in writing that any Subordinate Loan Default of which the Senior Lender has received a Default Notice has been cured or waived, as determined by the Subordinate Lender in its sole discretion, then provided that Senior Lender has not conducted a sale of the Property pursuant to its rights under the First Mortgage Loan Documents, any First Mortgage Loan Default under the First Mortgage Loan Documents arising solely from such Subordinate Loan Default shall be deemed cured, and the First Mortgage Loan shall be reinstated, provided, however, that the Senior Lender shall not be required to return or otherwise credit for the benefit of the Borrower any default rate interest or other default related charges or payments received by the Senior Lender during such First Mortgage Loan Default.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA Home Loan)
DETROIT 3938582 2

Form 4503    10/98    (Page 6)
© 1997-1998 Fannie Mae

**6.    Default Under First Mortgage Loan Documents.**

    **(a)    Notice of Default and Cure Rights.** The Senior Lender shall deliver to the Subordinate Lender a Default Notice within five Business Days in each case where the Senior Lender has given a Default Notice to the Borrower.  Failure of the Senior Lender to send a Default Notice to the Subordinate Lender shall not prevent the exercise of the Senior Lender's rights and remedies under the Senior Loan Documents, subject to the provisions of this Agreement.  The Subordinate Lender shall have the right, but not the obligation, to cure any such First Mortgage Loan Default within 60 days following the date of such notice; provided, however, that the Senior Lender shall be entitled during such 60-day period to continue to pursue its remedies under the First Mortgage Loan Documents.  Subordinate Lender may have up to 90 days from the date of the Default Notice to cure a non-monetary default if during such 90-day period Subordinate Lender keeps current all payments required by the First Mortgage Loan Documents.  In the event that such a non-monetary default creates an unacceptable level of risk relative to the Property, or Senior Lender's secured position relative to the Property, as determined by Senior Lender in its sole discretion, then Senior Lender may exercise during such 90-day period all available rights and remedies to protect and preserve the Property and the rents, revenues and other proceeds from the Property. All amounts paid by the Subordinate Lender to the Senior Lender to cure a First Mortgage Loan Default shall be deemed to have been advanced by the Subordinate Lender pursuant to, and shall be secured by the lien of, the Subordinate Mortgage.

    **(b)    Cross Default.** The Subordinate Lender agrees that, notwithstanding any contrary provision contained in the Subordinate Loan Documents, a First Mortgage Loan Default shall not constitute a default under the Subordinate Loan Documents if no other default occurred under the Subordinate Loan Documents until either (i) the Senior Lender has accelerated the maturity of the First Mortgage Loan, or (ii) the Senior Lender has taken affirmative action to exercise its rights under the First Mortgage to collect rent, to appoint (or seek the appointment of) a receiver or to foreclose on (or to exercise a power of sale contained in) the First Mortgage. At any time after a First Mortgage Loan Default is determined to constitute a default under the Subordinate Loan Documents, the Subordinate Lender shall be permitted to pursue its remedies for default under the Subordinate Loan Documents, subject to the restrictions and limitations of this Agreement.  If at any time the Borrower cures any First Mortgage Loan Default to the satisfaction of the Senior Lender, as evidenced by written notice from the Senior lender to the Subordinate Lender, any default under the Subordinate Loan Documents arising from such First Mortgage Loan Default shall be deemed cured and the Subordinate Loan shall be retroactively reinstated as if such First Mortgage Loan Default had never occurred.

**7.    Conflict.**

    The Borrower, the Senior Lender and the Subordinate Lender each agrees that, in the event of any conflict or inconsistency between the terms of the First Mortgage Loan Documents, the Subordinate Loan Documents and the terms of this Agreement, the terms of this Agreement shall govern and control solely as to the following:  (a) the relative priority of the security interests of the Senior Lender and the Subordinate Lender in the Property; (b) the

timing of the exercise of remedies by the Senior Lender and the Subordinate Lender under the First Mortgage and the Subordinate Mortgage, respectively; and (c) solely as between the Senior Lender and the Subordinate Lender, the notice requirements, cure rights, and the other rights and obligations which the Senior Lender and the Subordinate Lender have agreed to as expressly provided in this Agreement. Borrower acknowledges that the terms and provisions of this Agreement is not, and shall not be deemed to: extend Borrower's time to cure any First Mortgage Loan Default or Subordinate Loan Default, as the case may be; give the Borrower the right to notice of any First Mortgage Loan Default or Subordinate Loan Default, as the case may be other than that, if any, provided, respectively under the First Mortgage Loan Documents or the Subordinate Loan Documents; or create any other right or benefit for Borrower as against Senior Lender or Subordinate Lender.

**8.    Rights and Obligations of the Subordinate Lender Under the Subordinate Loan Documents and of the Senior Lender under the First Mortgage Loan Documents.**

Subject to each of the other terms of this Agreement, all of the following provisions shall supersede any provisions of the Subordinate Loan Documents covering the same subject matter:

(a)    **Protection of Security Interest.** The Subordinate Lender shall not, without the prior written consent of the Senior Lender in each instance, take any action which has the effect of increasing the indebtedness outstanding under, or secured by, the Subordinate Loan Documents, except that the Subordinate Lender shall have the right to advance funds to cure First Mortgage Loan Defaults pursuant to Section 6(a) above and advance funds pursuant to the Subordinate Mortgage for the purpose of paying real estate taxes and insurance premiums, making necessary repairs to the Property and curing other defaults by the Borrower under the Subordinate Loan Documents.

(b)    **Condemnation or Casualty.** In the event of: a taking or threatened taking by condemnation or other exercise of eminent domain of all or a portion of the Property (collectively, a "Taking"); or the occurrence of a fire or other casualty resulting in damage to all or a portion of the Property (collectively, a "Casualty"), at any time or times when the First Mortgage remains a lien on the Property the following provisions shall apply:

(1)    The Subordinate Lender hereby agrees that its rights (under the Subordinate Loan Documents or otherwise) to participate in any proceeding or action relating to a Taking and/or a Casualty, or to participate or join in any settlement of, or to adjust, any claims resulting from a Taking or a Casualty shall be and remain subordinate in all respects to the Senior Lender's rights under the First Mortgage Loan Documents with respect thereto, and the Subordinate Lender shall be bound by any settlement or adjustment of a claim resulting from a Taking or a Casualty made by the Senior Lender; provided, however, this subsection and/or anything contained in this Agreement shall not limit the rights of the Subordinate Lender to file any pleadings, documents,

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA Home Loan)**
DETROIT.3938582.2

Form 4503    10/98    (Page 8)
© 1997-1998 Fannie Mae

claims or notices with the appropriate court with jurisdiction over the proposed Taking and/or Casualty; and

(2)   all proceeds received or to be received on account of a Taking or a Casualty, or both, shall be applied (either to payment of the costs and expenses of repair and restoration or to payment of the First Mortgage Loan) in the manner determined by the Senior Lender in its sole discretion; provided, however, that if the Senior Lender elects to apply such proceeds to payment of the principal of, interest on and other amounts payable under the First Mortgage Loan, any proceeds remaining after the satisfaction in full of the principal of, interest on and other amounts payable under the First Mortgage Loan shall be paid to, and may be applied by, the Subordinate Lender in accordance with the applicable provisions of the Subordinate Loan Documents, provided however, the Senior Lender agrees to consult with the Subordinate Lender in determining the application of Casualty proceeds, provided further however that in the event of any disagreement between the Senior Lender and the Subordinate Lender over the application of Casualty proceeds, the decision of the Senior Lender, in its sole discretion, shall prevail.

(c)   **No Modification of Subordinate Loan Documents.**  The Borrower and the Subordinate Lender each agrees that, until the principal of, interest on and all other amounts payable under the First Mortgage Loan Documents have been paid in full, it will not, without the prior written consent of the Senior Lender in each instance, increase the amount of the Subordinate Loan, increase the required payments due under the Subordinate Loan, decrease the term of the Subordinate Loan, increase the interest rate on the Subordinate Loan, or otherwise amend the Subordinate Loan terms in a manner that creates an adverse effect upon the Senior Lender under the First Mortgage Loan Documents. Any unauthorized amendment of the Subordinate Loan Documents or assignment of the Subordinate Lender's interest in the Subordinate Loan without the Senior Lender's consent shall be void ab initio and of no effect whatsoever.

**9.     Modification or Refinancing of First Mortgage Loan.**

The Subordinate Lender consents to any agreement or arrangement in which the Senior Lender waives, postpones, extends, reduces or modifies any provisions of the First Mortgage Loan Documents, including any provision requiring the payment of money. Subordinate Lender further agrees that its agreement to subordinate hereunder shall extend to any new mortgage debt which is for the purpose of refinancing all or any part of the First Mortgage Loan (including reasonable and necessary costs associated with the closing and/or the refinancing); and that all the terms and covenants of this Agreement shall inure to the benefit of any holder of any such refinanced debt; and that all references to the First Mortgage Loan, the First Mortgage Note, the First Mortgage, the First Mortgage Loan Documents and Senior Lender shall mean, respectively, the refinance loan, the refinance note, the mortgage securing the refinance note, all documents evidencing securing or otherwise pertaining to the refinance note and the holder of the refinance note.

Fannie Mae Subordination Agreement --          Form 4503      10/98      (Page 9)
Affordable Housing                                          © 1997-1998 Fannie Mae
Eastside Lofts (ADFA Home Loan)
DETROIT.3938582.2

**10.    Default by the Subordinate Lender or Senior Lender.**

If the Subordinate Lender or Senior Lender defaults in performing or observing any of the terms, covenants or conditions to be performed or observed by it under this Agreement, the other, non-defaulting lender shall have the right to all available legal and equitable relief.

**11.    Notices.**

Each notice, request, demand, consent, approval or other communication (hereinafter in this Section referred to collectively as "notices" and referred to singly as a "notice") which the Senior Lender or the Subordinate Lender is required or permitted to give to the other party pursuant to this Agreement shall be in writing and shall be deemed to have been duly and sufficiently given if: (a) personally delivered with proof of delivery thereof (any notice so delivered shall be deemed to have been received at the time so delivered); or (b) sent by Federal Express (or other similar national overnight courier) designating early morning delivery (any notice so delivered shall be deemed to have been received on the next Business Day following receipt by the courier); or (c) sent by United States registered or certified mail, return receipt requested, postage prepaid, at a post office regularly maintained by the United States Postal Service (any notice so sent shall be deemed to have been received two days after mailing in the United States), addressed to the respective parties as follows:

**SENIOR LENDER:**

NEF Mortgage Corporation
120 South Riverside Plaza, 15th Floor
Chicago, Illinois 60606
Attention:  Mark Siranovic

With a copy to:                    The Community Development Trust, LP
1350 Broadway, Suite 700
New York, New York 10018
Attention:  Operations – Asset Management

**SUBORDINATE LENDER:**

Arkansas Development Finance Authority
P.O. Box 8052
Little Rock, Arkansas 72203
Attention: _____

Either party may, by notice given pursuant to this Section, change the person or persons and/or address or addresses, or designate an additional person or persons or an additional address or addresses for its notices, but notice of a change of address shall only be effective upon receipt.

---

**13.   General.**

(a)    **Assignment/Successors.**  This Agreement shall be binding upon the Borrower, the Senior Lender and the Subordinate Lender and shall inure to the benefit of the respective legal successors and assigns of the Senior Lender and the Subordinate Lender.

(b)    **No Partnership or Joint Venture.**  The Senior Lender's permission for the placement of the Subordinate Loan Documents does not constitute the Senior Lender as a joint venturer or partner of the Subordinate Lender.  Neither party hereto shall hold itself out as a partner, agent or Affiliate of the other party hereto.

I    **Senior Lender's and Subordinate Lender's Consent.**  Wherever the Senior Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Senior Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.  Wherever the Subordinate Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Subordinate Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.

(d)    **Further Assurances.**  The Subordinate Lender, the Senior Lender and the Borrower each agree, at the Borrower's expense, to execute and deliver all additional instruments and/or documents reasonably required by any other party to this Agreement in order to evidence that the Subordinate Mortgage is subordinate to the lien, covenants and conditions of the First Mortgage, or to further evidence the intent of this Agreement.

(e)    **Amendment.**  This Agreement shall not be amended except by written instrument signed by all parties hereto.

(f)    **Governing Law.**  This Agreement shall be governed by the laws of the State in which the Property is located.

(g)    **Severable Provisions.**  If any provision of this Agreement shall be invalid or unenforceable to any extent, then the other provisions of this Agreement, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

(h)    **Term.**  The term of this Agreement shall commence on the date hereof and shall continue until the earliest to occur of the following events: (i) the payment of all of the principal of, interest on and other amounts payable under the First Mortgage Loan Documents; (ii) the payment of all of the principal of, interest on and other amounts payable under the Subordinate Loan Documents, other than by reason of payments which the Subordinate Lender is obligated to remit to the Senior Lender pursuant to Section 4 hereof; (iii) the acquisition by the Senior Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the First Mortgage; or (iv) the acquisition by the

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA Home Loan)
DETROIT 3938582.2

Form 4503     10/98   (Page 11)
© 1997-1998 Fannie Mae

Subordinate Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the Subordinate Mortgage, but only if such acquisition of title does not violate any of the terms of this Agreement.

**(i)    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall together constitute one and the same instrument.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA Home Loan)
DETROIT 3938582.2

Form 4503       10/98    (Page 12)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SENIOR LENDER:**

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

Mark Siranovic
Its: Senior Vice President

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF COOK       )

On this, the 24th day of November, 2009, before me, a Notary Public, the undersigned officer, personally appeared Mark Siranovic who acknowledged himself to be the Senior Vice President of NEF Mortgage Corporation, an Illinois non-profit corporation, and that such officer, being authorized to do so, executed said instrument for the purposes contained therein.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.



Renee B. Murdock
Notary Public
My Commission Expires: 4/29/2011

[Notarial Seal]

RENEE B. MURDOCK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 29, 2011

Fannie Mae Subordination Agreement –
Affordable Housing
Eastside Lofts (ADFA Home Loan)
DETROIT.3938582.2

Form 4503    10/98    (Page 13)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SUBORDINATE LENDER:**

**ARKANSAS DEVELOPMENT FINANCE AUTHORITY**

By: _____

Name: MAC DODSON _____

Title: PRESIDENT _____


STATE OF ARKANSAS          )
                                           ) ss.
COUNTY OF Pulaski          )

On this, the 19 day, before me, a Notary Public, duly commissioned, qualified and acting, with and for said County and State, appeared in person the within named mac Dodson, to me well known, who stated that he was PRESIDENT of ARKANSAS DEVELOPMENT FINANCE AUTHORITY, and was duly authorized in that capacity to execute the foregoing instrument for and in the name and on behalf of said bank, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 19th day of November, 2009.

_____
Nancy A. Covington
Notary Public

My Commission Expires:

6-12-2016

*[Notary seal: NANCY A. COVINGTON, NOTARY PUBLIC, #12348457, EXPIRES 6-12-2016, JEFFERSON COUNTY, AR]*

Fannie Mae Subordination Agreement –
Affordable Housing
Eastside Lofts (ADFA Home Loan)
DETROIT.3938582.2

Form 4503      10/98    (Page 14)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**BORROWER:**

**EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:  Eastside Lofts GP II, LLC,
    an Arkansas limited liability company
Its:  General Partner

    By:  The ARC Arkansas,
        an Arkansas non-profit corporation
    Its:  Sole Member *managing member*

    By: _Steve Hitt_
        Steve Hitt
        Its: Chief Executive Officer

STATE OF _Arkansas_ )

COUNTY OF _Pulaski_ )

    On this _20th_ day of _November_ 2009 before me, a notary public duly commissioned, qualified and acting within and for said county and state, personally appeared in said county and state, Steve Hitt, who stated he is the Chief Executive Officer of The ARC Arkansas, an Arkansas non-profit corporation, sole member of Eastside Lofts GP II, LLC, an Arkansas limited liability company, the general partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership, and duly authorized on behalf of the corporation, the limited liability company and limited partnership to execute the foregoing instrument, and further stated and acknowledged that they had executed such instrument for the consideration and purposes set forth above.

    **IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal this day of _November_ , 2009.



Notary Public, State of _Arkansas_
My Commission Expires: _11-8-2004_

> RAMONA BOYCE
> Saline County
> My Commission Expires
> November 8, 2014

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA Home Loan)
DETROIT 3938582.2

Form 4503    10/98    (Page 15)
© 1997-1998 Fannie Mae

**EXHIBIT A**
**Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA Home Loan)**
DETROIT.3938582.2

**Form 4503**      10/98  (Page A-1)
© 1997-1998 Fannie Mae



Drafted by and when Recorded return to:
Roberta R. Russ
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226-3506

---

For Recorder's Use                                            For Recorder's Use

### SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is entered into as of the 24th day of November, 2009 by and among (i) **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, whose address is 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606 (the "Senior Lender"), (ii) **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, whose address is Attn: Cynthia R. Stone, 2004 Main Street, Little Rock, Arkansas 72206 (the "Borrower"), and (iii) **ARKANSAS DEVELOPMENT FINANCING AUTHORITY**, whose address is 43 Main Street, Suite 500, P. O. Box 802B, Little Rock, Arkansas 72201 ("Subordinate Lender") subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

### RECITALS:

A.    The Senior Lender has made or is making a loan (the "First Mortgage Loan") to the Borrower in the original principal amount of $809,000. The First Mortgage Loan is or will be secured by a first mortgage lien (the "First Mortgage") on a multifamily housing project located in the City of Little Rock, Pulaski County, Arkansas (the "Property"). The Property is more fully described in Exhibit A attached hereto. The Borrower's obligation to repay the First Mortgage Loan is evidenced by a Multifamily Note dated as of November 24, 2009 (the "First Mortgage Note"), and is due in full on December 1, 2027.

B.    The Subordinate Lender has previously made a subordinate loan to Borrower in the amount of $544,000 under the FAF loan program (the "Subordinate Loan") and has secured the Subordinate Loan by, among other things, placing a mortgage lien against the Property.

C.    Subject to the terms and conditions contained in this Agreement, Subordinate Lender has agreed to subordinate the Subordinate Loan to the First Mortgage Loan.

D.    The Senior Lender intends to sell, transfer and deliver the First Mortgage Note and assign the First Mortgage to The Community Development Trust, LP, a Delaware limited partnership ("CDT").

**Fannie Mae Subordination Agreement --**            **Form 4503**    10/98    (Page 1)
**Affordable Housing**                                       © 1997-1998 Fannie Mae
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

NOW, THEREFORE, The Senior Lender, the Subordinate Lender and the Borrower agree as follows:

**1.    Definitions.**

In addition to the terms defined in the Recitals to this Agreement, for purposes of this Agreement the following terms have the respective meanings set forth below:

"Affiliate" means, when used with respect to a Person, any corporation, partnership, joint venture, limited liability company, limited liability partnership, trust or individual controlled by, under common control with, or which controls such Person (the term "control" for these purposes shall mean the ability, whether by the ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to make management decisions on behalf of, or independently to select the managing partner of, a partnership, or otherwise to have the power independently to remove and then select a majority of those individuals exercising managerial authority over an entity, and control shall be conclusively presumed in the case of the ownership of 50% or more of the equity interests).

"Borrower" means the Person named as such in the first paragraph of this Agreement and any other Person (other than the Senior Lender) who acquires title to the Property after the date of this Agreement.

"Business Day" means any day other than Saturday, Sunday or a day on which the Senior Lender is not open for business.

"Default Notice" means: (a) a copy of the written notice from the Senior Lender to the Borrower stating that a First Mortgage Loan Default has occurred under the First Mortgage Loan; or (b) a copy of the written notice from the Subordinate Lender to the Borrower stating that a Subordinate Loan Default has occurred under the Subordinate Loan. Each Default Notice shall specify the default upon which such Default Notice is based.

"First Mortgage Loan Default" means the occurrence of an "Event of Default" as that term is defined in the First Mortgage Loan Documents.

"First Mortgage Loan Documents" means the First Mortgage Note and all other documents evidencing, securing or otherwise executed and delivered in connection with the First Mortgage Loan.

"Person" means an individual, estate, trust, partnership, corporation, limited liability company, limited liability partnership, governmental department or agency or any other entity which has the legal capacity to own property.

"Senior Lender" means the Person named as such in the first paragraph on page 1 of this Agreement. When CDT or any other Person becomes the legal holder of the First Mortgage Note, CDT or such other Person shall automatically become the Senior Lender.

"Subordinate Lender" means the Person named as such in the first paragraph on page 1 of this Agreement and any other Person who becomes the legal holder of the Subordinate Note after the date of this Agreement.

"Subordinate Loan Default" means a default by the Borrower in performing or observing any of the terms, covenants or conditions in the Subordinate Loan Documents to be performed or observed by it, which continues beyond any applicable period provided in the Subordinate Loan Documents for curing the default.

"Subordinate Loan Documents" means the Subordinate Note, the Subordinate Mortgage, and all other documents evidencing, securing or otherwise executed and delivered in connection with the Subordinate Loan.

"Subordinate Mortgage" means the modified mortgage or deed of trust encumbering the Property as security for the Subordinate Loan, as recorded in Instrument No. 2007091243 which modified a mortgage recorded as Instrument #2007064414, Official Records of Pulaski County, Arkansas.

"Subordinate Note" means the amended promissory note in the amount of $544,000 dated December 21, 2007 issued by the Borrower to the Subordinate Lender, or order, to evidence the Subordinate Loan, as amended by an Allonge dated December 28, 2007.

**2.      Permission to Place Mortgage Lien Against Property.**

The Senior Lender agrees, notwithstanding the prohibition against inferior liens on the Property contained in the First Mortgage Loan Documents and subject to the provisions of this Agreement, to permit the Subordinate Lender to record the Subordinate Mortgage and other recordable Subordinate Loan Documents against the Property (which are subordinate in all respects to the lien of the First Mortgage) to secure the Borrower's obligation to repay the Subordinate Note and all other obligations, indebtedness and liabilities of the Borrower to the Subordinate Lender under and in connection with the Subordinate Loan. Such permission is subject to the condition that each of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is true and correct on the date of this Agreement and on the date on which the proceeds of the Subordinate Loan are disbursed to the Borrower. If any of the representations and warranties made by the Borrower and the Subordinate Lender in Section 3 is not true and correct on both of those dates, the provisions of the First Mortgage Loan Documents applicable to unpermitted liens on the Property shall apply.

**3.      Borrower's and Subordinate Lender's Representations and Warranties.**

The Borrower and the Subordinate Lender each makes the following representations and warranties to the Senior Lender:

**(a)      [Intentionally Omitted]**

Fannie Mae Subordination Agreement —                    Form 4503      10/98     (Page 3)
Affordable Housing                                        © 1997-1998 Fannie Mae
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.3

**(b)     Relationship of Borrower to Subordinate Lender and Senior Lender.**  The Subordinate Lender is not an Affiliate of the Borrower and is not in possession of any facts which would lead it to believe that the Senior Lender is an Affiliate of the Borrower.

**(c)     Term.**  The term of the Subordinate Note does not end before the term of the First Mortgage Note.

**(d)     Subordinate Loan Documents.**   The executed Subordinate Loan Documents are substantially in the same forms as those submitted to, and approved by, CDT prior to the date of this Agreement.

**(e)     Senior Loan Documents**.   The executed Senior Loan Documents are substantially in the same forms as, when applicable, those submitted to, and approved by, CDT prior to the date of this Agreement.  Upon execution and delivery of the Senior Loan Documents, Borrower shall deliver to Subordinate Lender an executed copy of each of the Senior Loan Documents, certified to be true, correct and complete.

**4.     Terms of Subordination.**

**(a)     Agreement to Subordinate.**  The Senior Lender and the Subordinate Lender agree that: (i) the indebtedness evidenced by the Subordinate Loan Documents is and shall be subordinated in right of payment, to the extent and in the manner provided in this Agreement to the prior payment in full of the indebtedness evidenced by the First Mortgage Loan Documents, and (ii) the Subordinate Mortgage and the other Subordinate Loan Documents are and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of the First Mortgage and the other First Mortgage Loan Documents and to all advances heretofore made or which may hereafter be made pursuant to the First Mortgage and the other First Mortgage Loan Documents (including but not limited to, all sums advanced for the purposes of (1) protecting or further securing the lien of the First Mortgage, curing defaults by the Borrower under the First Mortgage Loan Documents or for any other purpose expressly permitted by the First Mortgage, or (2) constructing, renovating, repairing, furnishing, fixturing or equipping the Property).

**(b)     Subordination of Subrogation Rights.**  The Subordinate Lender agrees that if, by reason of its payment of real estate taxes or other monetary obligations of the Borrower, or by reason of its exercise of any other right or remedy under the Subordinate Loan Documents, it acquires by right of subrogation or otherwise a lien on the Property which (but for this subsection) would be senior to the lien of the First Mortgage, then, in that event, such lien shall be subject and subordinate to the lien of the First Mortgage.

**(c)     Payments Before First Mortgage Loan Default.**   Until the Subordinate Lender receives a Default Notice of a First Mortgage Loan Default from the Senior Lender, the Subordinate Lender shall be entitled to retain for its own account all payments made under or pursuant to the Subordinate Loan Documents.

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

**Form 4503**     10/98     (Page 4)
© 1997-1998 Fannie Mae

**(d)     Payments After First Mortgage Loan Default.** The Borrower agrees that, after it receives notice (or otherwise acquires knowledge) of a First Mortgage Loan Default, it will not make any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent.     The Subordinate Lender agrees that, after it receives a Default Notice from the Senior Lender with written instructions directing the Subordinate Lender not to accept payments from the Borrower on account of the Subordinate Loan, it will not accept any payments under or pursuant to the Subordinate Loan Documents (including but not limited to principal, interest, additional interest, late payment charges, default interest, attorney's fees, or any other sums secured by the Subordinate Mortgage) without the Senior Lender's prior written consent. If the Subordinate Lender receives written notice from the Senior Lender that the First Mortgage Loan Default which gave rise to the Subordinate Lender's obligation not to accept payments has been cured, waived, or otherwise suspended by the Senior Lender, the restrictions on payment to the Subordinate Lender in this Section 4 shall terminate, and the Senior Lender shall have no right to any subsequent payments made to the Subordinate Lender by the Borrower prior to the Subordinate Lender's receipt of a new Default Notice from the Senior Lender in accordance with the provisions of this Section 4(d).

**(e)     Remitting Subordinate Loan Payments to Senior Lender.** If, after the Subordinate Lender receives a Default Notice from the Senior Lender in accordance with subsection (d) above, the Subordinate Lender receives any payments under the Subordinate Loan Documents, the Subordinate Lender agrees that such payment or other distribution will be received and held in trust for the Senior Lender and unless the Senior Lender otherwise notifies the Subordinate Lender in writing, will be promptly remitted, in kind to the Senior Lender, properly endorsed to the Senior Lender, to be applied to the principal of, interest on and other amounts due under the First Mortgage Loan Documents in accordance with the provisions of the First Mortgage Loan Documents.     By executing this Agreement, the Borrower specifically authorizes the Subordinate Lender to endorse and remit any such payments to the Senior Lender, and specifically waives any and all rights to have such payments returned to the Borrower or credited against the Subordinate Loan.     Borrower and Senior Lender acknowledge and agree that payments received by the Subordinate Lender, and remitted to the Senior Lender under this Section 4, shall not be applied or otherwise credited against the Subordinate Loan, nor shall the tender of such payment to the Senior Lender waive any Subordinate Loan Default which may arise from the inability of the Subordinate Lender to retain such payment or apply such payment to the Subordinate Loan.

**(f)     Agreement Not to Commence Bankruptcy Proceeding.** The Subordinate Lender agrees that during the term of this Agreement it will not commence, or join with any other creditor in commencing any bankruptcy reorganization, arrangement, insolvency or liquidation proceedings with respect to the Borrower, without the Senior Lender's prior written consent.

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA-FAL Program)**
DETROIT 393859I.2

Form 4503     10/98     (Page 5)
© 1997-1998 Fannie Mae

5.    **Default Under Subordinate Loan Documents.**

    **(a)    Notice of Default and Cure Rights.** The Subordinate Lender shall deliver to the Senior Lender a Default Notice within five Business Days in each case where the Subordinate Lender has given a Default Notice to the Borrower. Failure of the Subordinate Lender to send a Default Notice to the Senior Lender shall not prevent the exercise of the Subordinate Lender's rights and remedies under the Subordinate Loan Documents, subject to the provisions of this Agreement. The Senior Lender shall have the right, but not the obligation, to cure any Subordinate Loan Default within 60 days following the date of such notice; provided, however that the Subordinate Lender shall be entitled, during such 60-day period, to continue to pursue its rights and remedies under the Subordinate Loan Documents. All amounts paid by the Senior Lender in accordance with the First Mortgage Loan Documents to cure a Subordinate Loan Default shall be deemed to have been advanced by the Senior Lender pursuant to, and shall be secured by the lien of, the First Mortgage.

    **(b)    Subordinate Lender's Exercise of Remedies After Notice to Senior Lender.** If a Subordinate Loan Default occurs and is continuing, the Subordinate Lender agrees that, without the Senior Lender's prior written consent, it will not commence foreclosure proceedings with respect to the Property under the Subordinate Loan Documents or exercise any other rights or remedies it may have under the Subordinate Loan Documents, including, but not limited to accelerating the Subordinate Loan, collecting rents, appointing (or seeking the appointment of) a receiver or exercising any other rights or remedies thereunder unless and until it has given the Senior Lender at least 60 days' prior written notice; during such 60 day period, however, the Subordinate Lender shall be entitled to exercise and enforce all other rights and remedies available to the Subordinate Lender under the Subordinate Loan Documents and/or under applicable laws, including without limitation, rights to enforce covenants and agreements of the Borrower relating to income, rent, or affordability restrictions contained in the Land Use Restriction Agreement.

    **(c)    Cross Default.** The Borrower and the Subordinate Lender agree that a Subordinate Loan Default shall constitute a First Mortgage Loan Default under the First Mortgage Loan Documents and the Senior Lender shall have the right to exercise all rights or remedies under the First Mortgage Loan Documents in the same manner as in the case of any other First Mortgage Loan Default. If the Subordinate Lender notifies the Senior Lender in writing that any Subordinate Loan Default of which the Senior Lender has received a Default Notice has been cured or waived, as determined by the Subordinate Lender in its sole discretion, then provided that Senior Lender has not conducted a sale of the Property pursuant to its rights under the First Mortgage Loan Documents, any First Mortgage Loan Default under the First Mortgage Loan Documents arising solely from such Subordinate Loan Default shall be deemed cured, and the First Mortgage Loan shall be reinstated, provided, however, that the Senior Lender shall not be required to return or otherwise credit for the benefit of the Borrower any default rate interest or other default related charges or payments received by the Senior Lender during such First Mortgage Loan Default.

Fannie Mae Subordination Agreement --
Affordable Housing
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

Form 4503    10/98    (Page 6)
© 1997-1998 Fannie Mae

## 6.    Default Under First Mortgage Loan Documents.

(a)    **Notice of Default and Cure Rights.**  The Senior Lender shall deliver to the Subordinate Lender a Default Notice within five Business Days in each case where the Senior Lender has given a Default Notice to the Borrower.  Failure of the Senior Lender to send a Default Notice to the Subordinate Lender shall not prevent the exercise of the Senior Lender's rights and remedies under the Senior Loan Documents, subject to the provisions of this Agreement.  The Subordinate Lender shall have the right, but not the obligation, to cure any such First Mortgage Loan Default within 60 days following the date of such notice; provided, however, that the Senior Lender shall be entitled during such 60-day period to continue to pursue its remedies under the First Mortgage Loan Documents.  Subordinate Lender may have up to 90 days from the date of the Default Notice to cure a non-monetary default if during such 90-day period Subordinate Lender keeps current all payments required by the First Mortgage Loan Documents.  In the event that such a non-monetary default creates an unacceptable level of risk relative to the Property, or Senior Lender's secured position relative to the Property, as determined by Senior Lender in its sole discretion, then Senior Lender may exercise during such 90-day period all available rights and remedies to protect and preserve the Property and the rents, revenues and other proceeds from the Property.  All amounts paid by the Subordinate Lender to the Senior Lender to cure a First Mortgage Loan Default shall be deemed to have been advanced by the Subordinate Lender pursuant to, and shall be secured by the lien of, the Subordinate Mortgage.

(b)    **Cross Default.**  The Subordinate Lender agrees that, notwithstanding any contrary provision contained in the Subordinate Loan Documents, a First Mortgage Loan Default shall not constitute a default under the Subordinate Loan Documents if no other default occurred under the Subordinate Loan Documents until either (i) the Senior Lender has accelerated the maturity of the First Mortgage Loan, or (ii) the Senior Lender has taken affirmative action to exercise its rights under the First Mortgage to collect rent, to appoint (or seek the appointment of) a receiver or to foreclose on (or to exercise a power of sale contained in) the First Mortgage.  At any time after a First Mortgage Loan Default is determined to constitute a default under the Subordinate Loan Documents, the Subordinate Lender shall be permitted to pursue its remedies for default under the Subordinate Loan Documents, subject to the restrictions and limitations of this Agreement.   If at any time the Borrower cures any First Mortgage Loan Default to the satisfaction of the Senior Lender, as evidenced by written notice from the Senior lender to the Subordinate Lender, any default under the Subordinate Loan Documents arising from such First Mortgage Loan Default shall be deemed cured and the Subordinate Loan shall be retroactively reinstated as if such First Mortgage Loan Default had never occurred.

## 7.    Conflict.

The Borrower, the Senior Lender and the Subordinate Lender each agrees that, in the event of any conflict or inconsistency between the terms of the First Mortgage Loan Documents, the Subordinate Loan Documents and the terms of this Agreement, the terms of this Agreement shall govern and control solely as to the following:  (a) the relative priority of the security interests of the Senior Lender and the Subordinate Lender in the Property; (b) the

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

Form 4503    10/98    (Page 7)
© 1997-1998 Fannie Mae

timing of the exercise of remedies by the Senior Lender and the Subordinate Lender under the First Mortgage and the Subordinate Mortgage, respectively; and (c) solely as between the Senior Lender and the Subordinate Lender, the notice requirements, cure rights, and the other rights and obligations which the Senior Lender and the Subordinate Lender have agreed to as expressly provided in this Agreement. Borrower acknowledges that the terms and provisions of this Agreement shall not, and shall not be deemed to: extend Borrower's time to cure any First Mortgage Loan Default or Subordinate Loan Default, as the case may be; give the Borrower the right to notice of any First Mortgage Loan Default or Subordinate Loan Default, as the case may be other than that, if any, provided, respectively under the First Mortgage Loan Documents or the Subordinate Loan Documents; or create any other right or benefit for Borrower as against Senior Lender or Subordinate Lender.

**8.    Rights and Obligations of the Subordinate Lender Under the Subordinate Loan Documents and of the Senior Lender under the First Mortgage Loan Documents.**

Subject to each of the other terms of this Agreement, all of the following provisions shall supersede any provisions of the Subordinate Loan Documents covering the same subject matter:

**(a)    Protection of Security Interest.** The Subordinate Lender shall not, without the prior written consent of the Senior Lender in each instance, take any action which has the effect of increasing the indebtedness outstanding under, or secured by, the Subordinate Loan Documents, except that the Subordinate Lender shall have the right to advance funds to cure First Mortgage Loan Defaults pursuant to Section 6(a) above and advance funds pursuant to the Subordinate Mortgage for the purpose of paying real estate taxes and insurance premiums, making necessary repairs to the Property and curing other defaults by the Borrower under the Subordinate Loan Documents.

**(b)    Condemnation or Casualty.** In the event of: a taking or threatened taking by condemnation or other exercise of eminent domain of all or a portion of the Property (collectively, a "Taking"); or the occurrence of a fire or other casualty resulting in damage to all or a portion of the Property (collectively, a "Casualty"), at any time or times when the First Mortgage remains a lien on the Property the following provisions shall apply:

(1)    The Subordinate Lender hereby agrees that its rights (under the Subordinate Loan Documents or otherwise) to participate in any proceeding or action relating to a Taking and/or a Casualty, or to participate or join in any settlement of, or to adjust, any claims resulting from a Taking or a Casualty shall be and remain subordinate in all respects to the Senior Lender's rights under the First Mortgage Loan Documents with respect thereto, and the Subordinate Lender shall be bound by any settlement or adjustment of a claim resulting from a Taking or a Casualty made by the Senior Lender; provided, however, this subsection and/or anything contained in this Agreement shall not limit the rights of the Subordinate Lender to file any pleadings, documents,

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

**Form 4503**    10/98    (Page 8)
© 1997-1998 Fannie Mae

claims or notices with the appropriate court with jurisdiction over the proposed Taking and/or Casualty; and

(2)     all proceeds received or to be received on account of a Taking or a Casualty, or both, shall be applied (either to payment of the costs and expenses of repair and restoration or to payment of the First Mortgage Loan) in the manner determined by the Senior Lender in its sole discretion; provided, however, that if the Senior Lender elects to apply such proceeds to payment of the principal of, interest on and other amounts payable under the First Mortgage Loan, any proceeds remaining after the satisfaction in full of the principal of, interest on and other amounts payable under the First Mortgage Loan shall be paid to, and may be applied by, the Subordinate Lender in accordance with the applicable provisions of the Subordinate Loan Documents, provided however, the Senior Lender agrees to consult with the Subordinate Lender in determining the application of Casualty proceeds, provided further however that in the event of any disagreement between the Senior Lender and the Subordinate Lender over the application of Casualty proceeds, the decision of the Senior Lender, in its sole discretion, shall prevail.

**(c)     No Modification of Subordinate Loan Documents.**  The Borrower and the Subordinate Lender each agrees that, until the principal of, interest on and all other amounts payable under the First Mortgage Loan Documents have been paid in full, it will not, without the prior written consent of the Senior Lender in each instance, increase the amount of the Subordinate Loan, increase the required payments due under the Subordinate Loan, decrease the term of the Subordinate Loan, increase the interest rate on the Subordinate Loan, or otherwise amend the Subordinate Loan terms in a manner that creates an adverse effect upon the Senior Lender under the First Mortgage Loan Documents. Any unauthorized amendment of the Subordinate Loan Documents or assignment of the Subordinate Lender's interest in the Subordinate Loan without the Senior Lender's consent shall be void ab initio and of no effect whatsoever.

**9.     Modification or Refinancing of First Mortgage Loan.**

The Subordinate Lender consents to any agreement or arrangement in which the Senior Lender waives, postpones, extends, reduces or modifies any provisions of the First Mortgage Loan Documents, including any provision requiring the payment of money. Subordinate Lender further agrees that its agreement to subordinate hereunder shall extend to any new mortgage debt which is for the purpose of refinancing all or any part of the First Mortgage Loan (including reasonable and necessary costs associated with the closing and/or the refinancing); and that all the terms and covenants of this Agreement shall inure to the benefit of any holder of any such refinanced debt; and that all references to the First Mortgage Loan, the First Mortgage Note, the First Mortgage, the First Mortgage Loan Documents and Senior Lender shall mean, respectively, the refinance loan, the refinance note, the mortgage securing the refinance note, all documents evidencing securing or otherwise pertaining to the refinance note and the holder of the refinance note.

**10.    Default by the Subordinate Lender or Senior Lender.**

If the Subordinate Lender or Senior Lender defaults in performing or observing any of the terms, covenants or conditions to be performed or observed by it under this Agreement, the other, non-defaulting lender shall have the right to all available legal and equitable relief.

**11.    Notices.**

Each notice, request, demand, consent, approval or other communication (hereinafter in this Section referred to collectively as "notices" and referred to singly as a "notice") which the Senior Lender or the Subordinate Lender is required or permitted to give to the other party pursuant to this Agreement shall be in writing and shall be deemed to have been duly and sufficiently given if: (a) personally delivered with proof of delivery thereof (any notice so delivered shall be deemed to have been received at the time so delivered); or (b) sent by Federal Express (or other similar national overnight courier) designating early morning delivery (any notice so delivered shall be deemed to have been received on the next Business Day following receipt by the courier); or (c) sent by United States registered or certified mail, return receipt requested, postage prepaid, at a post office regularly maintained by the United States Postal Service (any notice so sent shall be deemed to have been received two days after mailing in the United States), addressed to the respective parties as follows:

**SENIOR LENDER:**

NEF Mortgage Corporation
120 South Riverside Plaza, 15th Floor
Chicago, Illinois 60606
Attention: Mark Siranovic

With a copy to:                     The Community Development Trust, LP
1350 Broadway, Suite 700
New York, New York 10018
Attention:  Operations – Asset Management

**SUBORDINATE LENDER:**

Arkansas Development Finance Authority
43 Main Street, Suite 500
P.O. Box 802B
Little Rock, Arkansas 72201
Attention: _____

Either party may, by notice given pursuant to this Section, change the person or persons and/or address or addresses, or designate an additional person or persons or an additional address or addresses for its notices, but notice of a change of address shall only be effective upon receipt.

**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

**Form 4503**     10/98    (Page 10)
© 1997-1998 Fannie Mae

**13.    General.**

**(a)    Assignment/Successors.**  This Agreement shall be binding upon the Borrower, the Senior Lender and the Subordinate Lender and shall inure to the benefit of the respective legal successors and assigns of the Senior Lender and the Subordinate Lender.

**(b)    No Partnership or Joint Venture.**  The Senior Lender's permission for the placement of the Subordinate Loan Documents does not constitute the Senior Lender as a joint venturer or partner of the Subordinate Lender.  Neither party hereto shall hold itself out as a partner, agent or Affiliate of the other party hereto.

**I    Senior Lender's and Subordinate Lender's Consent.**  Wherever the Senior Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Senior Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.  Wherever the Subordinate Lender's consent or approval is required by any provision of this Agreement, such consent or approval may be granted or denied by the Subordinate Lender in its sole and absolute discretion, unless otherwise expressly provided in this Agreement.

**(d)    Further Assurances.**  The Subordinate Lender, the Senior Lender and the Borrower each agree, at the Borrower's expense, to execute and deliver all additional instruments and/or documents reasonably required by any other party to this Agreement in order to evidence that the Subordinate Mortgage is subordinate to the lien, covenants and conditions of the First Mortgage, or to further evidence the intent of this Agreement.

**(e)    Amendment.**  This Agreement shall not be amended except by written instrument signed by all parties hereto.

**(f)    Governing Law.**  This Agreement shall be governed by the laws of the State in which the Property is located.

**(g)    Severable Provisions.**  If any provision of this Agreement shall be invalid or unenforceable to any extent, then the other provisions of this Agreement, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**(h)    Term.**  The term of this Agreement shall commence on the date hereof and shall continue until the earliest to occur of the following events: (i) the payment of all of the principal of, interest on and other amounts payable under the First Mortgage Loan Documents; (ii) the payment of all of the principal of, interest on and other amounts payable under the Subordinate Loan Documents, other than by reason of payments which the Subordinate Lender is obligated to remit to the Senior Lender pursuant to Section 4 hereof; (iii) the acquisition by the Senior Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the First Mortgage; or (iv) the acquisition by the

Subordinate Lender of title to the Property pursuant to a foreclosure or a deed in lieu of foreclosure of, or the exercise of a power of sale contained in, the Subordinate Mortgage, but only if such acquisition of title does not violate any of the terms of this Agreement.

(i)    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall together constitute one and the same instrument.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA-FAL Program)
DETROIT 3938591.2

Form 4503    10/98    (Page 12)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SENIOR LENDER:**

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

By: _____

Mark Siranovic
Its:  Senior Vice President


STATE OF _Illinois_ )
                 ) ss.
COUNTY OF _Cook_ )

On this, the _24th_ day of _November_ 2009, before me, a Notary Public, the undersigned officer, personally appeared Mark Siranovic who acknowledged him to be the Senior Vice President of NEF Mortgage Corporation, an Illinois non-profit corporation, and that such officer, being authorized to do so, executed said instrument for the purposes contained therein.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires: _4/29/2011_

[Notarial Seal]



RENEE B. MURDOCK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 29, 2011


**Fannie Mae Subordination Agreement --**
**Affordable Housing**
**Eastside Lofts (ADFA-FAL Program)**
DETROIT.3938591.2

**Form 4503**    10/98   (Page 13)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**SUBORDINATE LENDER:**

**ARKANSAS DEVELOPMENT FINANCE AUTHORITY**

By: _____

Name: MAC DODSON _____

Title: PRESIDENT _____

STATE OF ARKANSAS          )
                                               ) ss.
COUNTY OF Pulaski        )

On this, the 19ᵀᴴ day, before me, a Notary Public, duly commissioned, qualified and acting, with and for said County and State, appeared in person the within named MAC DODSON, to me well known, who stated that he was PRESIDENT of Arkansas Development Finance Authority, and was duly authorized in that capacity to execute the foregoing instrument for and in the name and on behalf of said bank, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 19ᵀᴴ day of November, 2009.

_____
Notary Public

My Commission Expires:

6-12-2016

NANCY A. COVINGTON
NOTARY
★
PUBLIC
#12348457
EXPIRES
6-12-2016
JEFFERSON COUNTY, AR

Fannie Mae Subordination Agreement –
Affordable Housing
Eastside Lofts (ADFA–FAL Program)
DETROIT.3938591.2

Form 4503      10/98   (Page 14)
© 1997-1998 Fannie Mae

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**BORROWER:**

**EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:  Eastside Lofts GP II, LLC,
     an Arkansas limited liability company
Its: General Partner

     By:  The ARC Arkansas,
          an Arkansas non-profit corporation
          Its: Sole Member *Managing Member*

          By: _Steve Hitt_
              Steve Hitt
              Its: Chief Executive Officer

STATE OF _Arkansas_

COUNTY OF _Pulaski_  )

On this _20th_ day of _November_, 2009 before me, a notary public duly commissioned, qualified and acting within and for said county and state, personally appeared in said county and state, Steve Hitt, who stated he is the Chief Executive Officer of The ARC Arkansas, an Arkansas non-profit corporation, sole member of Eastside Lofts GP II, LLC, an Arkansas limited liability company, the general partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership, and duly authorized on behalf of the corporation, the limited liability company and limited partnership to execute the foregoing instrument, and further stated and acknowledged that they had executed such instrument for the consideration and purposes set forth above.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this day of _November_, 2009.

_Ramona Boyce_
Notary Public, State of _____
My Commission Expires: _11-8-2014_

(SEAL)

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA-FAL Program)
DETROIT 3938591.2

Form 4503    10/98    (Page 15)
© 1997-1998 Fannie Mae

## **EXHIBIT A**
## **Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

Fannie Mae Subordination Agreement --
Affordable Housing
Eastside Lofts (ADFA-FAL Program)
DETROIT.3938591.2

Form 4503      10/98  (Page A-1)
© 1997-1998 Fannie Mae

EXHIBIT C

Case 4:23-cv-00708-BSM   Document 1   Filed 08/25/22   Page 174 of 423



This instrument was prepared by:
Kevin R. Burns
Rose Law Firm, a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

## INTERCREDITOR AND SUBORDINATION AGREEMENT

This Intercreditor and Subordination Agreement ("Agreement") is entered into as of November 24, 2009 by and among **Arvest Bank** ("Arvest"), **Arkansas Development Finance Authority** ("ADFA"), the **City of Little Rock, Arkansas** ("City"), **The ARC Arkansas** ("ARC") and **Eastside Loft Apartments II Limited Partnership**, an Arkansas limited partnership ("Borrower"). Arvest, ADFA, the City, and ARC are sometimes hereinafter referred to individually as a "Lender" and collectively as the "Lenders".

## RECITALS

WHEREAS, Borrower is the owner of certain real property more particularly described on Exhibit A attached hereto and made a part hereof on which it has developed certain low-income housing units (the "Property");

WHEREAS, ARC is the sole member of Eastside Lofts GP Phase II, LLC, the General Partner of Borrower and has from time to time made loans and other extensions of credit to the Borrower (collectively, the "ARC Loan");

WHEREAS, on or about November 22, 2005, Borrower obtained a loan in the original principal amount of $400,000 from ADFA, as administrator of the federal HOME Investments Partnership Program (the "ADFA Home Loan"), to assist in financing the rehabilitation and/or construction of the Property, which loan is evidenced by a Promissory Note dated November 22, 2005, as amended by an Amended and Restated Promissory Note dated December 21, 2007, and is secured by a Mortgage dated November 22, 2005 and recorded in the real estate records of the Circuit Clerk and Ex-Officio Recorder of Pulaski County, Arkansas (the "Recording Office") as Instrument Number 2005103433 (together with all other documents executed in connection with the ADFA Home Loan, collectively, the "ADFA Home Loan Documents");

WHEREAS, on August 29, 2006 Borrower obtained a construction loan in the original principal amount of $3,000,000 from Arvest (the "Arvest Loan"), which loan is evidenced by a Negotiable Term Promissory Note in the amount of $3,000,000.00, a Construction Loan Agreement, a Construction Mortgage, and an Arkansas Absolute Assignment of Rents and Leases, each dated August 29, 2006, as amended by a First Allonge, First Modification of Construction Loan Agreement and a First Modification of Construction Mortgage, each dated November 26, 2008, and as further amended by a Second Allonge, Second Modification of Construction Loan Agreement and a Second Modification of Construction Mortgage, each dated June 2, 2009, and an Amended and Restated Promissory Note and an Amended and Restated

WHEREAS, ADFA subordinated the mortgage lien securing the ADFA Home Loan to the mortgage lien securing the Arvest Loan pursuant to a Subordination Agreement dated August 29, 2006 and recorded in the Recording Office as Instrument Number 2006068929;

WHEREAS, on August 14, 2007, Borrower obtained a loan in the original principal amount of $544,000 from ADFA under the ADFA Financing Adjustment Factor Program (the "ADFA FAF Loan"), to assist in financing the rehabilitation and/or construction of the Property, which loan is evidenced by a Promissory Note dated August 14, 2007, as amended by an Amended Promissory Note dated November 28, 2007 and as further amended by an Allonge to Amended Promissory Note dated December 28, 2007, and is secured by a Mortgage dated August 14, 2007 and recorded in the Recording Office as Instrument Number 2007064414, as amended by a Modified Mortgage dated November 28, 2007 and recorded in the Recording Office as Instrument Number 2007091243 (together with all other documents executed in connection with the ADFA FAF Loan, collectively, the "ADFA FAF Loan Documents");

WHEREAS, on or about August 2, 2007, Borrower obtained a HOME Investment Partnership Program subsidy loan in the original principal amount of $130,000 from the City (the "City Loan"), to assist in financing the rehabilitation and/or construction of the Property, which loan is evidenced by a Promissory Note in favor of the City executed by ARC dated December 21, 2007 and a Promissory Note in the amount of $130,000 in favor of ARC, and is secured by a Mortgage in favor of the City dated November 16, 2007 and recorded in the Recording Office as Instrument Number 2007088865 and an unrecorded Mortgage dated effective as of November 16, 2007, in favor of ARC (together with all other documents executed in connection with the City Loan, collectively, the "City Loan Documents");

WHEREAS, on or about the date hereof, Borrower will obtain a loan in the original principal amount of $809,000 (the "CDT Loan") from The Community Development Trust ("CDT") which will be used, along with capital contributions made to Borrower by Borrower's limited partner, to partially repay the Arvest Loan, leaving a remaining balance of principal of approximately $732,069.28;

WHEREAS, as a condition of making the CDT Loan, CDT has required Arvest to amend and restate the Arvest Loan Documents to conform to certain Fannie Mae requirements;

WHEREAS, Borrower and the Lenders desire to consent to such amendment and restatement of the Arvest Loan Documents and agree that the lien priorities of each Lenders' respective mortgages shall be as set forth herein; and

WHEREAS, Borrower and the lenders find it advantageous, desirable and in their best interest to set forth their agreement regarding the priority of the Lenders' respective mortgage liens and security interests and the payment of indebtedness owed by the Borrower.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties hereto agree as follows:

2

1.    Liens and Security Interests of Arvest Loan and ADFA Home Loan *Pari Passu*.

(a)    Arvest and ADFA agree that any mortgage, security interest, lien, or other encumbrance and interest of either party now existing or hereafter created in real and personal property constituting the Property pursuant to the Arvest Loan or the ADFA Home Loan is to be shared equally and shall be *pari passu* and of equal priority.

(b)    Arvest and ADFA each waive and release for the benefit of the other, all claims and rights concerning the validity, enforceability, lien priority, or related claims regarding the other party's mortgage, and/or security interest in the Project. Included within the intent of the preceding sentence is the intent to waive and release to the other any right to assert that the other party's lien or other security interest is inferior to its own. The foregoing shall not be deemed a waiver or release of such rights in the event a third person (other than a party to this Agreement) successfully challenges the validity, enforceability, perfection, or priority of any interest, and each party retains the right to defend and enforce any such attributes of its lien or other security interest against third parties.

(c)    Arvest and ADFA hereby terminate that certain Subordination Agreement dated August 29, 2006 and recorded in the real estate records of the Circuit Clerk and Ex-Officio Recorder of Pulaski County, Arkansas as Instrument Number 2006068929.

(d)    ADFA hereby subordinates and makes junior the ADFA FAF Loan, the ADFA FAF Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Arvest Loan and the ADFA Home Loan, (ii) the liens and security interests created by the Arvest Loan Documents and the ADFA Home Loan Documents, and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Arvest Loan Documents and the ADFA Home Loan Documents, and no amendments or modifications to the Arvest Loan Documents or the ADFA Home Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section.

(e)    The City and, to the extent applicable, ARC hereby subordinate and make junior the City Loan, the City Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Arvest Loan and the ADFA Home Loan, (ii) the liens and security interests created by the Arvest Loan Documents and the ADFA Home Loan Documents, and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Arvest Loan Documents and the ADFA Home Loan Documents, and no amendments or modifications to the Arvest Loan Documents or the ADFA Home Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section.

(f)    ARC hereby subordinates and makes junior the ARC Loan and the liens and security interests securing the ARC Loan, and all rights, remedies, terms and covenants contained therein to ((i) the Arvest Loan and the ADFA Home Loan, (ii) the liens and security interests created by the Arvest Loan Documents and the ADFA Home Loan Documents, and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Arvest Loan Documents and the ADFA Home Loan Documents, and no amendments or modifications to the

3

Arvest Loan Documents or the ADFA Home Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this <u>Section</u>.

    2.    **ADFA FAF Loan Mortgage Lien Priority.**

    (a)    The City and, to the extent applicable, ARC hereby subordinate and make junior the City Loan, the City Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the ADFA FAF Loan, (ii) the liens and security interests created by the ADFA FAF Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the ADFA FAF Loan Documents, and no amendments or modifications to the ADFA FAF Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this <u>Section</u>.

    (b)    ARC hereby subordinates and makes junior the ARC Loan and the liens and security interests securing the ARC Loan, and all rights, remedies, terms and covenants contained therein to (i) the ADFA FAF Loan, (ii) the liens and security interests created by the ADFA FAF Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the ADFA FAF Loan Documents, and no amendments or modifications to the ADFA FAF Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this <u>Section</u>.

    3.    **Payments.**

    (a)    The Lenders acknowledge that CDT has required that the lenders adhere to the Fannie Mae requirements for "soft financing" subordinate debt. Under Fannie Mae guidelines, "soft financing" is subordinate debt in which:

        (i) payments are made from available Property cash flow;

        (ii) there are no projected accruals of unpaid interest, or accruals will be satisfied from the Property's net cash flow and residuals;

        (iii) the Lenders have agreed to re-subordinate to a future first mortgage lender that will refinance any unpaid principal balance on the CDT Mortgage at the end of the CDT Mortgage Loan term; and

        (iv) the Borrower retains a twenty five percent (25%) equity share in the cash flow and appreciation of the Property.

    (b)    Due to the Fannie Mae guidelines, each Lender's promissory note must be paid, if at all, from available Property cash flow. Therefore, notwithstanding any other provision of this Agreement to the contrary, prior to the occurrence of an event of default under the Arvest Loan Documents, the lenders agree that available Property cash flow shall be paid to the Lenders as follows:

        (i) fifty Percent (50%) of available Property cash flow shall be paid to Arvest and applied to the Arvest Loan;

(ii) fifty percent (50%) of available Property cash flow shall be paid to ADFA and applied to the ADFA Home Loan or the ADFA FAF Loan, in ADFA's sole discretion.

All payments of available Property cash flow shall be applied by each Lender first against interest and then against principal for the then current monthly payment and then to all accrued, but unpaid monthly installments of principal and interest. The Lenders agree that no portion of the available Property cash flow shall be payable to the City or ARC due to the terms of the City Loan which permit the forgiveness thereof following the occurrence of certain events. ARC may not receive any payments on the ARC Loan until the payment in full of the CDT Loan, Arvest Loan, ADFA Home Loan and ADFA FAF Loan.

(c)     For purposes of this Agreement, "available Property cash flow" means the operating income of the Property (excluding interest income earned on tenant security deposits and reserve accounts) in excess of operating expenses and any retained Property cash flow required by Fannie Mae. The term "operating expenses" includes salaries of on-site property managers, management fees, accounting services, loan repayments, amounts deposited into a replacement reserve account, travel expenses, legal services, insurance expenses, taxes, advertising, grounds maintenance, utility expenses, office supplies, rental, maintenance (but not purchase) of office space, each specifically related to the Property.

5.     **Receipt of Collateral or Proceeds.** If and to the extent any Lender obtains, receives or otherwise has possession of any collateral or the proceeds of any collateral in which another party to this Agreement has a prior interest or claim pursuant to this Agreement, then after a default or an event of default by Borrower and acceleration of any indebtedness of CDT, Arvest, or ADFA, the party having such collateral or proceeds (a) shall hold it for the benefit of such other Lender, and (b) deliver and account for it to such other Lender. Additionally, if after a default or an event of default by Borrower and acceleration of any indebtedness of CDT, Arvest, or ADFA, any Lender obtains payment of any money which is proceeds of any collateral in which another party to this Agreement has a prior claim pursuant to this Agreement, then the party obtaining such payment shall pay such amount to such other party.

After a default or an event of default by Borrower and acceleration of any indebtedness of CDT, Arvest, or ADFA, all collateral shall be received by or paid (a) first, to CDT until all indebtedness under the CDT Loan is indefeasibly paid in full, (b) second, to Arvest and ADFA until all indebtedness under the Arvest Loan and the ADFA Home Loan are indefeasibly paid in full (with Arvest and ADFA each receiving 50% until payment in full of the ADFA Home Loan and Arvest receiving 100% thereafter), (c) third, to ADFA until all indebtedness under the ADFA FAF Loan is indefeasibly paid in full, (d) fourth, to the City until all indebtedness under the City Loan is indefeasibly paid in full, (e) fifth, to ARC until all indebtedness under the ARC Loan is indefeasibly paid in full, and (f) sixth, to Borrower.

6.     **Casualty or Condemnation.** In the event of a casualty to the buildings or improvements constructed on any portion of the Property or a condemnation or taking under a power of eminent domain of all or any portion of the Property, CDT shall have a first and prior

5

interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "Award"). If the amount of the Award is in excess of all amounts owed to CDT under the CDT Loan Documents, however, and either the CDT Loan has been paid in full or Borrower is entitled to a remittance of same under the CDT Loan Documents other than to restore the Property, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the CDT Loan Documents, be paid to or at the direction of Arvest and ADFA to the extent of the outstanding balances of the Arvest Loan and the ADFA Home Loan, then to ADFA to the extent of the outstanding balance of the ADFA FAF Loan, then to the City to the extent of the outstanding balance of the City Loan, then to ARC to the extent of the outstanding balance of the ARC Loan, with any remaining balance payable to Borrower, unless other persons have claimed the right to such awards or proceeds, in which case Borrower shall provide notice to the Lenders of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, CDT shall continue to hold such excess Award until CDT receives an agreement signed by all persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing CDT as to how and to which person(s) the excess Award is to be distributed. Any portion of the Award made available to the Borrower for the repair or restoration of the Property shall not be subject to attachment by the Lenders.

7. **Successors and Assigns.** References to Arvest, ADFA, the City, ARC and Borrower include, and this agreement is binding upon, the respective successors and assigns of each of them.

8. **Notices.** Notices made under this agreement shall be sent by prepaid certified mail, return receipt requested to:

If to ADFA:

ADFA
P.O. Box 8023
Little Rock, AR 72203
Attention: General Counsel

If to Arvest:

Arvest Bank
500 Broadway Place
Little Rock, AR 72201
Attention: Roger Steging

If to City:

Little Rock City Hall
500 West Markham, Ste. 120W
Little Rock, Arkansas 72201
Attention: CDBG Manager

If to ARC:

The ARC Arkansas
2004 South Main Street
Little Rock, AR 72206
Attention: Chief Executive Officer

6

If to Borrower:                   Eastside Lofts GP Phase II, LLC
                                  2004 South Main Street
                                  Little Rock, AR 72206

or such other address of which the others are given prior notice.

9.      **Relationship with Borrower.** Each Lender remains fully responsible for its relationship with Borrower, and has no responsibility to the other Lenders to advise regarding Borrower or its properties or financial condition except as stated in this agreement. No party to this Agreement is the agent of any other party to this Agreement.

10.     **Borrower Not Party.** Borrower is not a party to or a beneficiary of this Agreement and shall not have any right to enforce any provision of this Agreement. Borrower's signature to this Agreement is only an acknowledgement that Borrower is aware of the terms and conditions of this Agreement and that Borrower agrees to cooperate with the parties hereto in performing this Agreement. Nothing in this Agreement shall be deemed to impair, restrict or otherwise affect any right, remedy or power which any party to this Agreement has with respect to Borrower.

11.     **Continuing Agreement & Termination.** This Agreement shall be a continuing agreement and it shall remain in full force and effect unless and until all liabilities, obligations and indebtedness under or in connection with the Arvest Loan have been indefeasibly satisfied in full and the collateral therefore released.

12.     **Counterparts and Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when executed shall be deemed an original but all such counterparts taken together shall constitute one and the same instrument. Facsimile signatures on this Agreement or any subsequent amendments shall be considered as original signatures.

13.     **Further Assurances.** So long as all or any portion of the Arvest Loan, the ADFA Home Loan, the ADFA FAF Loan or the City Loan remains unpaid, each Lender will execute, acknowledge and deliver in recordable form and upon reasonable demand of any other Lender, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

14.     **No Release.** Nothing herein contained shall operate to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Arvest Loan Documents, the ADFA Home Loan Documents, the ADFA FAF Loan Documents, or the City Loan Documents or (b) any liability of Borrower under the Arvest Loan Documents, the ADFA Home Loan Documents, the ADFA FAF Loan Documents, or the City Loan Documents.

15.     **Amendments.** This Agreement may not be amended except in a writing signed by or on behalf of each party hereto and consented to by CDT or its successors and assigns.

16.    **Miscellaneous.**    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Arkansas, without regard to conflicts of laws principles that would result in the application of the law of another jurisdiction.

[The remainder of this page left blank intentionally.]

Effective as of the day first written above.


**Arkansas Development Finance Authority**

By:_____
        Mac Dodson, President


**Arvest Bank**

By:_____  S.V.P.
      Roger Steging, Senior Vice President


**City Of Little Rock, Arkansas**

By:_____
Its:


**The ARC Arkansas**

By:_____
      Steven W. Hitt, Chief Executive Officer


**Eastside Loft Apartments Phase II Limited Partnership**

By: Eastside Lofts GP Phase II LLC, General Partner

   By: The ARC Arkansas, an Arkansas nonprofit
       corporation, its sole member

By:_____
      Steven W. Hitt, Chief Executive Officer

Effective as of the day first written above.

**Arkansas Development Finance Authority**

By:_____
　　　　　Mac Dodson, President

**Arvest Bank**

By:_____
　　　Roger Steging, Senior Vice President

**City Of Little Rock, Arkansas**

By:_____
　　　Bruce T. Moore, City Manager

**The ARC Arkansas**

By:_____
　　　Steven W. Hitt, Chief Executive Officer

**Eastside Loft Apartments Phase II Limited Partnership**

By: Eastside Lofts GP Phase II LLC, General Partner

　　By: The ARC Arkansas, an Arkansas nonprofit
　　　　corporation, its sole member

　　By: _____
　　　Steven W. Hitt, Chief Executive Officer

9

## ACKNOWLEDGMENT

STATE OF ARKANSAS     )
                            ) ss.
COUNTY OF PULASKI     )

On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Mac Dodson, who stated that he is the President of Arkansas Development Finance Authority, an agency and instrumentality of the State of Arkansas, and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said entity; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _19_ day of November, 2009.

_Nancy A. Covington_
Notary Public

My Commission Expires:

_6-12-2016_

NANCY A. COVINGTON
NOTARY
★
PUBLIC
#12348457
EXPIRES
6-12-2016
JEFFERSON COUNTY AR

## ACKNOWLEDGMENT

STATE OF ARKANSAS    )
                               ) ss.
COUNTY OF PULASKI    )

      On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Roger Steging, who stated that he is the Senior Vice President of Arvest Bank, an Arkansas state bank, and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said entity; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _19th_ day of November, 2009.

                                               *Nadine G. Roller*
                                             Notary Public

My Commission Expires:

1-10-2016



## ACKNOWLEDGMENT

STATE OF ARKANSAS    )
                           ) ss.
COUNTY OF PULASKI    )

On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Bruce T. Moore, who stated that he is the City Manager of the City of Little Rock, Arkansas, and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said city; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 20th day of November, 2009.

_____
Notary Public

My Commission Expires:

6 / 15 / 2009

SUSAN K. LANGLEY
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS
My Commission Expires June 15, 2019
Commission No. 12371828

## ACKNOWLEDGMENT

STATE OF ARKANSAS     )
                                   ) ss.
COUNTY OF PULASKI     )

On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Steven W. Hitt, who stated that he is the Chief Executive Officer of The ARC Arkansas, an Arkansas nonprofit corporation, and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said corporation; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 20th day of November, 2009.

*Nadine G. Roller*
Notary Public

My Commission Expires:

1-10-2016



## ACKNOWLEDGMENT

STATE OF ARKANSAS    )
                         ) ss.
COUNTY OF PULASKI    )

On this day before me, a Notary Public, duly commissioned, qualified and acting within and for the State and County aforesaid, appeared in person, Steven W. Hitt, who stated that he is the Chief Executive Officer of The ARC Arkansas, an Arkansas nonprofit corporation, the sole member of Eastside Lofts GP Phase II, LLC, an Arkansas limited liability company, the General Partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership and was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of said company; and further stated that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 20th day of November, 2009.

_Nadine G. Roller_
Notary Public

My Commission Expires:

1-10-2016

**EXHIBIT A**

**LEGAL DESCRIPTION**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas, and being shown on plat records as Plat No. F-931, records of Pulaski County, Arkansas.

# EXHIBIT D

# MULTIFAMILY NOTE

US $809,000                                              As of November 24, 2009

**FOR VALUE RECEIVED**, the undersigned (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, the principal sum of Eight Hundred Nine Thousand and no/100 Dollars (US $809,000), with interest accruing at the Interest Rate on the unpaid principal balance from the Disbursement Date until fully paid.

1.    **Defined Terms.** In addition to defined terms found elsewhere in this Note, as used in this Note, the following definitions shall apply:

**Amortization Period:** 360 months.

**Business Day:** Any day other than a Saturday, Sunday or any other day on which Lender is not open for business.

**Debt Service Amounts:** Amounts payable under this Note, the Security Instrument or any other Loan Document.

**Default Rate:** A rate equal to the lesser of 4 percentage points above the Interest Rate or the maximum interest rate which may be collected from Borrower under applicable law.

**Disbursement Date:** The date of disbursement of Loan proceeds hereunder.

**First Payment Date:** The first day of January, 2010.

**Indebtedness:** The principal of, interest on, or any other amounts due at any time under, this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of the Security Instrument under Section 12 of the Security Instrument.

**Interest Rate:** The annual rate of seven percent (7%).

**Lender:** The holder of this Note.

**Loan:** The loan evidenced by this Note.

**Loan Term:** 216 months.

**Maturity Date:** The first day of December, 2027, or any earlier date on which the unpaid principal balance of this Note becomes due and payable by acceleration or otherwise.

**Property Jurisdiction:** The jurisdiction in which the Land is located.

**Security Instrument:** A multifamily mortgage, deed to secure debt or deed of trust dated as of the date of this Note.

**Yield Maintenance Period Term or Prepayment Premium Period Term**: 180 months.

**Yield Maintenance Period End Date or Prepayment Premium Period End Date:** The last day of November, 2024.

Event of Default, Key Principal and other capitalized terms used but not defined in this Note shall have the meanings given to such terms in the Security Instrument.

**2.      Address for Payment.** All payments due under this Note shall be payable at 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

**3.      Payment of Principal and Interest.** Principal and interest shall be paid as follows:

(a)      **Short Month Interest.** If disbursement of principal is made by Lender to Borrower on any day other than the first day of the month, interest for the period beginning on the Disbursement Date and ending on and including the last day of the month in which such disbursement is made shall be payable simultaneously with the execution of this Note.

(b)      **Interest Computation.** Interest under this Note shall be computed on the basis of (check one only):

☒      **30/360.** A 360-day year consisting of twelve 30-day months.

☐      **Actual/360.** A 360-day year. The amount of each monthly payment made by Borrower pursuant to Paragraph 3(c) below that is allocated to interest will be based on the actual number of calendar days during such month and shall be calculated by multiplying the unpaid principal balance of this Note by the per annum Interest Rate, dividing the product by 360 and multiplying the quotient by the actual number of days elapsed during the month. Borrower understands that the amount allocated to interest for each month will vary depending on the actual number of calendar days during such month.

(c)      **Monthly Installments.** Consecutive monthly installments of principal and interest, each in the amount of Five Thousand Three Hundred Eighty-Two and 30/100 Dollars (US $5,382.30), shall be payable on the First Payment Date and on the first day of every month thereafter, until the entire unpaid principal balance evidenced by this Note is fully paid. Any remaining principal and interest shall be due and payable on the Maturity Date. The unpaid principal balance shall continue to bear interest after the Maturity Date at the Default Rate set forth in this Note until and including the date on which it is paid in full.

(d)      **Payments Before Due Date.** Any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due.

(e)      **Accrued Interest.** Any accrued interest remaining past due for 30 days or more shall be added to and become part of the unpaid principal balance and shall bear

interest at the rate or rates specified in this Note. Any reference herein to "accrued interest" shall refer to accrued interest which has not become part of the unpaid principal balance. Any amount added to principal pursuant to the Loan Documents shall bear interest at the applicable rate or rates specified in this Note and shall be payable with such interest upon demand by Lender and absent such demand, as provided in this Note for the payment of principal and interest.

**4.    Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable nor Lender's application of such payment shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

**5.    Security.** The Indebtedness is secured, among other things, by the Security Instrument, and reference is made to the Security Instrument for other rights of Lender concerning the collateral for the Indebtedness.

**6.    Acceleration.** If an Event of Default has occurred and is continuing, the entire unpaid principal balance, any accrued interest, the prepayment premium payable under Paragraph 10, if any, and all other amounts payable under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower. Lender may exercise this option to accelerate regardless of any prior forbearance.

**7.    Late Charge.** If any monthly installment due hereunder is not received by Lender on or before the 10th day of each month or if any other amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within 10 days after the date such amount is due, counting from and including the date such amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to 5 percent of such monthly installment or other amount due. Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Paragraph represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late payment. The late charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Paragraph 8.

**8.    Default Rate.** So long as any monthly installment or any other payment due under this Note remains past due for 30 days or more, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of the first unpaid monthly installment or other payment due, as applicable, at the Default Rate. If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity Date at the Default Rate. Borrower also acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, that, during the time that any monthly installment or payment under this Note is delinquent for more than 30 days, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other

obligations and to take advantage of other investment opportunities, and that it is extremely difficult and impractical to determine those additional costs and expenses. Borrower also acknowledges that, during the time that any monthly installment or other payment due under this Note is delinquent for more than 30 days, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk. Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of the Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan.

**9.    Limits on Personal Liability.**

(a)    Except as otherwise provided in this Paragraph 9, Borrower shall have no personal liability under this Note, the Security Instrument or any other Loan Document for the repayment of the Indebtedness or for the performance of any other obligations of Borrower under the Loan Documents, and Lender's only recourse for the satisfaction of the Indebtedness and the performance of such obligations shall be Lender's exercise of its rights and remedies with respect to the Mortgaged Property (as such term is defined in the Security Instrument) and any other collateral held by Lender as security for the Indebtedness. This limitation on Borrower's liability shall not limit or impair Lender's enforcement of its rights against any guarantor of the Indebtedness or any guarantor of any obligations of Borrower.

(b)    Borrower shall be personally liable to Lender for the repayment of a portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of:

(1)    failure of Borrower to pay to Lender upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected by Borrower from tenants then in residence;

(2)    failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by the Security Instrument;

(3)    failure of Borrower to comply with Section 14(d) or (e) of the Security Instrument relating to the delivery of books and records, statements, schedules and reports;

(4)    fraud or written material misrepresentation by Borrower, Key Principal or any officer, director, partner, member or employee of Borrower in connection with the application for or creation of the Indebtedness or any request for any action or consent by Lender;

(5)    failure to apply Rents, first, to the payment of reasonable operating expenses (other than Property management fees that are not currently payable pursuant to the terms of an Assignment of Management Agreement or any other agreement with Lender executed in connection with the Loan) and then to Debt Service Amounts, except that Borrower will not be personally liable (i) to the extent that Borrower lacks the legal right to direct the disbursement of such sums because of a bankruptcy, receivership or similar judicial proceeding, or (ii) with respect to

Rents that are distributed in any calendar year if Borrower has paid all operating expenses and Debt Service Amounts for that calendar year; or

(6)     failure by Borrower to comply with the provisions of Section 17(a) of the Security Instrument.

(c)     Borrower shall become personally liable to Lender for the repayment of all of the Indebtedness upon the occurrence of any of the following Events of Default:

(1)     Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument;

(2)     a Transfer that is an Event of Default under Section 21 of the Security Instrument; or

(3)     the occurrence of a Bankruptcy Event (but only if the Bankruptcy Event occurs with the consent, encouragement or active participation of Borrower, Key Principal or any Borrower Affiliate).

(d)     To the extent that Borrower has personal liability under this Paragraph 9, Lender may exercise its rights against Borrower personally without regard to whether Lender has exercised any rights against the Mortgaged Property or any other security, or pursued any rights against any guarantor, or pursued any other rights available to Lender under this Note, the Security Instrument, any other Loan Document or applicable law. For purposes of this Paragraph 9, the term "Mortgaged Property" shall not include any funds that (1) have been applied by Borrower as required or permitted by the Security Instrument prior to the occurrence of an Event of Default, or (2) Borrower was unable to apply as required or permitted by the Security Instrument because of a bankruptcy, receivership, or similar judicial proceeding.

**10.     Voluntary and Involuntary Prepayments.**

(a)     A prepayment premium shall be payable in connection with any prepayment made under this Note as provided below:

(1)     Borrower may voluntarily prepay all (but not less than all) of the unpaid principal balance of this Note only on the last calendar day of a calendar month (the "Last Day of the Month") and only if Borrower has complied with all of the following:

(i)     Borrower must give Lender at least 30 days (if given via U.S. Postal Service) or 20 days (if given via facsimile, email or overnight courier), but not more than 60 days, prior written notice of Borrower's intention to make a prepayment (the "Prepayment Notice"). The Prepayment Notice shall be given in writing (via facsimile, email, U.S. Postal Service or overnight courier) and addressed to Lender. The Prepayment Notice shall include, at a minimum, the Business Day upon which Borrower intends to make the prepayment (the "Intended Prepayment Date").

(ii)    Borrower acknowledges that the Lender is not required to accept any voluntary prepayment of this Note on any day other than the Last Day of the Month even (A) if Borrower has given a Prepayment Notice with an Intended Prepayment Date other than the Last Day of the Month or (B) if the Last Day of the Month is not a Business Day. Therefore, even if Lender accepts a voluntary prepayment on any day other than the Last Day of the Month, for all purposes (including the accrual of interest and the calculation of the prepayment premium), any prepayment received by Lender on any day other than the Last Day of the Month shall be deemed to have been received by Lender on the Last Day of the Month and any prepayment calculation will include interest to and including the Last Day of the Month in which such prepayment occurs. If the Last Day of the Month is not a Business Day, then the Borrower must make the payment on the Business Day immediately preceding the Last Day of the Month.

(iii)    Any prepayment shall be made by paying (A) the amount of principal being prepaid, (B) all accrued interest (calculated to the Last Day of the Month), (C) all other sums due Lender at the time of such prepayment, and (D) the prepayment premium calculated pursuant to Schedule A.

(iv)    If, for any reason, Borrower fails to prepay this Note (A) within five (5) Business Days after the Intended Prepayment Date or (B) if the prepayment occurs in a month other than the month stated in the original Prepayment Notice, then Lender shall have the right, but not the obligation, to recalculate the prepayment premium based upon the date that Borrower actually prepays this Note and to make such calculation as described in Schedule A attached hereto. For purposes of such recalculation, such new prepayment date shall be deemed the "Intended Prepayment Date."

(2)    Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (i) all accrued interest and all other sums due Lender under this Note and the other Loan Documents, and (ii) the prepayment premium calculated pursuant to Schedule A.

(3)    Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium.

(b)    Notwithstanding the provisions of Paragraph 10(a), no prepayment premium shall be payable (1) with respect to any prepayment occurring as a result of the application of any insurance proceeds or condemnation award under the Security Instrument, or (2) as provided in subparagraph (c) of Schedule A.

(c)    Schedule A is hereby incorporated by reference into this Note.

(d)    Any required prepayment of less than the entire unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)    Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties. Borrower agrees to pay to Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages.    Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth on Schedule A represents a reasonable estimate of the damages Lender will incur because of a prepayment.

(f)    Borrower further acknowledges that the prepayment premium provisions of this Note are a material part of the consideration for the loan evidenced by this Note, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the prepayment premium provisions.

**11.    Costs and Expenses.** Borrower shall pay on demand all expenses and costs, including fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation, incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

**12.    Forbearance.** Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of that or any other right or remedy.  The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.  Enforcement by Lender of any security for Borrower's obligations under this Note shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**13.    Waivers.**    Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower, Key Principal, and all endorsers and guarantors of this Note and all other third party obligors.

**14.    Loan Charges.**  Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate provided for in this Note and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the loan evidenced by this Note and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents.  Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum

interest rate permitted to be charged under applicable law.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

**15.    Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**16.    Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of "days" means calendar days, not Business Days.

**17.    Governing Law.**  This Note shall be governed by the law of the jurisdiction in which the Land is located.

**18.    Captions.**  The captions of the paragraphs of this Note are for convenience only and shall be disregarded in construing this Note.

**19.    Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**20.    Consent to Jurisdiction and Venue.**    Borrower and Key Principal each agrees that any controversy arising under or in relation to this Note shall be litigated exclusively in the Property Jurisdiction.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note.  Borrower and Key Principal each irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**21.    WAIVER OF TRIAL BY JURY.    BORROWER, KEY PRINCIPAL AND LENDER EACH (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER, KEY PRINCIPAL AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**ATTACHED SCHEDULES.** The following Schedules are attached to this Note:

☒    **Schedule A   Prepayment Premium (required)**

☒    **Schedule B   Modifications to Multifamily Note (Governing Law)**

**IN WITNESS WHEREOF,** Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative.

**EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:   Eastside Lofts GP II, LLC,
      an Arkansas limited liability company
     Its:  General Partner

    By:   The ARC Arkansas,
        an Arkansas non-profit corporation
       Its:  Sole Member/Managing Member

    By:_____
          Steve Hitt
        Its:  Chief Executive Officer

## ACKNOWLEDGMENT AND AGREEMENT OF KEY PRINCIPAL TO
## PERSONAL LIABILITY FOR EXCEPTIONS TO NON-RECOURSE LIABILITY

Key Principal, who has an economic interest in Borrower or who will otherwise obtain a material financial benefit from the Loan, hereby absolutely, unconditionally and irrevocably agrees to pay to Lender, or its assigns, on demand, all amounts for which Borrower is personally liable under Paragraph 9 of the Multifamily Note to which this Acknowledgment is attached (the "**Note**"). The obligations of Key Principal shall survive any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the Security Instrument. Lender may pursue its remedies against Key Principal without first exhausting its remedies against the Borrower or the Mortgaged Property. All capitalized terms used but not defined in this Acknowledgment shall have the meanings given to such terms in the Security Instrument. As used in this Acknowledgment, the term "Key Principal" (each if more than one) shall mean only those individuals or entities that execute this Acknowledgment.

The obligations of Key Principal shall be performed without demand by Lender and shall be unconditional irrespective of the genuineness, validity, or enforceability of the Note, or any other Loan Document, and without regard to any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or a guarantor. Key Principal hereby waives the benefit of all principles or provisions of law, which are or might be in conflict with the terms of this Acknowledgment, and agrees that Key Principal's obligations shall not be affected by any circumstances which might otherwise constitute a legal or equitable discharge of a surety or a guarantor. Key Principal hereby waives the benefits of any right of discharge and all other rights under any and all statutes or other laws relating to guarantors or sureties, to the fullest extent permitted by law, diligence in collecting the Indebtedness, presentment, demand for payment, protest, all notices with respect to the Note including this Acknowledgment, which may be required by statute, rule of law or otherwise to preserve Lender's rights against Key Principal under this Acknowledgment, including notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any default or Event of Default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest, notice of the incurring by Borrower of any obligation or indebtedness and all rights to require Lender to (a) proceed against Borrower, (b) proceed against any general partner of Borrower, (c) proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness, or (d) if Borrower is a partnership, pursue any other remedy it may have against Borrower, or any general partner of Borrower.

At any time without notice to Key Principal, and without affecting the liability of Key Principal hereunder, (a) the time for payment of the principal of or interest on the Indebtedness may be extended or the Indebtedness may be renewed in whole or in part; (b) the time for Borrower's performance of or compliance with any covenant or agreement contained in the Note, or any other Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived; (c) the maturity of the Indebtedness may be accelerated as provided in the Note or any other Loan Document; (d) the Note or any other Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount; and (e) any security for the Indebtedness may be modified, exchanged, surrendered or otherwise dealt with or additional security may be pledged or mortgaged for the Indebtedness.

Key Principal acknowledges that Key Principal has received a copy of the Note and all other Loan Documents. Neither this Acknowledgment nor any of its provisions may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement. Key Principal agrees to notify Lender (in the manner for giving notices provided in Section 31 of the Security Instrument) of any change of Key Principal's address within 10 Business Days after such change of address occurs. Any notices to Key Principal shall be given in the manner provided in Section 31 of the Security Instrument. Key Principal agrees to be bound by Paragraphs 20 and 21 of the Note.

**THIS ACKNOWLEDGMENT IS AN INSTRUMENT SEPARATE FROM, AND NOT A PART OF, THE NOTE. BY SIGNING THIS ACKNOWLEDGMENT, KEY PRINCIPAL DOES NOT INTEND TO BECOME AN ACCOMMODATION PARTY TO, OR AN ENDORSER OF, THE NOTE.**

**IN WITNESS WHEREOF,** Key Principal has signed and delivered this Acknowledgment or has caused this Acknowledgment to be signed and delivered by its duly authorized representative.

**KEY PRINCIPAL:**

**THE ARK ARKANSAS,**
an Arkansas non-profit corporation

By: _Steven W. Hitt_
Name: _Steven W. Hitt_
Address: _2004 S. Main St._
_Little Rock, AR 72206_

**SCHEDULE A**

**PREPAYMENT PREMIUM**

Any prepayment premium payable under Paragraph 10 of this Note shall be computed as follows:

(a)    If the prepayment is made at any time after the date of this Note and before the Yield Maintenance Period End Date, the prepayment premium shall be the greater of:

        (i)    1% of the amount of principal being prepaid; or

        (ii)    The product obtained by multiplying:

            (A)    the amount of principal being prepaid,

            *by*

            (B)    the difference obtained by subtracting from the Interest Rate on this Note the Yield Rate (as defined below), on the twenty-fifth Business Day preceding (x) the Intended Prepayment Date, or (y) the date Lender accelerates the Loan or otherwise accepts a prepayment pursuant to Paragraph 10(a)(3) of this Note,

            *by*

            (C)    the present value factor calculated using the following formula:

$$\frac{1 - (1 + r)^{-n/12}}{r}$$

            [r =    Yield Rate

            n =    the number of months remaining between (1) either of the following: (x) in the case of a voluntary prepayment, the Last Day of the Month during which the prepayment is made, or (y) in any other case, the date on which Lender accelerates the unpaid principal balance of this Note and (2) the Yield Maintenance Period End Date.

For purposes of this clause (ii), the **"Yield Rate"** means the yield calculated by interpolating the yields for the immediately shorter and longer term U.S. "Treasury constant maturities" (as reported in the Federal Reserve Statistical Release H.15 Selected Interest Rates (the **"Fed Release"**) under the heading "U.S. government securities") closest to the remaining term of the Yield Maintenance Period Term, as follows (rounded to three decimal places):

$$\left( \frac{(a-b)}{(x-y)} \times (z-y) \right) + b$$

$a =$  the yield for the longer U.S. Treasury constant maturity
$b =$  the yield for the shorter U.S. Treasury constant maturity
$x =$  the term of the longer U.S. Treasury constant maturity
$y =$  the term of the shorter U.S. Treasury constant maturity
$z =$  "n" (as defined in the present value factor calculation above) divided by 12.

Notwithstanding any provision to the contrary, if "z" equals a term reported under the U.S. "Treasury constant maturities" subheading in the Fed Release, the yield for such term shall be used, and interpolation shall not be necessary. If publication of the Fed Release is discontinued by the Federal Reserve Board, Lender shall determine the Yield Rate from another source selected by Lender. Any determination of the Yield Rate by Lender will be binding absent manifest error.]

(b)    If the prepayment is made on or after the Yield Maintenance Period End Date but before the last calendar day of the 4th month prior to the month in which the Maturity Date occurs, the prepayment premium shall be 1% of the amount of principal being prepaid.

(c)    Notwithstanding the provisions of Paragraph 10(a) of this Note, no prepayment premium shall be payable with respect to any prepayment made on or after the last calendar day of the 4th month prior to the month in which the Maturity Date occurs.

_____
Borrower Initials

**SCHEDULE B**
**MODIFICATIONS TO MULTIFAMILY NOTE**
**(GOVERNING LAW)**

1.      Section 17 of the Note is hereby amended in its entirety as follows:

        This Note has been negotiated in the State of Illinois and as such will be governed, together with all other Loan Documents, by the laws of the State of Illinois, and the Borrower consents thereto, without regard to the conflict of law principles; provided, however, that all in rem rights shall be governed by the laws of the State of Arkansas.

2.      All capitalized terms used in this Exhibit, but otherwise not defined on this Exhibit, shall have the same meaning set forth in the Note or Security Instrument.

<br>

_____
Borrower Initials

**ENDORSEMENT OF
MULTIFAMILY NOTE**

FOR VALUE RECEIVED, the undersigned hereby assigns, transfers, conveys and endorses to the order of **THE COMMUNITY DEVELOPMENT TRUST, LP**, a Delaware limited partnership, all of the undersigned's right, title and interest in and to the **Multifamily Note** to which this Endorsement is attached, being specifically described as that certain **Multifamily Note** dated November 24, 2009, in the original stated principal amount of Eight Hundred Nine Thousand and no/100 ($809,000.00) wherein **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, is the Maker and **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, was the original Payee, as such Promissory Note has been amended from time to time.

Dated: as of November 24, 2009

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

Name: _____
            Mark Siranovic
            Its:  Senior Vice President

**Eastside Lofts**
DETROIT.3934603.2

# EXHIBIT E

2009079200 Received: 11/25/2009 8:23:28 AM
Recorded: 11/25/2009 09:00:35 AM Filed &
Recorded in Official Records of PAT O'BRIEN,
PULASKI COUNTY CIRCUIT/COUNTY CLERK
Fees $250.00

# MULTIFAMILY MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

This instrument prepared by and after recording return to:

Roberta R. Russ
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 First National Building
Detroit, MI 48226



---

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT.3934278.2

Form 4004          06/09
© 1998-2009 Fannie Mae

TABLE OF CONTENTS

Page

1. DEFINITIONS. .................................................................................................. 1

2. UNIFORM COMMERCIAL CODE SECURITY AGREEMENT. ......................................... 6

3. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. ................................................................................................... 6

4. ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY. ........... 8

5. PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM. ................................................................................ 10

6. EXCULPATION. ............................................................................................... 10

7. DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES. ................................. 10

8. COLLATERAL AGREEMENTS. ............................................................................. 11

9. APPLICATION OF PAYMENTS. ........................................................................... 12

10. COMPLIANCE WITH LAWS. ............................................................................... 12

11. USE OF PROPERTY. ........................................................................................ 12

12. PROTECTION OF LENDER'S SECURITY. .............................................................. 12

13. INSPECTION. ................................................................................................. 13

14. BOOKS AND RECORDS; FINANCIAL REPORTING. ................................................. 13

15. TAXES; OPERATING EXPENSES. ....................................................................... 15

16.    LIENS; ENCUMBRANCES. .............................................................................15

17.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED
       PROPERTY. ...............................................................................................15

18.    ENVIRONMENTAL HAZARDS. ......................................................................16

19.    PROPERTY AND LIABILITY INSURANCE. ......................................................21

20.    CONDEMNATION. .......................................................................................22

21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER. .........23

22.    EVENTS OF DEFAULT. ................................................................................27

23.    REMEDIES CUMULATIVE. ...........................................................................28

24.    FORBEARANCE. .........................................................................................28

25.    LOAN CHARGES.........................................................................................28

26.    WAIVER OF STATUTE OF LIMITATIONS. .....................................................29

27.    WAIVER OF MARSHALLING. .......................................................................29

28.    FURTHER ASSURANCES. .............................................................................29

29.    ESTOPPEL CERTIFICATE. ............................................................................29

30.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE. ..............................30

31.    NOTICE. ....................................................................................................30

32.    SALE OF NOTE; CHANGE IN SERVICER. ......................................................30

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -           **Form 4004**    06/09    *Page ii*
**ARKANSAS**                                            © 1998-2009 Fannie Mae
**Eastside Lofts**
DETROIT.3934278.2

33.    SINGLE ASSET BORROWER. .........................................................................31

34.    SUCCESSORS AND ASSIGNS BOUND. ..............................................................31

35.    JOINT AND SEVERAL LIABILITY. .....................................................................31

36.    RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY. ...............................31

37.    SEVERABILITY; AMENDMENTS...........................................................................31

38.    CONSTRUCTION. ............................................................................................31

39.    LOAN SERVICING. ..........................................................................................32

40.    DISCLOSURE OF INFORMATION.........................................................................32

41.    NO CHANGE IN FACTS OR CIRCUMSTANCES. .....................................................32

42.    SUBROGATION................................................................................................32

43.    ACCELERATION; REMEDIES. .............................................................................32

44.    RELEASE. .....................................................................................................33

45.    WAIVER OF HOMESTEAD, DOWER, REDEMPTION, AND APPRAISEMENT. .................33

46.    WAIVER OF TRIAL BY JURY. ...........................................................................33

## MULTIFAMILY MORTGAGE,
## ASSIGNMENT OF RENTS
## AND SECURITY AGREEMENT

THIS MULTIFAMILY MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the "**Instrument**") is dated as of the 24th day of November, 2009, between **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, a limited partnership organized and existing under the laws of Arkansas, whose address is Attention: Cynthia R. Stone, 2004 Main Street, Little Rock, Arkansas 72206, as mortgagor ("**Borrower**"), and **NEF MORTGAGE CORPORATION**, a non-profit corporation organized and existing under the laws of Illinois, whose address is 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606, as mortgagee ("**Lender**").

Borrower is indebted to Lender in the principal amount of $809,000.00, as evidenced by Borrower's Multifamily Note payable to Lender dated as of the date of this Instrument, and maturing on December 1, 2027.

TO SECURE TO LENDER the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower mortgages, warrants, grants, bargains, sells, conveys and assigns to Lender and Lender's successors and assigns forever, with power of sale, the Mortgaged Property, including the Land located in Pulaski County, State of Arkansas, and described in Exhibit A attached to this Instrument.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered. Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

**Covenants.** Borrower and Lender covenant and agree as follows:

1.      **DEFINITIONS.**

The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

(a)     "**Borrower**" means all persons or entities identified as "Borrower" in the first paragraph of this Instrument, together with their successors and assigns.

(b)     "**Collateral Agreement**" means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing a fund to assure completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account.

(c)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(d)    **"Event of Default"** means the occurrence of any event listed in Section 22.

(e)    **"Fixtures"** means all property which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

(f)    **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

(g)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(h)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

(i)    **"Impositions"** and **"Imposition Deposits"** are defined in Section 7(a).

**FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -**
**ARKANSAS**
**Eastside Lofts**
DETROIT 3934278.2

Form **4004**    06/09    *Page 2*
© 1998-2009 Fannie Mae

(j)    **"Improvements"** means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(k)    **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, this Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances as provided in Section 12 to protect the security of this Instrument.

(l)    [Intentionally omitted]

(m)    **"Key Principal"** means (A) the natural person(s) or entity identified as such at the foot of this Instrument; (B) the natural person or entity who signed either the Acknowledgement and Agreement of Key Principal to Personal Liability for Exceptions to Non-Recourse Liability or the Exceptions to Non-Recourse Guaranty (or is otherwise a guarantor on the Indebtedness); and (C) any person or entity who becomes a Key Principal after the date of this Instrument and is identified as such in an assumption agreement, or another amendment or supplement to this Instrument or who otherwise signs either the Acknowledgement and Agreement of Key Principal to Personal Liability for Exceptions to Non-Recourse Liability or Exceptions to Non-Recourse Guaranty (or any other guaranty of the Indebtedness).

(n)    **"Land"** means the land described in Exhibit A.

(o)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.

(p)    **"Lender"** means the entity identified as "Lender" in the first paragraph of this Instrument and its successors and assigns, or any subsequent holder of the Note.

(q)    **"Loan Documents"** means the Note, this Instrument, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Programs, and any other documents now or in the future executed by Borrower, Key Principal, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time.

(r)    **"Loan Servicer"** means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the loan evidenced by the Note for the benefit of Lender. Unless Borrower receives notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

(s)    **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following:

      (1)    the Land;

      (2)    the Improvements;

      (3)    the Fixtures;

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT 3934278.2

Form 4004    06/09    *Page 3*
© 1998-2009 Fannie Mae

(4) the Personalty;

(5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement;

(7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds;

(10) all Rents and Leases;

(11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12) all Imposition Deposits;

(13) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated);

(14) all tenant security deposits which have not been forfeited by any tenant under any Lease; and

(15)  all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

(t)  "**Note**" means the Multifamily Note described on page 1 of this Instrument, including the Acknowledgment and Agreement of Key Principal to Personal Liability for Exceptions to Non-Recourse Liability (if any), and all schedules, riders, allonges and addenda, as such Multifamily Note may be amended from time to time.

(u)  "**O&M Program**" is defined in Section 18(a).

(v)  "**Personalty**" means all equipment, inventory, general intangibles which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

(w)  "**Property Jurisdiction**" is defined in Section 30(a).

(x)  "**Rents**" means all rents (whether from residential or non-residential space), revenues and other income of the Land or the Improvements, including subsidy payments received from any sources (including, but not limited to payments under any Housing Assistance Payments Contract), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and deposits forfeited by tenants.

(y)  "**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(z)  "**Transfer**" means (A) a sale, assignment, transfer, or other disposition (whether voluntary, involuntary or by operation of law); (B) the grant, creation, or attachment of a lien, encumbrance, or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of a direct or indirect ownership interest; or (D) the withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity.

(aa)  "**Bankruptcy Event**" means any one or more of the following: (i) the commencement of a voluntary case under one or more of the Insolvency Laws by the Borrower; (ii) the acknowledgment in writing by the Borrower that it is unable to pay its debts generally as they mature; (iii) the making of a general assignment for the benefit of

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT.3934278 2

Form 4004    06/09    *Page 5*
© 1998-2009 Fannie Mae

creditors by the Borrower; (iv) an involuntary case under one or more Insolvency Laws against the Borrower; (v) the appointment of a receiver, liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over the Borrower or any substantial part of the assets of the Borrower provided that any proceeding or case under (iv) or (v) above is not dismissed within 90 days after filing.

(bb)    **"Borrower Affiliate"** means, as to either Borrower or Key Principal, (i) any entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of Borrower or of Key Principal, (ii) any corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by Borrower or by Key Principal, (iii) any partner, shareholder or, if a limited liability company, member of Borrower or Key Principal, or (iv) any other entity that is related (to the third degree of consanguinity) by blood or marriage to Borrower or Key Principal.

(cc)    **"Insolvency Laws"** means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding, as amended from time to time, to the extent applicable to the Borrower.

## 2.    UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture.

## 3.    ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require.

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT 3934278.2

Form 4004    06/09    *Page 6*
© 1998-2009 Fannie Mae

Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property," as that term is defined in Section 1(s). However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)     After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources (including, but not limited to subsidy payments under any Housing Assistance Payments Contract), pay the total amount of such receipts to the Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)     Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, enter upon and take and maintain full control of the Mortgaged Property in order to

perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 12.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

**4.     ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT 3934278.2

Form 4004     06/09     *Page 8*
© 1998-2009 Fannie Mae

establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property," as that term is defined in Section 1(s). However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    Until Lender gives notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease.  Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate.  Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements.  The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property.  Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (i) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (ii) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (iii) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units shall be on forms approved by Lender, shall be for initial terms of at least six months and not more than two years, and shall not include options to purchase.  If customary in the applicable

market, residential Leases with terms of less than six months may be permitted with Lender's prior written consent.

(f)     Borrower shall not lease any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender and Lender's prior written approval of the Lease agreement.  Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Instrument) without the prior written consent of Lender.  Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed.  All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (1) such Leases are subordinate to the lien of this Instrument (unless waived in writing by Lender); (2) the tenant shall attorn to Lender and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Mortgaged Property by any purchaser at a foreclosure sale or by Lender in any manner; (3) the tenant agrees to execute such further evidences of attornment as Lender or any purchaser at a foreclosure sale may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Mortgaged Property; (5) after a foreclosure sale of the Mortgaged Property, Lender or any other purchaser at such foreclosure sale may, at Lender's or such purchaser's option, accept or terminate such Lease; and (6) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

(g)     Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

## 5.     PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.

Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.  Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

## 6.     EXCULPATION.

Borrower's personal liability for payment of the Indebtedness and for performance of the other obligations to be performed by it under this Instrument is limited in the manner, and to the extent, provided in the Note.

## 7.     DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.

(a)     Borrower shall deposit with Lender on the day monthly installments of principal or interest, or both, are due under the Note (or on another day designated in writing by Lender), until the Indebtedness is paid in full, an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due (1) any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property, (2) the premiums for fire and other hazard insurance, rent loss insurance and such other insurance as Lender may require under Section 19, (3) Taxes, and (4) amounts for other charges and expenses which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's

interests, all as reasonably estimated from time to time by Lender. The amounts deposited under the preceding sentence are collectively referred to in this Instrument as the **"Imposition Deposits"**. The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Instrument as **"Impositions"**. The amount of the Imposition Deposits shall be sufficient to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added. Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required. Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon notice to Borrower.

(b)    Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency.    Lender shall not be obligated to open additional accounts or deposit Imposition Deposits in additional institutions when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing.   Unless applicable law requires, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits.   Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Instrument and the other Loan Documents. Any amounts deposited with Lender under this Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose under Section 7(e).

(c)    If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)    If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender, the excess shall be credited against future installments of Imposition Deposits. If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary, Borrower shall pay to Lender the amount of the deficiency within 15 days after notice from Lender.

(e)    If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in any amounts and in any order as Lender determines, in Lender's discretion, to pay any Impositions or as a credit against the Indebtedness. Upon payment in full of the Indebtedness, Lender shall refund to Borrower any Imposition Deposits held by Lender.

**8.    COLLATERAL AGREEMENTS.**

Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.

## 9.    APPLICATION OF PAYMENTS.

If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

## 10.    COMPLIANCE WITH LAWS.

Borrower shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of Improvements on the Mortgaged Property, fair housing, zoning and land use, and Leases. Borrower also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 10. Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

## 11.    USE OF PROPERTY.

Unless required by applicable law, Borrower shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (d) establish any condominium or cooperative regime with respect to the Mortgaged Property.

## 12.    PROTECTION OF LENDER'S SECURITY.

(a)    If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding (including a Bankruptcy Event) is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
Eastside Lofts
DETROIT 3934278.2

Form 4004    06/09    *Page 12*
© 1998-2009 Fannie Mae

Section 19, and (4) payment of amounts which Borrower has failed to pay under Sections 15 and 17.

(b)    Any amounts disbursed by Lender under this Section 12, or under any other provision of this Instrument that treats such disbursement as being made under this Section 12, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the **"Default Rate"**, as defined in the Note.

(c)    Nothing in this Section 12 shall require Lender to incur any expense or take any action.

### 13.  INSPECTION.

Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

### 14.  BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Borrower shall furnish to Lender:

(1)    (i) except as provided in clause (ii) below, within 45 days after the end of each fiscal quarter of Borrower, a statement of income and expenses for Borrower's operation of the Mortgaged Property on a year-to-date basis as of the end of each fiscal quarter, (ii) within 120 days after the end of each fiscal year of Borrower, (A) a statement of income and expenses for Borrower's operation of the Mortgaged Property for such fiscal year, (B) a statement of changes in financial position of Borrower relating to the Mortgaged Property for such fiscal year, and (C) when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of such fiscal year; and (iii) any of the foregoing at any other time upon Lender's request;

(2)    (i) except as provided in clause (ii) below, within 45 days after the end of each fiscal quarter of Borrower, and (ii) within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3) within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4) within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and the interest held by each, if Borrower is a corporation, all officers and directors of Borrower, and if Borrower is a limited liability company, all managers who are not members;

(5) upon Lender's request, a monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(6) upon Lender's request, a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year; and

(7) if required by Lender, within 30 days of the end of each calendar month, a monthly statement of income and expenses for such calendar month on a year-to-date basis for Borrower's operation of the Mortgaged Property.

(c) Each of the statements, schedules and reports required by Section 14(b) shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require. Lender also may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d) If Borrower fails to provide in a timely manner the statements, schedules and reports required by Section 14(b), Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 12.

(e) If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f) Borrower authorizes Lender to obtain a credit report on Borrower at any time.

**FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -**
**ARKANSAS**
**Eastside Lofts**
DETROIT 9934278 2

Form 4004    06/09    *Page 14*
© 1998-2009 Fannie Mae

### 15. TAXES; OPERATING EXPENSES.

(a)     Subject to the provisions of Section 15(c) and Section 15(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     Subject to the provisions of Section 15(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)     As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notices that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above.

(d)     Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)     Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

### 16. LIENS; ENCUMBRANCES.

Borrower acknowledges that, to the extent provided in Section 21, the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a **"Lien"**) on the Mortgaged Property (other than the lien of this Instrument) or on certain ownership interests in Borrower, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Instrument, is a **"Transfer"** which constitutes an Event of Default.

### 17. PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.

(a) Borrower (1) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (2) shall not abandon the Mortgaged Property, (3) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT.3934278 2

Form 4004    06/09    *Page 15*
© 1998-2009 Fannie Mae

costs of such restoration or repair, (4) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (5) shall provide for professional management of the Mortgaged Property by a residential rental property manager satisfactory to Lender under a contract approved by Lender in writing, and (6) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Borrower shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

(b)    If, in connection with the making of the loan evidenced by the Note or at any later date, Lender waives in writing the requirement of Section 17(a)(5) above that Borrower enter into a written contract for management of the Mortgaged Property and if, after the date of this Instrument, Borrower intends to change the management of the Mortgaged Property, Lender shall have the right to approve such new property manager and the written contract for the management of the Mortgaged Property and require that Borrower and such new property manager enter into an Assignment of Management Agreement on a form approved by Lender. If required by Lender (whether before or after an Event of Default), Borrower will cause any Affiliate of Borrower to whom fees are payable for the management of the Mortgaged Property to enter into an agreement with Lender, in a form approved by Lender, providing for subordination of those fees and such other provisions as Lender may require. "Affiliate of Borrower" means any corporation, partnership, joint venture, limited liability company, limited liability partnership, trust or individual controlled by, under common control with, or which controls Borrower (the term "control" for these purposes shall mean the ability, whether by the ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to make management decisions on behalf of, or independently to select the managing partner of, a partnership, or otherwise to have the power independently to remove and then select a majority of those individuals exercising managerial authority over an entity, and control shall be conclusively presumed in the case of the ownership of 50% or more of the equity interests).

## 18.    ENVIRONMENTAL HAZARDS.

(a)    Except for matters covered by a written program of operations and maintenance approved in writing by Lender (an "**O&M Program**") or matters described in Section 18(b), Borrower shall not cause or permit any of the following:

(1)    the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property;

(2)    the transportation of any Hazardous Materials to, from, or across the Mortgaged Property;

(3)    any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT.3934278.2

Form 4004    06/09    *Page 16*
© 1998-2009 Fannie Mae

(4)     any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (1) through (4) above are referred to collectively in this Section 18 as **"Prohibited Activities or Conditions"**.

(b)     Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties, (2) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(c)     Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.  Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(d)     If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons present on the Mortgaged Property to comply with the O&M Program.  All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12.

(e)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)     Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     except to the extent previously disclosed by Borrower to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Property which has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     there are no actions, suits, claims or proceedings pending or, to the best of Borrower's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property.

The representations and warranties in this Section 18 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the loan evidenced by the Note, until the Indebtedness has been paid in full.

(f)     Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Borrower's discovery of any Prohibited Activity or Condition;

(2)     Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 18 becomes untrue after the date of this Agreement.

Any such notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document.

(g)     Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -        Form 4004     06/09    *Page 18*
ARKANSAS                                                          © 1998-2009 Fannie Mae
**Eastside Lofts**
DETROIT.3934278.2

connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Borrower or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections.     Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.   Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.   Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(h)      If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property   or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Borrower shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2) 30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion; and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so. Any reimbursement due from Borrower to Lender shall become part of the Indebtedness as provided in Section 12.

(i)      Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(j)      Borrower shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out-of-pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)      any breach of any representation or warranty of Borrower in this Section 18;

(2)      any failure by Borrower to perform any of its obligations under this Section 18;

(3)     the existence or alleged existence of any Prohibited Activity or Condition;

(4)     the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property; and

(5)     the actual or alleged violation of any Hazardous Materials Law.

(k)     Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees. However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Borrower's expense.

(l)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(m)     Lender agrees that the indemnity under this Section 18 shall be limited to the assets of Borrower and Lender shall not seek to recover any deficiency from any natural persons who are general partners of Borrower.

(n)     Borrower shall, at its own cost and expense, do all of the following:

(1)     pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 18;

(2)     reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 18; and

(3)     reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 18, or in monitoring and participating in any legal or administrative proceeding.

(o)     In any circumstances in which the indemnity under this Section 18 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out-of-pocket expenses of such attorneys and consultants.

(p)     The provisions of this Section 18 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan

Documents, and each Indemnitee shall be entitled to indemnification under this Section 18 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Section 18 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 18 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument.

### 19.   PROPERTY AND LIABILITY INSURANCE.

(a)      Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage. If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood.

(b)      All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in favor of, and in a form approved by, Lender. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)      Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require.

(d)      All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender.

(e)      Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Borrower to maintain.

(f)      In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender.   Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property

damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties.

(g)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the net operating income generated by the Mortgaged Property after completion of the Restoration will be sufficient to support a debt service coverage ratio not less than the greater of (A) the debt service coverage ratio as of the date of this Instrument (based on the final underwriting of the Mortgaged Property) or (B) the debt service coverage ratio immediately prior to the loss (in each case, Lender's determination shall include all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property); (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Borrower provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to this Section 19.

(h)     If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

**20.    CONDEMNATION.**

(a)     Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "**Condemnation**"). Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing.    Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable.   However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action.   Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

**FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -**
**ARKANSAS**
**Eastside Lofts**
DETROIT.3934278 2

**Form 4004**    06/09    *Page 22*
© 1998-2009 Fannie Mae

(b)     Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower.  Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 7 of this Instrument or any Collateral Agreement, or change the amount of such installments.  Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

**21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**

(a)     The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

(1)     a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property;

(2)     a Transfer of a Controlling Interest in Borrower;

(3)     a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Borrower;

(4)     a Transfer of all or any part of a Key Principal's ownership interests in Borrower, or in any other entity which owns, directly or indirectly through one or more intermediate entities, an ownership interest in Borrower (other than a Transfer of an aggregate beneficial ownership interest in the Borrower of 49% or less of such Key Principal's original ownership interest in the Borrower and which does not otherwise result in a Transfer of the Key Principal's Controlling Interest in such intermediate entities or in the Borrower);

(5)     if Key Principal is an entity, (A) a Transfer of a Controlling Interest in Key Principal, or (B) a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Key Principal;

(6)     if Borrower or Key Principal is a trust, the termination or revocation of such trust; unless the trust is terminated as a result of the death of an individual trustor, in which event Lender must be notified and such Borrower or Key Principal must be replaced with an individual or entity acceptable to Lender, in accordance with the provisions of Section 21(c) hereof, within 90 days of such death (provided however that no property inspection shall be required and a 1% transfer fee will not be charged);

(7)     if Key Principal is a natural person, the death of such individual; unless the Lender is notified and such individual is replaced with an individual or entity acceptable to Lender, in accordance with the provisions of Section 21(c) hereof, within 90 days of such death (provided however that no property inspection shall be required and a 1% transfer fee will not be charged);

(8)     the merger, dissolution, liquidation, or consolidation of (i) Borrower, (ii) any Key Principal that is a legal entity, or (iii) any legal entity holding, directly or

indirectly, a Controlling Interest in the Borrower or in any Key Principal that is an entity;

(9) a conversion of Borrower from one type of legal entity into another type of legal entity (including the conversion of a general partnership into a limited partnership and the conversion of a limited partnership into a limited liability company), whether or not there is a Transfer; if such conversion results in a change in any assets, liabilities, legal rights or obligations of Borrower (or of Key Principal, guarantor, or any general partner of Borrower, as applicable), by operation of law or otherwise; and

(10)    a Transfer of the economic benefits or right to cash flows attributable to the ownership interests in Borrower and/or, if Key Principal is an entity, Key Principal, separate from the Transfer of the underlying ownership interests, unless the Transfer of the underlying ownership interests would otherwise not be prohibited by this Agreement

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 21.

(b)    The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 21(a) to the contrary:

(1)    a Transfer to which Lender has consented;

(2)    except as provided in Section 21(a)(6) and (7), a Transfer that occurs by devise, descent; pursuant to the provisions of a trust, or by operation of law upon the death of a natural person;

(3)    the grant of a leasehold interest in an individual dwelling unit for a term of two years or less not containing an option to purchase;

(4)    a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender;

(5)    the grant of an easement, servitude, or restrictive covenant if, before the grant, Lender determines that the easement, servitude, or restrictive covenant will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request;

(6)    the creation of a tax lien or a mechanic's, materialman's, or judgment lien against the Mortgaged Property which is bonded off, released of record, or otherwise remedied to Lender's satisfaction within 45 days after Borrower has actual or constructive notice of the existence of such lien; and

(7)    the conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument.

(c)    Lender shall consent to a Transfer that would otherwise violate this Section 21 if, prior to the Transfer, Borrower has satisfied each of the following requirements:

(1)    the submission to Lender of all information required by Lender to make the determination required by this Section 21(c);

(2)    the absence of any Event of Default;

(3)    the transferee meets all of the eligibility, credit, management, and other standards (including any standards with respect to previous relationships between Lender and the transferee and the organization of the transferee) customarily applied by Lender at the time of the proposed Transfer to the approval of borrowers in connection with the origination or purchase of similar mortgage finance structures on similar multifamily properties, unless partially waived by Lender in exchange for such additional conditions as Lender may require;

(4)    the Mortgaged Property, at the time of the proposed Transfer, meets all standards as to its physical condition that are customarily applied by Lender at the time of the proposed Transfer to the approval of properties in connection with the origination or purchase of similar mortgage finance structures on similar multifamily properties, unless partially waived by Lender in exchange for such additional conditions as Lender may require;

(5)    If transferor or any other person has obligations under any Loan Document, the execution by the transferee or one or more individuals or entities acceptable to Lender of an assumption agreement (including, if applicable, an Acknowledgement and Agreement of Key Principal to Personal Liability for Exceptions to Non-Recourse Liability) that is acceptable to Lender and that, among other things, requires the transferee to perform all obligations of transferor or such person set forth in such Loan Document, and may require that the transferee comply with any provisions of this Instrument or any other Loan Document which previously may have been waived by Lender;

(6)    If a guaranty has been executed and delivered in connection with the Note, this Instrument or any of the other Loan Documents, the Borrower causes one or more individuals or entities acceptable to Lender to execute and deliver to Lender a substitute guaranty in a form acceptable to Lender;

(7)    Lender's receipt of all of the following:

(A)    a non-refundable review fee in the amount of $3,000 and a transfer fee equal to 1 percent of the outstanding Indebtedness immediately prior to the Transfer; and

(B)    Borrower's reimbursement of all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the Transfer request, to the extent such expenses exceed $3,000; and

(8)    Borrower has agreed to Lender's conditions to approve such Transfer, which may include, but are not limited to (A) providing additional collateral, guaranties, or other credit support to mitigate any risks concerning the proposed transferee or the performance or condition of the Mortgaged Property, and (B)

**FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -**
**ARKANSAS**
**Eastside Lofts**
DETROIT:3934278.2

**Form 4004**    06/09    *Page 25*
© 1998-2009 Fannie Mae

amending the Loan Documents to (i) delete any specially negotiated terms or provisions previously granted for the exclusive benefit of transferor and (ii) restore to original provisions of the standard Fannie Mae form multifamily loan documents, to the extent such provisions were previously modified.

(d)    For purposes of this Section, the following terms shall have the meanings set forth below:

(1)    **"Initial Owners"** means, with respect to Borrower or any other entity, the persons or entities who on the date of the Note, directly or indirectly, own in the aggregate 100% of the ownership interests in Borrower or that entity.

(2)    A Transfer of a **"Controlling Interest"** shall mean:

(A)    with respect to any entity, the following:

(i)    if such entity is a general partnership or a joint venture, a Transfer of any general partnership interest or joint venture interest which would cause the Initial Owners to own less than 51% of all general partnership or joint venture interests in such entity;

(ii)    if such entity is a limited partnership, (A) a Transfer of any general partnership interest, or (B) a Transfer of any partnership interests which would cause the Initial Owners to own less than 51% of all limited partnership interests in such entity;

(iii)    if such entity is a limited liability company or a limited liability partnership, (A) a Transfer of any membership or other ownership interest which would cause the Initial Owners to own less than 51% of all membership or other ownership interests in such entity, (B) a Transfer of any membership, or other interest of a manager, in such entity that results in a change of manager, or (C) a change of the non-member manager;

(iv)    if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, a Transfer of any voting stock which would cause the Initial Owners to own less than 51% of voting stock in such corporation;

(v)    if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, a Transfer of any voting stock which would cause the Initial Owners to own less than a sufficient number of shares of voting stock having the power to elect the majority of directors of such corporation; and

(vi)    if such entity is a trust (other than a Publicly-Held Trust), the removal, appointment or substitution of a trustee of such trust other than (A) in the case of a land trust, or (B) if the trustee of such trust after such removal, appointment, or substitution is a trustee identified in the trust agreement approved by Lender; and/or

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT.3934278.2

Form 4004    06/09    *Page 26*
© 1998-2009 Fannie Mae

(B) any agreement (including provisions contained in the organizational and/or governing documents of Borrower or Key Principal) or Transfer not specified in clause (A), the effect of which, either immediately or after the passage of time or occurrence of a specified event or condition, including the failure of a specified event or condition to occur or be satisfied, would (i) cause a change in or replacement of the Person that controls the management and operations of the Borrower or Key Principal or (ii) limit or otherwise modify the extent of such Person's control over the management and operations of Borrower or Key Principal.

(3) **"Publicly-Held Corporation"** shall mean a corporation the outstanding voting stock of which is registered under Section 12(b) or 12(g) of the Securities and Exchange Act of 1934, as amended.

(4) **"Publicly-Held Trust"** shall mean a real estate investment trust the outstanding voting shares or beneficial interests of which are registered under Section 12 (b) or 12 (g) of the Securities Exchange Act of 1934, as amended.

(e) Lender shall be provided with written notice of all Transfers under this Section 21, whether or not such Transfers are permitted under Section 21(b) or approved by Lender under Section 21(c), no later than 10 days prior to the date of the Transfer."

## 22. EVENTS OF DEFAULT.

The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

(a) any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document;

(b) any failure by Borrower to maintain the insurance coverage required by Section 19;

(c) any failure by Borrower to comply with the provisions of Section 33;

(d) fraud or material misrepresentation or material omission by Borrower, or any of its officers, directors, trustees, general partners or managers, Key Principal or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e) any (i) Event of Default under Section 21 and/or (ii) occurrence of a Bankruptcy Event;

(f) the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

(g) any failure by Borrower to perform any of its obligations under this Instrument (other than those specified in Sections 22(a) through (f)), as and when required, which

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -            Form 4004    06/09    *Page 27*
ARKANSAS                                                © 1998-2009 Fannie Mae
**Eastside Lofts**
DETROIT:3934278.2

continues for a period of 30 days after notice of such failure by Lender to Borrower, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document;

(h)     any failure by Borrower to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document; and

(i)     any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

### 23.     REMEDIES CUMULATIVE.

Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

### 24.     FORBEARANCE.

(a)     Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Instrument, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Note, or any other Loan Document.

(b)     Any forbearance by Lender in exercising any right or remedy under the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

### 25.     LOAN CHARGES.

If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any

other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

### 26.  WAIVER OF STATUTE OF LIMITATIONS.

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document.

### 27.  WAIVER OF MARSHALLING.

Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

### 28.  FURTHER ASSURANCES.

Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

### 29.  ESTOPPEL CERTIFICATE.

Within 10 days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note; (iii) the date to which interest under the Note has been paid; (iv) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument or any of the other Loan Documents (or, if the Borrower is in default, describing such default in reasonable

detail); (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

**30.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the **"Property Jurisdiction"**).

(b)    Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**31.    NOTICE.**

(a)    All notices, demands and other communications (**"notice"**) under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. As used in this Section 31, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which Lender is not open for business.

(b)    Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 31. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 31, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)    Any notice under the Note and any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 31.

**32.    SALE OF NOTE; CHANGE IN SERVICER.**

The Note or a partial interest in the Note (together with this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower. A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

### 33.    SINGLE ASSET BORROWER.

Until the Indebtedness is paid in full, Borrower (a) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property; (b) shall not operate any business other than the management and operation of the Mortgaged Property; and (c) shall not maintain its assets in a way difficult to segregate and identify.

### 34.    SUCCESSORS AND ASSIGNS BOUND.

This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower. However, a Transfer not permitted by Section 21 shall be an Event of Default.

### 35.    JOINT AND SEVERAL LIABILITY.

If more than one person or entity signs this Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

### 36.    RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)    No creditor of any party to this Instrument and no other person shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a **"Servicing Arrangement"**) between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

### 37.    SEVERABILITY; AMENDMENTS.

The invalidity or unenforceability of any provision of this Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

### 38.    CONSTRUCTION.

The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in

this Agreement includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to."

### 39.  LOAN SERVICING.

All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

### 40.  DISCLOSURE OF INFORMATION.

Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

### 41.  NO CHANGE IN FACTS OR CIRCUMSTANCES.

All information in the application for the loan submitted to Lender (the "**Loan Application**") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects. There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

### 42.  SUBROGATION.

If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "**Prior Lien**"), such loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

### 43.  ACCELERATION; REMEDIES.

At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial proceeding and may invoke any one or more other remedies permitted by applicable law or provided in this Instrument or in any other Loan Document. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports. Lender specifically reserves the right to pursue statutory foreclosure of Borrower's rights under this Instrument pursuant to Ark. Code Ann. §18-50-101, et seq., or, alternatively, to pursue judicial foreclosure of all of Borrower's rights under this Instrument. No remedy shall be deemed exclusive, and pursuit of one remedy shall not be deemed an irrevocable election.

In particular, Lender may pursue statutory foreclosure and abandon that remedy before completion and proceed to foreclosure judicially.

### 44. RELEASE.

Upon payment of the Indebtedness, Lender shall release this Instrument. Borrower shall pay Lender's reasonable costs incurred in releasing this Instrument.

### 45. WAIVER OF HOMESTEAD, DOWER, REDEMPTION, AND APPRAISEMENT.

Borrower waives all right of homestead exemption in and statutory redemption of the Mortgaged Property and all right of appraisement of the Mortgaged Property and relinquishes all rights of dower and courtesy in the Mortgaged Property. Borrower specifically waives all redemption powers, and rights which otherwise might be available to Borrower pursuant to Ark. Code Ann. §18-49-106, or that Act of the Arkansas General Assembly passed on May 8, 1899, and all rights of appraisal which otherwise might be available to Borrower pursuant to Ark. Code Ann. §18-49-107.

### 46. WAIVER OF TRIAL BY JURY.

**BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Instrument:

| | | |
|---|---|---|
| |X| | Exhibit A | Description of the Land (required). |
| |X| | Exhibit B-I | Modifications to Instrument (Books and Financial Reporting) |
| |X| | Exhibit B-II | Modifications to Instrument (Bankruptcy) |
| |X| | Exhibit B-III | Modifications to Instrument (Tax Credit Rider) |
| |X| | Exhibit B-IV | Modifications to Instrument (Governing Law) |

FANNIE MAE MULTIFAMILY SECURITY INSTRUMENT -
ARKANSAS
**Eastside Lofts**
DETROIT:3934278.2

Form 4004    06/09    *Page 33*
© 1998-2009 Fannie Mae

IN WITNESS WHEREOF, Borrower has signed and delivered this Instrument or has caused this Instrument to be signed and delivered by its duly authorized representative.

**EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:  Eastside Lofts GP II, LLC,
an Arkansas limited liability company
Its:  General Partner

By:  The ARC Arkansas,
an Arkansas non-profit corporation
Its:  Sole Member *Managing* Member

By: _Steve Hitt_
Steve Hitt
Its:  Chief Executive Officer

STATE OF _Arkansas_ )

COUNTY OF _Pulaski_ )

On this _19th_ day of _November_, 2009 before me, a notary public duly commissioned, qualified and acting within and for said county and state, personally appeared in said county and state, Steve Hitt, who stated he is the Chief Executive Officer of The ARC Arkansas, an Arkansas non-profit corporation, sole member of Eastside Lofts GP II, LLC, an Arkansas limited liability company, the general partner of Eastside Loft Apartments Phase II Limited Partnership, an Arkansas limited partnership, and duly authorized on behalf of the corporation, the limited liability company and limited partnership to execute the foregoing instrument, and further stated and acknowledged that they had executed such instrument for the consideration and purposes set forth above.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal this day of _November_, 2009.

_Helen M. Dixon_

Notary Public, State of _Arkansas_

My Commission Expires: _6-18-2012_

(SEAL)

**KEY PRINCIPAL**

**The ARK Arkansas**
**2004 Main Street**
**Little Rock, Arkansas 72206**

**EXHIBIT A**

**LEGAL DESCRIPTION**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

**EXHIBIT B-1**
**MODIFICATIONS TO INSTRUMENT**

The following modifications are made to the text of the Instrument that precedes this Exhibit:

Section 14 of this Instrument is hereby amended and restated to provide as follows:

14. **BOOKS AND RECORDS; FINANCIAL REPORTING.**

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Borrower shall furnish to Lender:

(1)    within 30 days after the end of each fiscal quarter of Borrower, a statement of income and expenses for Borrower's operation of the Mortgaged Property for that fiscal quarter, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal quarter and a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal quarter;

(2)    within 30 days after the end of each fiscal quarter of Borrower, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)    within 30 days after the end of each fiscal quarter of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)    within 30 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and the interest held by each, if Borrower is a corporation, all officers and directors of Borrower, and if Borrower is a limited liability company, all managers who are not members;

(5)    upon Lender's request, a monthly property management report for the

Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(6)     upon Lender's request, a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year;

(7)     if required by Lender, within 30 days of the end of each calendar month, a monthly statement of income and expenses for such calendar month on a year-to-date basis for Borrower's operation of the Mortgaged Property; and

(8)     within 120 days after the end of each fiscal year of Borrower, an audited annual financial statement, showing the financial condition of Borrower at the close of such fiscal year and the results of operation during such fiscal year, which financial statement shall include a balance sheet, a statement of income and expenses, a statement of all assets and liabilities, a statement of contingent liabilities, a statement of cash flows and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year.

(c)     Each of the statements, schedules and reports required by Section 14(b) shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require. Lender also may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)     If Borrower fails to provide in a timely manner the statements, schedules and reports required by Section 14(b), Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 12.

(e)     If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f)     Borrower authorizes Lender to obtain a credit report on Borrower at any time.

_____

Borrower Initials

## EXHIBIT B-II

### MODIFICATION TO INSTRUMENT
### (Bankruptcy)

The following modifications are made to the text of the Instrument that precedes this Exhibit:

**The following terms, when used in the Instrument, shall have the following meanings:**

**"Bankruptcy Event"** means any one or more of the following: (i) the commencement of a voluntary case under one or more of the Insolvency Laws by the Borrower; (ii) the acknowledgment in writing by the Borrower that it is unable to pay its debts generally as they mature; (iii) the making of a general assignment for the benefit of creditors by the Borrower; (iv) an involuntary case under one or more Insolvency Laws against the Borrower; (v) the appointment of a receiver, liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over the Borrower or any substantial part of the assets of the Borrower provided that any proceeding or case under (iv) or (v) above is not dismissed within 90 days after filing.

**"Borrower Affiliate"** means, as to either Borrower or Key Principal, (i) any entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of Borrower or of Key Principal, (ii) any corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by Borrower or by Key Principal, (iii) any partner, shareholder or, if a limited liability company, member of Borrower or Key Principal, or (iv) any other entity that is related (to the third degree of consanguinity) by blood or marriage to Borrower or Key Principal.

**"Insolvency Laws"** means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding, as amended from time to time, to the extent applicable to the Borrower.

The definition of **"Transfer"** in Section 1 is modified to replace the reference in (E)(ii) to the "United States Bankruptcy Code" with "Insolvency Laws."

**Section 12(a) is modified to read as follows:**

"(a)    If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding (including a Bankruptcy Event) is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make

repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Sections 15 and 17."

Section 22 is modified to delete "and" at the end of Section 22(h); delete the period at the end of Section 22(i) and substitute "; and" therefor; and to add the following as a new Section 22(j):

"(j)     the occurrence of a Bankruptcy Event"

All capitalized terms used in this Exhibit not specifically defined herein shall have the meanings set forth in the text of the Instrument that precedes this Exhibit.

_____

Borrower Initials

**EXHIBIT B-III**
**MODIFICATIONS TO INSTRUMENT**
**(Tax Credit Properties)**

The following modifications are made to the text of the Instrument that precedes this Exhibit:

1.  Section 21(b) is amended by adding the following at the end of such Section:

"(7)  a Transfer of an interest by a Key Principal or the Borrower as described in Section 21(a) (2), (3) or (4) resulting from any transfer described below, provided that Eastside Loft Apartments Phase II Limited Partnership owns the Mortgaged Property and remains the Borrower under the Note and Eastside Lofts GPII, LLC (the "Borrower General Partner") is the sole general partner or is the managing general partner in Borrower and NEF Assignment Corporation, as nominee (the "Equity Investor") is a 99 percent limited partner in Borrower:

(A)  the removal of the Borrower General Partner as general partner of Borrower and its replacement as general partner by the Equity Investor or by an affiliate of the Equity Investor in accordance with the terms of the limited partnership agreement of Borrower, provided that (1) the entity replacing the Borrower General Partner must be a single purpose entity and (2) after such replacement, the Initial Owners of the Equity Investor or its affiliates will own no less than 51 percent of the interests in the entity which replaced the Borrower General Partner; or

(B)  a Transfer of any Key Principal's interest in Borrower provided that, upon written notice from Lender to Borrower and to the Equity Investor, the Equity Investor shall identify an individual or entity meeting the requirements of the DUS Guide to serve as substitute Key Principal and such individual or entity is substituted as Key Principal under this Instrument within 10 days following the receipt by the Equity Investor of such notice of transfer;

provided that (1) Borrower must provide Lender with advance written notice of the identity of any entity replacing the Borrower General Partner and (2) upon request by Lender from time to time, Borrower will provide Lender with the names of all owners of interests in Borrower, whether such interests are owned directly or indirectly. For purposes of this Section 21(b), "Initial Owners" means, with respect to Borrower or any other entity, the persons or entities who, on the date of the Note, own in the aggregate 100 percent of the ownership interests in Borrower or that entity."

2.    Section 21(c) is amended to add a new clause (8):

"(8)    In the event the Borrower General Partner is removed as general partner of Borrower, in accordance with the terms of the limited partnership agreement of Borrower, and is replaced by another entity (that is not either the Equity Investor or an affiliate of the Equity Investor) selected by the Equity Investor (to the extent that a Transfer of an Interest by a Key Principal, or the Borrower as described in Section 21(a) (2), (3) or(4) above is accomplished thereby), the 1 percent transfer fee shall not be due; provided that the transferor and transferee shall be required to comply all the other requirements of this Section 21 (c)."

3.    Section 31 is amended to add the following new Section 31(d):

"(d)    Lender agrees that effective notice to Borrower under this Instrument and the Loan Documents shall require delivery of a copy of such notice to the Equity Investor.  Such notice shall be given in the manner provided in this Section, at the Equity Investor's address set forth below:

NEF Assignment Corporation
120 S. Riverside Plaza
15th Floor
Chicago, Illinois 60606

4.    The following new Sections are added to the Instrument after the last numbered Section:

"47.    RECOURSE LIABILITY.  The provisions of Paragraph 9(c) of the Note, as they relate to Events of Default described in Paragraphs 9(c)(1) and 9(c)(2), shall be operative only after the Equity Investor has been given 30 days notice of the applicable Event(s) of Default described in Paragraphs 9(c)(1) and 9(c)(2), together with an opportunity within such 30-day period to remedy the applicable Event(s) of Default.  In all events, Lender shall be entitled during such 30-day period to exercise all of its rights and remedies under this Instrument upon the occurrence of such Event of Default other than foreclosure of the Mortgaged Property.

48.    EXTENDED LOW-INCOME HOUSING COMMITMENT.  Lender agrees that the lien of this Instrument shall be subordinate to any extended low-income housing commitment (as such term is defined in Section 42(h)(6)(B) of the Internal Revenue Code) (the "Extended Use Agreement") recorded against the Mortgaged Property; provided that such Extended Use Agreement, by its terms, must terminate upon foreclosure under this Instrument or upon a transfer of the Mortgaged Property by instrument in lieu of foreclosure, in accordance with Section 42(h)(6)(E) of the Internal Revenue Code.

49.    ANNUAL LIHTC REPORTING REQUIREMENTS.  Borrower must submit to Lender, each year at the time of annual submission of Borrower's financial analysis of operations, a copy of the following sections of Borrower's federal tax return: Internal Revenue Forms 1065, 8586, 8609 and Form 8609, Schedule A, which must

reflect the total low-income housing tax credits ("LIHTCs") allocated to the Mortgaged Property and the LIHTCs claimed for the Mortgaged Property in the preceding year.

**50. CROSS-DEFAULT.** Borrower acknowledges and agrees that any default, event of default, or breach (however such terms may be defined) after the expiration of any applicable notice and/or cure periods under the Extended Use Agreement shall be an Event of Default under this Instrument and that any costs, damages or other amounts, including reasonable attorney's fees incurred by the Lender as a result of such an Event of Default by Borrower, including amounts paid to cure any default or event of default, under the Extended Use Agreement shall be an obligation of Borrower and become a part of the Indebtedness secured by this Instrument.

**51. ANNUAL COMPLIANCE.** Borrower shall submit to Lender on an annual basis, evidence that the Mortgaged Property is in ongoing compliance with all income, occupancy and rent restrictions under the Extended Use Agreement relating to the Mortgaged Property.  Such submissions shall be made contemporaneously with Borrower's reports required to be made to the regulator under the Extended Use Agreement."

5.    All capitalized terms used in this Exhibit not specifically defined herein shall have the meanings set forth in the text of the Instrument that precedes this Exhibit.

BORROWER'S INITIALS: _____

**EXHIBIT B-IV**
**MODIFICATION TO INSTRUMENT**
**(Governing Law)**

The following modifications are made to the text of the Instrument that precedes this Exhibit.

**Governing Law.**

1.    Section 30(a) of the Instrument is hereby deleted and replaced with the following:

> "(a)    The Lender and Borrower have designated that this Instrument and all other Loan Documents shall be governed by the laws of the State of Illinois; provided, however that all In rem rights remedies and procedures in enforcing this Instrument or realizing on any collateral located in the Property Jurisdiction shall be governed by the laws in which the Land is located ("Property Jurisdiction")."

2.    All capitalized terms used in this Exhibit not specifically defined herein shall have the meanings set forth in the text of the Instrument that precedes this Exhibit.

_____
Borrower Initials

**Modifications to Instrument-Standard Form**          RID-03 1/99          04/00    *Page BIV-1*
**Eastside Lofts**
DETROIT.393427R.2

# EXHIBIT F

## ASSIGNMENT OF COLLATERAL AGREEMENTS
## AND OTHER LOAN DOCUMENTS

The undersigned ("Lender") hereby assigns to **THE COMMUNITY DEVELOPMENT TRUST, LP**, a Delaware limited partnership ("CDT"), all right, title and interest of Lender in and to all of the loan documents (the "Loan Documents"), including but not limited to the Loan Documents listed on Exhibit A hereto, executed in connection with the loan (the "Loan") in the original principal amount of $809,000 to **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership ("Borrower"), as evidenced by a Multifamily Note (and any Addenda) and secured by a Multifamily Mortgage, Assignment of Rents and Security Agreement (and any Riders) dated as of November 24, 2009.

This Assignment is given in connection with, and in consideration of, CDT's purchase of the Loan made by Lender to Borrower, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged.

In witness whereof, Lender has caused this Assignment to be executed, sealed and delivered as of the 24th day of November, 2009.

**LENDER:**

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

By: _____

Name: _Mark Siranovic_

Title: _SVP   Business Development Officer_

Fannie Mae Assignment of Collateral Agreements
and Other Loan Documents
**Eastside Lofts**
DETROIT 3934687 2

Form 4509    08/04    *Page 1*
© 1997-2004 Fannie Mae

## EXHIBIT A

1.  Replacement Reserve and Security Agreement dated as of November 24, 2009, by and between Lender and Borrower.

2.  Certificate of Borrower dated as of November 24, 2009, by Borrower.

3.  Assignment of Management Agreement dated as of November 24, 2009, by and among Borrower, Lender and The Ark Arkansas, Inc.

4.  Operating Reserve and Security Agreement dated as of November 24, 2009, by and between Lender and Borrower.

5.  Notice Letter to Eastside Loft Apartments Phase II Limited Partnership.

6.  Subordination Agreement dated as of November 24, 2009, by and among Lender, Borrower and the Arkansas Development Finance Authority ("ADFA").

7.  Subordination Agreement dated as of November 24, 2009, by and among Lender, Borrower, The Ark Arkansas and the City of Little Rock, Arkansas.

8.  Subordination Agreement dated as of November 24, 2009, by and among Borrower, Lender and Arvest Bank.

9.  Subordination Agreement dated as of November 24, 2009, by and among Borrower, Lender and ADFA.

10. Agreement to Amend or Comply dated as of November 24, 2009, by Borrower in favor of Lender.

**Fannie Mae Assignment of Collateral Agreements**
**and Other Loan Documents**
**Eastside Lofts**
DETROIT.3934687.2

Form 4509   08/04   *Page A-1*
© 1997-2004 Fannie Mae

Prepared by and when recorded
Return to:
Roberta R. Russ, Esq.
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226-3506

---

(For Recorder's Use)                                                      (For Recorder's Use)

## ASSIGNMENT OF LOAN AND MORTGAGE

**NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation, with an office at 120 South Riverside Plaza, 15th Floor, Chicago, Illinois 60606 ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby absolutely sells, transfers, assigns, delivers, sets-over and conveys to **THE COMMUNITY DEVELOPMENT TRUST, LP**, a Delaware limited partnership, with an office at 1350 Broadway, Suite 700, New York, NY 10018-7702 ("Assignee"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

The Multifamily Mortgage, Assignment of Rents, and Security Agreement dated as of November 24, 2009, executed and delivered by **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership, and recorded forthwith as Instrument No. _____, in Official Records of Pulaski County, Arkansas (the "Mortgage"), which constitutes a lien upon certain real property and specifically described in Exhibit A attached to and made a part hereof, together with the promissory note related thereto and with all amendments, supplements and modifications thereto and all liens, financing statements, guaranties and security interests securing the payment thereof, including, without limitation, Assignor's interest under the Mortgage and any other documents recorded in the records of the jurisdiction in which the security is located with respect to such Mortgage, and any other documents, agreements, instruments or property relating to the Mortgage and all right, title, interest, claims, demands, causes of action and judgments securing or related to the Mortgage, to Assignor (collectively, the "Loan Documents and Collateral").

TO HAVE AND TO HOLD the Mortgage and the Loan Documents and Collateral, together with all and singular the rights and privileges thereunto in any way belonging unto Assignee, its successors and assigns, forever.

**Eastside Lofts**
DETROIT.3934650.2

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment as of November 24, 2009.

**NEF MORTGAGE CORPORATION,**
an Illinois non-profit corporation

By: _____
Mark Siranovic
Its: Senior Vice President

### ACKNOWLEDGMENT

STATE OF ILLINOIS          )
                           )ss
COUNTY OF _COOK_           )

On this 24th day of November, 2009 before me personally came Mark Siranovic, to me known, who, being by me duly sworn, did depose and say he resides at _____, that he is the Senior Vice President of NEF Mortgage Corporation, an Illinois non-profit corporation, the corporation described in and which executed the above instrument; and that she/he signed her name thereto by order of the board of directors of said corporation.

_____
Notary Public

My Commission Expires: _4/29/2011_

**(AFFIX SEAL)**

RENEE B. MURDOCK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 29, 2011

# EXHIBIT A
### Legal Description

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

EXHIBIT G



**Charlie Daniels**
**Arkansas Secretary of State**
Business and Commercial Services Division

Financing Statement - Initial

Date Filed: 11/30/2009 10:00 AM          Page(s): 7

Filing ID      : 40000004284426
Document ID : 190808002

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Roberta R. Russ, Esq. (313) 465-7534**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Roberta R. Russ, Esq.
Honigman Miller Schwartz and Cohn LLP
2290 First National Bldg., 660 Woodward Ave.
Detroit, MI 48226

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only **one** debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP** | | | | |

1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Cynthia R. Stone, 2004 Main Street | Little Rock | AR | 72206 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | limited partnership | Arkansas | AR#800071920   ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only **one** debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only **one** secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **THE COMMUNITY DEVELOPMENT TRUST, LP** | | | | |

3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1350 Broadway, Suite 700 | New York | NY | 10018-7702 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See Schedule A attached hereto for a description of the collateral.

See Exhibit A attached hereto for a description of the real property.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

Eastside Lofts/Personalty/Arkansas Secretary of State/Detroit 3947400

FILING OFFICE COPY - UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME |
|---|---|
| OR | EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP |

| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|---|
| | | | |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - not abbreviate or combine names**

| | 11a. ORGANIZATION'S NAME |
|---|---|
| OR | |

| | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 11 c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11 e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|
| | | | | | |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☒ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| | 12a. ORGANIZATION'S NAME |
|---|---|
| OR | NEF MORTGAGE CORPORATION |

| | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 120 South Riverside Plaza, 15th Floor | Chicago | IL | 60606 | USA |

**13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.**

**14. Description of real estate:**

See Exhibit A attached hereto for a description of the real property.

**15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):**

**16. Additional collateral description:**

See Schedule A attached hereto for a description of the collateral.

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

## SCHEDULE A

**DEBTOR:**  **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**, an Arkansas limited partnership

**SECURED PARTY:**  **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation

**ASSIGNEE**
**SECURED PARTY:**  **THE COMMUNITY DEVELOPMENT TRUST, LP**, a Delaware limited partnership

---

This financing statement covers the following types (or items) of property (the "Collateral Property"):

1. **Improvements.** The buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the land described in Exhibit A attached hereto (the "Land"), including any future replacements and additions (the "Improvements");

2. **Fixtures.** All property which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment (the "Fixtures");

3. **Personalty.** All equipment, inventory, general intangibles which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land (the "Personalty");

**DEBTOR:**  **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP**

**SECURED PARTY:**  **NEF MORTGAGE CORPORATION,** an Illinois non-profit corporation

**ASSIGNEE**
**SECURED PARTY:**  **THE COMMUNITY DEVELOPMENT TRUST, LP,** a Delaware limited partnership

---

4.    **Other Rights.** All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated (the "Other Rights");

5.    **Insurance Proceeds.** All proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement (the "Insurance Proceeds");

6.    **Awards.** All awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof (the "Awards");

7.    **Contracts.** All contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations (the "Contracts");

8.    **Other Proceeds.** All proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds (the "Other Proceeds");

9.    **Rents.** All rents (whether from residential or non-residential space), revenues and other income of the Land or the Improvements, including subsidy payments received from any sources (including, but not limited to payments under any Housing Assistance Payments Contract), including parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Collateral Property, whether now due, past due, or to become due, and deposits forfeited by tenants (the "Rents");

10.    **Leases.** All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Collateral Property, or any portion of the Collateral Property (including proprietary

## EXHIBIT A
## Legal Description

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

# EXHIBIT H

## UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Roberta R. Russ, Esq. (313) 465-7534

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Roberta R. Russ, Esq.
Honigman Miller Schwartz and Cohn LLP
2290 First National Bldg., 660 Woodward Ave.
Detroit, MI 48226

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME -insert only one debtor name (1a or 1b) -do not abbreviate or combine names**

**1a. ORGANIZATION'S NAME**
EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Cynthia R. Stone, 2004 Main Street | Little Rock | AR | 72206 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | limited partnership | Arkansas | AR#800071920 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

**2a. ORGANIZATION'S NAME**

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE & ASSIGNOR S/P) -insert only one secured party name (3a or 3b)**

**3a. ORGANIZATION'S NAME**
THE COMMUNITY DEVELOPMENT TRUST, LP

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1350 Broadway, Suite 700 | New York | NY | 10018-7702 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Schedule A attached hereto for a description of the collateral.

See Exhibit A attached hereto for a description of the real property.

**5. ALTERNATIVE DESIGNATION [if applicable]** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

**6.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]   **7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE) [optional]** ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
Eastside Lofts/Fixtures/Pulaski County, Arkansas/Detroit 3947391

**FILING OFFICE COPY - UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)**

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME |
|---|---|
| **OR** | EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP |

| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|---|
| | | | |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11a) - not abbreviate or combine names**

| | 11a. ORGANIZATION'S NAME |
|---|---|
| **OR** | |

| | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☒ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| | 12a. ORGANIZATION'S NAME |
|---|---|
| **OR** | NEF MORTGAGE CORPORATION |

| | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 120 South Riverside Plaza, 15th Floor | Chicago | IL | 60606 | USA |

**13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing.**

**14. Description of real estate:**

See Exhibit A attached hereto for a description of the real property.

**16. Additional collateral description:**

See Schedule A attached hereto for a description of the collateral.

**15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

## SCHEDULE A

| | |
|---|---|
| **DEBTOR:** | **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP,** an Arkansas limited partnership |
| **SECURED PARTY:** | **NEF MORTGAGE CORPORATION,** an Illinois non-profit corporation |
| **ASSIGNEE SECURED PARTY:** | **THE COMMUNITY DEVELOPMENT TRUST, LP,** a Delaware limited partnership |

This financing statement covers the following types (or items) of property (the "Collateral Property"):

1.    **Improvements.**   The buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the land described in Exhibit A attached hereto (the "Land"), including any future replacements and additions (the "Improvements");

2.    **Fixtures.**  All property which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment (the "Fixtures");

3.    **Personalty.**  All equipment, inventory, general intangibles which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land (the "Personalty");

| | |
|---|---|
| **DEBTOR:** | **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP** |
| **SECURED PARTY:** | **NEF MORTGAGE CORPORATION**, an Illinois non-profit corporation |
| **ASSIGNEE SECURED PARTY:** | **THE COMMUNITY DEVELOPMENT TRUST, LP**, a Delaware limited partnership |

4.      **Other Rights**.  All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated (the "Other Rights");

5.      **Insurance Proceeds**.  All proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement (the "Insurance Proceeds");

6.      **Awards**.  All awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof (the "Awards");

7.      **Contracts**.  All contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations (the "Contracts");

8.      **Other Proceeds**.  All proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds (the "Other Proceeds");

9.      **Rents**.  All rents (whether from residential or non-residential space), revenues and other income of the Land or the Improvements, including subsidy payments received from any sources (including, but not limited to payments under any Housing Assistance Payments Contract), including parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Collateral Property, whether now due, past due, or to become due, and deposits forfeited by tenants (the "Rents");

10.      **Leases**.  All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Collateral Property, or any portion of the Collateral Property (including proprietary

| | |
|---|---|
| **DEBTOR:** | **EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP** |
| **SECURED PARTY:** | **NEF MORTGAGE CORPORATION,** an Illinois non-profit corporation |
| **ASSIGNEE SECURED PARTY:** | **THE COMMUNITY DEVELOPMENT TRUST, LP,** a Delaware limited partnership |

leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals (the "Leases");

11.    **Other.** All earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Collateral Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

12.    **Imposition Deposits.** Deposits held by the Lender to pay when due (1) any water and sewer charges which, if not paid, may result in a lien on all or any part of the Collateral Property, (2) the premiums for fire and other hazard insurance, rent loss insurance and such other insurance as Lender may require, (3) taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements, and (4) amounts for other charges and expenses which Lender at any time reasonably deems necessary to protect the Collateral Property, to prevent the imposition of liens on the Collateral Property, or otherwise to protect Lender's interests, all as reasonably estimated from time to time by Lender (the "Imposition Deposits");

13.    **Refunds or Rebates.** All refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which the Security Instrument is dated);

14.    **Tenant Security Deposits.** All tenant security deposits which have not been forfeited by any tenant under any Lease; and

**DEBTOR:**            **EASTSIDE    LOFT    APARTMENTS    PHASE    II    LIMITED PARTNERSHIP**

**SECURED PARTY:**      **NEF    MORTGAGE    CORPORATION,** an    Illinois    non-profit corporation

**ASSIGNEE**
**SECURED PARTY:**      **THE    COMMUNITY    DEVELOPMENT    TRUST,    LP,** a    Delaware limited partnership

---

15.    **Names.** All names under or by which any of the above Collateral Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Collateral Property.

**BORROWER:**

**EASTSIDE LOFT APARTMENTS PHASE II**
**LIMITED PARTNERSHIP,**
an Arkansas limited partnership

By:  Eastside Lofts GP II, LLC,
     an Arkansas limited liability company
     Its:  General Partner

     By:  The ARC Arkansas,
          an Arkansas non-profit corporation
          Its:  Sole Member / *Managing Member*

     By: _____
          Steve Hitt
          Its:  Chief Executive Officer

**EXHIBIT A**
**Legal Description**

Lot 2R, Block 20, Original City of Little Rock, Pulaski County, Arkansas and being shown on plat recorded as Plat No. F-931, records of Pulaski County, Arkansas.

2014044881 Received: 9/5/2014 8:22:15 AM Recorded: 08/05/2014 08:23:54 AM Filed
& Recorded in Official Records of Larry Crane, PULASKI COUNTY CIRCUIT/COUNTY
CLERK Fees $6.50

Case 4:23-cv-00788-BSM   Document 1   Filed 08/25/23   Page 276 of 423

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company    1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

83886918 - 336190

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Arkansas
(Pulaski)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 2009079208   11/25/2009 | (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

CONTINUATION

20

Pulaski Circuit County Clerk

By DC

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME THE COMMUNITY DEVELOPMENT TRUST, LP | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. **OPTIONAL FILER REFERENCE DATA:** 030263992/lib/lkd Debtor:EASTSIDE LOFT APARTMENTS PHASE II LIMITED PART

83886918

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd. Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM
**FOLLOW INSTRUCTIONS**

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form
**2009079208    11/25/2009**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

| | |
|---|---|
| 12a. ORGANIZATION'S NAME | |
| | **THE COMMUNITY DEVELOPMENT TRUST, LP** |
| OR | 12b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)      SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only **one** Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☑ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

**2019039477**
**PULASKI CO. AR FEE $6.50**
**PRESENTED**
**6/26/2019 2:07:41 PM**
**RECORDED**
**06/26/2019 02:21:38 PM**
TERRI HOLLINGSWORTH
Circuit / County Clerk
BY: REGINA HAMPTON
DEPUTY RECORDER

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC   1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

1477 71638

CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Arkansas
(Pulaski)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
2009079208 11/25/2009

1b. ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:                    AND  Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record     ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c     ☐ ADD name: Complete item 7a or 7b, and item 7c     ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTNERSHIP | | | |
|---|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY USA |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | THE COMMUNITY DEVELOPMENT TRUST, LP | | | |
|---|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: 030263992/MLS/mk Debtor:EASTSIDE LOFT APARTMENTS PHASE II LIMITED PARTN

1477 71638

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form
**2009079208 11/25/2009**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

| | 12a. ORGANIZATION'S NAME |
|---|---|
| | THE COMMUNITY DEVELOPMENT TRUST, LP |

OR

| | 12b. INDIVIDUAL'S SURNAME |
|---|---|
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| | 13a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:

☐ covers timber to be cut  ☐ covers as-extracted collateral  ☑ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17
(if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

# EXHIBIT I

0482

# MASTER PARTICIPATION AGREEMENT

This Master Participation Agreement (this "Agreement") is dated the 13th day of March, 2003, and entered into by and between **THE COMMUNITY DEVELOPMENT TRUST, LP**, a Delaware limited partnership ("Seller"), **MIDLAND LOAN SERVICES, INC.**, a Delaware corporation ("Servicer"), and **FANNIE MAE** ("Fannie Mae"), a corporation organized and existing under the laws of the United States (each a "Party" and together, the "Parties").

## RECITALS

A.     From time to time, Seller acquires from originators of multifamily mortgage loans (each a **"Loan"** and collectively, the **"Loans"**) of the type(s) described on **Exhibit A** hereto, (each an **"Eligible Loan"** and collectively the **"Eligible Loans"**) and each secured by a multifamily residential property with 9% low income housing tax credits (each a **"Property"** and collectively, the **"Properties"**).

B.     On the terms and subject to the conditions set forth in this Agreement, Seller desires to sell to Fannie Mae and Fannie Mae desires to purchase from Seller undivided ownership interests (each a **"Senior Participation,"** and collectively, the **"Senior Participations"**) in an amount equal to either 90% or 85%, as may be determined by Fannie Mae based upon Fannie Mae's analysis of the Eligible Loan as hereinafter described, of Eligible Loans that Seller may acquire during the term of this Agreement up to $100,000,000 in the aggregate, (i) so long as such Eligible Loans meet Fannie Mae's requirements set forth herein and (ii) on the condition that Seller retains and continues to own the remaining interest in each Eligible Loan, junior in priority of payments (the **"Junior Participation"** and together with the Senior Participation, the **"Participations"**).   An Eligible Loan in which Fannie Mae has purchased a Participation from Seller on the terms and subject to the conditions set forth in this Agreement is hereinafter referred to as a **"Participated Loan,"** and collectively, the **"Participated Loans."**

C.     Seller and Fannie Mae desire that Servicer service the Participated Loans (Servicer and any successor servicer selected in accordance with the terms hereof, shall be referred to herein as **"Servicer"**).

D.     The parties hereto desire to set forth the terms and conditions under which Seller will sell, and Fannie Mae will purchase, the Participations and the terms and conditions under which Servicer will service the Participated Loans.

**NOW, THEREFORE**, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1



Section 1.1    **Definitions**.    Capitalized terms used herein (including in the exhibits hereto) and not otherwise defined shall have the respective meanings given such terms in the Glossary contained in the Guide and incorporated herein by reference.

**"Acquisition Date"** shall mean, with respect to any Participation, the date on which Fannie Mae remits the applicable Participation Amount (less any applicable accrued interest) for such Participation to Seller as provided herein.

**"Agreement"** shall mean this Master Participation Agreement.

**"Borrower"** shall mean any maker of a promissory note evidencing any Participated Loan.

**"Business Day"** shall mean any day, other than a Saturday, a Sunday or any other day on which Fannie Mae is closed for business. If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

**"Collateral"** shall mean any and all property, real and personal, given by a Borrower as security for a Loan.



**"Commitment Fee"** shall mean that fee identified as the Commitment Fee and payable by the Seller to Fannie Mae in accordance with Section 2(c).

**"Deadlock"** shall have the meaning given to it in Section 8 hereof.

**"DSCR"**, with respect to any Participated Loan shall mean the Debt Service Coverage Ratio as such term is defined in the Glossary to the Guide.

**"Due Diligence Fee"** shall mean that fee identified as the Due Diligence Fee and payable by the Seller to Fannie Mae in accordance with Section 2(c).

**"Eligible Loan"** and **"Eligible Loans"** shall have the meaning given to them in the Recitals.

**"Guide"** shall mean, collectively, the Fannie Mae's Multifamily Negotiated Transactions Guide (the "NT Guide"), except those portions of the NT Guide specifically set forth in **Exhibit D** attached hereto, and Part III of the Fannie Mae Delegated Underwriting and Servicing Guide (the "DUS Guide"), except those portions of the DUS Guide specifically set forth in **Exhibit D** attached hereto, as they shall be amended, supplemented, revised or superseded from time to time by Fannie Mae in its sole discretion. Except for explicit references to Part III of the DUS Guide, all references herein to "the Guide" shall mean to the NT Guide.



**"Junior Participation"** shall have the meaning ascribed to it in the Recitals.

2



"**Loan**" shall have the meaning given to it in the Recitals.

"**Loan Documents**" shall mean, collectively, the Note evidencing any Participated Loan, the Security Instrument on the Property financed by the Participated Loan, and all other instruments, agreements and documents executed and delivered contemporaneously with such Note and in connection with the financing of the Property, all as may be amended from time to time.

"**LTV**", with respect to any Property, shall mean the Loan to Value Ratio for such Property as such term is defined in the Glossary to the Guide.

"**Monetary Default**" shall mean a default by the Borrower in paying any sums due under the Loan Documents which continues beyond any applicable period provided in the Loan Documents for curing such default.

"**Participated Loan**" shall have the meaning given to it in the Recitals.

"**Participation**" and "**Participations**" shall have the meanings given to them in the Recitals.

"**Participation Amount**" shall mean the product of the Principal Amount and the Participation Percentage of any Participated Loan.

"**Participation Certificate**" shall mean, with respect to any Participated Loan, the certificate issued by the Seller to Fannie Mae which shall be in substantially the form of **Exhibit B** hereto.

"**Participation Percentage**" shall mean a 90% interest in the Loan, unless, based upon Fannie Mae's assessment of the credit risk associated with such purchase and in its sole discretion, Fannie Mae elects to purchase only an 85% in the Loan.

"**Party**" and "**Parties**" shall have the meaning given to them in the Preamble to this Agreement.

"**Post-commitment Review**" shall mean a review by Fannie Mae, conducted after Fannie Mae has issued its rate-lock commitment with respect to a Participation, of the Participation Certificate (including each of the documents required to be enclosed therewith) and Seller's MCODES submission relating to such Participated Loan and done pursuant to Section 2(d) hereof.

"**Pre-commitment Review**" shall mean a review by Fannie Mae, conducted prior to Fannie Mae issuing its rate-lock commitment with respect to a Participation, of the Participation Certificate (including each of the documents required to be enclosed therewith) and Seller's MCODES submission relating to such Participated Loan and done pursuant to Section 2(d) hereof.



3



"**Principal Amount**" shall mean, with respect to any Participated Loan, the unpaid principal balance of such Participated Loan on the Acquisition Date for such Participated Loan.

"**Property**" and "**Properties**" shall have the meanings given to them in the Recitals.

"**Purchase Price**" shall mean the amount due upon the purchase of a Participation, as determined by Fannie Mae.

"**Repurchase Price**" shall mean for any Senior Participation an amount equal to the sum of the (i) aggregate outstanding principal balance of such Participated Loan multiplied by the Purchase Price (expressed as a percentage of par) multiplied by the Participation Percentage, plus (ii) all accrued and unpaid interest owing in respect of such Participation, plus (iii) any Servicing or Delinquency Advances made by Fannie Mae with respect to such Participation.

"**Security Instrument**" shall mean, with respect to any Participated Loan, the mortgage or deed of trust on the Property financed by such Participated Loan.

"**Seller**" shall have the meaning given to it in the Preamble to this Agreement.

"**Seller MSSC**" shall mean the Mortgage Selling and Servicing Contract dated October 25, 2002, between Seller and Fannie Mae.



"**Senior Participation**" shall have the meaning ascribed to it in the Recitals.

"**Servicer MSSC**" shall mean the Mortgage Selling and Servicing Contract dated March 31, 1998, between Servicer and Fannie Mae.

"**Servicing Advance**" shall mean all "out-of-pocket" costs and expenses incurred by the Servicer in performing its servicing obligations -- such as those related to the preservation and protection of the Property, the payment of taxes and insurance, the enforcement of judicial proceedings, and the management and disposition of acquired Properties; provided, however, Servicing Advances shall not include any out-of-pocket costs and expenses for routine servicing obligations (such as the costs of collecting monthly payments under the Mortgages and the costs of performing annual inspections of the Properties), for which the Servicer is compensated through the Servicing Fee, and, provided, further, Servicing Advances shall not include any costs, losses, or other items that the Servicer agrees to hold the Participants harmless against under its representations, warranties, or indemnification agreements between the Servicer and the Participants or for advances made in connection with litigation or proceedings that the Participants did not approve or authorize pursuant to the terms of this Agreement.

"**Servicing Fee**" shall mean the fee owed to the Servicer for servicing the Participated Loans as more fully described in Section 3(c).

Section 1.2    **Governing Documents**. The obligations of Seller, Servicer and Fannie Mae regarding this Agreement (including, without limitation, the sale of the Senior Participations to Fannie Mae, the representations and warranties made by Seller to Fannie Mae respecting the

4



Participated Loans, and by Servicer respecting its servicing of the Participated Loans) shall be governed by the terms and conditions of: (i) this Agreement, including, without limitation, the Exhibits to this Agreement; (ii) the Guide; (iii) the Seller MSSC, as applicable, and (iv) the Servicer MSSC, as applicable.  In the event of a conflict between this Agreement, including without limitation, the Exhibits to this Agreement, the Guide, the Seller MSSC, as applicable, or the Servicer MSSC, as applicable, the following is the order of priority regarding the governing provisions: (A) this Agreement, including without limitation, the Exhibits to this Agreement; (B) the Guide; and (C) the Seller MSSC, as applicable, and the Servicer MSSC, as applicable.

Section 2.    **Offer and Commitment; Payments**.

(a)    On the terms and subject to the conditions set forth in this Agreement, Seller shall sell and Fannie Mae shall purchase Senior Participations in Eligible Loans which have a minimum DSCR of 1.15 to 1.00 and a maximum LTV of 90%.  Fannie Mae shall pay the Purchase Price of each such Participated Loan to Seller, all in accordance with the procedures set forth herein and in Part V of the NT Guide, and at the interest rate locked in by Seller in accordance with the procedures set forth in Part V and Sections 1102.01, 1102.02 and 1102.03 of Part IX of the NT Guide.  Fannie Mae shall have no interest in (i) interest accrued on any Participated Loan or any portion thereof prior to Fannie Mae's purchase of its Senior Participation in any such Participated Loan, (ii) any commitment or origination fee, paid or payable with respect to such Participated Loan paid by the Borrower to the Seller, except as may expressly be provided otherwise herein, and (iii) any other fee or sum received or receivable by Seller in respect of the Participated Loan or under any Loan Document that Seller is not required to remit to Fannie Mae pursuant to this Agreement.



(b)    Fannie Mae's obligation to deliver commitments to purchase Senior Participations hereunder shall terminate immediately upon the earlier of (i) the issuance of a commitment to purchase a Senior Participation, the unpaid principal balance of which, when added to the original unpaid principal balance of all previously delivered Senior Participations, exceeds One Hundred Million Dollars ($100,000,000.00), and (ii) the date that is the first anniversary of the date hereof; provided, however that if on the first anniversary of the date hereof, Fannie Mae has not delivered commitments to purchase Senior Participations the original unpaid balances of which, in the aggregate, exceed One Hundred Million Dollars ($100,000,000.00), then Fannie Mae, in its sole discretion, may extend this Agreement for an additional term of months (not in excess of one year) in order to permit Fannie Mae to deliver additional commitments.

(c)    In connection with the purchase of each Senior Participation, the Seller shall pay to Fannie Mae a due diligence fee in the amount of one thousand dollars ($1,000.00).  The due diligence fee shall be drawn from an account specifically designated for such purpose by the Seller. The due diligence fee is non-refundable and shall not be subject to any Seller set-off or counterclaim.  The Seller shall also pay to Fannie Mae a Commitment Fee in the amount of two percent (2%) of the Acquisition Date Participation Amount of the Participated Loan on the Commitment confirmation date, which fee is refundable by Fannie Mae to Seller upon Fannie Mae's purchase of a Senior Participation as herein provided.

(d)    (i) Fannie Mae shall commit to purchase Senior Participations in the first ten (10) Eligible Loans offered by the Seller after conducting its Pre-commitment Review. Fannie Mae reserves the right, in its reasonable discretion, to accept or reject any Eligible Loan submitted for purchase and, if after performing its Pre-commitment Review Fannie Mae elects to reject an Eligible Loan for purchase, Fannie Mae shall nonetheless be entitled to retain the due diligence fee for such Eligible Loan. If, after conducting its Pre-commitment Review, Fannie Mae is satisfied, in its reasonable discretion, that Seller is consistently offering Eligible Loans for participation that have been underwritten in accordance with the requirements of Part III of the DUS Guide and the representations and warranties set forth in **Exhibit C** attached hereto, then Fannie Mae shall commit to purchase Participations on a Post-commitment Review basis; provided, however, that Fannie Mae, at any time and in Fannie Mae's sole discretion, may give notice to the Seller that, from and after the date of such notice, Fannie Mae will only issue commitments after conducting a Pre-commitment Review.

(ii)    Subject to Section 2(d)(i), the remedies described in Section 7 hereof, and the procedures set forth in Part V and Sections 1102.01, 1102.02 and 1102.03 of Part IX of the NT Guide, Fannie Mae shall commit to purchase the Senior Participations provided, however, that such commitment shall be subject to the conditions that the Borrower has executed the Loan Documents and the loan proceeds have been disbursed to the Borrower. Seller shall utilize the prescribed Fannie Mae forms for obtaining indicative pricing and rate locking, copies of each of which are attached hereto as Exhibits E and F, respectively. If Fannie Mae accepts a Participation, then, not later than 3:00 p.m. (EST time), on the date that is two (2) Business Days after such acceptance, Fannie Mae shall pay to Seller, as payment for Fannie Mae's purchase of such Senior Participation, an amount equal to the Purchase Price for such Senior Participation. Fannie Mae shall make payment, via wire transfer of same day funds, to Seller at:

| | |
|---|---|
| Bank: | First Union Bank |
| ABA No.: | 05300219 |
| Credit Acct: | 5-000000016439 |
| For further credit to: | 2556005665 |

for further credit to the Loan Number indicated in the Participation Confirmation for such Participation, and sent to the attention of Camille Perkowski (telephone number 973-606-4306). No funds will be wired to Seller until Seller shall have delivered a Senior Participation Certificate, substantially in the form of **Exhibit B** attached hereto, together with all of the documents listed on **Schedule 1 to Exhibit B**, as evidence of Fannie Mae's purchase of the Senior Participation. The Senior Participation Certificate shall be delivered via overnight courier to the following address:

Fannie Mae (MF)
13150 Worldgate Drive
Herndon, VA 22070



With a copy to:    Midland Loan Services, Inc.
                   10851 Mastin Street, Suite 300
                   Overland Park, Kansas 66210
                   Attention: Dennis Siefers

(d)    Without Fannie Mae's prior written approval, Seller shall not sell or otherwise transfer the Junior Participation of any Participated Loan.

Section 3.    **Servicing**.

(a)    Servicer shall Service each Participated Loan in accordance with (i) the Servicer MSSC, which is incorporated herein, and (ii) the additional provisions set forth in this Section 3.

(b)    For so long as the Participated Loan is a performing loan, Servicer shall service the Participated Loan and the Loan Documents in accordance with the applicable provisions of the procedures for servicing loans in Parts II, VI and IX of the NT Guide, as the same shall be modified from time to time by Fannie Mae in its sole discretion. Servicer shall service each Loan as a Primary Risk Mortgage. From and after such time as the Loan is not a performing loan, Servicer shall service the Participated Loan and the Loan Documents in accordance with the applicable provisions of the procedures for servicing non-performing loans in Chapters 5 and 6 of Part VI of the NT Guide, as the same shall be modified from time to time by Fannie Mae in its sole discretion.

(c)    Seller shall include in the Gross Note Rate for each Participated Loan, the Servicing Fee specified in the Commitment Confirmation. The Servicer shall deduct and retain the Servicing Fee from the Borrower's monthly payment. Servicer shall be the initial Servicer of the Participated Loans. In the event Servicer resigns or is removed as the Servicer for the Participated Loans prior to the final maturity of any Participated Loan participated pursuant to this Agreement, the Servicing Fee set forth above and payable thereafter shall be paid to the successor Servicer.

(d)    Servicer shall report and remit funds from the Participated Loan in accordance with the applicable provisions of the procedures for Part VII, Chapter 5 of the NT Guide, as such procedures may be amended from time to time by Fannie Mae in its sole discretion.

(e)    Once each calendar year (or more frequently if Fannie Mae has a reasonable basis for so doing) Fannie Mae may examine and review Servicer's servicing of the Participated Loans. Fannie Mae will notify Servicer of the annual examination and review by sending a notice not less than 10 Business Days prior to the date set forth in such notice for the examination and review to Servicer at its address for notices listed in Section 10 hereof. The examination and review will take place at Servicer's main offices for servicing the Participated Loans, as reasonably determined by Fannie Mae, at a time and date designated (on a Business Day and during normal business hours) by Fannie Mae in the notice. During such annual examination and review, Servicer shall make available to Fannie Mae and its representatives, all of Servicer's books, records and accounts related to the servicing of the Participated Loans as well as Servicer's employees primarily responsible for servicing the Participated Loans. If, as a

7



result of an examination and review, Fannie Mae believes in good faith that Servicer is no longer capable or willing to service the Participated Loans to the standards set out in this Section 3, Fannie Mae shall terminate the then-current Servicer and substitute therefor a successor Servicer; provided, however, that the Servicer shall continue to service the Participated Loans until the acceptance of appointment by a successor Servicer. In addition, either Fannie Mae or the Seller shall have the right to terminate Servicer and substitute therefor a successor Servicer at any time for cause in accordance with the procedures for MBS transactions described in Section 208.03 of Part II of the NT Guide (i) upon the occurrence of a Servicer Event of Default, provided, however, with regard to the defaults specified in subclauses (i), (iii) and (viii) of the definition of "Servicer Events of Default" contained in the Glossary of the NT Guide, the Servicer shall have a cure period of one (1) Business Day if such Event of Default is a Monetary Default and a cure period of five (5) Business Days if such Event of Default is a non-Monetary Default; (ii) upon Fannie Mae's and/or the Seller's reasonable determination that Servicer has materially failed to perform its servicing duties in accordance with this Section 3; or (iv) upon Fannie Mae's and/or the Seller's reasonable determination that there is a material decline generally in Servicer's financial condition which, with the passage of time, could lead to one of the events described in subclauses (iv), (v), or (vi) of the definition of "Servicer Event of Default" contained in the Glossary of the NT Guide. If Fannie Mae terminates the Servicer without cause, Fannie Mae will (i) pay a lump-sum termination fee in an amount equal to twice the Servicer's then-current, annualized servicing fee and (ii) follow the procedures of Section 208.01 of Part II of the NT Guide with regard to terminating servicing in an MBS transaction. Notwithstanding the foregoing, in the event that Fannie Mae has elected to terminate the Servicer for any reason, Fannie Mae shall provide to Seller prior written notice of such fact. Within five (5) Business Days after receipt of such notice, Seller shall notify Fannie Mae in writing either that it accepts such termination or that it objects to such termination. If Seller objects to such termination and Fannie Mae desires to proceed with such termination, then Seller shall be obligated to repurchase Fannie Mae's Senior Participation for the Deadlock repurchase price stated in Section 8 hereof. The Servicer is acting as initial Servicer hereunder at the request of the Seller. In the event that Seller desires to terminate the Servicer for cause as provided above and transfer the servicing of the Participated Loans to a substitute servicer, then Seller shall provide prior written notice of such fact to Fannie Mae which notice shall include a selection of proposed substitute servicers. The selection of a substitute servicer shall be subject to the prior approval of Fannie Mae and any such substitute servicer must be an approved Fannie Mae servicer or capable of being approved as a Fannie Mae servicer pursuant to Fannie Mae's then-current requirements therefor.



(f)    Servicer hereby covenants that regardless of whether it has collected sufficient funds from the Borrower, the Servicer shall monitor and to the extent the Borrower fails to make such payments, shall be responsible for making all required payments of taxes, assessments and insurance premiums and any other payments which may be required to ensure that no liens attach to the affected Property that would have a higher priority than the lien created by the Security Instrument. If the Servicer has to make any payment of any amount of money required by the preceding sentence, the Servicer shall first notify the Parties of the amount required to be paid which notice shall indicate each Parties' pro-rata share of the payment, shall explain why such amount is required to be paid and shall indicate the date on which the Servicer intends to make such payment. Upon receipt of the notice required by the preceding sentence, each Party will, promptly but in no event later than the date for payment specified in the notice, pay the Servicer

8

its pro-rata portion of the required payment. If, on the date specified by the Servicer for payment by the Parties any of the Parties shall not have paid the Servicer its pro-rata portion of the required payment, then the Servicer shall make such payment on behalf of the Party whereupon such Party shall owe and pay such amount to the Servicer on demand with interest accruing at the Federal Funds rate for the period from and including the date on which such payment was made to but not including the date on which payment is made to the Servicer by the Party. For purposes of this Section, "Federal Funds rate" shall be the rate set forth from time to time in Federal Statistical Release H.15 (519), as most recently published by the Board of Governors of the Federal Reserve System, or such other commercially reasonable rate of interest that Fannie Mae may choose in its sole discretion from time to time.

(g)    Servicer shall be responsible to the Parties for all breaches of its servicing obligations under this Section 3. Notwithstanding the foregoing, the Parties' remedies for any Servicer breach shall be limited to termination, as provided in this Section 3, and the remedies set forth in Section 7.

(h)    Notwithstanding anything herein to the contrary, the Servicer shall be the initial Servicer of the Participated Loans. Without Fannie Mae's prior written approval, Servicer shall not sell or otherwise transfer the servicing of any Participated Loan.

Section 4.    **Nature of Transaction**. Fannie Mae and Seller intend and agree that (a) the transactions contemplated by this Agreement are purchases and sales of undivided interests in the Participated Loans in consideration for Fannie Mae's payments pursuant to Section 2; (b) such purchases and sales shall not constitute loans by Fannie Mae to Seller; and (c) such purchases and sales shall not result in the creation of any trust or fiduciary relationship between Seller and Fannie Mae or a joint venture. Each purchase shall be without recourse to Seller or Servicer except as otherwise provided in Section 7 hereof, and without any representation or warranty by Seller or Servicer except as is otherwise expressly provided in Section 6 hereof.

Section 5.    **Priority and Allocation of Payments**.

(a)    **Priority of Payments**. All Junior Participations shall be subject and subordinate in right of payment, in accordance with the provisions of this Agreement, to the prior payment in full in cash of all Senior Participations, and no payment in respect of any Junior Participation shall be made at any time from amounts paid by or on behalf of a Borrower or arising from execution or realization upon the Collateral while the respective Senior Participation (or any portion thereof) remains outstanding, other than to the extent that funds are available therefor after the payment of all amounts then required to be paid to Fannie Mae in connection with a Senior Participation in accordance with the Loan Documents or otherwise required to be paid prior to payments on a Junior Participation in accordance with the provisions of Section 5(b) hereof. For purposes of this Section 5, all references to interest on the Senior Participation shall be deemed to include, without limitation, any interest that accrues after the commencement of any bankruptcy action relating to the Borrower, whether or not such interest would be allowed in such case, proceeding or action.

9



(b)    **Allocation of Payments**.

(1)    **Performing Loan**. With respect to any Loan, up to, but not including the date of any monetary default under such Loan's Loan Documents which has not been expressly waived by the Senior Participant in its sole discretion (a "Waived Default"), or the date of any bankruptcy action with respect to the Borrower, whichever is earlier, and from and after the date on which the Loan is reinstated pursuant to a final non-appealable order of a bankruptcy court of competent jurisdiction to and until any subsequent monetary default which is not a Waived Default or until any subsequent bankruptcy action, all amounts received in respect of any such Loan or any security therefor shall be allocated in the following order of priority:

First, to the Servicer for any Servicing Fees then due and owing and for any unreimbursed Servicing Advances;

Second, to the Participants, pro rata, for the payment of any accrued interest;

Third, to the Participants, pro rata, for scheduled payments of principal that are then due on the Loan;

Fourth, to the Participants, pro rata, for the payment of principal until the obligations due with respect to the Loan have been paid in full.

Fifth, to Servicer and the Participants, for the payment of any yield maintenance premium paid by Borrower. Each Participant's share of such yield maintenance premium shall be paid as follows:

(a)    First, Servicer will receive the present value of the Servicing Fees due for the remainder of the Loan Term, with the discount rate used for such calculation being the U.S. Treasury Issue derived "Reinvestment Yield" as described in the prepayment provisions of the Promissory Note evidencing the Loan;

(b)    Then, Senior Participant and Junior Participant will receive their pro rata share of any remaining yield maintenance premium in accordance with their respective Participation Percentages.

; and

Sixth, to the Participants, pro rata, based upon the original principal Participation Percentage.



(2)    **Non-Performing Loan**. From and after the date of any monetary default under the Loan Documents which is not a Waived Default or the date of any bankruptcy action with respect to the Borrower, or the date any REO (as hereinafter defined) is acquired by the Participants as a result of foreclosure, deed in lieu of foreclosure or otherwise, whichever is earlier, all amounts received in respect of the Loan or any security therefor shall be allocated in



the following order of priority unless and until such time as a monetary default is cured or waived by Senior Participant in its sole discretion in which case such amounts shall once again be distributed in accordance with Section 5(b)(1) above:

First, to the Servicer for the repayment of any unreimbursed Servicing Advances;

Second, to the Servicer for all Servicing Fees then due and owing;

Third, to the Senior Participant and the Junior Participant, respectively, in proportion to any unreimbursed Servicing Advances made by them regarding the Loan and any unreimbursed Delinquency Advances made by them;

Fourth, to the Senior Participant for the payment of any accrued interest due with respect to the Senior Participation;

Fifth, to the Senior Participant until all of the obligations then due and payable (other than any yield maintenance payments) with respect to the Senior Participation have been paid in cash in full, if any;

Sixth, to the Junior Participant for the payment of any accrued interest due with respect to the Junior Participation;

Seventh, to the Junior Participant until all of the obligations then due and payable (other than any yield maintenance payments) with respect to the Junior Participation have been · paid in cash in full, if any;

Eighth, to Servicer and the Participants, for the payment of any yield maintenance premium paid by Borrower. Each Participant's share of such yield maintenance premium shall be paid as follows:

(a)     First, Servicer will receive the present value of the Servicing Fees due for the remainder of the Loan Term, with the discount rate used for such calculation being the U.S. Treasury Issue derived "Reinvestment Yield" as described in the prepayment provisions of Promissory Note evidencing the Loan;

(b)     Second, Senior Participant and Junior Participant will receive their pro rata share of any remaining yield maintenance premium in accordance with their respective Participation Percentages.

; and

Ninth, to the Participants, pro rata, based upon the original principal Participation Percentage.

(c)     **Distributions to Junior Participant**.  As to each Participated Loan, in the event of any distribution or payment to the Junior Participant on or with respect to the Junior



Participation, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, other than as permitted in this Agreement, then, and in any such event, any such payment or distribution of any kind or character, which shall be payable or deliverable upon or with respect to any of the Junior Participation, shall, until all of the obligations then due and payable with respect to the Senior Participation as set forth in this Section above have been indefeasibly paid in cash and satisfied in full, be paid or delivered directly to the Senior Participant for application against the Senior Participation, whether secured or unsecured, in accordance with this Agreement. Such distribution or payment shall be delivered in the form of its receipt (except for the addition of any endorsement or assignment necessary to effect a transfer of all rights therein to the Senior Participant), and the Senior Participant is irrevocably authorized to supply any endorsement or assignment which may have been omitted or insufficient. Until so delivered, any such distribution or payment shall be held in trust by the Junior Participant for the benefit of the Senior Participant.

Section 6.    **Representations and Warranties**.

(a)    Seller hereby represents and warrants that the matters set forth in Section II of **Exhibit C** are true and correct as of the date hereof or as of such other date specified therein, and, as of the Acquisition Date of each Senior Participation by Fannie Mae. Seller also hereby agrees and covenants that the sale of any Senior Participation hereunder shall constitute a representation and warranty by Seller to Fannie Mae that, unless expressly disclosed in writing and approved by Fannie Mae, each of the matters set forth in Section I of **Exhibit C** is true and correct solely with respect to the Senior Participation then being sold to Fannie Mae as of the Acquisition Date of such Senior Participation by Fannie Mae or as of such other date specified therein. The representations and warranties set forth in **Exhibit C** attached hereto are in lieu of the representations and warranties contained in the Guide and in the MSSC.

(b)    Fannie Mae hereby represents and warrants to Seller that the execution and delivery by Fannie Mae of this Agreement, the consummation of the transactions contemplated by this agreement, and the performance and compliance by Fannie Mae with the terms of this Agreement are within the power of Fannie Mae and have been duly authorized by all necessary action on the part of Fannie Mae. All organizational resolutions and consents necessary for Fannie Mae to enter into and consummate all transactions contemplated by this Agreement have been obtained. This Agreement has been duly executed and delivered by Fannie Mae and constitutes a legal, valid and binding obligation of Fannie Mae, subject to bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally, and general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(c)    The performance by Fannie Mae of a Pre- or Post-commitment review in connection with any Participation shall in no way constitute a waiver of any Seller representations and warranties related to such Participation.

(d)    Servicer hereby represents and warrants to Seller and Fannie Mae that the execution and delivery by Servicer of this Agreement and the performance and compliance by Servicer with the terms of this Agreement are within the corporate power of Servicer and have

12

been duly authorized by all necessary action on the part of Servicer. All organizational resolutions and consents necessary for Servicer to enter into and consummate all transactions of the Servicer contemplated by this Agreement have been obtained. This Agreement has been duly executed and delivered by Servicer and, assuming due authorization, execution and delivery by each of the other parties hereto, constitutes a legal, valid and binding obligation of Servicer, enforceable against the Servicer in accordance with the terms hereof, subject to applicable bankruptcy, insolvency, reorganization, receivership, moratorium, and other similar laws affecting enforcement of creditors' rights generally, and general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law. The Servicer is in compliance with the requirements of Section 305 of Part II of the NT Guide. The Servicer is an approved servicer of multifamily Loan(s) for Fannie Mae. The employment practices, policies, and programs of the Servicer comply with the requirements of Executive Order 11246, to the extent applicable to the Servicer, as it relates to equal employment opportunity and non-discrimination practices.

(e)     The representations and warranties made by Seller, Servicer, and Fannie Mae in this Agreement shall survive execution of this Agreement and any subsequent transfer of the Senior Participation either to another party or to a trust formed by Fannie Mae or another party.

Section 7.     **Remedies**.

(a)     Seller hereby agrees to indemnify and hold Fannie Mae and Servicer (and their successors and assigns) harmless from and against all losses, damages, claims, liabilities, judgments, and costs, including, without limitation, legal fees, arising out of (i) a breach of any representations, warranties, or covenants made by Seller under this Agreement, (ii) its failure to perform any obligation or duty required in accordance with the terms of this Agreement, or (iii) its bad faith, willful misconduct or negligence.

(b)     Fannie Mae may require the repurchase of any Senior Participation if any representation or warranty made by Seller relating to such Senior Participation is untrue or otherwise breached and materially and adversely affects the value of such Senior Participation, whether or not Seller had actual knowledge of the untruth or breach (unless the representation or warranty specifically states that it is being made to "the best of Seller's knowledge"). In connection with any repurchase made pursuant to this Section 7, Seller shall pay Fannie Mae the then-current Repurchase Price for the Senior Participation. In addition to the remedy of repurchase described in the preceding sentence, Fannie Mae may also enforce any other rights or remedies available to it at law or equity.

(c)     Upon discovery of a breach of a representation or warranty, Seller must, within seven (7) days after such discovery, inform Fannie Mae in writing of the breach. Fannie Mae will consult with Seller regarding the breach and determine whether (i) such breach is capable of being cured, and (ii) such breach will necessitate a repurchase of the affected Participation if not cured. Once Fannie Mae has made such determination, Fannie Mae will notify Seller in writing of its decision.



(d)     If Fannie Mae determines that a breach of a representation or warranty is capable of being cured, then Seller must complete such cure within sixty (60) days of receipt of notice from Fannie Mae requesting that such breach be cured; provided, however, that if Seller is making a good faith effort to complete such cure and is unable to do so within such 30-day period, Fannie Mae may, in its sole discretion, grant Seller such additional time as it shall deem appropriate to complete such cure. Fannie Mae will, in its reasonable discretion, make the final decision with respect to the successful completion of any cure and will notify Seller in writing whether such cure has been successfully completed or whether the Participation will have to be repurchased.

(e)     In all events, if Seller is unable to cure a breach of a representation or warranty to Fannie Mae's satisfaction (or Fannie Mae determined that such breach was not capable of cure), and Fannie Mae has determined that such breach will necessitate a repurchase of the affected Participation, then Seller shall repurchase such Participation within five (5) Business Days after delivery of Fannie Mae's written demand for repurchase.

(f)     If Fannie Mae takes legal action to enforce the repurchase right and prevails in such action, Seller will be liable to Fannie Mae for all legal fees, costs, and related expenses.

(g)     Servicer hereby agrees to indemnify and hold the Parties (and their respective successors and assigns) harmless from and against all losses, damages, claims, liabilities, judgments, and costs, including, without limitation, legal fees, arising out of (i) a breach of any representations, warranties, or covenants made by Servicer under this Agreement, (ii) its failure to perform any obligation or duty required in accordance with the terms of this Agreement, or (iii) its bad faith, willful misconduct or negligence.



Section 8.     **Consultation Upon Default; Deadlock**.  Upon receipt of a notice from Servicer of a default by a Borrower, the Seller and Fannie Mae shall attempt to determine by mutual agreement whether, and in what manner, any remedies of the Seller and Fannie Mae under the related Participated Loan should be exercised.  If Seller and Fannie Mae disagree or there is no agreement ("Deadlock") within five (5) Business Days after receipt of such notice, Seller, within five (5) days after the Deadlock may, but need not, repurchase Fannie Mae's Senior Participation for an amount equal to the sum of (i) all Servicing Advances made by Fannie Mae pursuant to the terms hereof and (ii) the Participation Percentage of the total outstanding balance of the Participated Loan, including principal and accrued interest.  If Seller does not exercise the buyout option outlined in the preceding sentence, then the determination of remedies to be exercised shall be made by Fannie Mae and such determination shall be binding on all Parties.

Section 9.     **The Loan Documents**.  So long as Seller is an approved Fannie Mae seller, Seller shall retain all original Loan Documents executed in connection with any Participated Loan. If Seller is no longer an approved Fannie Mae Seller, Seller shall promptly transfer all original Loan Documents in its possession relating to such Participated Loan to Fannie Mae or Fannie Mae's designee.





Section 10.    **Miscellaneous**.

(a)    The parties acknowledge that Fannie Mae may hold any or all of the Senior Participations for investment, or may sell them to any third party, or may issue mortgage-backed securities backed by the Participations, or may use the Participations for any other lawful purpose; provided, however, that Fannie Mae hereby covenants that any sale to a third party shall be made only to Accredited Investors (as such term is defined in Regulation D promulgated under the Securities Exchange Act of 1934) or shall otherwise be consummated in a manner that is exempt from registration under U.S. securities laws. Notwithstanding the foregoing, Fannie Mae agrees that Seller shall have no obligation to seek consents from any party other than Fannie Mae and furthermore, Seller shall have no obligation to wire funds to more than one party for any specific Participated Loan.

(b)    Seller acknowledges and agrees that Fannie Mae may identify Seller to any investor, rating agency or other party as seller of the Senior Participations. In addition, Seller acknowledges and agrees that Fannie Mae may, from time to time, publish information regarding the terms and performance of the Participations and may identify the originator of the Eligible Loans in such publication.

(c)    Unless expressly stated herein, all notices or other communications called for by this Agreement shall be deemed to have been sufficiently given either when (i) personally delivered, (ii) sent by facsimile with an answer sufficient to show receipt thereof, or (iii) received through overnight express mail or any overnight commercial carrier customarily used for business transactions, addressed as follows:

To Fannie Mae:    Fannie Mae
3900 Wisconsin Ave., N.W.
Washington, D.C. 20016
Attention: Vice President, Multifamily-Capital Markets
Fax:    202-752-4231

With a copy to:    Fannie Mae
3900 Wisconsin Ave., N.W.
Washington, D.C. 20016
Attention: Legal Department – Multifamily
Fax:    202-752-5023

To Seller:    The Community Development Trust, LP
1350 Broadway, Suite 700
New York, NY 10018
Attention: Mark R. Jarrell, Senior Vice President
Fax:    212-271-5079



With a copy to:            The Community Development Trust, LP
                           1350 Broadway, Suite 700
                           New York, NY 10018
                           Attention: Susan T. Robbins, General Counsel
                           Fax:   212-271-5079

To the Servicer:           Midland Loan Services, Inc.
                           10851 Mastin Street, Suite 300
                           Overland Park, Kansas 66210
                           Attention: Dennis Siefers
                           Fax:   913-253-9001

With a copy to:            Stinson Morrison Hecker LLP
                           2600 Grand Boulevard
                           Kansas City, Missouri 64108
                           Attention: Russell A. Brien
                           Fax:   816-474-4208

Any requests to Fannie Mae for Fannie Mae's consent to any material amendment, modification or waiver to any of the Loan Documents made by the Seller, and any request to Fannie Mae for a waiver made by the Servicer, pursuant to the servicing requirements of Section 3 hereof shall be made via electronic mail sent to Fannie Mae at the following address: rhoda_newman@fanniemae.com with a copy to marsha_baumgarner@fanniemae.com. Fannie Mae shall promptly respond to any such request, and Fannie Mae's response may be given in writing in the manner provided above in this Section, or by return electronic mail; provided, however, that Fannie Mae's failure to respond promptly shall in no way be deemed to be consent by Fannie Mae to any proposed amendment, modification, or waiver of the Loan Documents or any waiver requested by the Seller or Servicer.

(d)     This Agreement applies to, inures to the benefit of, and binds all parties hereto and their respective successors and assigns.

(e)     This Agreement shall be governed by, and construed in accordance with, the laws of the District of Columbia.

(f)     If any provision of this Agreement shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining portions shall not be affected or impaired. In case any covenant, stipulation, obligation, or agreement of any party hereto contained herein shall for any reason be held to be in violation of law, then such covenant, stipulation, obligation, or agreement shall be deemed to be the covenant, stipulation, obligation, or agreement of such party to the fullest extent permitted by law.

(g)     Seller shall execute, acknowledge, deliver, procure, record, and file such further instruments and do such further acts deemed necessary, desirable, or proper by Fannie Mae to carry out the purposes of this Agreement and to consummate the purchase of the Participations by Fannie Mae. Fannie Mae shall execute, acknowledge, deliver, procure, record, and file such



further instruments and do such further acts deemed necessary, desirable, or proper by Seller to carry out the purposes of this Agreement and to consummate the sale of the Participations by Seller.

(h)    The terms and provisions of this Agreement shall survive the consummation of the transaction contemplated herein.

(i)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.

(k)    Promotions, advertising, circulars, press releases and other public statements concerning the terms of this Agreement may not be distributed or made by Seller without the prior written consent of Fannie Mae.

(l)    Servicer shall keep books and records in accordance with generally accepted accounting principles with respect to Participated Loans and such books and records shall reflect the Party's ownership of their respective percentage ownership interest of the Participated Loans. Such books and records shall be deemed prima facie correct as to such matters.

(m)    THE PARTIES HERETO (I) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING UNDER THIS AGREEMENT TRIABLE BY A JURY AND (II) WAIVE ANY RIGHT TO A TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST.    THIS WAIVER IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE ACCRUE. FURTHER, EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO (INCLUDING, BUT NOT LIMITED TO, SUCH OTHER PARTY'S COUNSEL) HAS REPRESENTED, EXPRESSLY OR OTHERWISE, TO THE OTHER PARTY THAT THEY WILL NOT SEEK TO ENFORCE THE PROVISIONS OF THIS SECTION. THE FOREGOING PROVISIONS WERE KNOWINGLY, WILLINGLY AND VOLUNTARILY AGREED TO BY THE PARTIES HERETO UPON CONSULTATION WITH LEGAL COUNSEL SELECTED BY EACH PARTY EXERCISING ITS FREE WILL.

(n)    This Agreement may be amended, modified, altered or terminated only by written instrument or written instruments signed by all the parties hereto.

[Remainder of Page Intentionally Left Blank;
Signature Page Follows]

17

[Signature Page of Master Participation Agreement
dated March 13, 2003,
by and between
The Community Development Trust, LP
and
Fannie Mae]


**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the dates hereinafter set forth.  This Agreement shall take effect as of the date of its execution by Fannie Mae.

THE COMMUNITY DEVELOPMENT TRUST, LP, a
Delaware limited partnership,
as Seller and Party

Date:_____     By:     _____
                                   Name:   _____
                                   Title:  _____


FANNIE MAE, as Party

Date: March 13, 2003              By:     _____
                                  Name:   Wendell L. Johns
                                  Title:  Vice President


MIDLAND LOAN SERVICES, as Servicer

Date:_____     By:     _____
                                   Name:   _____
                                   Title:  _____


Exhibit A   Eligible Loans
Exhibit B   Form of Participation Certificate
Exhibit C   Seller's Representations and Warranties
Exhibit D   Inapplicable Provisions of the Negotiated Transactions Guide

18

**Exhibit A**

**Eligible Loans**

"Eligible Loans" under this Agreement shall be first priority liens on multifamily rental housing properties with 9% low income housing tax credits in the original principal amount of less than or equal to Five Million Dollars ($5,000,000.00) having the following terms and conditions:

A.    A term of 15 years and a 25 or 30-year amortization, during which time, if Borrower elects to prepay the loan during the first 14.5 years of the loan term, the Borrower shall pay a prepayment premium of the greater of yield maintenance or 1% of the outstanding principal balance at the time of prepayment and, for the next 3 months, 1% of the outstanding principal balance at the time of prepayment; provided, however, that no prepayment premium shall be due during the last 3 months prior to maturity.

B.    A term of 18 years and a 25 or 30-year amortization, during which time, if Borrower elects to prepay the loan during the first 17.5 years of the loan term, the Borrower shall pay a prepayment premium of the greater of yield maintenance or 1% of the outstanding principal balance at the time of prepayment and, for the next 3 months, 1% of the outstanding principal balance at the time of prepayment; provided, however, that no prepayment premium shall be due during the last 3 months prior to maturity.



**Exhibit B**

**Form of
Senior Participation Certificate**

Date: _____

Certificate No.: _____

Seller's Loan No.: _____

    This Participation Certificate evidences the sale by The Community Development Trust, LP, a Delaware limited partnership, with its principal office at 1350 Broadway, Suite 700, New York, NY 10018 ("Seller"), to Fannie Mae, a corporation organized and existing under the laws of the United States ("Fannie Mae") of a Senior Participation in an Eligible Loan held by Seller as hereinafter described, pursuant to the provisions of the Master Participation Agreement by and between Seller and Fannie Mae dated as of March __, 2003 (terms defined therein being herein used with the same meanings):

1.    Loan Terms

| Borrower's Name | |
|---|---|
| Borrower's SSN/TIN | |
| Principal Amount | |
| Interest Payment Date(s) | |
| Maturity Date | |
| Interest Rate | |

2.    Participation Terms

| Participation Amount | |
|---|---|
| Acquisition Date | |
| Participation Percentage | |

    The Loan is evidenced by a Promissory Note dated as of _____, _____ made by the Borrower payable to the order of _____, and endorsed to the Seller and is secured by a [mortgage][deed of trust] executed by the Borrower and Seller on _____ __, 20__, which [mortgage][deed of trust] was assigned to Seller on _____ ___, 20__.

    As per Fannie Mae's Instructions, the Purchase Price will be paid on the Acquisition Date by wire transfer of immediately available funds in accordance with the Master Participation Agreement. This Participation Certificate is not effective until receipt by Seller of payment in full of the Purchase Price.



Attached hereto are true and correct copies of each of the items listed on Schedule 1 to this Exhibit B, none of which has been amended, modified, revised or rescinded.

**THE COMMUNITY DEVELOPMENT TRUST, LP,** a
Delaware limited partnership

By: _____
Name: _____
Title: _____

21

## Schedule 1

**(Copies of Original, Executed Documents
to be Attached to Participation Certificate)**

1.  Commitment Confirmation

2.  Promissory Note with all allonges, schedules, exhibits, modifications, and/or endorsements attached

3.  Mortgage/Deed of Trust with all schedules, exhibits, and/or modifications attached

4.  Assignment of Leases and Rents with all schedules, exhibits, and/or modifications attached

5.  UCC-1 Financing Statement with all schedules, exhibits, and/or UCC-3 Financing Statement Modifications and/or Extensions attached

6.  Replacement Reserve and Security Agreement with all schedules, exhibits, and/or modifications attached, if applicable

7.  Completion/Repair and Security Agreement with all schedules, exhibits, and/or modifications attached, if applicable

8.  Certificate of Borrower

9.  Guaranty (full or non-recourse carveouts), if applicable

10. Assignment of Beneficial Interest in Land Trust with all schedules, exhibits, and/or modifications attached, if applicable

11. Opinion of Borrower's Counsel

12. Assignment of Management Agreement with all schedules, exhibits (including copy of Management Agreement) and/or modifications attached

13. Title Insurance Policy with all endorsements and copies of all non-utility easement exception documents attached

14. Assignment(s) from the originator of the Eligible Loan to the Seller for the following:

    1.  Mortgage/Deed of Trust
    2.  Assignment of Leases and Rents
    3.  UCC-1 Financing Statement (e.g., UCC-3)

4.  Other collateral agreements (e.g., Replacement Reserve and Security Agreement, Completion/Repair and Security Agreement, Assignment of Management Agreement)

## Exhibit C

### Seller's Representations and Warranties

It is acknowledged by the parties that the Seller is not the originator of the Participated Loans; however, the Seller is hereby making the following representations and warranties as if it were the originator and, as such, participated in the underwriting and origination of the Participated Loans, or re-underwriting undertaken by the Seller in connection with the purchase by Seller of the Participated Loans, Seller agrees not to claim as a defense to the breach of any of the following representations and warranties or otherwise that it was not the originator of the Participated Loans.

I.     The Loans

a.     Complies with Guide Requirements

The Seller has taken all actions and followed all standards required by the Guide in connection with the origination, underwriting, and documentation of the Participated Loan and the sale of the Participation to Fannie Mae.

b.     Complies with Contract Requirements

Each Participated Loan has been underwritten by Seller in material compliance with all applicable requirements of the Master Participation Agreement (including without limitation, the requirement that each Participated Loan have a minimum debt service coverage of 1.15 and a maximum loan to value ratio of 90%) and has been documented in substantial compliance with the Master Participation Agreement as it may have been modified on the date of closing of the Participated Loan, except as otherwise specifically approved in writing by Participants.

c.     Seller Authorized to Do Business

The Seller either:

(a)     was authorized to transact business and licensed in the jurisdiction where the property is located, or

(b)     under the laws of the jurisdiction where the property is located, was not required to be so authorized and none of the following activities, taking into account all of Seller's other activities in the Property Jurisdiction, constitute doing business in the Property Jurisdiction:

-- acquiring the Loans;
-- holding the Loans; or
-- transferring Loans in whole or in part.

24



If, under the laws of the Property Jurisdiction, the Seller was not required to be authorized to do business in the Property Jurisdiction, the failure of the Seller to be authorized to do business will have no adverse effect on the mortgagee's ability to enforce the Participated Loan (assuming that the mortgagee itself is, or need not be, authorized to do business in the Property Jurisdiction).

The Seller will pay all costs (including by way of example and not limitation, expenses and penalties) related to qualification or authorization to do business or obtaining licenses in the event that enforcement of any Participated Loan so requires or is delayed in connection with the Seller's failure to be so qualified, authorized or licensed.

d.    Authority to Sell; Free and Clear

The Seller is the sole owner and holder of the Participated Loan. The Seller has full right and authority to sell, assign, and transfer the Participation to Fannie Mae, and either no consent or approval of any other Person is necessary to effect such sale, assignment, and transfer, or any such consent or approval previously has been obtained. The Seller is selling and transferring the Participation free and clear of any and all liens, pledges, charges, and security interests of any nature encumbering such Participation.

e.    Accuracy of Information



To the best of Seller's knowledge, the data elements provided to Fannie Mae by the Seller in its MCODES submission are true, complete, and accurate in all material respects. The description of the Participated Loan set forth in the Loan Delivery Package delivered to Fannie Mae is true, complete, and accurate in all material respects and the Loan Documents accompanying the Loan Delivery Packages are true and complete copies of the original Loan Documents executed by the Borrower.

With respect to the Seller's MCODES submission for the Participated Loan, the Seller calculated income and expenses using the methodology outlined in Fannie Mae Form 4254 in all material respects.

With respect to the Seller's MCODES submission for the Participated Loan, the Seller calculated and submitted the "gross rental income" figure for such MCODES submission (which figure is used in the calculation of "net operating income") in accordance with the following requirements:

1.    income from a source such as late fees, forfeited security deposits, unit utility reimbursements, storage, pet fees, cable television fees, or in-unit washer and dryer rental was included in the gross monthly rental income amount only to the extent set forth in this clause 1. and only if (a) the Borrower prepared, and the Seller was in possession of, operating statements for the related Property for the one year preceding the MCODES submission, and (b) such source of income was identified on a line item basis in such operating statements and was consistent and stable over such one-year period; and





2.    interest income, rental premiums for corporate and/or short-term leases, and rental premiums for furnished units do not comprise any part of the gross monthly rental income amount.

With respect to the Seller's MCODES submission for the Participated Loan, the underwritten "economic vacancy factor" of such MCODES submission (which factor is used in the calculation of "net operating income") is not less than the greater of (i) an amount representing 5 percent of gross potential residential income from the related Property (on an annual basis), or (ii) an amount on an annual basis representing the vacancy rate for the market in which the property is located.

With respect to the Seller's MCODES submission for the Participated Loan, the Seller calculated and submitted a "replacement reserve amount" figure for such MCODES submission, which figure is not less than $150 per unit of the Property.

f.    Accuracy of Loan Documents

Unless otherwise agreed to in writing by Fannie Mae in its sole discretion, the text of the Loan Documents delivered to Fannie Mae are the same forms and contain the same material provisions as the Loan Documents provided by the Seller to Fannie Mae (either electronically or in hard copy form), except for other changes made on a schedule or exhibit which is either a standard form modification or has been approved in writing by Fannie Mae prior to delivery.

g.    Full Disbursement; No Capitalization; Amortization



The principal amount of the Participated Loan stated in the Note has been fully disbursed as of the Acquisition Date of the Participated Loan (except for any amounts that may be held in a replacement reserve, or completion repair reserve, or another reserve approved in writing by Fannie Mae), and there are no future advances required to be made by the mortgagee under any of the Loan Documents. Seller has not, directly or indirectly, advanced funds to any party other than the Borrower or on the Borrower's behalf or at the Borrower's direction, or received payments of any amounts under the Loan Documents from any person other than Borrower. The Participated Loan does not include any capitalized sums in its Acquisition Date Principal Balance, and the Participated Loan does not provide for the capitalization of any sums due from the Borrower.

h.    Interest Rate

If the Participated Loan is a fixed-rate Loan, the Seller has no authority under the Loan Documents to adjust such fixed rate of interest. If the Participated Loan is an adjustable rate Loan, (i) all of the terms set forth in the Loan Documents and the Commitment pertaining to interest rate adjustments, payment adjustments, and adjustments of the unpaid principal balance are enforceable, (ii) all such adjustments have been correctly made in accordance with the terms of the related Note and applicable law, (iii) such adjustments will not affect the first lien priority of the Participated Loan, and (iv) the Commitment correctly and accurately describes how such adjustments are to be made pursuant to the Loan Documents.

i.    Payment History; No Defaults

As of the Acquisition Date, all payments due under the Participated Loan have been made by the Borrower, or if any such payments due have not been made, the grace periods with respect thereto as set forth in the Loan Documents have not expired. Since the date of the Participated Loan, no payment on the Participated Loan was received 30 days or more beyond its scheduled payment due date and there existed no material default, breach, violation, or event of acceleration, nor any event that with the passage of time or with notice, or both, would constitute a material default, breach, violation, or event of acceleration, under any of the Loan Documents. The Seller has not waived any material default, breach, violation, or event of acceleration under any of the Loan Documents. Pursuant to the terms of the Loan Documents, no person or party other than the holder of the Note may declare an event of default or accelerate the related indebtedness under such Loan Documents.

j.     Borrower Bankruptcy

To the best of the Seller's knowledge, at no time from the date of origination of the Participated Loan through the Acquisition Date has the Borrower, Key Principals, Principals, or any guarantors of the Participated Loan been the subject of any bankruptcy, reorganization, insolvency, or comparable proceeding.

k.     Lien Priority and Subordinate Liens

As of the Acquisition Date, to the best of Seller's knowledge: (i) the Security Instrument creates a first and paramount lien on the related Property and all leases, rents, and profits related thereto; (ii) the Property does not secure any subordinate indebtedness unless such subordinate indebtedness meets the requirements set forth in Part III, Chapter 12, of the DUS Guide; and (iii) such Property is free and clear of any mechanics' and materialmen's liens or other liens in the nature thereof.

l.     Cross Collateralization and Cross Default

No Participated Loan is cross collateralized or cross defaulted with another Loan unless approved by Fannie Mae in writing.

m.     Enforceability of Loan Documents; Compliance

(1) If the Participated Loan (i) is an adjustable rate Loan; or (ii) the provisions of the Loan Documents have been modified (except by a standard Fannie Mae form Schedule or Exhibit), then, the Seller has either obtained a waiver from Fannie Mae or an opinion of Borrower's counsel in the form required by Fannie Mae, which provides substantially as follows:

The Mortgage Note, Security Instrument and other Loan Documents have been properly executed by the Borrower, any Key Principal and any guarantor, are valid, and their terms may be enforced by the mortgagee of record, or by their respective successors and assigns as mortgagee, subject to any applicable bankruptcy, insolvency, reorganization, moratorium, and



other laws of general applicability to or affecting creditor's rights, and to the exercise of judicial discretion in accordance with general principles of equity, whether applied by a court of law or of equity.

Any and all requirements of any federal, state, and local law, rule, or regulation applicable to originating and closing the Participated Loan were complied with as of the date of origination of the Participated Loan.

(2)    There is no offset, defense, counterclaim, or right of rescission with respect to the Loan Documents.

n.    No Amendments, Waivers or Releases

The terms and conditions of the Participated Loan as reflected in the Loan Documents delivered to Fannie Mae have not been amended, modified or supplemented by any other agreement or understanding of the parties or waiver of any of the material provisions of those Loan Documents. The Participation Certificate has been delivered to Fannie Mae. The terms of the Loan Documents have not been waived, modified, altered, satisfied, cancelled, subordinated, or rescinded in any respect, in whole or in part other than as approved by Fannie Mae in writing.

o.    Interest in Property



Unless the Participated Loan is secured by a leasehold estate, then to the best of the Seller's knowledge the Borrower's interest in the Property securing the Participated Loan is a fee simple interest.

p.    Title Insurance

The title insurance policy requirements set forth in Part III of the Guide have been satisfied in all material respects. No survey exception is set forth in the Seller's title insurance policy. No claims have been made under the title insurance policy insuring the lien of the Security Instrument. Seller has not done, by act or omission, anything which would materially impair the coverage of such title insurance policy to the best of the Seller's knowledge. Such title insurance policy is in full force and effect.

q.    Property Intact

To the best of the Seller's knowledge, as of the acquisition date (i) the Mortgaged Property has not been damaged by fire, wind or other cause of loss (in an amount exceeding $50,000) and (ii) the Mortgaged Property has not been taken in condemnation or other like proceeding to an extent that would impair the value of the Participated Loan or the Mortgaged Property or the usefulness of the Mortgaged Property for the contemplated purposes, nor (iii) are there any proceedings pending or contemplated for the partial or total condemnation of the Mortgaged Property.

r.    Taxes Paid



All taxes and governmental assessments, water, sewer, and municipal charges, and ground rents, if any, that prior to the date of this representation became due and owing in respect of the related Property have been paid, or an escrow of funds in an amount sufficient to cover such payments (and all interest and penalties thereon) has been established and fully funded.

s.    Regulatory Agreements

If the Property has been or continues to be encumbered by restrictions, covenants, agreements, or obligations arising out of or relating to tax-exempt or other bond transactions (whether pursuant to certificate of deposit programs, loans to Seller programs, multifamily residential development programs, or otherwise) or in connection with HAP Contracts, the allocation of low-income housing tax credits pursuant to the Code, or any other affordable housing programs (such bond transactions, HAP Contract transactions, low-income housing tax credit transactions, and other affordable housing programs being hereinafter referred to collectively as "Targeted Affordable Housing Transactions"), and whether or not the bonds, contracts, and other indebtedness or assistance payments relating to the Targeted Affordable Housing Transactions are outstanding, then:

(i)    no violations of the terms and provisions of any regulatory agreement, HAP Contract, trust indenture, deed restriction, or declaration of land use restrictive covenant related to any such Targeted Affordable Housing Transaction (collectively, the "Targeted Affordable Housing Documents"), including, without limitation, any tenant income, occupancy, and rent restrictions provisions, have occurred since the date of the execution of the Targeted Affordable Housing Documents, and no reversion of title has occurred as a result of any transfer restrictions contained in any of the Targeted Affordable Housing Documents;

(ii)    the Property has been operated in compliance with the rental and occupancy restrictions and tenant qualification requirements contained in the Targeted Affordable Housing Documents, and no event or circumstance has occurred which would cause a violation of any special tax covenants contained in the Targeted Affordable Housing Documents or, if the Targeted Affordable Housing Documents relate to a tax-exempt bond transaction, otherwise give rise to a determination of taxability with respect to the income attributable to such bond transaction that affected or presently affects the Property;

(iii)    to the best of the Seller's knowledge there have been no claims or demands for indemnification asserted by or on behalf of any party entitled to such indemnification pursuant to the terms of any Targeted Affordable Housing Document, nor does there exist any basis for the assertion by or on behalf of any such party of a claim or demand for such indemnification; and

(iv)    to the best of the Seller's knowledge no claims, demands, actions, or proceedings have been asserted or initiated to enforce any of the rental, occupancy, or other restrictions and obligations evidenced and created by the Targeted Affordable Housing Documents, nor have any such claims, demands, actions, or proceedings been threatened.



t.    <u>Environmental</u>

A Phase I Assessment has been performed by an independent third-party consultant qualified to perform such assessments on each Property substantially in accordance with the Guide, and a Phase II Assessment by an independent third-party consultant qualified to perform such assessments has been performed substantially in accordance with the Guide, if such Phase II Assessment was required by the terms of the Guide;

The results of the Phase I and/or Phase II Assessments performed on each Property do not reveal any environmental hazards that would cause the Property to be ineligible or unacceptable pursuant to the Guide;

Each Borrower has put into place an operations and maintenance plan where recommended or required by such Phase I and/or Phase II Assessments or as otherwise required by the Guide, such operations and maintenance plans to be in accordance with the Guide;

The Seller has not received any notice of, or is otherwise not aware of any actions, suits, proceedings, orders, inquiries or investigations pending or threatened, involving or affecting the Property, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, alleging the violation of any federal, state or local law, statute, ordinance, rule, regulation, decree, order and/or permit relating to Environmental Matters ("Environmental Matters" shall include, without limitation, matters relating to the generation, manufacture, use, storage, handling, transportation and/or disposal of hazardous substances or wastes, chemical substances or conditions with respect to the atmosphere, soil, surface and ground waters, wetlands, stream sediments and vegetation);



The Seller has not received any claim, notice or opinion that the ownership or operation of the Property violates any federal, state or local law, statute, ordinance, rule, regulation, decree, order and/or permit relating to Environmental Matters, and to the best of the Seller's knowledge, no valid basis for any proceeding, action or claim of such nature exists; and

The Seller and its officers, directors, agents and employees have complied in all material respects with applicable environmental laws, statutes, ordinances, rules, regulations, decrees, orders and/or permits of foreign, federal, state and/or local governments and all agencies thereof in connection with any ownership, operation, use or control by the Seller of the Property.

Fannie Mae may select an independent expert to verify compliance. Review or lack of review by such an independent expert shall not in any way, modify, waive, or otherwise nullify in whole or part any of the foregoing representations or warranties. The cost of such expert shall be borne solely by the Seller if the review of an independent expert reveals that Seller has violated the foregoing representations or warranties.



u.    Participated Loan Is Acceptable Investment

The Seller knows of nothing involving the Participated Loan, the Property, the Borrower, or the Borrower's credit standing that can reasonably be expected to:  (i) cause the Seller to regard the Participated Loan as an unacceptable investment; (ii) cause the Participated Loan to become delinquent; or (iii) cause Seller to believe that the Participated Loan's value or marketability has been adversely affected.

v.    Servicing File and Servicing

The Servicing File contains each of the items listed in Part VI, Section 102, of the Guide, and each such item is accurate and complete, and contains all documents necessary to service the Participated Loan.

w.    Appraisal

The Underwriting Package contains an Appraisal of the related Property, which Appraisal was made in connection with the requirements of Part III of the Guide.

x.    Property and Liability Insurance



The Property related to the Participated Loan is insured with property and liability insurance policies and other related policies that meet in all material respects the requirements set forth in the Guide.  All such policies are in full force and effect.

y.    No Side Agreements

There are no side agreements containing provisions governing the Participated Loan.  All terms governing the Participated Loan are set forth in the Loan Documents, and have been noted in the Loan Delivery Package delivered to Fannie Mae in advance of the purchase of the Participated Loan, and all such Loan Documents will be or have been delivered to Fannie Mae in connection with such purchase.

z.    No Shortening or Extension of Term

The Seller has no right or obligation under the Loan Documents to shorten (except as allowed in the related Note in the event of a Borrower default) or extend the original term of the Participated Loan.  The Participated Loan is not due and payable on demand or on a date certain that is earlier than the stated maturity date (except as allowed in the related Note in the event of a Borrower default).

aa.    Borrower Eligibility



The Borrower is one or more individuals, a limited or general partnership, a corporation, a trust, or a limited liability company (or a co-tenancy of such individual entities), but such Borrower is not a foreign individual or foreign entity (nor a co-tenancy consisting of any foreign individual or



foreign entity). The Seller has reviewed the credit records of the Borrower and Principals of the Borrower (including, without limitation, if the Property is being refinanced, appropriate documentation of the Borrower's mortgage payment history from the existing note holder indicating any recasting of the Mortgage, problems with timely payment, or other problems) and such credit records establish a history of meeting obligations on a timely basis, and nothing set forth in such credit records would cause a prudent lender not to make a loan to such Borrower. The Seller has also reviewed the financial statements of the Borrower and the Principals of the Borrower, Borrower's two most recent federal tax returns, a current rent roll, Borrower's operating history and capital expense history all as reflected in a standard Credit Approval Summary and none of which would cause a prudent lender not to make a loan to such Borrower. The Seller has no knowledge of any proceedings that would, in its opinion, adversely affect the ability of the Borrower to meet its obligations under the Loan Documents. The Loan Documents do not preclude the Servicer from obtaining Property operating statement data from the Borrower.

The Seller has established that the Borrower, and its Key Principals and Principals, have a suitable business organization and the requisite business experience to operate and manage (directly or by contract) a multifamily housing Property throughout the term of the Participated Loan. Additionally, the Seller has checked Fannie Mae's experience with the Borrower and each Key Principal and Principal of the Borrower as required by Part III, Chapter 6, Section 604.03 of the Guide and has received a "Yes" response with respect to the Borrower and each of its Key Principals and Principals.



The Seller has identified at least one Key Principal for each Participated Loan. Such Key Principal is a natural person.

bb.  Not Obsolete

The Property securing the Participated Loan is not materially functionally or economically obsolete (as such terms are described in Part III, Section 207 of the Guide,), as of the Acquisition Date of the related Participation.

cc.  Parcels

Each Property consists of either (i) a single parcel of real property, or (ii) two or more parcels of real property that are contiguous or are separated only by streets which are not major arteries.

dd.  Phased Properties

. If the Property securing the Participated Loan is one section of an existing complex, or a complex being built in several phases, then (i) the Property can succeed independently from the other phases, and (ii) the Seller has complied with, and the Property and such other phases comply with, the respective requirements set forth in Part III, Section 208 of the Guide.



ee.  Public Services; Access; Utilities



The Property related to the Participated Loan (i) is located on a dedicated, all-weather road, or is accessible from such a road by means of access subject to a satisfactory easement, (ii) is equipped (i.e., electrical wiring, plumbing, etc.) to provide the accepted level of utility service for the market area, and (iii) has access to police and fire protection, public transportation, refuse removal, and public education if available to the community as a whole.

ff.    Intentionally Deleted.

gg.    Intentionally Deleted.

hh.    Legal Non-Conforming Uses.

If the Property is a legal nonconforming use under applicable zoning and land use laws and regulations, the Seller has considered (i) the degree of destruction that must occur before local zoning and land use laws and regulations would preclude restoration or rebuilding of the Property to the same size and density as existed on the date the Participated Loan was originated, (ii) the amount of insurance coverage maintained by the applicable borrower, (iii) the type of construction of the applicable improvements and (iv) the Loan-to-Value Ratio of the applicable Participated Loan and has reasonably determined that sufficient insurance proceeds and reserves of the borrower would be available to repay the Participated Loan in full, in the event that an insured casualty resulted in destruction that, under local zoning and land use laws and regulations, would preclude restoration or rebuilding to the same size and density as existed on the date the Participated Loan was originated.



ii.    Walkups

No Property is improved by a building of five stories or more that does not contain elevators.

jj.    No Construction or Rehabilitation

The Property is not in construction or significant rehabilitation.

kk.    Occupancy

If the Property contains five to ten dwelling units, it has no more than one vacancy; any other Property has had an average occupancy level of at least 90 percent over the course of the 12 most recent calendar months.

ll.    Student Housing

If 20 percent or more of the units comprising the Property are leased to students, the Property has had a stable annual occupancy of no less than 90 percent each year for the three-year period immediately preceding the Acquisition Date.

mm.    Military Housing



No more than 40 percent of the units comprising the Property are occupied by persons serving in or employed by the military. The Property is not located in an area where military employment accounts for over 40 percent of the local employment base.

nn.    Cooperatives

If the Property is owned by a cooperative corporation, then

1.    the Participated Loan was underwritten and appraised at origination (and for purposes of the Seller's MCODES submission) as a rental property with units available at market rents (or, with respect to any sponsor-owned, occupied units such rents as are permitted under any applicable rent control or rent stabilization requirements);

2.    if the Loan-to-Value Ratio (based on the value of the Property as a rental property) is 65 percent or less, shares for at least 50 percent of all units in the Property have been sold to owner-occupants (i.e., shareholders who reside in the units they own);

3.    if the Loan-to-Value Ratio (based on the value of the Property as a rental property) is more than 65 percent, but not more than 80 percent, shares for at least 50 percent of all units in the Property have been sold to owner-occupants and the income from the rental of the units which have not been sold is greater than the sum of the maintenance fee and the amount required for upkeep and improvements on those units;

4.    based on the operating statement most recently received by the Seller prior to its MCODES submission, the Seller has analyzed all aggregate negative cash flow on a cooperative basis and determined that the potential maintenance fee (increased to cover such negative cash flow) does not exceed the rent-stabilized rent for the immediate area;

5.    to the best of the Seller's knowledge, such cooperative housing corporation borrower is not involved in any legal disputes or litigation, including, without limitation, litigation involving environmental hazards, insolvency, or bankruptcy proceedings which, if decided adversely to such borrower would have a material adverse effect upon (i) such borrower's business, operations, property or financial condition, (ii) its present or future ability to perform any obligation for which it is liable or (iii) the validity, priority, perfection or enforceability of its Loan or the rights or remedies of the Seller against such borrower; and

6.    it has the fidelity bond insurance required by Part III, of the Guide.

oo.    Section 8 Housing Assistance Payment Contracts

If the Participated Loan is secured by a Property with a HAP Contract, then the origination and underwriting of such Participated Loan complies in all material respects with the requirements of Part III, Chapter 12, of the DUS Guide.

pp.    Composition of Property; Non-Residential Space



The Property is improved by a multifamily residential structure composed of at least five dwelling units, and no more than 40 percent of the net rentable space of the Property is used for non-residential purposes.

qq.    Corporate Leases; Leases to One Entity

As of the Acquisition Date, no more than 10 percent of the total units comprising the Property are leased by corporations, partnerships, trusts, or other entities.  As of the Acquisition Date, no more than 5 percent of the total units comprising the Property are leased to any single corporation, partnership, trust, or individual.

rr.    Original Amount Compliance

The original principal balance of the Participated Loan did not exceed 125 percent (or 240 percent in the case of a Participated Loan secured by a Property in a geographic location designated as a high cost area by the U.S. Department of Housing and Urban Development) of the aggregate dollar amount calculated in accordance with Section 207(c)(3) of the National Housing Act, as amended, with respect to the related Property.

ss.    No Conversion



The Participated Loan does not permit the related Property to be converted from rental apartments to condominiums or to convert rental apartments into non-residential space.

tt.    Site Inspections

Seller has performed or obtained a Site Inspection for each Participated Loan from a qualified inspector and has reviewed such inspector's report.  Seller obtained information regarding the condition of the Property, an identification of the Property's immediate repair needs, its expected repair, replacement, and major maintenance needs over a specified time period.  Seller has documented its material findings and included its findings in the underwriting file.

uu.    Property Conditions, Repairs and Replacements

Each Property was built as a multifamily residential property, has not been converted from its original use and is not any of the following:

A Property with significant rehabilitation requirements;
Seniors housing, as contemplated by the Guide, other than a Property subject to age restrictions, but not offering congregate care or other medical or assisted living services;
A mixed-use property with over 40 percent nonresidential use;
A single room occupancy property;
A Property in a Planned Urban Development (PUD) exhibiting financial weakness; or
A manufactured housing park.

35



The Property securing each Participated Loan has been well maintained in order to protect the health and safety of its tenants, and in such a manner as, in Seller's good faith belief, to attract and retain tenants, and to obtain sufficient refinancing funds at the maturity of the Participated Loan to repay the Participated Loan and to fund any needed renovations.

On the Acquisition Date, Seller was aware of:

        1.    The then-current condition of the Property, including any deferred maintenance;

        2.    Any immediate repairs needed which have been reflected in a Completion/Repair Agreement; and

        3.    Replacements, or major maintenance items expected during the term of the Mortgage).

Seller has evaluated the physical condition of each Property to determine whether the Borrower will need to deposit funds with the Seller pursuant to a Completion/Repair Agreement. If Seller determined a Completion/Repair agreement was necessary, then funds in an amount not less than 150% of the estimated cost to complete the repairs was deposited with Seller at the time of the closing of the Participated Loan; provided, however, that such Completion/Repair Agreement need not include minor, inexpensive repairs or maintenance items that are covered by the Borrower's current Property maintenance program and budget, or routine replacements that may be necessary during the first two years of the Mortgage term.



All Replacement Reserve Agreements entered into with the Borrower were assigned to the Seller and are still in effect and pursuant to which the Borrower has funded a replacement reserve account for the payment of certain major maintenance items.

II.    The Seller

a.    <u>Organization and Good Standing</u>

The Seller is an entity duly organized, validly existing, and in good standing under the laws of its state of incorporation or formation or the laws of the United States. The Seller is in compliance with the laws of each state in which any Property is located to the extent necessary to ensure the enforceability of each Loan and to perform its obligations under this Agreement.

b.    <u>No Violation</u>

Neither the execution and delivery by the Seller of this Agreement, nor the consummation by the Seller of the transactions contemplated in this Agreement, nor the performance of and compliance by the Seller with the provisions of this Agreement, will conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or



the lapse of time, or both, would constitute a default) under, the organizational documents (its articles of incorporation or charter or by-laws) of the Seller, or any of the provisions of any law, rule, regulation, judgment, decree, demand, or order (of any federal, state, or local governmental or regulatory authority or court) binding on the Seller or its properties, or any of the provisions of any indenture, Loan, contract, instrument, or other document to which the Seller is a party or by which it is bound, or result in the creation or imposition of any lien, charge, or encumbrance upon any of its property pursuant to the terms of any such indenture, Loan, contract, instrument, or other document. The Seller is not otherwise in violation of any law, rule, regulation, judgment, decree, demand, or order (of any federal, state, or local governmental or regulatory authority or court), which violation, in the Seller's good faith and reasonable judgment, is likely to affect materially and adversely either the ability of the Seller to perform its obligations under this Agreement or the financial condition of the Seller.

c.    Authorization and Enforceability

The execution and delivery by the Seller of this Agreement, the consummation of the transactions contemplated by this Agreement, and the performance and compliance by the Seller with the terms of this Agreement are within the power of the Seller and have been duly authorized by all necessary action on the part of the Seller. All organizational resolutions and consents necessary for the Seller to enter into and consummate all transactions contemplated by this Agreement have been obtained. This Agreement has been duly executed and delivered by the Seller and constitute a legal, valid, and binding obligation of the Seller enforceable against the Seller in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally, and (ii) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law. The Seller has not failed to obtain any consent, approval, authorization, or order of, and has not failed to cause any registration or qualification with, any court or regulatory authority or other governmental body having jurisdiction over the Seller, which consent, approval, authorization, order, registration, or qualification is required for, and the absence of which would materially and adversely affect, the legal and valid execution, delivery, and performance of this Agreement by the Seller.

d.    Approvals and Permits

The Seller possesses such certificates, authorizations, licenses, and permits issued by the appropriate state, federal, and foreign regulatory agencies or bodies necessary to conduct the business now operated by it, and the Seller has not received any notice of proceedings relating to the revocation or modification of any such certificate, authorization, or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling, or finding, would materially and adversely affect the conduct of the business, operations, financial condition, or income of the Seller and its affiliates considered as one enterprise.

e.    No Litigation or Adverse Conditions



No litigation is pending or, to the best of the Seller's knowledge, threatened against the Seller which, if determined adversely to the Seller, would prohibit the Seller from entering into



this Agreement or, in the Seller's good faith and reasonable judgment, is likely to materially and adversely affect either the ability of the Seller to perform its obligations under this Agreement or the financial condition of the Seller. The Seller has no knowledge of any recent adverse financial condition or event with respect to itself that, in the Seller's/Servicer's good faith and reasonable judgment, is likely to materially and adversely affect its ability to perform its obligations under this Agreement.

f.    Employment Practices

The employment practices, policies, and programs of the Seller comply with the requirements of Executive Order 11246, to the extent applicable to the Seller, as it relates to equal employment opportunity and non-discrimination practices.



## EXHIBIT D

## INAPPLICABLE PROVISIONS OF THE NEGOTIATED TRANSACTIONS GUIDE

The following provisions of the Negotiated Transactions Guide are inapplicable:

1. Part I in its entirety
2. Part III in its entirety
3. Part V in its entirety except for Chapter 1, Sections 101, 102.03 and 102.04
4. Part IX, Chapters 1, 2, 4 through 6, inclusive, 9, 10, and 14, in their entirety
5. Part IX, Chapter 3, Sections 302 through 304 and Section 306
6. Part IX, Chapter 12, Sections 1201, 1203 and 1208
7. That portion of the NT Guide Lender Memo 2002-01 dated May 6, 2002, which contradicts the provisions of Section 3(c) of this Agreement. All other requirements of Lender Memo 2002-01 remain applicable.

## INAPPLICABLE PROVISIONS OF PART III OF THE DUS GUIDE

1. Inasmuch as the Seller is not the originator of the Participated Loans, certain underwriting functions, including those described in Section 301.04 of Part III of the DUS Guide, to be performed by the Seller will be performed by Seller's correspondents. Notwithstanding such fact, the Seller retains responsibility for the quality and performance of such functions as if it were the originator.

2. Inasmuch as Fannie Mae is purchasing a participation interest only in each Participated Loan, provisions of Part III of the DUS Guide relating to assignment of loan documents, title policies, surveys, and like documentation, do not apply and the Seller will remain the record owner of the Participated Loan. Fannie Mae's interest in each Participated Loan will be evidenced by the Participation Certificate.

3. References in Part III of the DUS Guide to Tier pricing are inapplicable.

4. Use of a narrative appraisal form is acceptable in lieu of Fannie Mae Appraisal Form 1050 so long as all appraisal requirements referenced in Part III, Chapter 5, of the DUS Guide are met.

5. The following Fannie Mae published forms will not be utilized by the Seller and Seller's forms, which contain substantially equivalent information, will be used:

   - Certification to Project Rent Roll (Fannie Mae Form 4243/Exhibit III-3)
   - Certified Multifamily Ownership and Loan History Statement (Exhibit III-13)
   - DUS Property and Liability insurance Warranty (Exhibit III-10)
   - Description of Insurance Policies (Exhibit III-11)
   - Multifamily Physical Inspection and Evaluation Report (Form 4255/Exhibit VI)



It is acknowledged by Fannie Mae that Seller's form Loan Purchase Summary and Cash Flow Analysis satisfy the requirements of the DUS Underwriting Narrative and Standard Underwriting Analysis Spreadsheet.



## EXHIBIT E

## CASH PARTICIPATION REQUEST FOR A/B PRICING

| Submitted By: | |
|---|---|
| Submission Date: | |
| Date Needed By: | |

| Project Name: | |
|---|---|
| Project Location (Street, City, State, Zip): | |
| Borrower (Principals and type): | |
| Project Type / Units: | |
| Loan Amount: | |
| Loan Per Unit: | |
| Projected Property Value: | |
| Projected Property LTV: | |
| DSC: | |
| Loan Term: | |
| Amortization: | |
| Lockout Term: | |
| Prepayment Penalty Terms : | |
| Occupancy: | |
| All-in spread needed: | |
| Origination fee: | |
| Competition & Bids (if known): | |
| "B" Piece Amount: | |
| Servicing Fee: | |
| Comments / Special Provisions: | |

41



## EXHIBIT F

## CASH PARTICIPATION RATE LOCK TERM SHEET

**Seller Number:**

**Project Name:**

**Project Location:**

**Original Loan Amount:**

**Original Funding Date:**

**Fannie Mae Participation Amount:**     ___%

**Participation Amount:**     ___%

**Current Loan Balance:**     $_____ as of _____

**Trade Amount:**     $_____

**Price:**     $_____

**Required Net Yield to Fannie Mae:**

**Servicing Fee:**

**Note Rate:**

**Interest Rate Basis**

**Loan Term:**

**Loan Amortization Term:**

**Yield Maintenance Period:**

**Yield Maintenance Expiration Date:**

**Maturity Date:**

**LTV:**

**Debt Service Coverage:**

**Number of Units:**

**Servicing Fee:**

**Trade Date:**

**Funding Date:**

# EXHIBIT J

## Senior Participation Certificate

Date:                        November 24, 2009

Certificate No.:             25

Seller's Loan No.:           469.001

C&D Commitment No.           860823

This Participation Certificate evidences the sale by The Community Development Trust, LP, a Delaware limited partnership, with its principal office at 1350 Broadway, Suite 700, New York, NY 10018 ("Seller"), to Fannie Mae, a corporation organized and existing under the laws of the United States ("Fannie Mae") of a Senior Participation in an Eligible Loan held by Seller as hereinafter described, pursuant to the provisions of the Master Participation Agreement by and between Seller and Fannie Mae dated as of March 13, 2003, as amended by that certain First Amendment to Master Participation Agreement dated December 19, 2003, Second Amendment to Master Participation Agreement dated March 9, 2004, Third Amendment to Master Participation Agreement dated July 29, 2005, Fourth Amendment to Master Participation Agreement dated January 31, 2007, Fifth Amendment to Master Participation Agreement dated January 31, 2008, Sixth Amendment to Master Participation Agreement dated July 31, 2008, Seventh Amendment to Master Participation Agreement dated October 31, 2008, Eighth Amendment to Master Participation dated April 1, 2009 and Ninth Amendment to Master Participation Agreement dated August 1, 2009 (collectively, the "**Master Participation Agreement**") (terms defined therein being herein used with the same meanings):

1. Loan Terms

| Borrower's Name | Eastside Lofts Apartments Phase II Limited Partnership |
|---|---|
| Deal Name | Eastside Lofts Phase II Apartments |
| Borrower's SSN/TIN | 20-2827817 |
| Principal Amount | $809,000.00 |
| Interest Payment Date(s) | First Day of the Month |
| Maturity Date | December 1, 2027 |
| Interest Rate | 7.00% |

2. Participation Terms

| Participation Amount | $728,100.00 |
|---|---|
| Anticipated Acquisition Date | December 1, 2009; Commitment Expires December 1, 2009 |
| Participation Percentage | 90% |

1

The Loan is evidenced by a Promissory Note dated November 24 2009, made by the Borrower payable to the order of NEF Mortgage Corporation. ("Lender"), and endorsed to the Seller and is secured by Multifamily Mortgage, Assignment of Rents and Security Agreement executed by the Borrower to Lender as of November 24 2009 which mortgage was assigned to Seller on November 24, 2009.

As per Fannie Mae's Instructions, the Purchase Price will be paid on the Acquisition Date by wire transfer of immediately available funds in accordance with the Master Participation Agreement. This Participation Certificate is not effective until receipt by Seller of payment in full of the Purchase Price.

True and correct copies of each of the items listed on Schedule 1 to this Exhibit B have been delivered to Fannie Mae, and none of these items have been amended, modified, revised or rescinded.

**THE COMMUNITY DEVELOPMENT TRUST, LP,** a
Delaware limited partnership

By:  The Community Development Trust, Inc., its general
partner

By: _____
Name:  Brian Gallagher
Title:    Senior Vice President-Debt

2

**SCHEDULE 1**

**EASTSIDE LOFTS PHASE II**

01.     Commitment Confirmation

02.     Multifamily Note and Endorsement of Multifamily Note, with all allonges, schedules, exhibits and/or modifications attached

03.     Multifamily Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, with all schedules, exhibits, and/or modifications attached

04.     UCC-1 Financing Statements (for Secretary of State and for Pulaski County) with all schedules, exhibits

05.     Replacement Reserve and Security Agreement with all schedules, exhibits, and/or modifications attached, if applicable

06.     Certificate of Borrower

07.     Opinion of Borrower's Counsel

08.     Assignment of Management Agreement with all schedules and/or exhibits attached (including copy of the Management Agreement with Addendum and Second Addendum attached).

09.     Title Insurance Policy with all endorsements

10.     Opinion from Illinois counsel

11.     Operating Reserve and Security Agreement with all schedules, exhibits, and/or modifications attached, if applicable

12.     Assignment of Loan and Deed of Trust from the originator of the Eligible Loan to the Seller

13.     Assignment of Collateral Agreements from the originator of the Eligible Loan to the Seller

14.     Subordination Agreement (Arvest Loan)

15.     Subordination Agreement (ADHF)

16.     Subordination Agreement (Arkansas Finance Development Finance Authority

17.     Subordination Agreement (The ARC Arkansas)

18.     Opinion of Borrower's Counsel regarding choice of law

## SCHEDULE 2 TO CERTIFICATE
### Exceptions to representations and warranties provided in Exhibit C to the Master Participation Agreement

**Representations
Reference
Number**

aa.   Borrower Eligibility

    The Key Principal is a not-for-profit organization.

kk.   Occupancy

    As this is a conversion of an unfunded forward, the property stabilized at 90% or higher for 90 days.

# EXHIBIT K



MIDLAND
LOAN
SERVICES

5/12/2023

Eastside Lofts Apartments Phase II
1400 Cumberland
Little Rock, AR 72202

RE: Eastside Lofts Apartments Phase II
MLS #030263992

Dear Borrower,

We are writing to advise you that the loan on the above property is now in default.  The loan is due for the 4/1/2023 debt service payment, including the monthly tax, insurance and replacement reserve constants.  Payments are due on the first day of each month.  A late fee is assessed if payments are received after the 9th day of each month.

In accordance with the terms outlined in the Multifamily Note dated 11/24/2009, whenever a monthly installment remains due for 30 days or more, interest under the note shall accrue on the unpaid principal balance from the due date of the first unpaid monthly installment at a rate of 4% + the note rate which equals  per annum.  The default interest amount due is $2,120.17 with a per diem accrual of $70.6722.  In addition, a monthly late fee of $807.36 has been incurred for April.

The following amounts are due for remittance:

- $11,133.86 – April monthly installment
- $2,120.17 - Default interest (Plus any additional per diem amount)
- $807.36– Late fee(s)
- **$70.6722 – Plus any additional per diem amount**

Please send the funds to the following address:

| Payment Addresses & Instructions | | |
|---|---|---|
| **Payment Mailing Address** | **Payment Overnight Address** | **Payment Wiring Instructions** |
| Midland Loan Services, a PNC Real Estate Business PNC Bank Lockbox Lockbox Number 771223 1223 Solutions Center Chicago, IL 60677-1002 | Midland Loan Services, a PNC Real Estate Business PNC Bank Lockbox Attn: LBX 771223 350 East Devon Avenue Itasca, IL 60143 | PNC Bank NA ABA#: 043000096 Midland Loan Services Credit #: 1006967647 Ref Loan#: 030263992 |

If you have any questions please contact me at (913) 253-9651.

Sincerely,
Midland Loan Services, a PNC Real Estate business
Vickie Stone
Loan Support Analyst Senior
Agency Servicing Department

# EXHIBIT L

# BAKER DONELSON
## BEARMAN, CALDWELL & BERKOWITZ, PC

2000 FIRST HORIZON BUILDING
165 MADISON AVENUE
MEMPHIS, TENNESSEE 38103

PHONE:    901.526.2000
FAX:          901.577.2303

www.bakerdonelson.com

ROBERT F. TOM, SHAREHOLDER
**Direct Dial:** 901.577.2159
**Direct Fax:** 901.577.0818
**E-Mail Address:** rtom@bakerdonelson.com

July 5, 2023

**VIA OVERNIGHT COURIER**

Eastside Loft Apartments Phase II, Limited Partnership
Attention: Cynthia R. Stone
2004 Main Street
Little Rock, Arkansas 72206

The ARK Arkansas
2004 Main Street
Little Rock, Arkansas 72206

Re:    Multifamily Note ("*Note*") dated November 24, 2009, executed by Eastside Loft
Apartments Phase II, Limited Partnership ("*Borrower*") and The ARK Arkansas
("*Key Principal*") to the order of NEF Mortgage Corporation ("*Original Lender*")
in the face amount of $809,000.00 ("*Loan*") secured by, *inter alia*, the liens on
certain real property and personal property located at 1400 Cumberland Street,
Little Rock, Arkansas 72202 ("*Property*") pursuant to that certain Multifamily
Mortgage, Assignment of Rents and Security Agreement ("*Security Instrument*")
dated as of November 24, 2009 and recorded in the Official Records of the Circuit
Court of Pulaski County, Arkansas ("*Recording Office*") on November 25, 2009
as Instrument Number 2009079200, which Note, Security Instrument, and loan
documents were assigned to The Community Development Trust LP ("*CDT*")
pursuant to the certain Assignment of Collateral Agreements and other Loan
Documents ("*Note Assignment*"), dated November 24, 2009, and that certain
Assignment of Loan and Mortgage ("*Mortgage Assignment*") dated November 24,
2009 and recorded on November 25, 2009 as Instrument Number 2009079201 in
the Recording Office, and ninety percent (90%) of the Loan was sold to Fannie Mae
pursuant to that certain Master Participation Agreement, as amended.

Dear Borrower and Key Principal:

Eastside Loft Apartments Phase II, Limited Partnership
July 5, 2023
Page 2

This firm represents Fannie Mae with respect to the Note, Security Instrument, Note Assignment, Mortgage Assignment, and all other loan documents executed in connection with the Loan (collectively, the "***Loan Documents***"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Documents.

By its terms, the Loan on the above Property is now in default. The Loan is due for the April to July 2023 debt service payments, including the monthly tax, insurance and replacement reserve constants. Pursuant to Section 22 of the Security Instrument, Borrower and Key Principal's failure to timely pay debt service constitutes an Event of Default. Accordingly, pursuant to Section 6 of the Note, all amounts due under the Loan have been accelerated and are fully due and payable to Fannie Mae.

While notice of the Event of Default is not required under the Loan Documents, this letter constitutes formal notice that the entire outstanding indebtedness evidenced by the Note has been accelerated and is fully due and owing under the Note and the governing Loan Documents. Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus any accrued interest, default interest, Fannie Mae's expenses, costs and fees, including attorney's fees, and any other sums paid by Fannie Mae to protect its rights or the subject Property, as provided by the Loan Documents. In order to determine the exact payoff figures currently owing to Fannie Mae pursuant to the Loan Documents, please contact me by email or telephone.

You are further notified that, by reason of the Event of Default, Fannie Mae may immediately institute foreclosure proceedings under the Security Instrument and may otherwise exercise any and all other rights and remedies enumerated in the Loan Documents or otherwise available at law or in equity including, without limitation, the appointment of a receiver over the Property and application of escrow deposits, reserves and/or other funds held by Servicer toward payment of Borrower's obligations under the Loan Documents.

Please be advised that the demand made hereby is being given pursuant to the terms and provisions of the Loan Documents. By making this demand, Fannie Mae does not waive any of the rights or remedies available to Fannie Mae and no delay in exercising any such rights or remedies shall operate as a waiver of any of the rights that Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise. Furthermore, any reference by Fannie Mae or Servicer to any event of default or default shall in no way constitute, or be construed to be, a waiver of any other event of default or default which may now exist or hereafter arise under the Loan Documents.

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED OR RECEIVES AFTER THE MATURITY DATE SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN

Eastside Loft Apartments Phase II, Limited Partnership
July 5, 2023
Page 3

CONNECTION WITH THE OPERATION OF THE PROPERTY WITH THE EXCESS RENTS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

Also, please be advised that under Section 9 of the Note, Borrower is liable to Fannie Mae for, among other things, any loss or damage suffered by Fannie Mae as a result of, among other things: (a) failure to handle rents according to the terms of the Loan Documents and this notice following the Borrower's defaults; (b) failure to apply all insurance proceeds required by the Loan Documents; and/or (c) waste or abandonment of the subject Property. Likewise, the Key Principal is liable to Fannie Mae consistent with the provisions in the Loan Documents.

Please be further advised that any discussions that may have occurred or may occur in the future between representatives of the Borrower and Fannie Mae regarding the Property or the Mortgage Loan constitute nothing more than the continuing good faith attempts of Fannie Mae to work out the existing problems in a manner reasonably acceptable to all parties. The Borrower may not rely upon any such discussions in any manner or fashion. Unless and until a binding, written agreement has been fully executed by and between all parties, Fannie Mae's rights and remedies are and will continue to be fully enforceable under the terms of the Loan Documents.

For your information, this letter is also being sent to The Ark Arkansas in its capacity as Key Principal. In the event that Fannie Mae's demands identified above are not satisfied, Fannie Mae, at is sole option and in addition to any other remedies available to Fannie Mae, may seek to recover from Key Principal with respect to any obligations owed by Key Principal under the Loan Documents.

Notwithstanding any previous action or inaction by or on behalf of Fannie Mae or Servicer to the contrary, if any, you are hereby notified that Fannie Mae will hereafter require strict compliance with the terms and conditions of the Note and other Loan Documents, and Fannie Mae does not in any manner waive any rights or remedies available against Borrower or Key Principal pursuant to the Note or other Loan Documents or applicable law, including without limitation the rights described in this letter.

Your immediate attention to this matter is recommended.

Sincerely,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

Robert F. Tom, Shareholder

EXHIBIT M



**MIDLAND
LOAN
SERVICES**

| | |
|---|---|
| Issue Date: | 08/09/2023 |

**Expiration Date:**  08/09/2023
Loan #:  030263992

Borrower's Name:  Eastside Lofts II

Property Address:  1400 Cumberland

Requested by:  Vickie Stone
Phone/Email:  MLS Agency

The loan payoff is as follows:

This quote is based on interest paid to 03/01/2023, and includes interest through 08/31/2023.
**Please see quote attachment for additional information.**

| | |
|---|---|
| Principal | $636,049.95 |
| Interest | $22,261.74 |
| Default Interest Receivable | $9,046.06 |
| Late Charge Receivable | $1,345.60 |
| Prepayment Premium | $12,868.56 |
| Reconveyance/Payoff Fee | $1,500.00 |
| Special Reserve Administration Fee | $333.33 |
| Total Amount Due | $683,405.24 |

All funds must be received by 2:00 PM CT to receive same day credit.
You are still responsible for keeping your account current during the payoff quotes process.
If applicable, escrow will be refunded under a separate cover.
Satisfactions and Note will be returned in the ordinary course of business.

Every effort has been made to ensure the informational accuracy of this Payoff Quote and, if applicable, all accompanying attachment(s).
Please review the loan number, name of mortgagor, property address, principal balance and confirm this information agrees with your
record of the loan.  Notification is hereby given that, in the event of error or omission, the lender does not, in any way, prejudice its right
and entitlement to all monies lawfully due it under the terms of the Mortgage, Note or related documents including any prepayment
premiums or related charges or costs thereunder.  Mortgagor will have to review the loan documents to determine the existence of such
provisions including, but not limited to prohibitions on prepayments.  Accordingly, this quote does not alter or amend in any way such
provisions or prohibitions in the loan documents.

Remittance Instructions

| Payment Mailing Address | Payment Overnight Address | Payment Wiring Instructions |
|---|---|---|
| Midland Loan Services, a PNC Real Estate Business | Midland Loan Services, a PNC Real Estate Business | |
| PNC Bank Lockbox | PNC Bank Lockbox | PNC Bank NA |
| Lockbox Number 771223 | Attn: LBX 771223 | ABA#: 043000096 |
| 1223 Solutions Center | 350 East Devon Avenue | Midland Loan Services |
| Chicago, IL 60677-1002 | Itasca, IL 60143 | Credit #: 1006967647 |
| | | Ref Loan#: 030263992 |

This payoff quote is intended for the use solely by the party to whom it is addressed.  All figures are subject to change based on further
verification and confirmation by MIDLAND LOAN SERVICES.

**A division of PNC Bank, NA**
10851 Mastin Boulevard  Overland Park Kansas  66210
www.pnc.com/midland    1 800 327 8083  T    1 888 706 3565  F  .

 **PNC**
REAL ESTATE

**Quote Attachment**       **08/09/2023**
**MLS # 030263992**        **Eastside Lofts II**

**Prepayment Conditions**

Borrower must provide not less than twenty (20) but not more than sixty (60) days prior written notice of intent to prepay.

Prepayment must occur on the last day of the month.

During a period of Default, Interest is assessed at a rate of four percent (4.00%) above the Note Rate. Default Interest has been assessed from 04/01/2023 to 08/09/2023.

| | |
|---|---|
| Interest per diem: | $  123.6764 |
| Default Interest per diem: | $   70.6722 |
| Total per diem: | $  194.3486 |

The Prepayment Premium is equal to the greater of one percent (1%) of the principal balance prepaid or the Yield Maintenance Premium as defined in the Multifamily Note.

**Notification Received**

Per the above prepayment conditions, interest is due through 08/31/2023.

Payoff funds remitted on 08/09/2023 must include interest through 08/31/2023.

**Quote Restrictions**

The Prepayment Premium calculation is based on the U.S. Government Securties/Treasury Constant Maturities as reported in the Federal Reserve Statistical Release H.15 on the twenty-fifth (25th) Business Day prior to the scheduled prepayment date.  **Accordingly, the amount of the prepayment premium can fluctuate daily.**

# EXHIBIT N



# Property Condition Assessment

### Eastside Lofts Apartments Phase II
### 1400 Cumberland Street
### Little Rock, AR 72202

## Prepared For:
**Fannie Mae**
5600 Granite Parkway
Plano, TX 75024

## As Of:
July 05, 2023

## Job Reference No:
23.0373

104 S Main St, Suite 500, Greenville, SC 29601
www.armadaanalytics.com
(636) 462-4132

# Table of Contents

**Section 1 EXECUTIVE SUMMARY**.................................................................1

  1.1 Property Description.......................................................................3

  1.2 Property Useful Life Table................................................................5

  1.3 Cost Estimates...........................................................................6

  1.4 Known Problematic Building Materials.....................................................7

  1.5 Project Team.............................................................................8

**Section 2 LIFE SAFETY, CRITCAL, DEFERRED MAINTENANCE AND REPLACEMENT RESERVES**......................................................................................9

  2.1 Immediate Repair / Life Safety Issues.....................................................9

  2.2 Immediate Repair / Critical Repair Items..................................................9

  2.3 Immediate Repair / Deferred Maintenance Items..........................................10

  2.4 Immediate Repairs and Replacement of Capital Items Schedule...........................11

**Section 3 PROPERTY CHARACTERISTICS**...........................................................16

  3.1 Site Components.........................................................................16

  3.2 Architectural Components................................................................18

  3.3 Mechanical / Electrical / Plumbing Components...........................................23

  3.4 Dwelling Unit Components and Observations..............................................28

**Section 4 MOISTURE AND MICROBIAL GROWTH AND PEST MANAGEMENT**.........................33

  4.1 Moisture and Microbial Growth..........................................................33

  4.2 Pest Management........................................................................34

**Section 5 SPECIAL HAZARDS, ZONING, BUILDING CODE VIOLATIONS AND REGULATORY COMPLIANCE**..................................................................................35

  5.1 Special Hazard Assessment...............................................................35

  5.2 Zoning and Code Information.............................................................36

  5.3 Regulatory Compliance..................................................................37

**Section 6 AREAS OF ADDITIONAL ASSESSMENT**....................................................41

  6.1 Problematic Materials, Historical Repairs and Replacements, Work in Progress, and Planned Capital Improvements.......................................................................41

**Section 7 REFERENCES AND LIMITATIONS**........................................................42

  7.1 Fannie Guide............................................................................42

  7.2 Methodology............................................................................42

  7.3 Limitations...............................................................................43

**EXHIBITS**

Exhibit A: Photo Documentation                                                          45

Exhibit B: Location Map, Aerial Photo and Site Plan                                      56

Exhibit D: Pre-Site Visit Questionnaire                                                  59

Exhibit E: Record of all Documents Reviewed, Interviews, and Supporting Information      68

Exhibit F: Property Evaluator Qualifications                                             80

# Section I EXECUTIVE SUMMARY

The following Property Condition Assessment (PCA) summarizes the conclusions representing the best professional judgment of Armada Analytics, Inc. The assessment is based upon information and data available to us during the course of this assignment and of the day(s) of the site survey. Factual information regarding operations, conditions, and test data provided by the Property owner, and/or their representative(s) has been assumed to be correct and complete. Additionally, the conclusions presented herein are based solely upon the conditions that existed at the time of the assessment. Note that on-site observation of the Property consisted of readily visible, accessible areas only. There may be physical deficiencies that were not easily accessible for discovery, readily visible, or which could have been inadvertently overlooked.

This report is the property of Armada Analytics, Inc. and Fannie Mae Corporation and was prepared for a specific use purpose and reliance as defined within the agreement between Armada Analytics, Inc. and Fannie Mae Corporation and this report. This report may not be used or relied upon by any other party without the express written permission of Armada Analytics, Inc. There shall be no third party beneficiaries, intended or implied, unless specifically identified herein.

The opinions Armada Analytics, Inc. express in this report were formed utilizing the level of skill and care ordinarily exercised by members of the profession and in accordance with generally accepted practices of other consultants currently practicing in the same locality under similar conditions. No other representation, expressed or implied, and no warranty or guarantee is included or intended. Armada Analytics, Inc. assumes no responsibility or liability for the accuracy of information contained in this report which has been obtained from the Client or the Client's representatives, from other interested parties, or from the public domain. The conclusions presented represent Armada Analytics, Inc.'s professional judgment based on information obtained during the course of this assignment. Armada Analytics, Inc.'s evaluations, analyses and opinions are not representations regarding either the design integrity, structural soundness, or actual value of the property. Factual information regarding operations, conditions and test data provided by the Client or their representative have been assumed to be correct and complete. The conclusions presented are based on the data provided, observations made, and conditions that existed specifically on the date of the assessment.

This assessment is based on the evaluator's opinion of the physical condition of the improvements and the estimated expected remaining useful life of those improvements, based on his observations in the field at the time of the survey, and the written or verbal information received. The conclusions presented are based on the evaluator's professional judgment.

The actual performance of individual components or systems may vary from a reasonably expected standard and may be affected by circumstances that are not readily ascertainable or viewable, or that occur after the date of the survey.

This report is prepared solely for the use and benefit of Fannie Mae Corporation in accordance with Fannie Mae Selling and Servicing Guide and Form 4099, Instructions for Performing a Multifamily Property Condition Assessment. Armada Analytics, Inc. also utilizes the standards set forth by ASTM E2018-15, Standard Guide for Property Condition Assessments: Baseline Property Condition Assessment Process. This report is understood to be used as part of a financing transaction. It is not intended to provide advice or guidance with regard to the purchase of the real estate referenced herein. The on-site Field Observer and the Report Reviewer meet the requirements of Form 4099.

| PCA Consultant (Firm) | Armada Analytics, Inc. |
|---|---|
| PCA Consultant Street Address | 15 Ellis Avenue |
| PCA Consultant (City, State and Zip Code) | Troy, MO 63379 |
| PCA Consultant Signatory | Erin Kleppe |

| Property Assessment Date (Mo/Day/Year) | July 5, 2023 |
|---|---|
| Date Report Signed (Mo/Day/Year) | July 17, 2023 |

| Property Name | Eastside Lofts Apartments Phase II |
|---|---|
| Street Address | 1400 Cumberland Street |
| City | Little Rock |
| State | Arkansas |
| Zip | 72202 |
| MSA | Little Rock - North Little Rock - Conway, AR |

| Lender Prepared for | Fannie Mae |
|---|---|
| Engaged by Lender? | Yes |
| Individual at Lender Who Engaged PCA | James Noakes |
| Requested Turn Time | 3 Weeks |

| Modules Completed: | Yes / No |
|---|---|
| Student Housing Module Completed? | No |
| Seniors Housing Module Completed? | No |
| Manufactured Housing Module Completed? | No |
| Cooperative Property Module Completed? | No |
| Modular Housing / Modular Construction Model Completed? | No |
| Commercial/Retail Use Module Completed? | No |
| Solar PV System Module Completed? | No |
| Integrated Pest Management Plan Module Completed? | No |
| HPB Module or Report Completed? | No |
| Technical Solar Assessment Module Completed? | No |

| OVERALL PROPERTY RATING | 4 |
|---|---|

| Quick Facts Table | |
|---|---|
| Property Name | Eastside Lofts Apartments Phase II |
| Street Address | 1400 Cumberland Street |
| City | Little Rock |
| State | Arkansas |
| Zip | 77202 |
| MSA | Little Rock - North Little Rock - Cumberland, AR |
| Site acreage | 0.82 |
| No. of Parcels | 1 |
| Assessor | Pulaski County |
| Adjoining Parcel | No |
| Scattered Parcel | No |
| Total # of apartment buildings | 1 |
| Total # of other buildings | 0 |
| Building Type | Mid Rise |
| Building Type Description | Reinforced Concrete Frame |
| No. of Stories (if multiple provide each) | 4 |
| Use of Ground Floor | Other |
| Use of Ground Floor Description | Residential, Elevator Lobby, and Leasing Office |
| Total # of Dwelling Units | 34 |
| Total # of Beds | NA |
| Occupancy on Inspection date | 76% |
| Down Units on Date of Inspection | 4 |
| Total Parking Spaces | 35 |
| Total Handicapped Accessible Parking Spaces | 2 |
| Parking Ratio | 1.029 |
| Total Net Rentable SF | 22,166 |
| Total Gross SF | 38,087 |
| Year(s) Built / Date of construction | 1912 |
| Year(s) of Substantial Rehab / Renovation | 2007 |

## 1.1 Property Description

The Property is located at the southwest corner of E. Daisy L. Gatson Bates Drive and Cumberland Street in Little Rock, Pulaski County, AR. Adjacent properties include single-family residential to the north; Scott Street followed by a multi-family building to the west; Lofts at SoMa followed by East 15th Street to the south with a rehabilitation center beyond; and single-family houses to the east.

The Property consists of one four-story residential building (including the basement) containing 34 one- and two-bedroom apartment units. The site is located on a main thoroughfare with good street visibility, and the main entrance from Cumberland Street is easily identified. The site is relatively flat with a slight gradient toward the southeast, and is moderately landscaped with trees and lawn areas. The building was constructed as Little Rock High School (later East Side Junior High) in 1912 and renovated in 2007 for multi-family use, according to Pulaski County Assessor's Office records. Construction is reinforced concrete and CMU framing with a concrete basement foundation, a hipped 3-tab composition asphalt shingled roof, and brick veneer and pre-cast concrete exteriors.

Our survey of the Property was conducted by Jeff Roden on July 5, 2023. The weather at the time of our survey was sunny and 80 degrees. At the Property, we met with Area Operations Manager Ethen Schultz, who escorted us through occupied and vacant dwelling units and common areas. Mr. Schultz has been with the Property for 1 and 1/2 years and had a thorough knowledge of the history of the physical asset.

### 1.1.1 Overall Condition Assessment

The building was constructed as Little Rock High School (later East Side Junior High) 1912 and renovated for multifamily use in 2007, according to Pulaski County Assessor's Office records. The unit interiors are in overall average condition; however, four units are down. Three units (102, 103, and 104) have extensive mold contamination due to a sewer leak in May of this year. A fourth down unit is being utilized for appliance and maintenance equipment storage. One of the units (205) is being utilized as the leasing office. The remaining vacant units were either made ready for occupancy or could be made ready within one week.

The asphalt pavement is damaged and seal coat is worn. The building exterior brick veneer is stained and damaged in large areas, and the mortar joints are deteriorating. The exterior concrete areas are stained throughout, and the painted wood roof soffits are damaged. The roof is hipped and covered with 3-tab shingles that appear to have reached the end of their useful life. The sanitary sewer system in the building is augmented with a sewer lift station. The lift station pumps failed in May of this year, resulting in flooding of three currently down basement level apartments. Only one of the pumps was replaced leaving the system without a back-up system. In addition, the fire extinguishers in the common areas have expired inspection tags.

Overall the Property is in inferior condition, and is substandard when compared to properties of similar age and construction type. It is our opinion that the estimated useful life of the Property, in its current use, is at least an additional 30 years, if repairs described in the report are made, the physical improvements receive continuing maintenance and if the various components and/or systems are replaced or repaired on a timely basis as needed.

## 1.2 Property Useful Life Table

| Overall Property Rating | 4 |
|---|---|

## 1.3 Cost Estimates

The summary of the opinion of probable costs for life safety, critical and deferred items, as well as a 12-year capital expenditure estimate is as follows:

| | Cost | Reference |
|---|---|---|
| Immediate Repairs: Life Safety Items - (May impact health or safety) | $1,600.00 | See Table 2.1 |
| Immediate Repairs: Critical Items - (Recommended Completion within 6 months) | $77,650.00 | See Table 2.1 |
| Immediate Repairs: Deferred Maintenance - (Recommended Completion within 12 months) | $146,400.00 | See Table 2.1 |
| **Total of Immediate Repairs** | **$225,650.00** | **See Table 2.1** |
| Replacement of Capital Items - (Uninflated per unit / per annum) | $258.31 | See Table 2.2 |
| Replacement of Capital Items - (Inflated per unit / per annum) | $310.57 | See Table 2.2 |
| Inflation Rate: | 3.00% | |

The cost estimates for the repair or replacement of all systems or components are based on parts and equipment that meet the most stringent of either minimum specifications mandated by applicable federal, state and local building codes and regulations for renovations, or the minimum guidelines established by the Environmental Protection Agency (EPA). No contingency factors are included in our cost estimates, since it is assumed that contingency amounts will be added by the Property owner and/or lender. The reserve replacements in Section 2.5 include the approximate total costs to complete the anticipated repairs and replacements over the loan term; It is the opinion of Armada Analytics, Inc. that a general contractor will not be required to complete the repairs outlined in our replacement reserve schedule.

A more detailed breakdown of the estimated costs is provided in the Cost Estimate Schedule located in Section 2:

- Section 2.4 Cost Estimate Schedules - Immediate Repairs and Replacement of Capital Items
- Section 2.5 Replacement of Capital Items Schedule

## 1.4 Known Problematic Building Materials

| Item | Identified (Yes/No) | Action Recommended (Yes/No) | Section Reference |
|---|---|---|---|
| KPBM Action Recommended | Yes | Yes | |
| Fire Retardant Treated Plywood (FRTP) | No | No | 3.2.3 |
| Compressed Wood or Composite Board Siding | No | No | 3.2.4 |
| Exterior Insulation and Finishing (EIFS) | No | No | 3.2.4 |
| Problem Drywall | No | No | 3.4.4 |
| Unit Electrical Capacity Less Than 60 amps | No | No | 3.3.5 |
| Aluminum Branch Wiring | No | No | 3.3.5 |
| Electrical Overload Protection - Fused Subpanels | No | No | 3.3.5 |
| Federal Pacific Electric Stab-Lok panels | No | No | 3.3.5 |
| Ground Fault Circuit Interrupter (GFCI) in Wet Exterior Locations | No | No | 3.3.5 |
| Polybutylene Water Distribution Lines | No | No | 3.3.1 |
| Galvanized Steel Water Distribution Lines | No | No | 3.3.1 |
| Recalled Fire Sprinkler Heads (Central Omega Gem Star) | No | No | 3.3.6 |
| Recalled Cadet Brand Electric In-Wall Heaters | No | No | 3.3.3 |
| Recalled General Electric Hotpoint Dishwashers | No | No | 3.4.6 |
| Microbial Growth | Yes | Yes | 4.1 |
| Wood Destroying Organisms | No | No | 4.2 |
| Lack of GFCI in Wet Locations | No | No | |
| Lack of GFCI in Exterior Locations | No | No | |
| KPBM Other Description | No | No | |

## 1.5 Project Team

The project team consisted of the following individuals:

| | |
|---|---|
| Jeff Roden | Erin Kleppe |
| Field Observer and PCA writer | PCA Reviewer |

**This report has not been signed.**

Additional Reviewer

# Section 2 LIFE SAFETY, CRITCAL, DEFERRED MAINTENANCE AND REPLACEMENT RESERVES

Life Safety, Critical and Deferred Maintenance listings are discussed in this section. Following the sections pertaining to each specific type of recommended repair is the Immediate Repairs schedule which lists each of the designated immediate repairs, required remediation related to the presence of moisture, microbial growth, and pests; and/or repairs necessary for the Property to comply with all federal, state or local retro- commissioning, energy audit and reporting, or other energy-related compliance requirements as well as the estimated cost for completion.

## 2.1 Immediate Repair / Life Safety Issues

**Fire Extinguisher Inspection**

Type ABC fire extinguishers are installed in cabinets in the hallways. The inspection tags are expired (June 2022). Armada Analytics, Inc. recommends all fire extinguishers be inspected and current certification tags be obtained to ensure proper function and eliminate potential life safety concerns.

## 2.2 Immediate Repair / Critical Repair Items

**Lift Station Pump**

The sanitary sewer system in the building is augmented with a sewer lift station. The lift station pumps failed in May of this year, resulting in flooding of the 3 currently down basement level apartments. Only one of the pumps was replaced leaving the system without a back-up system. Armada Analytics, Inc. recommends the back-up pump be replaced to ensure proper function in the event of main pump failure.

**Down Units**

Three down units (102, 103, and 104) have been damaged by a sewer leak in May of this year and have extensive mold contamination. Armada Analytics, Inc. recommends these three units be renovated and returned to rent ready condition. Renovation activities should include, but are not limited to: mold remediation, replacement of damaged drywall walls and ceilings, cabinets, appliances, flooring. final clean, and paint. Down unit 204 is being used for used appliance and maintenance equipment storage. Unit 204 should be renovated and returned to rent ready condition. Renovation activities should include, but are not limited to: flooring replacement, repair/replacement of appliances, cabinets, countertops, plumbing and electrical fixtures, final clean, and painting.

**Moisture Management Plan**

Water intrusion was noted at select basement level dwelling units. Management did not produce a Mold and Moisture Plan for the Property. A Moisture Management Plan (MMP) should be implemented at the Property to address any current and future water infiltration / mold growth issues at the Property. Mold growth in buildings is recognized by the EPA to pose a potential threat to human health; however, the extent of repercussions of

prolonged exposure to mold is yet to be determined. Studies have shown that toxins produced by some molds may cause health problems in some individuals. These health risks can range from minor irritation to more serious respiratory and/or nervous system problems. Armada Analytics, Inc. recommends the development and implementation of a moisture management plan for the Property.

## 2.3 Immediate Repair / Deferred Maintenance Items

**Asphalt Pavement/Repair, Seal, Stripe**

The Property contains a 35-space asphalt paved parking lot on the west side of the building with a total of 2 ADA parking spaces, one of which is van accessible. The pavement is damaged with large areas of missing asphalt pavement. This is due to exposure to the elements and a lack of timely repairs. Armada Analytics, Inc. recommends the parking lot be re-surfaced, followed by seal coat and parking stall striping. Appropriate ADA parking signage and stall markings should also be provided.

**Cladding / Building Exterior**

The building exterior brick veneer is stained, damaged in large areas, and the mortar joints are deteriorating. The exterior concrete areas are stained throughout, the exterior concrete stairways are damaged in areas, and the painted wood roof soffits and fascia are rotted. These conditions are due to exposure to the elements and a lack of timely preventative maintenance. Armada Analytics, Inc. recommends the building be power or acid washed, the brick veneer be re-pointed as required, the stairways be acid washed and repaired as needed, and the fascia, soffits, and wood trim be replaced as needed and painted.

**Roof Replacement**

The building roof is hipped and covered with 3-tab shingles that appear to be over 20 years old. According to historic satellite imagery, the roofs appear to have been installed in 2002. The shingles are curling and cracking in large areas and there are multiple areas of missing shingles. The condition of the roof shingles is due to exposure to the elements, possible wind damage, and a lack of timely preventative maintenance. Armada Analytics, Inc. recommends the shingles be removed and replaced.

## 2.4 Immediate Repairs and Replacement of Capital Items Schedule

| | | | | |
|---|---|---|---|---|
| **Assessment Date(s):** | 07/05/2023 | | **Number of Units:** | 34 |
| **Age(s):** | 111 | | **Parking Spaces:** | 35 |
| **Total Leaseable SF:** | 22,166 | | | |
| **Total Gross SF:** | 38,087 | | | |
| **Apartment Buildings:** | 1 | | | |
| **Stories:** | 4 | | | |

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description | Section Reference |
|---|---|---|---|---|---|---|
| Life Safety: Items that may impact the health or safety of residents, employees or visitors | | | | | | |
| Fire Extinguisher Inspection | 16 | EA | $100 | $1,600 | Type ABC fire extinguishers are installed in cabinets in the hallways. The inspection tags are expired (June 2022). Armada Analytics, Inc. recommends all fire extinguishers be inspected and current certification tags be obtained to ensure proper function and eliminate potential life safety concerns. | 3.3.6 |
| SubTotal Life Safety | | | | $1,600 | | |
| Critical Repair: Items recommended for completion within the next six months. ADA Repairs for completion within the next three months. | | | | | | |
| Lift Station Pump | 1 | ALW | $12000 | $12,000 | The sanitary sewer system in the building is augmented with a sewer lift station. The lift station pumps failed in May of this year, resulting in flooding of the 3 currently down basement level apartments. Only one of the pumps was replaced leaving the system without a back-up system. Armada Analytics, Inc. recommends the back-up pump be replaced to ensure proper function in the event of main pump failure. | 3.3.2 |
| Down Units | 1 | ALW | $65000 | $65,000 | Three down units (102, 103, and 104) have been damaged by a sewer leak in May of this year and have extensive mold contamination. Armada Analytics, Inc. recommends these three units be renovated and returned to rent ready condition. Renovation activities should include, but are not limited to: mold remediation, replacement of damaged dry wall walls and ceilings, cabinets, appliances, flooring, final clean, and paint. Down unit 204 is being used for used appliance and maintenance equipment storage. Unit 204 should be renovated and returned to rent ready condition. Renovation activities should include, but are not limited to: flooring replacement, repair/replacement of appliances, cabinets, countertops, plumbing and electrical fixtures, final clean, and painting. | 3.4.3 |
| Moisture Management Plan | 1 | EA | $650 | $650 | Water intrusion was noted at select basement level dwelling units. Management did not produce a Mold and Moisture Plan for the Property. A Moisture Management Plan (MMP) should be implemented at the Property to address any current and future water infiltration / mold growth issues at the Property. Mold growth in buildings is recognized by the EPA to pose a potential threat to human health; however, the extent of repercussions of prolonged exposure to mold is yet to be determined. Studies have shown that toxins produced by some molds may cause health problems in some individuals. These health risks can range from minor irritation to more serious respiratory and/or nervous system problems. Armada Analytics, Inc. recommends the development and implementation of a moisture management plan for the Property. | 4.1 |
| SubTotal Critical Repair | | | | $77,650 | | |
| Deferred Maintenance: Non-recurring capital items typically recommended for completion within 12 months. | | | | | | |
| Asphalt Pavement/Repair, Seal, Stripe | 12,250 | SF | $3.00 | $36,750 | The Property contains a 35-space asphalt paved parking lot on the west side of the building with a total of 2 ADA parking spaces, one of which is van accessible. The pavement is damaged with large areas of missing asphalt pavement. This is due to exposure to the elements and a lack of timely repairs. Armada Analytics, Inc. recommends the parking lot be re-surfaced, followed by seal coat and parking stall striping. Appropriate ADA parking signage and stall markings should also be provided. | 3.1.6 |

| | | |
|---|---|---|
| **Assessment Date(s):** | 07/05/2023 | |
| **Age(s):** | 111 | |
| **Total Leaseable SF:** | 22,166 | |
| **Total Gross SF:** | 38,087 | |
| **Apartment Buildings:** | 1 | |
| **Stories:** | 4 | |

| | |
|---|---|
| **Number of Units:** | 34 |
| **Parking Spaces:** | 35 |

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description | Section Reference |
|---|---|---|---|---|---|---|
| Cladding / Building Exterior | 1 | ALW | $75000 | $75,000 | The building exterior brick veneer is stained, damaged in large areas, and the mortar joints are deteriorating. The exterior concrete areas are stained throughout, the exterior concrete stairways are damaged in areas, and the painted wood roof soffits and fascia are rotted. These conditions are due to exposure to the elements and a lack of timely preventative maintenance. Armada Analytics, Inc. recommends the building be power or acid washed, the brick veneer be re-pointed as required, the stairways be acid washed and repaired as needed, and the fascia, soffits, and wood trim be replaced as needed and painted. | 3.2.4 |
| Roof Replacement | 12,375 | SF | $2.80 | $34,650 | The building roof is hipped and covered with 3-tab shingles that appear to be over 20 years old. According to historic satellite imagery, the roofs appear to have been installed in 2002. The shingles are curling and cracking in large areas and there are multiple areas of missing shingles. The condition of the roof shingles is due to exposure to the elements, possible wind damage, and a lack of timely preventative maintenance. Armada Analytics, Inc. recommends the shingles be removed and replaced. | 3.2.5 |
| SubTotal Deferred Maintenance | | | | $146,400 | | |
| **Total Immediate Repairs** | | | | $225,650 | | |

| | | |
|---|---|---|
| **Assessment Date(s):** | 07/05/2023 | |
| **Age(s):** | 111 | |
| **Total Leaseable SF:** | 22,166 | |
| **Total Gross SF:** | 38,087 | |
| **Apartment Buildings:** | 1 | |
| **Stories:** | 4 | |

| | | |
|---|---|---|
| **Number of Units:** | 34 |
| **Parking Spaces:** | 35 |

| Sect. No. | Item | Capital Expense Category | AVG EUL (YR) | EFF AGE (YR) | RUL (YR) | Qty | Unit of Meas. | Unit Cost | Total Cost over Eval. Period | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Site Components** | | | | | | | | | | | | | | | | | | | | | |
| 3.1.6 | Asphalt / Seal & Stripe Parking | Parking Pavement | 5 | 0 | 5 | 24,500 | SF | $0.30 | $7,350 | | | | | $3,675 | | | | | $3,675 | | |
| **Structural Frame And Building Envelope (Architectural Components)** | | | | | | | | | | | | | | | | | | | | | |
| 3.2.4 | Cladding / Power Wash and Paint | Cladding | 10 | 0 | 10 | 1 | ALW | $15000 | $15,000 | | | | | | | | | | $15,000 | | |
| **Mechanical, Electrical And Plumbing Systems** | | | | | | | | | | | | | | | | | | | | | |
| 3.3.3 | Condensing units (1.5 to 4Ton) | Air Conditioning Equipment | 20 | 1+ | 1+ | 12 | EA | $900 | $10,800 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 |
| 3.3.3 | FAU, electric | Heating Equipment | 20 | 1+ | 1+ | 12 | EA | $900 | $10,800 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 |
| 3.3.1 | Water heater domestic electric (10, 30, 40, 52 GAL.) | Water Heaters | 10 | 1+ | 1+ | 36 | EA | $350 | $12,600 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 |
| **Vertical Transportation, Including Elevators And Stairs** | | | | | | | | | | | | | | | | | | | | | |
| **Life Safety And Fire Protection** | | | | | | | | | | | | | | | | | | | | | |
| **Interior Elements (Dwelling Units And Common Areas)** | | | | | | | | | | | | | | | | | | | | | |
| 3.4.4 | Vinyl flooring - Living Areas, Kitchens, and Baths | Overall Unit Interiors | 10 | 1+ | 1+ | 36 | UNIT | $350 | $12,600 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 | $1,050 |
| 3.4.6 | Refrigerator residential 18cf | Overall Unit Interiors | 10 | 1+ | 1+ | 36 | EA | $425 | $15,300 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 | $1,275 |
| 3.4.6 | Dishwasher residential | Overall Unit Interiors | 10 | 1+ | 1+ | 36 | EA | $315 | $11,340 | $945 | $945 | $945 | $945 | $945 | $945 | $945 | $945 | $945 | $945 | $945 | $945 |
| 3.4.6 | Range/oven residential | Unit Range/Oven | 15 | 1+ | 1+ | 24 | EA | $400 | $9,600 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 |

| | | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Uninflated** | | $105,390 | $6,920 | $6,920 | $6,920 | $6,920 | $10,595 | $6,920 | $6,920 | $6,920 | $6,920 | $25,595 | $6,920 | $6,920 |
| **Annual Inflation Factor @ 3.00%** | | | 1.000 | 1.030 | 1.061 | 1.093 | 1.126 | 1.159 | 1.194 | 1.230 | 1.267 | 1.305 | 1.344 | 1.384 |
| **Total Inflated** | | $126,712 | $6,920 | $7,128 | $7,341 | $7,562 | $11,925 | $8,022 | $8,263 | $8,511 | $8,766 | $33,396 | $9,300 | $9,579 |
| **Cumulative Total** | | | $6,920 | $14,048 | $21,389 | $28,951 | $40,875 | $48,898 | $57,160 | $65,671 | $74,437 | $107,833 | $117,133 | $126,712 |
| **Average Annual Cost Per Unit 12 Years (uninflated)** | | | | | | | | | | | | | | $258 |
| **Average Annual Cost Per Unit 12 Years (inflated)** | | | | | | | | | | | | | | $311 |

| RATING CATEGORY AND DESCRIPTION OF PROPERTY SYSTEM/COMPONENT. | |
|---|---|
| **PCR 1: No concerns observed. No further action required.** | |
| Summary | Excellent condition; typically newer property or property with recent major rehab/significant investment |
| Life Safety | No Life Safety issues observed |
| Deferred Maintenance | No observed or reported Deferred Maintenance issues |
| Routine Maintenance | Superior Routine Maintenance practices that are extending the RUL of systems and components |
| Capital Needs | Capital needs are addressed; major components and systems are like new, in excellent condition and high probability they will significantly exceed the loan term |
| RUL | The specified system or component has an Effective Age that is significantly less than the actual age due to quality materials and/or superior Property maintenance practices. The RUL and the Effective Age may exceed the actual age and/or the average EUL. |
| **PCR 2: Some minor issues noted. Limited follow-up required.** | |
| Summary | Very Good/Good condition with isolated and relatively minor issues that are unlikely to negatively impact operations and can be addressed in house |
| Life Safety | No/minor Life Safety issues observed |
| Deferred Maintenance | Isolated or minor Deferred Maintenance can be addressed in house and/or at limited expense |
| Routine Maintenance | Proactive Routine Maintenance practices ensuring good overall system performance and functionality |
| Capital Needs | Majority of capital needs are being addressed, property performance does not appear to be impacted; components and systems in good condition and very likely will exceed the loan term |
| RUL | The specified system or component is expected to have an Effective Age that is less than or equal to the actual age due to quality materials and/or adequate Property maintenance practices. The RUL and the Effective Age may exceed or equal the actual age and/or the average EUL. |
| **PCR 3: Overall declining condition or isolated deterioration. Documented follow up required.** | |
| Summary | Average to Fair condition; requiring investment |
| Life Safety | Some Life Safety issues observed requiring immediate attention; but no capital expenditure |
| Deferred Maintenence | Deferred Maintenance of heightened concern; likely not addressed in-house |
| Routine Maintenance | Some reactive Routine Maintenance practices impacting a limited number of components requiring attention |
| Capital Needs | Critical capital needs are being addressed as needed, but additional capital required to maintain asset quality and system functionality; RUL of major systems/components may not meet or exceed the loan term |
| RUL | The specified system or component is anticipated to have a lower RUL due to the quality of materials and or maintenance and may have a greater Effective Age than the actual age. Generally, the quality of materials and/or maintenance practices is below average. |

| PCR 4: Substantial issues noted. Documented follow up with possible action plan required. | |
|---|---|
| Summary | Deteriorated overall conditions, substandard materials and practices, or major issues have not been addressed since prior inspection; requiring significant investment |
| Life Safety | Life Safety issues observed that require immediate attention and possible capital expenditure |
| Deferred Maintenance | Substantial Deferred Maintenance affecting major/several property areas/systems, requiring significant investment |
| Routine Maintenance | Reactive Routine Maintenance practices that do not address concerns in a timely manner |
| Capital Needs | Some critical capital needs are not being addressed, and property performance may be negatively impacted; very likely that the RUL of major systems/components will not meet or exceed the loan term |
| RUL | The RUL of the system or component is less than 3 years and/or the Effective Age is greater than the actual age. Generally, the quality of materials is substandard, the system or component has exceeded its Estimated Useful Life, and/or materials are poorly maintained. |
| PCR 5: Severe Deferred Maintenance observed. Follow up and substantial action plan required. | |
| Summary | Unacceptable overall conditions. Widespread neglect or casualty event; condition materially impacts marketability. Functionality of systems and components is compromised. |
| Life Safety | Significant Life Safety issues requiring capital expenditure |
| Deferred Maintenance | Excessive Deferred Maintenance affecting multiple areas/property systems, requiring significant investment; impacting collateral value |
| Routine Maintenance | Inadequate Routine Maintenance practices that do not ensure reasonable functionality of the property systems and components and may impact collateral value |
| Capital Needs | Major and pervasive issues with major components and systems; critical capital needs are not being addressed, property performance is being impacted and RUL of major systems/components has been exceeded |
| RUL | The RUL of the system or component has been exceeded or, based on the quality of materials and/or inferior maintenance practices, may have an Effective Age that exceeds the actual age and requires immediate capital expenditures. Generally, the quality of original materials is poor, the system has exceeded its EUL by a significant margin, and maintenance is poor. |

# Section 3 PROPERTY CHARACTERISTICS

## 3.1 Site Components

### 3.1.1 Site Configuration and Size

| No. of Parcels | Site Acreage | Configuration |
|---|---|---|
| 1 | 0.82 | Irregular shaped |

### 3.1.2 Site Utilities

| Item | Utility Provider | Units Individually Metered |
|---|---|---|
| Electricity | Entergy | Yes |
| Fuel Oil (include type) | NA | NA |
| Natural Gas | NA | NA |
| Gas (Propane, other) | NA | NA |
| Water & Sewage | City of Little Rock | No |

### 3.1.3 Landscaping, Grading and Drainage

| | | | | | | |
|---|---|---|---|---|---|---|
| Signage | Pylon | Category | 3 | Action* | R&M | |
| Landscaping | Moderate | Category | 3 | Action* | R&M | |
| Irrigation System | Sprinkler Irrigation | Category | 3 | Action* | R&M | |
| Storm Water Drainage | Drains to Municipal System | Category | 3 | Action* | R&M | |
| Detention/Retention | None Present | Category | NA | Action* | - | |
| Topography | Flat, Slight gradient from northwest to southeast. | Category | 3 | Action* | - | |
| Comments | A controlled irrigation system is in place at lawn areas and planter beds. No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.1.4 Site Water and Sanitary Lines

| | | | | | |
|---|---|---|---|---|---|
| Water Lines | Copper | Category | 3 | Action* | R&M |
| Sanitary Lines | Cast Iron and PVC | Category | 3 | Action* | R&M |
| Comments | Management reports no problems or failures with the site water or sanitary lines. Anticipate drain cleaning as part of routine maintenance as necessary. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.1.5 Ingress / Egress

| Ingress/Egress | Off Cumberland Street; vehicular access via E. Daisy L. Gatson Bates Drive | Category | - | Action* | - |
|---|---|---|---|---|---|
| Walkable Neighborhood? | Yes | Category | - | Action* | - |
| Sidewalks connected to neighborhood walkways? | Yes | Category | - | Action* | - |
| Security Gate? | No | Category | NA | Action* | - |
| Security Guard? | No | Category | NA | Action* | - |
| Comments | No issues observed. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.1.6 Flatwork: Parking Areas and Walkways

| Pavement | Asphalt | Category | 4 | Action* | IM, R&M |
|---|---|---|---|---|---|
| Number of Parking Spaces | 35 | Category | NA | Action* | - |
| Sealcoat Condition / Age | Poor; 15+ years | Category | 4 | Action* | IM, RR |
| Garages | None Present | Category | NA | Action* | - |
| Carports | None Present | Category | NA | Action* | - |
| Sidewalks | Concrete | Category | 3 | Action* | R&M |
| Patios | None Present | Category | NA | Action* | - |
| Pool Decks | None Present | Category | NA | Action* | - |
| Comments | The Property contains a 35-space asphalt paved parking lot on the west side of the building with a total of 2 ADA parking spaces, one of which is van-accessible. The parking lot is damaged with large areas of missing asphalt pavement. See Section 2. Anticipate additional seal coat and striping during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

ASSOCIATED PHOTOGRAPHS



The asphalt parking areas are damaged in large areas and the fire lane and parking stall markings are faded.



View of missing asphalt pavement.

ASSOCIATED PHOTOGRAPHS continued



View of missing asphalt pavement.

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Asphalt Pavement/Repair, Seal, Stripe | 25 | 15+ | 0-12+ | Deferred | $36,750 |
| Asphalt / Seal & Stripe Parking | 5 | 0 | 5 | 5 | $3,675 |
| | | | | 10 | $3,675 |
| Total | | | | | $44,100 |

### 3.1.7 Site Lighting

| Exterior | Building Mounted, City Street Lights | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Controls | Photocell Sensor | Category | 3 | Action* | R&M |
| Lighting Adequacy | Light fixtures are operational, Lamp covers are free from excessive staining, Light fixtures are non-obstructed by landscaping or other material, The Property appears to have sufficient lighting | Category | - | Action* | - |
| Comments | No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.1.8 Site Fencing / Retaining Walls

| Fencing | Wood, Around HVAC condensers only | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Retaining Walls | None present | Category | NA | Action* | - |
| Comments | No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

## 3.2 Architectural Components

### 3.2.1 Apartment Structure

The building was constructed as Little Rock High School (later East Side Junior High) in 1912 and renovated in 2007 for multi-family use, according to Pulaski County Assessor's Office records. Construction is reinforced

concrete and CMU framing with a concrete basement foundation, a hipped 3-tab composition asphalt shingled roof, and brick veneer and pre-cast concrete exteriors.

### 3.2.2 Foundations

| Construction Plans | Not Available for Review | Category | NA | Action* | - |
|---|---|---|---|---|---|
| Foundation Type | Raised floor system with a basement; CMU walls. | Category | 3 | Action* | R&M |
| Condition | No significant issues observed or reported. | Category | 3 | Action* | R&M |
| Moisture | No leaking or excess moisture observed | Category | 3 | Action* | R&M |
| Crawl Space | Not Present | Category | NA | Action* | - |
| Comments | No issues observed. | | | | |

### 3.2.3 Framing (Floors, Walls, Roof)

| Types of Structures | Cast-in-place Concrete | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Floors | Concrete frame with concrete slabs. | Category | 3 | Action* | R&M |
| Roof | Pitched with prefabricated wood truss framing and plywood sheathing. | Category | 3 | Action* | R&M |
| Comments | No issues observed. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.2.4 Building Cladding (Exterior Wall Finishes)

| Material | Brick veneer, Concrete Panels | Category | 4 | Action* | IM, RR |
|---|---|---|---|---|---|
| Condition | Issues observed; see Section 2. | Category | 4 | Action* | IM, RR |
| Soffits | Wood | Category | 4 | Action* | IM, RR |
| Fascia | Wood | Category | 4 | Action* | IM, RR |
| Trim | Wood | Category | 4 | Action* | IM, RR |
| Type and Age of Insulation | Not reported or observed | Category | NA | Action* | - |
| Comments | The building exterior brick veneer is stained and dirty, damaged in large areas, and the mortar joints are deteriorating. The exterior concrete areas are stained throughout, the exterior concrete stairways are damaged in areas, and the painted wood roof soffits and fascia are damaged; see Section 2.<br><br>Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

ASSOCIATED PHOTOGRAPHS



The mortar joints securing the brick veneer have deteriorated.



The roof soffits are rotted and damaged.



The concrete panels and columns are stained.



View of substandard brick tuck pointing.



View of substandard brick repairs.

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Cladding / Building Exterior | 10+ | 10+ | 0 | Deferred | $75,000 |
| Cladding / Power Wash and Paint | 10 | 0 | 10 | 10 | $15,000 |
| Total | | | | | $90,000 |

### 3.2.5 Roof Systems

| Roof Type | Hipped | Category | - | Action* | - |
|---|---|---|---|---|---|
| Material | Three tab asphalt shingles. | Category | 4 | Action* | IM, R&M |
| Age, years | 20+ | Category | - | Action* | - |
| Warranty | None reported | Category | NA | Action* | - |
| Access | Ceiling panel, Roof Hatch | Category | NA | Action* | - |
| Roof Insulation | Foam board | Category | 3 | Action* | R&M |
| Drains | Scupper Drains | Category | 3 | Action* | R&M |
| Gutters and Downspouts | Routine maintenance required, Gutters and Scuppers | Category | 3 | Action* | R&M |
| Ancillary Features | Not Present | Category | NA | Action* | - |
| Green Technology | Not Present | Category | NA | Action* | - |
| Comments | The building roof is hipped and covered with 3-tab shingles that appear to be over 20 years old. According to historic satellite imagery, the roofs appear to have been installed in 2002. The shingles are curling and cracking in large areas and there are multiple areas of missing shingles. The condition of the roof shingles is due to exposure to the elements, possible wind damage, and a lack of timely preventative maintenance. Armada Analytics, Inc. recommends the shingles be removed and replaced. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

ASSOCIATED PHOTOGRAPHS



View of roof.



View of roof.

ASSOCIATED PHOTOGRAPHS continued



View of roof.

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Roof Replacement | 20 | 20+ | 0 | Deferred | $34,650 |

### 3.2.6 Solar PV System

| Comments | None Present |
|---|---|

### 3.2.7 Appurtenances: Stairways, Patios, Balconies, Decks, Breezeways

| First Level Unit Access | Interior corridors | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Upper Level Unit Access | Interior stairways with corridors | Category | 3 | Action* | R&M |
| Stair/Landing Railings | Metal | Category | 3 | Action* | R&M |
| Corridors | Concrete | Category | 3 | Action* | R&M |
| Balconies | Not Present | Category | NA | Action* | - |
| Balcony Enclosures | Not Present | Category | NA | Action* | - |
| Patios | Not Present | Category | NA | Action* | - |
| Patio Enclosures | Not Present | Category | NA | Action* | - |
| Comments | No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.2.8 Doors and Windows

| Building Entrance Doors (for buildings with interior access to units) | Metal with metal frames | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Stairwell and Corridor Fire Doors | Insulated metal with metal frames | Category | 3 | Action* | R&M |
| Common Area Doors | Metal with metal frames | Category | 3 | Action* | R&M |
| Unit Entry Doors | Metal in metal frames | Category | 3 | Action* | R&M |
| Interior Doors | Wood, flat | Category | 3 | Action* | R&M |

| Patio / Balcony Doors | Not Present | Category | NA | Action* | - |
|---|---|---|---|---|---|
| Weather-stripping condition | Good | Category | 3 | Action* | R&M |
| Door Sweep Condition | Good | Category | 3 | Action* | R&M |
| Overhead Doors | Not Present | Category | NA | Action* | - |
| Common Area Windows | Double pane, single hung | Category | 3 | Action* | R&M |
| Common Area Window Framing | Metal | Category | 3 | Action* | R&M |
| Unit Windows | Double pane, single hung | Category | 3 | Action* | R&M |
| Unit Window Framing | Metal | Category | 3 | Action* | R&M |
| Comments | Hardware replacements and adjustments for doors and windows are anticipated as part of routine maintenance. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.2.9 Common Areas and Amenities

| Leasing Office | Located in apartment unit. | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Leasing Office Appliances | Refrigerator, Electric range, Dishwasher | Category | 3 | Action* | R&M |
| Energy Star | NA | Category | NA | Action* | - |
| Watersense Rated | NA | Category | NA | Action* | - |
| Clubhouse | Not Present | Category | NA | Action* | - |
| Mail Center | Mailbox unit in buildings | Category | 3 | Action* | R&M |
| Swimming Pool | Not Present | Category | NA | Action* | - |
| Laundry Rooms | Not Present | Category | NA | Action* | - |
| Clothes Washers | Not Present | Category | NA | Action* | - |
| Clothes Dryers | Not Present | Category | NA | Action* | - |
| Fitness Room | Not Present | Category | NA | Action* | - |
| Tot Lot | Not Present | Category | NA | Action* | - |
| Sports Court | Not Present | Category | NA | Action* | - |
| Bicycle Storage | Not Present | Category | NA | Action* | - |
| Comments | No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

## 3.3 Mechanical / Electrical / Plumbing Components

### 3.3.1 Water Distribution and Hot Water System

| Water Piping | Copper | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Low Flow Fixtures | Kitchen, Bathroom faucet, Toilets, Showers | Category | 3 | Action* | R&M |
| Hot Water (units) | Individual water heaters in units | Category | 3 | Action* | RR |
| Hot Water (units) Equipment Size and Age | 40 Gallon Electric, 1+ | Category | 3 | Action* | RR |
| Hot Water Heater Insulation | Not Present | Category | NA | Action* | - |

| Hot Water (laundry) Size and Age | Not Present | Category | NA | Action* | - |
|---|---|---|---|---|---|
| Comments | No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Water heater domestic electric (10, 30, 40, 52 GAL.) | 10 | 1+ | 1+ | 1 | $1,050 |
| | | | | 2 | $1,050 |
| | | | | 3 | $1,050 |
| | | | | 4 | $1,050 |
| | | | | 5 | $1,050 |
| | | | | 6 | $1,050 |
| | | | | 7 | $1,050 |
| | | | | 8 | $1,050 |
| | | | | 9 | $1,050 |
| | | | | 10 | $1,050 |
| | | | | 11 | $1,050 |
| | | | | 12 | $1,050 |
| Total | | | | | $12,600 |

### 3.3.2 Sanitary Waste Plumbing

| Piping | PVC, Cast iron | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Piping Observed | Under sinks | Category | 3 | Action* | R&M |
| Treatment | Municipal system | Category | NA | Action* | - |
| Comments | The sanitary sewer system in the building is augmented with a sewer lift station. The lift station pumps failed in May of this year, resulting in flooding of the 3 currently down basement level apartments. Only one of the pumps was replaced leaving the system without a back-up system; see Section 2. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

ASSOCIATED PHOTOGRAPHS



The sewer lift station pump is missing a back-up pump.

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Lift Station Pump | | NA | | Crit. | $12,000 |

### 3.3.3 Heating / Cooling / HVAC / Renewable Energy Systems

| | | | | | |
|---|---|---|---|---|---|
| Unit Heating | Split system | Category | 3 | Action* | RR |
| Unit Heating Location | Closet, Ceiling | Category | - | Action* | - |
| Unit Heating Energy | Electric | Category | - | Action* | - |
| Unit Heating Brand and Size | Varies | Category | - | Action* | - |
| Unit Cooling | Split System | Category | 3 | Action* | RR |
| Unit Cooling Location | Pad mounted | Category | - | Action* | - |
| Unit Cooling Brand and Size | Varies  1.5 to 4 Ton | Category | - | Action* | - |
| Filter Replacement | Yes | Category | 3 | Action* | R&M |
| Duct Cleaning | No | Category | NA | Action* | - |
| Maintenance Plan | Yes | Category | NA | Action* | - |
| Unit Controls | Manual thermostat | Category | 3 | Action* | R&M |
| HVAC Distribution | Conditioned air supplied through a low velocity duct | Category | 3 | Action* | R&M |
| Common Area Heating | Wall mounted | Category | 3 | Action* | RR |
| Common Area Cooling | Ductless Mini Split System | Category | 3 | Action* | R&M |
| Energy Management System | None reported | Category | NA | Action* | - |
| Comments | No issues observed. Anticipate HVAC replacements as well as Repairs and Maintenance during the loan term. The common area mini split system can be maintained as part of normal operating expenses. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Condensing units (1.5 to 4Ton) | 20 | 1+ | 1+ | 1 | $900 |
| | | | | 2 | $900 |
| | | | | 3 | $900 |
| | | | | 4 | $900 |
| | | | | 5 | $900 |
| | | | | 6 | $900 |
| | | | | 7 | $900 |
| | | | | 8 | $900 |
| | | | | 9 | $900 |
| | | | | 10 | $900 |
| | | | | 11 | $900 |
| | | | | 12 | $900 |
| FAU, electric | 20 | 1+ | 1+ | 1 | $900 |
| | | | | 2 | $900 |
| | | | | 3 | $900 |
| | | | | 4 | $900 |

COST SUMMARY continued

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| | | | | 5 | $900 |
| | | | | 6 | $900 |
| | | | | 7 | $900 |
| | | | | 8 | $900 |
| | | | | 9 | $900 |
| | | | | 10 | $900 |
| | | | | 11 | $900 |
| | | | | 12 | $900 |
| Total | | | | | $21,600 |

### 3.3.4 Ventilation Systems

| Ventilation | Bath exhaust, Range hood | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Ventilation Control | Switch | Category | 3 | Action* | R&M |
| Vent Condition | Clean | Category | 3 | Action* | R&M |
| Air Ducts | Appear to be sealed | Category | 3 | Action* | R&M |
| Roof Fans | Not Present | Category | NA | Action* | - |
| Smoking Policy | Designated smoke free areas | Category | 3 | Action* | R&M |
| Comments | No issues observed. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.3.5 Electrical Service

| Transformers | Pad mounted | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Branch Wiring | Copper | Category | 3 | Action* | R&M |
| Unit Meters | Individual | Category | 3 | Action* | R&M |
| Service Amps | 125 | Category | 3 | Action* | R&M |
| Unit Panels | Circuit breakers | Category | 3 | Action* | R&M |
| GFCI | Observed at kitchen and bath wet areas | Category | 3 | Action* | R&M |
| Comments | No significant issues were observed or reported with the electrical distribution systems. The electrical service is adequate by today's standards to service the lighting and power needs of the Property with respect to current electrical loads. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.3.6 Fire and Life Safety Systems

| Fire Extinguishers | Hallways, Common areas | Category | 4 | Action* | IM, R&M |
|---|---|---|---|---|---|
| Fire Extinguisher Inspections | Expired; see Section 2 | Category | 4 | Action* | IM, R&M |
| Sprinkler System | Central System, Current | Category | 2 | Action* | R&M |
| Smoke Detectors | Hard wired with battery backup | Category | 2 | Action* | R&M |
| Fire Alarm | Central System | Category | 2 | Action* | R&M |
| CO Detectors | Not Applicable - All electric units | Category | NA | Action* | - |
| Exit Signs | Hallways | Category | 2 | Action* | R&M |

| Emergency Lights | Hallways | Category | . 2 | Action* | R&M |
|---|---|---|---|---|---|
| Hydrants | Along public right of way | Category | NA | Action* | - |
| Comments | Hard-wired with battery backup smoke detectors were observed in all dwelling units. Type ABC fire extinguishers are installed in cabinets in the hallways. The inspection tags are expired (June 2022). See Section 2.<br><br>Anticipate continuing inspections during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

ASSOCIATED PHOTOGRAPHS



Type ABC fire extinguishes with expired inspection tags
are installed in the hallways.

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Fire Extinguisher Inspection | 1 | 1+ | 0 | LS | $1,600 |

### 3.3.7 Elevators

| Type | Hydraulic | Category | 2 | Action* | R&M |
|---|---|---|---|---|---|
| Capacity | 2500 lbs | Category | - | Action* | - |
| Maintenance Contractor | ThyssenKrupp | Category | - | Action* | - |
| Inspection Date | Current | Category | 2 | Action* | R&M |
| Cab Finishes | Metal and Laminate | Category | 2 | Action* | R&M |
| Comments | The elevator was replaced when the building was renovated. Machine room less (MRL) hydraulic elevators do not have a fixed machine room to house the hydraulic machinery. The machinery, which includes the pump, is installed in a basement closet. The controllers are located on a wall near the elevator.<br><br>No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.3.8 Site Security

| Component | Not Present | Category | NA | Action* | - |
|---|---|---|---|---|---|
| Monitoring | Not Present | Category | NA | Action* | - |

## 3.4 Dwelling Unit Components and Observations

### 3.4.1 Common Area Finishes

| Leasing Office Floors | Laminate | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Leasing Office Ceilings | Open | Category | 3 | Action* | R&M |
| Leasing Office Walls | Drywall | Category | 3 | Action* | R&M |
| Clubhouse | Not Present | Category | NA | Action* | - |
| Interior Corridor Floors | Laminate | Category | 3 | Action* | R&M |
| Interior Corridor Ceilings | Open | Category | 3 | Action* | R&M |
| Interior Corridor Walls | Drywall, Plaster | Category | 3 | Action* | R&M |
| Laundry Room Floors | Not Present | Category | NA | Action* | - |
| Laundry Room Ceilings | Not Present | Category | NA | Action* | - |
| Laundry Room Walls | Not Present | Category | NA | Action* | - |
| Other | | Category | NA | Action* | - |
| Comments | No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

### 3.4.2 Dwelling Unit Summary

In accordance with the scope of work, Armada Analytics, Inc. physically inspected 29.4% of the dwelling units. Units inspected were randomly selected by Armada Analytics, Inc.

| Number of buildings: 1 | Vacant: 4 | No. of Units: 34 | No. Down:  4 |
|---|---|---|---|
| Comments | Unit 205 functions as the leasing office and is included in the rent roll and total unit count. | | |

| Occupied Units Inspected | | | | | | |
|---|---|---|---|---|---|---|
| Unit Number | Studio | I BR | 2 BR | 3 BR | Other | Floor |
| 107 | | X | | | | 1 |
| 205 (office) | | x | | | | 2 |
| Vacant Units Inspected | | | | | | |
| Unit number | Studio | I BR | 2 BR | 3 BR | Other | Floor |
| 105 | | x | | | | 1 |
| 106 | | x | | | | 1 |
| 201 | | x | | | | 2 |
| 401 | | x | | | | 4 |

| Down Units Inspected | | | | | | |
|---|---|---|---|---|---|---|
| Unit Number | Studio | I BR | 2 BR | 3 BR | Other | Floor |
| 102 | | x | | | | 1 |
| 103 | | x | | | | 1 |
| 104 | | x | | | | 1 |
| 204 | | x | | | | 1 |

| Unit Mix | | | |
|---|---|---|---|
| Unit Type | # of Units | Unit Square Footage | Total Square Footage |
| 1BR/1BA | 2 | 498 | 996 |
| 1BR/1BA | 4 | 460 | 1,840 |
| 1BR/1BA | 2 | 560 | 1,120 |
| 1BR/1BA | 2 | 482 | 964 |
| 1BR/1BA | 1 | 519 | 519 |
| 1BR/1BA | 1 | 465 | 465 |
| 1BR/1BA | 4 | 473 | 1,892 |
| 1BR/1BA | 4 | 490 | 1,960 |
| 1BR/1BA | 3 | 525 | 1,575 |
| 1BR/1BA | 1 | 467 | 467 |
| 2BR/2BA | 4 | 681 | 2,724 |
| 2BR/BA | 2 | 1,230 | 2,460 |
| 2BR/2BA | 2 | 1,072 | 2,144 |
| 2BR/2BA | 2 | 1,520 | 3,040 |
| TOTAL | | | 22,166 |

### 3.4.3 Vacant and Down Units

Eight (8) of the units are vacant, four of which are "down" (un-leasable). Three down units (102, 103, and 104) have been damaged by a sewer leak in May of this year and have extensive mold contamination. Armada Analytics, Inc. recommends these three units be renovated and returned to rent ready condition. Renovation activities should include, but are not limited to: mold remediation, replacement of damaged drywall walls and ceilings, cabinets, appliances, flooring, final clean, and paint. Down unit 204 is being used for used appliance and maintenance equipment storage. Unit 204 should be renovated and returned to rent ready condition. Renovation activities should include, but are not limited to: flooring replacement, repair/replacement of appliances, cabinets, countertops, plumbing and electrical fixtures, final clean, and painting.

The remaining vacant units were either made ready for occupancy or could be made ready within one week.

ASSOCIATED PHOTOGRAPHS




Three of the apartments are down and have extensive mold contamination.

View of mold contamination.



View of mold contamination.

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Down Units | | NA | | Crit. | $65,000 |

### 3.4.4 Unit Finishes

| Walls / Ceilings | Drywall walls with open ceilings | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Flooring - Living Areas | Laminate | Category | 3 | Action* | RR |
| Flooring - Kitchen and Bath | Ceramic Tile, Laminate | Category | 3 | Action* | RR |
| Mold | Mold growth observed in areas noted below; see Section 2 | Category | 4 | Action* | IM, R&M |
| Maintenance Practices | Needs Improvement | Category | - | Action* | - |
| Unit Inspection | Performed at unit turn | Category | NA | Action* | - |
| Comments | Anticipate vinyl flooring replacements during the loan term. Ceramic tile can be addressed as normal operating expenses. Mold was observed in down units 102, 103, and 104. A Moisture Management Plan should be prepared and implemented at the Property as addressed in Section 4.1. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Vinyl flooring - Living Areas, Kitchens, and Baths | 10 | 1+ | 1+ | 1 | $1,050 |
| | | | | 2 | $1,050 |
| | | | | 3 | $1,050 |
| | | | | 4 | $1,050 |
| | | | | 5 | $1,050 |
| | | | | 6 | $1,050 |
| | | | | 7 | $1,050 |
| | | | | 8 | $1,050 |
| | | | | 9 | $1,050 |
| | | | | 10 | $1,050 |
| | | | | 11 | $1,050 |
| | | | | 12 | $1,050 |
| Total | | | | | $12,600 |

## 3.4.5 Kitchen Cabinets, Counters, Sinks

| Kitchen Cabinets | Wood | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Kitchen Sinks | Double bowl, Stainless steel | Category | 3 | Action* | R&M |
| Kitchen Countertops | Laminate | Category | 3 | Action* | R&M |
| Comments | The cabinets and countertops are from the 2007 conversion to multi-family use. No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

## 3.4.6 Appliances

| Management Provides | Refrigerator, Electric range, Dishwasher | Category | 3 | Action* | RR |
|---|---|---|---|---|---|
| Appliance Package Age | 1-16 | Category | 3 | Action* | RR |
| Comments | Anticipate replacement of vent hoods during the loan term as part of normal operating expenses. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

COST SUMMARY

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| Refrigerator residential 18cf | 10 | 1+ | 1+ | 1 | $1,275 |
| | | | | 2 | $1,275 |
| | | | | 3 | $1,275 |
| | | | | 4 | $1,275 |
| | | | | 5 | $1,275 |
| | | | | 6 | $1,275 |
| | | | | 7 | $1,275 |
| | | | | 8 | $1,275 |
| | | | | 9 | $1,275 |
| | | | | 10 | $1,275 |
| | | | | 11 | $1,275 |
| | | | | 12 | $1,275 |
| Range/oven residential | 15 | 1+ | 1+ | 1 | $800 |
| | | | | 2 | $800 |

COST SUMMARY continued

| Description and Recommendation | EUL | EFF AGE | RUL | Year | Cost |
|---|---|---|---|---|---|
| | | | | 3 | $800 |
| | | | | 4 | $800 |
| | | | | 5 | $800 |
| | | | | 6 | $800 |
| | | | | 7 | $800 |
| | | | | 8 | $800 |
| | | | | 9 | $800 |
| | | | | 10 | $800 |
| | | | | 11 | $800 |
| | | | | 12 | $800 |
| Dishwasher residential | 10 | 1+ | 1+ | 1 | $945 |
| | | | | 2 | $945 |
| | | | | 3 | $945 |
| | | | | 4 | $945 |
| | | | | 5 | $945 |
| | | | | 6 | $945 |
| | | | | 7 | $945 |
| | | | | 8 | $945 |
| | | | | 9 | $945 |
| | | | | 10 | $945 |
| | | | | 11 | $945 |
| | | | | 12 | $945 |
| Total | | | | | $36,240 |

## 3.4.7 Bathroom Vanities, Shower / Tub and Toilet

| Bath Vanities | Wood | Category | 3 | Action* | R&M |
|---|---|---|---|---|---|
| Bathroom Sinks | Drop in | Category | 3 | Action* | R&M |
| Bathroom Countertops | Laminate | Category | 3 | Action* | R&M |
| Bathtub/Shower Surround | Fiberglass | Category | 3 | Action* | R&M |
| Fixtures | Standard grade | Category | 3 | Action* | R&M |
| Comments | The vanities are from the 2007 conversion to multi-family use. No issues observed. Anticipate Repairs and Maintenance during the loan term. | | | | |

*R&M = Repairs & Maintenance, IM = Immediate Repair, RR = Replacement Reserve

## 3.4.8 Cable or Internet Availability

| Cable Available | Yes | Category | NA | Action* | - |
|---|---|---|---|---|---|
| Internet Access | Yes | Category | NA | Action* | - |

# Section 4 MOISTURE AND MICROBIAL GROWTH AND PEST MANAGEMENT

## 4.1 Moisture and Microbial Growth

Mold was observed in down units 102,103, and 104. This is the result of a sewer lift station pump failure. Major repairs are needed to restore the down units. Armada Analytics, Inc. recommends the mold be remediated immediately; see Section 2.

Mold growth in buildings is recognized by the EPA to pose a potential threat to human health, however, the extent of repercussions of prolonged exposure to mold is yet to be determined. Studies have shown that toxins produced by some molds may cause health problems in some individuals. These health risks can range from minor irritation to more serious respiratory and/or nervous system problems. It is therefore recommended that management survey the unit noted above for the presence of moisture intrusion, moisture damage and/or mold growth. All sources of moisture intrusion should be repaired and/or replaced to prevent further damage and/or future mold growth. Additionally, all dwelling units should be surveyed for mold growth upon tenant turn-over. Tenant education and disclosures should be distributed to educate tenants on conditions of mold growth and sources of water infiltration (closed windows, non-operable bathroom exhaust fans and leaks under sinks) that may result in mold growth. Unit inspections and tenant education will help eliminate the possibility of future mold growth at the Property. Moisture damaged areas and areas of mold growth should be repaired and remediated in strict compliance with EPA guidelines. The Environmental Protection Agency (EPA) indicates that remediation of minor mold growth (less than 10 square feet at each location) can be conducted by regular building maintenance staff during routine maintenance activities. Maintenance personnel involved with mold remediation should receive adequate training on proper clean up methods, personal protection, and potential health hazards associated with mold. This training can be performed as part of a program to comply with the requirements of the EPA and OSHA Hazard Communication Standard (29 CFR 1910.1200). Should additional information be required on clean-up methods, consultation with a Certified Industrial Hygienist (CIH) is recommended.

Water intrusion was noted at select basement level dwelling units. Management did not produce a Mold and Moisture Plan for the Property. A Moisture Management Plan (MMP) should be implemented at the Property to address any current and future water infiltration / mold growth issues at the Property. Mold growth in buildings is recognized by the EPA to pose a potential threat to human health; however, the extent of repercussions of prolonged exposure to mold is yet to be determined. Studies have shown that toxins produced by some molds may cause health problems in some individuals. These health risks can range from minor irritation to more serious respiratory and/or nervous system problems. Armada Analytics, Inc. recommends the development and implementation of a moisture management plan for the Property.

ASSOCIATED PHOTOGRAPHS



Three of the apartments are down and have extensive mold contamination.

## 4.2 Pest Management

At the time of our survey we noted no current evidence of termite or other pest infestation damage.

# Section 5 SPECIAL HAZARDS, ZONING, BUILDING CODE VIOLATIONS AND REGULATORY COMPLIANCE

Although it is assumed that the noted improvements were constructed in compliance with contemporary building codes and standard building practices at the time of construction, and while the Property remains adequate for present day use, our survey does not include a review to determine compliance with local Building Department codes, Fire Department requirements, or Planning Department ordinances. However, the following information is provided.

## 5.1 Special Hazard Assessment

### 5.1.1 Peak Ground Acceleration (PGA)

According to the USGS National Seismic Hazard Maps (2008), the Property is not in an area that has a 10% or greater probability of exceeding a Peak Ground Acceleration (PGA) value of 0.15g (or greater) in 50 years. Based on the Property's location, the PGA is 0.0780g. Because of this designation, a Structural Risk Evaluation Questionnaire (Form 4099C) is not required.



### 5.1.2 Hazards / Geographic Conditions / Catastrophic Loss Potential

The following are geological or meteorological hazards that, if occurring or present, could affect the Property, causing a potentially significant loss.

| Hazard | Risk |
|---|---|
| Tornadoes | Very high |
| Hurricanes | Low |
| Expansive soils | Not likely |
| Floods | Low |
| Sinkholes | Not likely |
| Landslides | Low |
| Wind | High |
| Volcanic activity | Low |

The Property is in a Very High risk for tornadoes. An F4 storm on 4-27-2014 touched down 13 miles from the Property ZIP code, causing a total of 16 deaths and 193 injuries. The Property is in an area of Low risk for hurricanes. A review of the NOAA Historical Hurricane tracks map shows that the area has experienced only the remnants of recorded hurricanes. The Property is not underlain by Karst-based geology or sub-surface clay-based soils. The Property is not located in a Special Flood Area. Because the Little Rock area has 6-10 recorded tornadoes per 1,000 square miles and is located in Wind Zone IV (Design Wind Speeds in excess of 250 mph consistent with ASCE 7-95), the Property is at High Risk for Wind Loss Potential.

No detailed investigation has been made into the presence of these hazards; our conclusions are based solely on observations made during our site visit, review of available documents or interviews with others.

### 5.1.3 Flood Zone

A review of FEMA flood zone map 05119C0457G, dated July 6, 2015, indicates the Property building is located in Zone X, designated as an area outside the 500 year flood plain.

## 5.2 Zoning and Code Information

### 5.2.1 Building Zoning

The Property is zoned CAPN "Capital Zoning District" (MacArthur Park Historic Overlay) by the City of Little Rock Department of Planning and Development. The Property conforms to this zoning designation.

Information in regards to inspections, violations, deficiencies and hazardous material on the site has been requested from the City of Little Rock FOIA Coordinator. According to the response received, "The Arkansas Freedom of Information Statute ACA 25-19-105(a) states that 'all public records shall be open to inspection and

copying by any citizen of the State of Arkansas.' As the inspector/requestor is not a resident of the State of Arkansas, the request for information was denied.

### 5.2.2 Building Code Violations

A Freedom of Information Act (FOIA) request was submitted to the City of Little Rock FOIA Coordinator requesting information pertaining to building code inspections and open code violations and/or permits as well as date of certification of occupancy.  According to the response received, "The Arkansas Freedom of Information Statute ACA 25-19-105(a) states that 'all public records shall be open to inspection and copying by any citizen of the State of Arkansas.' As the inspector/requestor is not a resident of the State of Arkansas, the request for information was denied.

### 5.2.3 Fire Code Violations

Information in regards to inspections, violations, deficiencies and hazardous material on the site has been requested from the City of Little Rock FOIA Coordinator. According to the response received, "The Arkansas Freedom of Information Statute ACA 25-19-105(a) states that 'all public records shall be open to inspection and copying by any citizen of the State of Arkansas.' As the inspector/requestor is not a resident of the State of Arkansas, the request for information was denied.

## 5.3 Regulatory Compliance

### 5.3.1 Americans With Disabilities (ADA) Compliance

Because apartment projects are considered a place of residence, they typically do not fall under ADA criteria. The possible exception to this is rental offices or common area amenities (swimming pool) that are made available to the general public, not just tenants and their guests. An example of a common area amenity that may be subject to ADA criteria is a recreation center that sold memberships to the general public. A rental office may generally be considered a place of public accommodation as the public is invited into that area.

Building codes, both current and past, have included barrier free and handicapped access requirements. These requirements may or may not coincide with the precise ADA Accessibility Guidelines (ADAAG). In such cases where access features were provided according to standards other than ADAAG, barrier free access features can enable disabled access but do not necessarily provide compliance with the ADAAG.

Section 36.304 of the ADA requires a place of public accommodation to remove architectural and communication barriers that are structural in nature in existing facilities, where such removal is readily achievable. The law defines readily achievable as meaning easily accomplishable and able to be carried out without much difficulty or expense. Readily achievable is determined on an individual basis. What the readily achievable standard will mean in any particular public accommodation will depend on the individual circumstances. No numerical formula or threshold of any kind has been set by the Justice Department. In order to determine what is readily achievable, an entity should consult with a team consisting of a lawyer and an accountant.

The obligation to engage in readily achievable barrier removal is a continuing responsibility of a public accommodation. Items that are currently not readily achievable may become so in the future. No periodic assessment or self-assessment is required by the ADA. However, the Justice Department urges public accommodations to establish procedures for an ongoing assessment of their compliance with the barrier removal requirements.

| No. | Building Access | Yes | No | N/A | Comments |
|-----|-----------------|-----|-----|-----|----------|
| | **ADA Evaluation Checklist** | | | | |
| 1 | Are there accessible parking space(s) available (96" wide/60" aisle) at public access areas? (i.e. leasing office) | X | | | |
| 2 | Is there at least one wheelchair accessible van parking space (96" wide/96") aisle at public access areas? | X | | | |
| 3 | Are accessible parking spaces located on the shortest accessible route of travel from an accessible building entrance? | X | | | |
| 4 | Does signage exist designating wheelchair accessible parking? | | X | | Appropriate signage should be installed in conjunction with recommended asphalt pavement repairs; see Section 2. |
| 5 | Is there a ramp from parking to an accessible building entry (1:12 slope or less)? | X | | | |
| 6 | Are public use areas accessible?  If not are there alternate accessible entries? | X | | | |
| 7 | Is the accessible entry doorway at least 32" wide? | X | | | |
| 8 | Is the entry door hardware easy to open (lever/push type with no twisting required, not higher than 48" above (floor)? | X | | | |
| 9 | Are entry doors other than revolving doors available? | X | | | |

| No. | Building Access | Yes | No | N/A | Comments |
|-----|-----------------|-----|-----|-----|----------|
| 1 | Are there publicly accessible restrooms present? | | X | | |
| 1a | Is the accessible doorway of the public restrooms at least 32" wide? | | | X | |

| 1b | Does at least one stall meet the following requirements:<br>- minimum stall width of 60-inches<br>- minimum depth of 56-inches<br>- toilet seat height between 17- and 19-inches above the floor<br>- flush controls a maximum of 44-inches above the floor<br>- toilet paper dispenser 19-inches above the floor and 36-inches from the rear wall<br>- grab bars 36-inches above the floor and a minimum of 40-inches in length along the sidewalls. | | | X | |
| 1c | Does the sink/vanity meet the following requirements:<br>- counter tops a maximum of 34-inches above the floor<br>- extend a minimum of 17-inches from the wall<br>- minimum clearance of 29-inches from the floor to the bottom of the apron<br>- clear floor space at least 30" x 48" in front of counter<br>- bottom edge of the mirror a maximum of 40-inches above the floor<br>- sinks have one handed controls (i.e. levers, push or electronic controls) | | | X | |
| 2 | Are there elevators at the Property? | X | | | |
| 2a | Are elevator controls low enough to be reached from a wheelchair (48" from approach/54" side approach)? | X | | | |
| 2b | Are there raised elevator markings in Braille and Standard alphabet for the blind? | X | | | |
| 2c | Are there audible/visual signals inside cars and at elevator landings indicating floor change? | X | | | |
| 3 | Does strobe lighting exist in the corridors and restrooms? | X | | | |

| 4 | If there is public access to a pool or spa, is a pool lift present? | | | X | |

## 5.3.2 Fair Housing Act (FHA) Compliance

The scope of this report is limited to a very general overview of the subject improvements based upon the requirements of the Fair Housing Act Accessibility Guidelines in an attempt to identify clear and unequivocal violations of the Act. It is not intended for use or reliance as an audit for purposes of determining strict compliance, but it is a tool to identify whether or not a full compliance audit may be appropriate. No physical measurements have been made as part of this survey; notations made in the table below are based on visual observations only.

The Fair Housing Act does not require any renovations to existing buildings. Its design requirements apply to new construction only — to covered multifamily dwellings that are built for first occupancy after March 13, 1991. First occupancy is defined as "a building that has never before been used for any purpose."

The design and construction requirements of the Fair Housing Act apply to all new multifamily housing consisting of four or more dwelling units. The Fair Housing Act's definition of "covered multifamily dwellings" distinguishes between buildings with elevators and buildings without elevators. Thus, if a building has one or more elevators all of the dwelling units in the building are covered and require compliance with the FHA. Such buildings must meet specific design requirements so public and common use spaces and facilities are accessible to people with disabilities. In addition, the interior of dwelling units covered by the Fair Housing Act must be designed so they too meet certain accessibility requirements.

Based upon the date of construction of 1912, the Property is NOT subject to compliance with the Fair Housing Act. Therefore no further evaluation of compliance is provided.

## 5.3.3 Benchmarking Disclosure, Energy Audit, Retro-Commissioning Laws and Requirements

There are no prevailing local, state or federal laws or requirements to conduct energy audits or retro-commissioning studies.

# Section 6 AREAS OF ADDITIONAL ASSESSMENT

## 6.1 Problematic Materials, Historical Repairs and Replacements, Work in Progress, and Planned Capital Improvements

### 6.1.1 Known Problematic Building Materials and Property Design Issues

No problematic materials listed in Section 1.4 were observed. However, mold contamination was observed in three down units (102, 103, and 104) due to a failed sewer lift station pump. See Sections 2 and 4.1.

### 6.1.2 Summary of Historical Repairs and Replacements

Due to the effective age of the Property (16 years), no major capital expenditure for repairs, renovations or upgrades were reported or observed.

### 6.1.3 Work in Progress

Other than routine maintenance, there are no ongoing capital repairs.

### 6.1.4 Planned Capital Improvements

According to Management, funds for the following capital improvements have been requested from the Property owner, but have not been received:

Install one additional sewer lift station pump.

Power wash/acid wash building exterior, re-point brick veneer, repair/replace soffits and fascia and paint.

Remediate and renovate down units with mold contamination.

Repair/peplace building roof.

# Section 7 REFERENCES AND LIMITATIONS

## 7.1 Fannie Guide

This report was prepared in general accordance with Fannie Mae Selling and Servicing Guide and Form 4099, Instructions for Performing a Multifamily Property Condition Assessment.

## 7.2 Methodology

### Assessment Methodology - Property Condition Assessment

This assessment is based on the evaluator's judgment of the physical condition of the improvements and the estimated expected remaining useful life of those improvements. The conclusions presented are based on the evaluator's professional judgment. The actual performance of individual components may vary from a reasonably expected standard and may be affected by circumstances that occur after the date of the evaluation.

### Assessment Activities - Property Condition Assessment

1) Identify repairs, replacements and significant maintenance items that should be completed immediately;

2) Identify repairs, replacements and significant maintenance items that are likely to occur over the next approximately 12-year period;

3) Estimate the cost to repair the above deferred maintenance items; and

4) Estimate the lapsed and remaining life expectancies of the Property improvements.

### Cost Estimation Methodology - Property Condition Assessment

The estimated costs detailed in this report are based on a survey of representative building areas. Items of deferred maintenance and the effective ages of building components observed are projected onto the balance of the complex. Where actual cost information for specific items is not available from the Property management, industry costs are derived from our field experience and from reference material such as BNI, D4Cost, R.S. Means Co., Inc., and National Construction Estimator. General contractor overhead and profit costs, should a general contractor be required, have not been included in these estimates. General contractor fees can vary widely; an allowance of 10-15% mark-up would not be unreasonable.

When work in progress has been observed, such work is noted in the report and assumed for cost estimating purposes to be complete, unless observed to be unacceptable in quality or scope.

The purpose of the report is not to identify minor, inexpensive repairs or other maintenance items that are part of the Property owner's current operating pattern and budget, so long as these items appear to be taken care of on a regular basis. However, such items are commented on if they do not appear to be routinely addressed or are in need of immediate repair.

## 7.3 Limitations

This report is prepared solely for the use and benefit of the Client in accordance with Fannie Mae guidelines. Our recommendations have been prepared in accordance with customary principles and practices. This warranty is in lieu of all other warranties either expressed or implied. Armada Analytics, Inc. is not responsible for the independent conclusions, opinions or recommendations made by others based on the field exploration presented in this report.

### *Limitations - Property Condition Assessment*

Armada Analytics, Inc. bears no control over the cost of labor, materials, equipment or services furnished by others, over contractors' methods of determining prices, or over competitive bidding and market conditions. Opinions of probable construction costs provided herein reflect adjusted industry averages and are made on the basis of Armada Analytics, Inc.'s experience and qualifications. Armada Analytics, Inc. cannot and does not guarantee that proposals, bids or construction costs will not vary from opinions of probable costs prepared by same. This PCA is based upon the Field Observer(s)' judgment of the physical condition of the components, their ages, and their EUL. The actual performance of individual components may vary from a reasonable expected standard and will be affected by circumstances that occur after the date of our site visit.

This survey and report pertain only to the current physical conditions of the premises and existing improvements and relate only to those areas readily accessible and available for visual observation. No structural, seismic, invasive or destructive investigations were performed since it is beyond the scope of our Property Condition Assessment. Observations were limited to "representative" property improvements including exterior surfaces and open spaces, accessible areas of the roof, representative rooms, mechanical and common areas. Areas behind walls, inside plenums, crawl spaces or in any other area generally inaccessible or deemed unsafe by the field observer were not surveyed. No representation is made as to the status of title, legality of lots or zoning of the Property, nor is any representation made as to the advisability or inadvisability of the purchase of, investment in, or financing of the Property.

The field observer has not conducted an asbestos survey or visibly identified there are ACMs within the building. It is Armada Analytics, Inc.'s understanding the nature of the proposed occupancy will require repairs and replacement of the building finishes, systems, etc. Armada Analytics, Inc. has not budgeted for any future ACM surveys and testing, permitting, or abatement. It is possible that local municipalities and/or state agencies may include ACM testing as part of any alteration work and permit filing.

Conditions, codes, covenants and restrictions which may be part of the legal deed of title to the Property, and which may vary in description of Property boundaries, easements or dedications have not been disclosed or reviewed as part of this Assessment.

The roof observations and related comments are not to be interpreted as a full and comprehensive roof survey and should not be interpreted to mean the roof is free of leaks. Should a comprehensive report on the condition of the system be required, the services of a qualified roofing consultant should be considered.

Mechanical and electrical recommendations are subject to consultation of a licensed contractor prior to finalization of the work scopes.

Armada Analytics, Inc. assumes no responsibility for the accuracy or completeness of information provided by building management, tenants, service firms interviewed, or governmental agencies. Armada Analytics, Inc. is not responsible for any patent or latent defects that an owner or his agents may have withheld from Armada Analytics, Inc. whether by non-disclosure, passive concealment, or by fraud.

# Exhibit A:

# Photo Documentation



1: View of building signage.



2: The asphalt parking areas are damaged in large areas and the fire lane and parking stall markings are faded.



3: View of missing asphalt pavement.



4: View of missing asphalt pavement.



5: The sewer lift station pump is missing a back-up pump.



6: The mortar joints securing the brick veneer have deteriorated.



7: The roof soffits are rotted and damaged.



8: The concrete panels and columns are stained.



9: View of substandard brick tuck pointing.



10: View of substandard brick repairs.



11: View of roof.



12: View of roof.



13: View of roof.



14: There are two interior fire escape stairways in the building.



15: View of stairway.



16: View of stairway framing.



17: The apartment windows are dual pane, single hung assemblies.



18: View of apartment window.



19: Apartment doors are metal in metal frames.



20: View of common area.



21: Each apartment has washer/dryer connections.



22: A US mail kiosk is installed in the building.



23: The sanitary drain lines are PVC.



24: Cooling is provided by pad mounted AC condensers.



25: Heating is provided by ceiling-mounted electric fan coil units.



26: Temperature is controlled by manual thermostats.



27: Common area cooling and heating is provided by ductless mini split systems.



28: Each apartment has a 40 gallon electric water heater.



29: Electric service is provided by a pad-mounted transformer.



30: Each apartment is separately metered for electric service.



31: The electric service is protected by circuit breakers.



32: GFCI receptacles are installed in all wet areas.



33: View of GFCI.



34: The 110 volt electric branch wiring is copper.



35: Fire alarm pull boxes are installed in the hallways.



36: Type ABC fire extinguishes with expired inspection tags are installed in the hallways.



37: The building has a wet-pipe fire suppression system.



38: The hallways have emergency back-up lighting.



39: The fire riser has a current inspection tag.



40: View of the fire sprinkler riser and copper piping.



41: View of fire alarm control panel.



42: Each apartment has a fire alarm.



43: Each apartment contains a hard wired smoke detector.



44: The elevator controlls are ADA compliant.



45: View of elevator control.



46: View of elevator cab.



47: View of interior hallway.



48: View of interior hallway.



49: View of common area.



50: Three of the apartments are down and have extensive mold contamination.



51: View of mold contamination.



52: View of mold contamination.



53: View of apartment kitchen.



54: View of apartment kitchen and living area.



55: Each kitchen has a management supplied electric range, refrigerator, and a dishwasher.



56: View of kitchen appliances



57: View of living room flooring.



58: View of tub and shower surround with grab bars.



59: The vanities are wood with laminate countertops and drop-in sinks.



60: The toilets are low-flow.

# Exhibit B:

# Location Map, Aerial Photo and Site Plan



North ↑



104 S Main St, Suite 500, Greenville, SC 29601
(636) 462-4132 phone (636) 462-4139 fax

**Site Vicinity Map**
**Eastside Lofts Apartments Phase II**
**1400 Cumberland Street**
**Little Rock, AR 72202**

**PREPARED FOR: Fannie Mae**
**DRAWN BY: Mary E. McGuire**
**DATE: June 30, 2023**                    **PROJ. #: 23.0373**



**North** ↑





104 S Main St, Suite 500, Greenville, SC 29601
(636) 462-4132 phone (636) 462-4139 fax

**Site Plan**
**Eastside Lofts Apartments Phase II**
**1400 Cumberland Street**
**Little Rock, AR 72202**

**PREPARED FOR: Fannie Mae**
**DRAWN BY: Mary E. McGuire**
**DATE: June 30, 2023**                    **PROJ. #: 23.0373**

# Exhibit D:

# Pre-Site Visit Questionnaire

## ASTM E-1527 PHASE I ENVIRONMENTAL SITE ASSESSMENT
## PRE-SURVEY QUESTIONNAIRE AND DISCLOSURE STATEMENT

**Borrower/User**: Please complete this questionnaire before the Consultant's site visit. For those questions that are not applicable to the subject please respond with an "N/A". This document must be signed by the Owner or his/her representative (Item No. 2). If you have any questions about how to answer any of the questions please call f3, inc. If additional pages for response are necessary please attach them to this form. Clearly mark all references to the appropriate question number(s). This document and your written response to same will be an exhibit in f3, inc.'s report.

## 1. PROPERTY INFORMATION:

| | |
|---|---|
| Property Name: | Eastside Lofts Apartments Phase II |
| Property Address: | 1400 Cumberland Street |
| City: Little Rock | State: Arkansas  Zip: 72202 |
| Assessor's Parcel Number: | 34L2000200200 |

## 2. COMPLETED BY

| | |
|---|---|
| Signature: Ethen Schultz | Date: 7-3-2023 |
| Printed Name: Ethen Schultz | Title: Senior Community Manager |

## 3. ASTM-REQUIRED INQUIRIES

| | | |
|---|---|---|
| Property Owner: Eastside Lofts Apartments Phase II, LP Name: | Phone: 501-200-9526 Fax: 501-200-9546 | |
| Key Site Manager (Site contact): Name: Tiffany Anthony | Phone: 501-200-9526 Fax: 501-200-9546 | |
| If not residential Property, please provide list of tenants, including contact names and phone numbers. | | |
| Can you provide a Current Title Abstract for the Property, including a chain of Title? If so, please send documents along with completed questionnaire to f3, inc | | ☐ Yes ☒ No |
| Do you have knowledge of any environmental liens recorded against the Property, or environmentally related Activity and Use Limitations of the Property? | | ☐ Yes ☒ No |
| Do you have any specialized knowledge that would be material in identifying recognized environmental conditions in connection with the Property? | | ☐ Yes ☒ No |
| Are you aware of a reduction in the property value due to environmental issues? | | ☐ Yes ☒ No |
| **Please attach explanation of all affirmative answers.** | | |

Please return completed form and any attachments via fax to:
**F3, inc, 15 ellis Ave., Troy, MO 63379**
**Telephone: 636-432-4132   Fax: 636-462-4139**

8)  Please state reason for procuring this Phase 1 ESA:

☐ Qualify for Innocent Landowner defense to CERCLA Liability.

☒ Other: (state below)  *Midland Loan Serviceing Request - CDT*

## 4. PLEASE PROVIDE A GENERAL SITE DESCRIPTION BY COMPLETING THE FOLLOWING TABLE:

| Legal description/ boundary survey/ plat available (please send to F3, INC if "yes") | ☐ Yes ☒ No |
|---|---|
| Total Property Size *0.820 Acres* | |
| Total number of buildings *1* | |
| Total square footage of buildings | |
| Date of construction | |
| Dates of significant renovation *12-28-2007- Tax Credit Rehab* | |

| Waste water discharge | | |
|---|---|---|
| ☒ Municipal Sanitary Sewer | ☐ On-site septic system | ☒ Other *Building Pump* |

| Potable water source | | |
|---|---|---|
| ☒ Community Water Supplier | ☐ On-site well | ☐ Other |

Please describe prior use of property, if known: *School Building*

## 5. PREVIOUS INVESTIGATIONS:

| Have any previous environmental investigations been performed at the site? |  |
|---|---|
| ☐ Yes ☒ No *- not under our management* | |
| **INVESTIGATION TYPE** If yes, please describe conclusions, and attach copy of report(s) | |
| Phase 1 ESA | |
| Phase 2 ESA | |
| Tank Tightness Testing | |
| Asbestos Survey/ O&M | |
| Radon | |
| Lead-based Paint | |

ESA Pre-Survey Questionnaire & Disclosure

| Have any previous environmental investigations been performed at the site? | |
|---|---|
| ☐ Yes     ☒ No | |
| **INVESTIGATION TYPE**<br>**If yes, please describe conclusions, and attach copy of report(s)** | |
| ☐   Lead in Water | |
| ☐   Operations & Maintenance Plan(s) | |
| ☐   Other (i.e. Mold) | |

## 6. ON SITE OPERATIONS

| Condition | Response | If yes, please describe |
|---|---|---|
| Are you aware of any of the following conditions, either past or present, on the site? | | |
| 1.   Stored Chemicals | ☒ Yes ☐ No | Apartment Cleaning Supplies |
| 2.   Underground Storage Tanks | ☐ Yes ☒ No | |
| 3.   Aboveground Storage Tanks | ☐ Yes ☒ No | |
| 4.   Spills or Releases | ☐ Yes ☒ No | |
| 5.   Dump Areas/ Landfills | ☐ Yes ☒ No | |
| 6.   Waste Treatment Systems | ☐ Yes ☒ No | |
| 7.   Clarifies/ Separators | ☐ Yes ☒ No | |
| 8.   Air stacks/ Vents/ Odors | ☐ Yes ☒ No | |
| 9.   Floor Drains/Sumps | ☒ Yes ☐ No | RPZ - Room - 1st Floor - |
| 10. Stained Soil/ Impacted Vegetation | ☐ Yes ☒ No | |
| 11. On-site OWNED Electrical Transformers | ☐ Yes ☒ No | |
| 12. Hydraulic lifts/ Elevators | ☒ Yes ☐ No | Elevator |
| 13. Dry Cleaning Operations | ☐ Yes ☒ No | |
| 14. Wetlands/ Flooding | ☐ Yes ☒ No | |
| 15. Oil/ Gas/ Water/ Monitoring Wells | ☐ Yes ☒ No | |
| 16. Environmental Cleanups | ☐ Yes ☒ No | |
| 17. Environmental Permits | ☐ Yes ☒ No | If yes, please describe and ATTACH ALL COPIES of permits. Please attach last three waste manifests. |
|    a)   Industrial Discharge | ☐ Yes ☐ No | |
|    b)   POTW (NPDES) | ☐ Yes ☐ No | |
|    c)   Hazardous Waste Generator | ☐ Yes ☐ No | |
|    d)   Air Quality | ☐ Yes ☐ No | |
|    e)   Flammable Materials | ☐ Yes ☐ No | |
|    f)   AST/UST | ☐ Yes ☐ No | |
|    g)   Waste Manifest(s) | ☐ Yes ☐ No | |
|    h)   Other ? | ☐ Yes ☐ No | |

ESA Pre-Survey Questionnaire & Disclosure

| Are you aware of any of the following conditions, either past or present, on the site? | | |
|---|---|---|
| Condition | Response | If yes, please describe |
| 18. Are there or have there been any mold related problems at the subject property? | ☒ Yes ☐ No | Sewer pump went out - flooded 3 units (102, 103, 104) |
| 19. Are there or have there been any moisture problems at the property (i.e. flooding of unit(s), HVAC condensate leaks, roof leaks, improper falshing, etc.)? | ☒ Yes ☐ No | |

## 7. OFF SITE ENVIRONMENTAL CONCERNS

| Are you aware of any of the following conditions, either past or present, Adjacent to the site? | | |
|---|---|---|
| Condition | Response | If yes, please describe |
| Gasoline Stations | ☐ Yes ☒ No | |
| Dry Cleaners | ☐ Yes ☒ No | |
| Industrial Uses | ☐ Yes ☒ No | |
| Other | ☐ Yes ☒ No | |

# Exhibit E:

# Record of all Documents Reviewed, Interviews, and Supporting Information

# Parcel Detail Report

Created: 6/30/2023 10:59:49 AM

## Basic Information

| | |
|---|---|
| Parcel Number: | 34L2000200200 |
| County Name: | Pulaski County |
| Property Address: | EASTSIDE LOFT APARTMENTS PHASE II<br>1400 CUMBERLAND ST<br>LITTLE ROCK, AR 722020000 |
| Mailing Address: | EASTSIDE LOFORT APARTMENTS PHASE II LTD PTNSHP<br>2004 S MAIN ST<br>LITTLE ROCK AR 72206 |
| Total Acres: | 0.82 |
| Timber Acres: | 0.00 |
| Sec-Twp-Rng: | 10-1N-12W |
| Lot/Block: | 2R/20 |
| Subdivision: | EASTSIDE LOFTS REPLAT |
| Legal Description: | REPLAT OF BOCK 20 ORGINIAL CITY OF LITTLE ROCK |
| School District: | 001 LRSD - 001 |
| Homestead Parcel?: | No |
| Tax Status: | Taxable |
| Over 65?: | No |

## Land Information

| Land Type | Quantity | Front Width | Rear Width | Depth 1 | Depth 2 | Quarter |
|---|---|---|---|---|---|---|
| COMSQFT | 35,719 sqft | | | | | |

## Valuation Information

| Entry | Appraised | Assessed |
|---|---|---|
| Land: | 178,595 | 35,719 |
| Improvements: | 1,380,405 | 276,081 |
| Total Value: | 1,559,000 | 311,800 |
| Taxable Value: | | 267,240 |
| Millage: | | 0.07 |
| Estimated Taxes: | | $18,706.80 |
| Assessment Year: | | 2023 |

## Sales History ⊘

| Filed | Sold | Price | Grantor | Grantee | Book | Page | Deed Type |
|---|---|---|---|---|---|---|---|
| 12/1/2005 | 11/22/2005 | 0 | THE ARC OF ARKANSAS | EASTSIDE LOFT APARTMENTS PHASE | 2005 | 100881 | HIST(HISTORICAL) |
| 10/27/2000 | 10/27/2000 | 0 | BELL-CORLEY INVESTMENTS LLC (1 | THE ARC ARKANSAS (100%) | 2000 | 076679 | SWD(SPECIAL WARRANTY DEED) |
| 10/26/2000 | 10/26/2000 | 0 | EASTSIDE LOFTS INC (1%) | BELL-CORLEY INVESTMENTS LLC (1 | 2000 | 076092 | SWD(SPECIAL WARRANTY DEED) |
| 10/26/2000 | 10/26/2000 | 0 | EASTSIDE HIGH SCHOOL LTD PTNSH | EASTSIDE LOFTS INC (1%) | 2000 | 076091 | SWD(SPECIAL WARRANTY DEED) |
| 10/26/2000 | 10/26/2000 | 0 | EASTSIDE HIGH SCHOOL LTD PTNSH | BELL-CORLEY INVESTMENTS LLC (9 | 2000 | 076090 | SWD(SPECIAL WARRANTY DEED) |
| 10/25/2000 | 10/25/2000 | 0 | PLAT#F-931 | | 2000 | 075552 | HIST(HISTORICAL) |
| 5/1/2000 | 4/27/2000 | 230,000 | LR SCHOOL DISTRICT OF PUCC | EASTSIDE HIGH SCHOOL LTD PTNSH | 2000 | 029042 | HIST(HISTORICAL) |

## Improvement Information

### Commercial Improvements

Commercial Improvement #1





| | |
|---|---|
| Building Section #: | 1 |
| Business Name: | EASTSIDE LOFTS II |
| Location: | 1400 CUMBERLAND ST LITTLE ROCK |
| Total SF: | 38,087 (34 Units) |
| Stories: | 4 |
| Number of Units: | 34 |
| Year Built: | 1912 |
| Effective Age: | 35 |

| Occupancy: | Code | Description | Class | Percent | |
|---|---|---|---|---|---|
| | 300 | APARTMENT | C-2 | | 100% |

| Additive Items: | Description | Qty. |
|---|---|---|
| | CANPY, PCH, DECK,ATRIUM,BALC,WALKW PATIO / SIDEWALK, CONCRETE | 470 |
| | CANPY, PCH, DECK,ATRIUM,BALC,WALKW PATIO COVER, FIBERGLASS OR SCR | 224 |
| | CANPY, PCH, DECK,ATRIUM,BALC,WALKW PORCH, COVERED | 220 |
| | FENCES, WOOD FENCE - WOOD GATE - SQFT | 64 |
| | FENCES, WOOD FENCE - WOOD PRIVACY 4FT - LNFT | 170 |
| | LIGHTING BUILDING LIGHTS, EXT- NCV | 1 |
| | LIGHTING ENTERGY LIGHTS & POLES - NCV | 1 |
| | LIGHTING INCANDESCENT FIXTURES(EA.) | 2 |
| | LIGHTING LIGHTING-FLOODLIGHTS, METAL HALIDE | 2 |
| | LIGHTING POLES, STEEL-CCNC, PER FOOT OF HEIGH | 60 |
| | LIGHTING POST LANTERN(EA.) | 2 |
| | MISCELLANEOUS CHNLNK FENCE, 4' - NCV | 60 |
| | MISCELLANEOUS LANDSCAPING- NCV | 1 |
| | MISCELLANEOUS METAL RAILING- NCV | 1 |
| | MISCELLANEOUS WD TRASH AREA - NCV | 1 |
| | PAVING 2\" ASPHALT PAVING-2\" BASE | 7800 |
| | SIGNS ENTER/EXIT SIGNS - NCV | 1 |
| | SIGNS OTHER BLDG SIGNS-NCV | 1 |
| | SIGNS SIGN POSTS OR POLES, 4 IN | 8 |
| | SIGNS SIGNS, METAL, SINGLE FACE PAINTED | 8 |
| | SPRINKLERS | 100% |
| | STAIRS. EXTERIOR STAIRS, CONCRETE OR STEEL | 258 |





## Zoning Map

Data is live (Zoning).

Disclaimer: Information hereon is representational
only and is not intended to meet legal standards.
Use at your own risk.



CITY of LITTLE ROCK

PLANNING & DEVELOPMENT

# National Flood Hazard Layer FIRMette

FEMA



0    250    500        1,000        1,500        2,000    Feet

1:6,000

AREA OF MINIMAL FLOOD HAZARD

T1N R12W S10    CITY OF LITTLE ROCK
050181
05119C0457G
eff. 7/6/2015
T1N R12W S11

## Legend

SEE FIS REPORT FOR DETAILED LEGEND AND INDEX MAP FOR FIRM PANEL LAYOUT

## FOIA Request 2023-331

FOIA <FOIA@littlerock.gov>
Fri 6/30/2023 11:34 AM
To:Mary E. "Meg" McGuire <MMcGuire@ArmadaAnalytics.com>;FOIA <FOIA@littlerock.gov>

Subject:  FOIA Request 2023-331


The Arkansas Freedom of Information Statute ACA 25-19-105(a), states "all public records shall be open to inspection and copying by **any citizen of the State of Arkansas**" therefore please provide us with proof of your Arkansas citizenship, such as a copy of your current Arkansas Driver's license, voter's registration card or property tax statement.



Thank you,

Theresa Morris
She/Her
Assistant City Attorney
FOIA Division
Office of the City Attorney
foia@littlerock.gov
501-371-6896


An FOIA request may be so large that to capture the data requires the City use a CD, a thumb drive, an external hard drive, or some other device. It is not always reasonable to scan material in response to an FOI request and send the material by email. If it is determined that is the case with your request, the City will use a device that it knows cannot damage the City computer system. The cost of this device will vary. Prior to moving forward to collect the information on such a device, the City will contact you so you can arrange for the cost of the device before the information is downloaded; or, you will be able at that time to direct that the request not be fulfilled. The request will not be fulfilled until the City has an affirmative answer from you on how to proceed, and payment has been received. If it turns out that you are due some refund – for example, it was believed an external hard drive was required, but in fact only a less expensive thumb drive was used – you will be reimbursed for the difference in cost when you pick up the material.



**From:** Mary E. "Meg" McGuire [mailto:MMcGuire@ArmadaAnaly cs.com]
**Sent:** Friday, June 30, 2023 11:12 AM
**To:** FOIA <FOIA@li lerock.gov>
**Subject:** FOIA Request for Apt building in Li le Rock

**CAUTION:** This email originated from outside of the organiza on. Do not click links or open a achments unless you recognize the sender and know the content is safe.

To Whom it May Concern:

We are performing a Property Condition Assessment at the following location:

Eastside Lofts Apartments, Phase II
1400 Cumberland Street
Little Rock, AR 72202

We would like to make a Public Records Request for information on this site which would be of environmental concern, such as: presence of underground storage tanks, leaks from underground storage tanks, chemical spills, fires, or problems related to public health; especially any building, zoning, or fire code violations.

Thank you!



**Mary E. "Meg" McGuire**
Project Manager
Armada Analytics, Inc.

O: (214) 551-1013 | Central
www.armadaanalytics.com
3415 Custer Rd, Suite 119 Plano, TX 75023

OneSite Rents v3.0

06/28/2023 2:09:14PM

**Intrepid Management, Inc - Eastside Lofts II**

**RENT ROLL DETAIL**

As of 06/27/2023

Page 1 of 4

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Sub Journal | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Dep balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-101 | 1 | N/A | 498 | Occupied | Kirkland, Hiawatha | 10/06/2017 | 10/06/2017 | 10/05/2022 | 600.00 | RESIDENT | RENT | 525.00 | 0.00 | 525.00 | 300.00 | 0.00 |
| 1-102 | 3 | N/A | 465 | Vacant | VACANT | | | | 600.00 | | | 0.00 * | 0.00 * | | | |
| 1-103 | 4 | N/A | 473 | Vacant | VACANT | | | | 600.00 | | | 0.00 * | 0.00 * | | | |
| 1-104 | 4 | N/A | 473 | Vacant | VACANT | | | | 600.00 | | | 0.00 * | 0.00 * | | | |
| 1-105 | 1 | N/A | 498 | Vacant | VACANT | | | | 600.00 | | | 0.00 * | 0.00 * | | | |
| 1-106 | 6 | N/A | 1230 | Vacant | VACANT | | | | 750.00 | | | 0.00 * | 0.00 * | | | |
| 1-107 | 2 | N/A | 1520 | Occupied | DENNIS, ANDREA | 11/29/2022 | 11/29/2022 | 11/28/2023 | 800.00 | RESIDENT | RENT | 800.00 | 0.00 | 800.00 | 400.00 | 549.57 |
| 1-108 | 2 | N/A | 1520 | Occupied | ALLEN, PATRICK | 11/01/2022 | 11/01/2022 | 10/31/2023 | 800.00 | RESIDENT | RENT | 800.00 | 0.00 | 800.00 | 0.00 | 343.74 |
| 1-109 | 6 | N/A | 1230 | Occupied | Wright, Odane | 06/01/2019 | 06/01/2021 | 05/31/2023 | 750.00 | RESIDENT | RENT | 745.00 | 0.00 | 745.00 | 300.00 | 4,960.00 |
| 1-201 | 7 | N/A | 1072 | Vacant | VACANT | | | | 750.00 | | | 0.00 * | 0.00 * | | | |
| 1-202 | 9 | N/A | 467 | Occupied | Stanley, Edna | 09/29/2021 | 09/29/2021 | 09/28/2022 | 600.00 | RESIDENT | RENT | 330.00 | 0.00 | 330.00 | 300.00 | .0.00 |
| 1-203 | 4 | N/A | 473 | Occupied | Nelson, Songhai | 08/07/2012 | 08/07/2021 | 08/06/2022 | 600.00 | RESIDENT | RENT | 525.00 | 0.00 | 525.00 | 220.00 | 0.00 |
| 1-204 | 4 | N/A | 473 | Vacant | VACANT | | | | 600.00 | | | 0.00 * | 0.00 * | | | |
| 1-205 | 7 | N/A | 1072 | Vacant | VACANT | | | | 750.00 | | | 0.00 * | 0.00 * | | | |
| 1-301 | 5 | N/A | 490 | Occupied | DAVIS, FRANK | 02/03/2023 | 02/03/2023 | 02/02/2024 | 600.00 | RESIDENT | RENT | 600.00 | 0.00 | 600.00 | 400.00 | (14.92) |
| 1-302 | 8 | N/A | 525 | Occupied | Ellisworth, Horace | 04/24/2020 | 04/24/2021 | 04/23/2022 | 600.00 | RESIDENT | RENT | 158.00 | 0.00 | 158.00 | 300.00 | 0.00 |
| | | | | | | | | | | SUBSIDY | HOUSING | 417.00 | 0.00 | 834.00 | 0.00 | 0.00 |
| | | | | | | | | | | SUBSIDY | MHA Voucher | 417.00 | 0.00 | | | |
| 1-303 | 8 | N/A | 525 | Occupied | Eatmon, Jerry | 12/19/2019 | 12/19/2021 | 12/18/2022 | 600.00 | RESIDENT | LATEFEE | 0.00 | 75.00 | 352.00 | 300.00 | 0.00 |
| | | | | | | | | | | RESIDENT | | 277.00 | 0.00 | | | |
| | | | | | | | | | | SUBSIDY | MHA Voucher | 298.00 | 0.00 | 298.00 | 0.00 | (1.00) |
| 1-304 | 11 | N/A | 560 | Occupied | GAYNOR, MICHAEL | 01/05/2023 | 01/05/2023 | 01/04/2024 | 600.00 | RESIDENT | RENT | 700.00 | 0.00 | 700.00 | 400.00 | 0.00 |
| 1-305 | 5 | N/A | 490 | Occupied | Austin, Tamara | 01/26/2023 | 01/26/2023 | 01/31/2024 | 600.00 | SUBSIDY | HOUSING | 700.00 | 0.00 | 700.00 | 0.00 | 0.00 |
| | | | | | | | | | | RESIDENT | | 0.00 | 0.00 | | 435.00 | 0.00 |
| 1-306 | 10 | N/A | 460 | Occupied | TURNER, WILLIE | 06/27/2023 | 06/27/2023 | 06/30/2024 | 600.00 | RESIDENT | RENT | 338.00 | 0.00 | 338.00 | 0.00 | 17.07 |
| | | | | | | | | | | SUBSIDY | HOUSING | 362.00 | 0.00 | 362.00 | 0.00 | (313.73) |
| 1-307 | 12 | N/A | 681 | Occupied | Sain, John | 09/01/2014 | 08/18/2022 | 07/31/2023 | 750.00 | RESIDENT | RENT | 600.00 | 0.00 | 600.00 | 400.00 | 0.00 |
| 1-308 | 12 | N/A | 681 | Occupied | Jones, Shawn | 02/14/2013 | 02/14/2022 | 02/13/2023 | 750.00 | RESIDENT | LATEFEE | 0.00 | 75.00 | 313.00 | 220.00 | (49.00) |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/28/2023 2:09:14PM

**Intrepid Management, Inc - Eastside Lofts II**

**RENT ROLL DETAIL**

As of 06/27/2023

Page 2 of 4

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;
details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Sub Journal | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | On Hand | Dep balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|-------------|------------|------------|------------------------|---------------|---------|-------------|
| | | | | | | | | | | RESIDENT | RENT | 238.00 | 0.00 | | | |
| | | | | | | | | | | SUBSIDY | HOUSING | 387.00 | 0.00 | 774.00 | 0.00 | 0.00 |
| | | | | | | | | | | SUBSIDY | MHA Voucher | 387.00 | 0.00 | | | |
| 1-309 | 10 | N/A | 460 | Occupied | Conley, John | 12/15/2016 12/15/2021 | | 12/14/2022 | 600.00 | RESIDENT | LATEFEE | 0.00 | 75.00 | 625.00 | 300.00 | 395.00 |
| | | | | | | | | | | RESIDENT | RENT | 550.00 | 0.00 | | | |
| 1-401 | 5 | N/A | 490 | Occupied | Woods, Donald | 09/01/2022 09/01/2022 06/27/2023 | | 08/31/2023 | 600.00 | RESIDENT | RENT | 346.00 | 0.00 | 346.00 | 0.00 | 1,648.89 |
| | | | | | | | | | | SUBSIDY | MHA Voucher | 354.00 * | 0.00 * | 354.00 * | 0.00 | 0.00 |
| 1-402 | 14 | N/A | 519 | Occupied | Hairston, Fred | 03/08/2021 03/08/2021 | | 03/07/2022 | 600.00 | RESIDENT | RENT | 124.00 | 0.00 | 124.00 | 300.00 | 0.00 |
| | | | | | | | | | | SUBSIDY | HOUSING | 446.00 | 0.00 | 897.00 | 0.00 | 0.00 |
| | | | | | | | | | | SUBSIDY | PCH Voucher | 451.00 | 0.00 | | | |
| 1-403 | 8 | N/A | 525 | Occupied | Thompson, Herman | 08/02/2008 08/02/2021 | | 08/01/2022 | 600.00 | SUBSIDY | HOUSING | 575.00 | 0.00 | 1,150.00 | 0.00 | 575.00 |
| | | | | | | | | | | SUBSIDY | MHA Voucher | 575.00 | 0.00 | | | |
| | | | | | | | | | | RESIDENT | | 0.00 | 0.00 | | 220.00 | (575.00) |
| 1-404 | 11 | N/A | 560 | Occupied | Elrod, Geoff | 03/01/2018 03/01/2021 | | 02/28/2022 | 600.00 | RESIDENT | RENT | 575.00 | 0.00 | 575.00 | 300.00 | (290.00) |
| 1-405 | 5 | N/A | 490 | Occupied | Johnson, Noble | 03/06/2014 03/06/2021 | | 03/05/2022 | 600.00 | RESIDENT | RENT | 340.00 | 0.00 | 340.00 | 300.00 | (75.00) |
| 1-406 | 10 | N/A | 460 | Occupied | McGee, Wallace | 10/02/2014 10/02/2021 | | 10/01/2022 | 600.00 | RESIDENT | RENT | 550.00 | 0.00 | 550.00 | 150.00 | (21.00) |
| 1-407 | 12 | N/A | 681 | Occupied | Cannady, Brandon | 01/14/2016 01/14/2021 | | 01/13/2023 | 750.00 | RESIDENT | LATEFEE | 0.00 | 75.00 | 625.00 | 300.00 | 0.00 |
| | | | | | | | | | | RESIDENT | RENT | 550.00 | 0.00 | | | |
| | | | | | | | | | | SUBSIDY | HOUSING | 391.00 | 0.00 | 782.00 | 0.00 | 0.00 |
| | | | | | | | | | | SUBSIDY | MHA Voucher | 391.00 | 0.00 | | | |
| 1-408 | 13 | N/A | 482 | Occupied | Walters, Mikal | 04/16/2021 04/16/2021 | | 04/15/2022 | 600.00 | RESIDENT | RENT | 575.00 | 0.00 | 575.00 | 300.00 | 0.00 |
| 1-409 | 13 | N/A | 482 | Occupied | Jackson, Brandon | 08/01/2022 08/01/2022 | | 07/31/2023 | 600.00 | RESIDENT | RENT | 600.00 | 0.00 | 600.00 | 400.00 | 750.00 |
| 1-410 | 12 | N/A | 681 | Occupied | Smith Jr, Reginald | 02/23/2021 02/23/2021 | | 02/22/2023 | 750.00 | RESIDENT | LATEFEE | 0.00 | 75.00 | 700.00 | 300.00 | 675.00 |
| | | | | | | | | | | RESIDENT | RENT | 625.00 | 0.00 | | | |
| 1-411 | 10 | N/A | 460 | Occupied | Jackson, Dewayne | 09/02/2014 09/02/2021 | | 09/01/2022 | 600.00 | RESIDENT | RENT | 550.00 | 0.00 | 550.00 | 150.00 | 0.00 |
| **totals:** | | | | | | | | | **22,000.00** | | | **17,818.00** | **375.00** | **18,193.00** | **6,995.00** | |

* indicates amounts not included in detail totals

**Intrepid Management, Inc - Eastside Lofts II**

## RENT ROLL DETAIL

As of 06/27/2023

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

Amt / SQFT: Market = 22,166 SQFT; Leased =  16,410 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market + Addl. | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 498 | 600.00 | 1.20 | 525.00 | 1.05 | 1 | 50.00 | 1 |
| 10 | 4 | 460 | 600.00 | 1.30 | 587.50 | 1.28 | 4 | 100.00 | 0 |
| 11 | 2 | 560 | 600.00 | 1.07 | 637.50 | 1.14 | 2 | 100.00 | 0 |
| 12 | 4 | 681 | 750.00 | 1.10 | 892.25 | 1.31 | 4 | 100.00 | 0 |
| 13 | 2 | 482 | 600.00 | 1.24 | 587.50 | 1.22 | 2 | 100.00 | 0 |
| 14 | 1 | 519 | 600.00 | 1.16 | 1,021.00 | 1.97 | 1 | 100.00 | 0 |
| 2 | 2 | 1,520 | 800.00 | 0.53 | 800.00 | 0.53 | 2 | 100.00 | 0 |
| 3 | 1 | 465 | 600.00 | 1.29 | 0.00 | 0.00 | | 0.00 | 1 |
| 4 | 4 | 473 | 600.00 | 1.27 | 525.00 | 1.11 | 1 | 25.00 | 3 |
| 5 | 4 | 490 | 600.00 | 1.22 | 585.00 | 1.19 | 4 | 100.00 | 0 |
| 6 | 2 | 1,230 | 750.00 | 0.61 | 745.00 | 0.61 | 1 | 50.00 | 1 |
| 7 | 2 | 1,072 | 750.00 | 0.70 | 0.00 | 0.00 | | 0.00 | 2 |
| 8 | 3 | 525 | 600.00 | 1.14 | 905.67 | 1.73 | 3 | 100.00 | 0 |
| 9 | 1 | 467 | 600.00 | 1.28 | 330.00 | 0.71 | 1 | 100.00 | 0 |
| totals / averages: | 34 | 652 | 647.06 | 0.99 | 698.92 | 1.11 | 26 | 76.47 | 8 |

### occupancy and rents summary for current date

| unit status | Market + Addl. | # units | potential rent |
|---|---|---|---|
| Occupied, no NTV | 16,750.00 | 26 | 18,172.00 |
| Occupied, NTV | | 0 | - |
| Occupied NTV Leased | | 0 | - |
| Vacant Leased | | 0 | - |
| Admin/Down | | 0 | - |
| Vacant Not Leased | 5,250.00 | 8 | 5,250.00 |
| totals: | 22,000.00 | 34 | 23,422.00 |

### summary billing by sub journal for current date

| sub journal | amount |
|---|---|
| RESIDENT | 12,396.00 |
| SUBSIDY | 6,151.00 |

OneSite Rents v3.0

06/28/2023 2:09:14PM

**Intrepid Management, Inc - Eastside Lofts II**

**RENT ROLL DETAIL**

As of 06/27/2023

Page 4 of 4

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

| total: | 18,547.00 |
|---|---|

**summary billing by transaction code for current date**

| code | amount |
|---|---|
| HOUSING | 3,278.00 |
| LATEFEE | 375.00 |
| MHA Voucher | 2,422.00 |
| PCH Voucher | 451.00 |
| RENT | 12,021.00 |
| **total:** | **18,547.00** |

# Exhibit F:

# Property Evaluator Qualifications

# JEFFRY E. RODEN

3415 Custer Road ▪ Plano, TX 75023 ▪ Phone: 214.577.0826 ▪ JRoden@ArmadaAnalytics.com

Since 1992, Mr. Roden has completed over 2,000 Phase I Environmental Site Assessments and Property Condition Reports as well as completing/coordinating over 300 HUD/MAP Architectural and Environmental Reports. Property Condition and Phase I ESA Reports completed included Multi-Family Properties, Office Buildings, Industrial Properties, Retail Centers, and Schools. In addition, Mr. Roden has participated in over 500 construction plan and cost reviews, and construction monitoring projects as well as Phase II Environmental Site Assessments: including subsurface investigations, remediation, planning, and execution. Mr. Roden also provides Expert Witness Testimony for clients if requested.

In 1980, Mr. Roden founded Roden Properties, Inc. to develop residential communities on large tracts of land. He supervised the land planning, zoning, and infrastructure construction necessary for the communities. The company also custom designed, built, and sold the individual homes. Mr. Roden developed over 20 residential communities and built and sold approximately 1,500 houses. The company also developed ten apartment complexes containing over 3,000 apartment units.

From 1992 until 2015, Mr. Roden served as Director of Sales / Project Manager for Aqua Terra Assessments and RERC Environmental, National Engineering and Environmental Consultant Firms.

In addition, Mr. Roden constructed and rehabilitated improved real estate throughout the Dallas/Ft. Worth area for over 10 years. These projects included construction and renovations of apartment buildings, garden office buildings, and single-family homes.

**Education**

**SUL ROSS UNIVERSITY**
Bachelor of Science – 1963

**NORTH TEXAS STATE**
Graduate Program in Education -1973

**UNIVERSITY OF TEXAS**
EPA AHERA Certified Inspector at Arlington –1992 Continuing Certification yearly.

**Certifications:** HUD Multifamily Accelerated Processing (MAP) 3rd Party Technical Training & Certification, HUD Multifamily Certified Architectural and Environmental Inspector, Texas Department of State Health Services AHERA Asbestos Inspector (Current Certification), Plan Reviews, Construction Cost Evaluations, Expert Witness Testimony

## Professional Experience

**F3, INC. (ACQUIRED BY ARMADA ANALYTICS, INC. SEPTEMBER 2022)**               2015 to Present
Office Manager / Project Manager. Dallas Office

***Key Results:***

- Manage projects for phase I environmental site assessments, property physical needs assessments, and construction progress monitoring.
- Interface directly with local health departments, local building departments, department of natural resources, and U.S. EPA during inspections across the United States.
- Conduct residential and commercial building inspections for warranty purposes.

# ERIN N. KLEPPE

3415 Custer Road ▪ Plano, TX 75023 ▪ Phone: 972.769.2529 ▪ EKleppe@ArmadaAnalytics.com

Ms. Kleppe has over 25 years of experience conducting various tasks and written over 2,000 reports related to engineering and environmental site assessments and investigations. These include, but are not limited to, Phase I Environmental Site Assessments, Engineering Property Condition Assessments with ADA Compliance Surveys in various formats including FMAC, FNMA DUS, SBL, and HUD. Ms. Kleppe has also successfully completed Transaction Screen Assessments, Environmental Database Reviews, Regulatory File Reviews, Repair Verification Inspections, Construction Monitoring and Rehab Plan/Budget Reviews, Property Zoning Reports, Phase II Subsurface Investigations, Tank Removal projects, and Voluntary Cleanup Program (VCP) and Innocent Owner/Operator (IOP) reports and agency application submittals.

## EDUCATION

**TEXAS A&M UNIVERSITY**
B.S., Civil Engineering – 1996

### OTHER
Engineer in Training (E.I.T.), State of Texas
HUD Multifamily Accelerated Processing (MAP), 3rd Party Technical Training - 2002

**Certifications:** Licensed Asbestos Inspector in Texas (#601894)

## PROFESSIONAL EXPERIENCE

**F3, INC. (ACQUIRED BY ARMADA ANALYTICS, INC. SEPTEMBER 2022)**          2015 to Present
<u>Project Manager</u>

***Key Results:***

- Manage projects for phase I environmental site assessments, property physical needs assessments, and construction progress monitoring.

- Interface directly with local health departments, local building and fire departments, state departments of natural resources, and U.S. EPA during inspections across the United States.

- Conduct residential and commercial building inspections for warranty purposes

**PRESERVATION ASSESSMENT SERVICES, LLC (D/B/A AQUATERRA**          2002 to 2015
**ASSESSMENTS), DALLAS, TX**
<u>Project Manager</u>

***Key Results:***

- Managed projects for phase I environmental site assessments, property physical needs assessments, limited asbestos surveys, and construction progress monitoring.
- Interfaced directly with local health departments, local building and fire departments, state departments of natural resources, and U.S. EPA during inspections across the United States.
- Conducted residential and commercial building inspections for warranty purposes.
- Successfully completed over 1,000 Engineering Property Condition Assessments and Phase I Environmental Site Assessments.

**AQUATERRA ASSESSMENT SERVICES CORP., DALLAS, TX**                              1999 to 2001
Project Manager

***Key Results:***

- Managed projects for phase I environmental site assessments, property physical needs assessments, and construction progress monitoring.

- Interfaced directly with local health departments, local building and fire departments, state departments of natural resources, and U.S. EPA during inspections across the United States.

- Conducted residential and commercial building inspections for warranty purposes.


**RERC ENVIRONMENTAL, INC., DALLAS, TX**                              1997 to 1999
Project Manager

***Key Results:***

- Managed projects for phase I and phase II environmental site assessments, property physical needs assessments.

- Interfaced directly with local health departments, local building and fire departments, state departments of natural resources, and U.S. EPA during inspections across the United States.
- Conducted residential and commercial building inspections for warranty purposes.


**OMEGA ENVIRONMENTAL, INC., DALLAS, TX**                              1997
Staff Engineer

***Key Results:***

- Prepared Risk-based Assessment Reports to determine the effects of petroleum hydrocarbon contamination on subsurface soil and ground water.

- Developed plans of action to further delineate petroleum hydrocarbon plumes in soil and ground water.